# EXHIBIT A

## IN THE UNITED STATES DISTRICT COURT
## FOR THE MIDDLE DISTRICT OF ALABAMA

**JARROD TAYLOR,**

      **Plaintiff,**

v.

**JOHN Q. HAMM, in his official capacity
as Commissioner, Alabama Department of
Corrections, and**

**TERRY RAYBON, in his official capacity
as Warden, Holman Correctional Facility,**

      **Defendants.**

2025 AUG 22  P 2: 50

Case No. _____

2:25-cv-678-RAH

**CAPITAL CASE**

---

## COMPLAINT

---

## INTRODUCTION

1. Plaintiff Jarrod Taylor is in the custody of the Alabama Department of Corrections ("ADOC") under a sentence of death, despite the jury's recommendation that he be sentenced to life in prison without the possibility of parole—a practice now deemed unconstitutional by the United States Supreme Court, and rejected by the Alabama legislature. The State nevertheless seeks to execute Mr. Taylor by nitrogen gas asphyxiation by means of Alabama's Nitrogen Hypoxia Protocol (the "Nitrogen Hypoxia Protocol" or "Protocol").

2. Mr. Taylor brings this action, pursuant to 42 U.S.C. § 1983, alleging that Defendants have deprived, or will deprive, him of rights and privileges secured by the Constitution and laws of the United States and of the State of Alabama.

3. First, the Protocol is unconstitutional under the Eighth and Fourteenth Amendments to the United States Constitution because it involves superadded pain and suffering.

4.      There is now a record of five executions in which individuals were suffocated by nitrogen gas in Alabama.  That record is grim but unassailable: it can no longer be subject to any doubt that asphyxiation by nitrogen gas is torturous.  Multiple eyewitnesses to prior executions using Alabama's Nitrogen Hypoxia Protocol have consistently reported that inmates appeared to experience prolonged pain and conscious asphyxiation.  The Supreme Court of the United States made clear in *Baze v. Rees*, 553 U.S. 35, 53 (2008), that conscious suffocation during an execution violates the Eighth Amendment.  Moreover, there are feasible and readily implemented alternatives that would reduce the substantial risk of severe pain that accompanies an execution pursuant to Alabama's unconstitutional Protocol.

5.      Second, the Protocol is likewise unconstitutional under Article I, Section 15 of the Alabama Constitution because it amounts to a cruel or unusual form of punishment.

6.      Finally, Defendants have violated Mr. Taylor's procedural due process rights under the Fourteenth Amendment to the United States Constitution by keeping a significant portion of the Protocol hidden from scrutiny behind redactions.  Mr. Taylor has never received an unredacted copy of the Protocol and thus cannot fully evaluate it or effectively challenge it under the law.

### JURISDICTION AND VENUE

7.      This is an action for declaratory relief, injunctive relief, and any other relief the Court deems necessary and proper.

8.      This Court has subject matter jurisdiction under 42 U.S.C. § 1983 and 28 U.S.C. §§ 1331, 1343, 1367, 2201, and 2202.

9.      Venue lies in the Middle District of Alabama pursuant to 28 U.S.C. § 1391(b) as all Defendants, in their official capacity, reside in Alabama, and a substantial part of the events giving rise to the claims alleged herein occurred in this venue.

## PARTIES

10.     Plaintiff Jarrod Taylor is a citizen of the United States and a resident of the State of Alabama. He is subject to execution by the State of Alabama pursuant to a state court judgment of conviction imposing a death sentence. He is currently being held in custody at William C. Holman Correctional Facility in Atmore, Alabama ("Holman"). He elected to be executed by means of nitrogen gas asphyxiation, before the Protocol was developed and reserving his rights to challenge the constitutionality of any protocol subsequently adopted.

11.     Defendant John Q. Hamm, sued in his official capacity, is the Commissioner of the ADOC, which is headquartered in Montgomery, Alabama. He is responsible for overseeing ADOC operations, including executions.     He is responsible for the development and implementation of policies and procedures governing the execution of inmates sentenced to death in the State of Alabama, including the Protocol, and for providing the materials necessary to carry out such executions. *See* Ala. Code § 15-18-82(b). Mr. Hamm has an obligation to ensure that all executions are carried out in compliance with the laws of the State of Alabama and the United States, as well as the United States Constitution and the Alabama Constitution.

12.     Defendant Terry Raybon, sued in his official capacity, is Correctional Warden III of Holman and the State of Alabama's statutory executioner. *See* Ala. Code § 15-18-82(c). He is responsible for organizing, managing, and supervising executions and the execution team, and for carrying out executions at Holman in accordance with ADOC policies and procedures, including the Protocol. Defendant Raybon has an obligation to ensure that all executions are carried out in compliance with the laws of the State of Alabama and the United States, as well as the United States Constitution and the Alabama Constitution.

13.     At all times relevant to this action, Defendants acted—and are acting—under the color of state law and their actions constituted—and constitute—state action. They are sued here

3

in their official capacities for purposes of obtaining declaratory and injunctive relief to prevent the violation of Mr. Taylor's constitutional rights. Upon information and belief, all Defendants are citizens and residents of the State of Alabama.

## CASE OR CONTROVERSY

14.    There is a real and justiciable case or controversy between the parties. Defendants intend to execute Mr. Taylor by nitrogen gas asphyxiation using the Protocol,[1] which will subject Mr. Taylor to an intolerable risk of superadded pain and suffering, and deprive him of his rights.[2]

## EXHAUSTION OF ADMINISTRATIVE REMEDIES

15.    No administrative grievance is available at Holman for Mr. Taylor to challenge the way in which Defendants seek to execute him via a method that will subject him to an intolerable risk of superadded pain and suffering, and deprive him of his rights.

16.    Mr. Taylor has no available administrative remedies, as "[t]he policies and procedures of the Department of Corrections for execution of persons sentenced to death shall be exempt from the Alabama Administrative Procedure Act, Chapter 22 of Title 41." Ala. Code § 15-18-82.1(g).[3]

---

[1]    The Protocol uses the term "nitrogen hypoxia." The word "hypoxia" means a state of being involving "low oxygen." A medical professional would instead describe the method of execution in the Protocol as "asphyxiation"—i.e., the process of being deprived of oxygen. This Complaint thus uses the phrase "nitrogen gas asphyxiation," rather than "nitrogen hypoxia." "Suffocation" is a form of asphyxiation.

[2]    This Complaint does not challenge Mr. Taylor's conviction and sentence, although Mr. Taylor is currently pursuing a case challenging his conviction, which is pending in the Alabama Court of Criminal Appeals. *Taylor v. State*, No. CR-2024-0427 (Ala. Crim. App.).

[3]    *See also In re Alabama Lethal Injection Protocol*, No. 12-cv-00316-WKW, ECF No. 354 at 5 (M.D. Ala. 2012) (stating that "[n]o administrative grievance process is available for Plaintiffs or other death row inmates to challenge the procedures to be employed during their executions").

## PROCEDURAL HISTORY

17.    On April 17, 1998, a Mobile County grand jury indicted Jarrod Taylor on three counts of capital murder in violation of Ala. Code § 13A-5-40(a)(2) and on one count of capital murder in violation of Ala. Code § 13A-5-40(a)(10).

18.    On May 7, 1998, Mr. Taylor pleaded not guilty to all counts.

19.    A jury trial began on August 3, 1998 in the Circuit Court of Mobile County.  On August 11, 1998, the jury convicted Mr. Taylor of all four counts of capital murder.  That same day, the jury voted that Mr. Taylor should receive a sentence of life imprisonment without parole.

20.    On August 25, 1998, the presiding Circuit Court Judge, Judge Douglas I. Johnstone, overrode the jury's recommendation of a sentence of life imprisonment without parole and instead sentenced Mr. Taylor to death by electrocution.  The Court imposed four separate death sentences, one for each count of conviction.

21.    On direct appeal, the Alabama Court of Criminal Appeals upheld Mr. Taylor's conviction and sentence. *Taylor v. State*, 808 So. 2d 1148 (Ala. Crim. App. 2000).  The Supreme Court of Alabama affirmed on March 9, 2001.  *Ex parte Taylor*, 808 So. 2d 1215 (Ala. 2001), *reh'g denied* July 6, 2001.  The Supreme Court of the United States denied Mr. Taylor's petition for a writ of certiorari on January 7, 2002. *Taylor v. Alabama*, 534 U.S. 1086 (2002).

22.    On July 31, 2002, Mr. Taylor filed a Petition for Relief from Judgment Pursuant to Rule 32 of the Alabama Rules of Criminal Procedure in the Circuit Court for Mobile County setting forth multiple claims for relief. *Taylor v. State*, No. CC98-1328 (Ala. Cir. Ct. July 31, 2002).  On May 5, 2003, Mr. Taylor filed a Corrected First Amended Petition for Relief from Judgment pursuant to Rule 32. *Taylor v. State*, No. CC98-1328 (Ala. Cir. Ct. May 5, 2003).  On October 23, 2003, Circuit Court Judge Herman Thomas granted the State's motion to dismiss certain of Mr. Taylor's claims. On August 1, 2005, Judge Thomas erroneously entered an order, *sua sponte*,

summarily dismissing Mr. Taylor's petition in its entirety. On appeal of that order, the Court of Criminal Appeals ruled on October 1, 2010 that Judge Thomas had improperly dismissed certain of Mr. Taylor's claims. *Taylor v. State*, No. CR-05-0066 (Ala. Crim. App. Oct. 1, 2010). The case was remanded to the Circuit Court.

23.    On December 12, 2011, the Circuit Court held an evidentiary hearing on certain paragraphs of the claims in Mr. Taylor's petition that the Court of Criminal Appeals had reinstated and remanded. On May 23, 2012, the Circuit Court dismissed all of Mr. Taylor's reinstated and remanded claims. The dismissal of Mr. Taylor's petition was affirmed by the Court of Criminal Appeals on April 26, 2013. The Supreme Court of Alabama denied Mr. Taylor's petition for a writ of certiorari on April 25, 2014. *Ex parte Taylor*, No. 1130313 (Ala. Apr. 25, 2014). That same day, the Court of Criminal Appeals certified the April 26, 2013 affirmance of dismissal as final.

24.    Mr. Taylor filed a habeas corpus petition in the United States District Court for the Southern District of Alabama, pursuant to 28 U.S.C. § 2254, on September 22, 2014, and later filed an amended habeas corpus petition on December 19, 2014. *Taylor v. Thomas*, No. 14-cv-00439, ECF Nos. 5, 25 (S.D. Ala. 2014). The District Court denied Mr. Taylor's habeas corpus petition on January 25, 2018, and denied his Rule 59(e) motion on March 12, 2018. *Taylor v. Dunn*, No. 14-cv-00439, ECF Nos. 50, 54 (S.D. Ala. 2018).

25.    On April 26, 2018, Mr. Taylor filed a motion in the United States Court of Appeals for the Eleventh Circuit seeking a certificate of appealability, which was denied on October 5, 2018. *Taylor v. Dunn*, No. 18-11523-P, ECF Nos. 10, 12 (11th Cir. 2018).

26.    On March 4, 2019, Mr. Taylor filed a petition for a writ of certiorari in the Supreme Court of the United States, which was denied on May 13, 2019. *Taylor* v. *Dunn*, No. 18-1158 (U.S. 2019).

27.    On November 15, 2022, Mr. Taylor filed a successive Petition for Relief from Judgment in the Circuit Court for Mobile County, seeking relief pursuant to Rules 32.1(a) and 32.1(e) of the Alabama Rules of Criminal Procedure. *Taylor* v. *State*, No. CC-98-1328.62 (Ala. Cir. Ct.).

28.    The Circuit Court summarily dismissed Mr. Taylor's successive Rule 32 petition on May 3, 2024. Mr. Taylor filed a notice of appeal to the Court of Criminal Appeals on June 11, 2024. Briefing was completed in that appeal on August 16, 2024, and the appeal remains pending. *Taylor* v. *State*, No. CR-2024-0427 (Ala. Crim. App.).

## FACTUAL ALLEGATIONS

29.    Mr. Taylor is in the custody of the ADOC under a sentence of death imposed by the State of Alabama. Mr. Taylor has been incarcerated since December 1997. He is currently being held at Holman.

30.    Mr. Taylor is subject to execution by the State of Alabama's Nitrogen Hypoxia Protocol.

### A.    Alabama's Nitrogen Hypoxia Protocol

31.    In 2018, the Alabama Legislature authorized for the first time execution by an untested method: nitrogen gas asphyxiation. *See* Ala. Laws Act 2018-353 (S.B. 272).

32.    Inmates already sentenced to death in Alabama were given 30 days from June 1, 2018 to decide whether to opt in to execution by nitrogen gas asphyxiation—without any details regarding the protocol by which such executions would be carried out, as it was not yet drafted— or remain subject to execution by lethal injection. Ala. Code § 15-18-82.1(b)(2).

7

33.    At the time of the opt-in, binding Eleventh Circuit precedent prohibited Mr. Taylor from challenging lethal injection, his then-method of execution, in favor of any alternative method other than one already provided for by statute. *Arthur* v. *Comm'r, Ala. Dep't of Corr.*, 840 F.3d 1268, 1317–18 (11th Cir. 2016) (holding, generally, that an alternative method must be statutorily authorized), *abrogation recognized by Nance* v. *Comm'r, Ga. Dep't of Corr.*, 981 F.3d 1201, 1207 (11th Cir. 2020).

34.    As a result, at the time of the initial opt-in deadline, election of nitrogen gas asphyxiation was the only other option for inmates sentenced to death in Alabama who would have sought to challenge their execution by lethal injection—based on the well-documented suffering caused by ADOC's lethal injection protocol—as there was no other statutorily authorized method.

35.    Mr. Taylor opted in to execution by nitrogen gas asphyxiation in June 2018, before the Protocol was developed and made public. In making this election, Mr. Taylor expressly reserved his rights to challenge the constitutionality of any protocol adopted for carrying out executions by any method, including by nitrogen gas asphyxiation.

36.    The Protocol has never been publicly released, but became available for the first time on August 25, 2023, when the State of Alabama attached a heavily redacted copy of it to a motion to set an execution date for another inmate sentenced to death.[4]

37.    Mr. Taylor has never been provided with a redacted or unredacted copy of the Protocol. When Mr. Taylor elected execution by nitrogen gas asphyxiation in 2018, he did not agree to be executed without knowing the full scope of the procedures for his execution or being afforded a full and fair opportunity to challenge them.

---

[4]    All references in this Complaint to the "Nitrogen Hypoxia Protocol" or "Protocol" refer to the heavily redacted Protocol attached to the August 25, 2023 motion to set an execution date for another inmate, which was publicly filed in this Court later that same day in connection with a motion to dismiss the inmate's challenge to his execution by lethal injection. *See Smith* v. *Hamm*, No. 22-cv-00497, ECF No. 104-2 (M.D. Ala. Aug. 25, 2023).

38.    Defendant Hamm adopted the Protocol for use in nitrogen gas asphyxiation executions at ADOC facilities.

39.    Defendant Hamm provides the materials necessary to carry out nitrogen gas asphyxiation executions at ADOC facilities pursuant to the Protocol. *See* Ala. Code § 15-18-82(b).

40.    Defendant Raybon, as statutory executioner, implements and carries out the Protocol for nitrogen gas asphyxiation executions at Holman and organizes, manages, and supervises the teams carrying out executions there pursuant to the Protocol.

41.    Defendants executed Mr. Kenneth Smith using the Protocol on January 25, 2024.

42.    The execution of Mr. Smith was the first execution in the United States of a human being using the experimental method of nitrogen gas asphyxiation.

43.    Defendants executed Mr. Alan Miller using the Protocol on September 26, 2024.

44.    Defendants executed Mr. Carey Grayson using the Protocol on November 21, 2024.

45.    Defendants executed Mr. Demetrius Frazier using the Protocol on February 6, 2025.

46.    Defendants executed Mr. Gregory Hunt using the Protocol on June 10, 2025.

47.    Defendants plan to execute Mr. Geoffrey West using the Protocol on September 25, 2025.

48.    Defendants plan to execute Mr. Anthony Boyd using the Protocol on October 23, 2025.

49.    The Protocol does not specify the purity of nitrogen gas to use or the minimum amount of nitrogen gas that will be available for uninterrupted use.

50.    The Protocol does not provide for the use of a sedative prior to initiating the flow of nitrogen gas into the mask.

51.   The mask that is used in the Protocol is designed and intended to help workers breathe in oxygen-deficient environments or environments containing harmful gases or substances. The mask is not designed, nor intended, to deliver nitrogen gas to cause death by asphyxiation.

52.   The manufacturer of the mask requires it be fitted and tested on the intended user before it is used. The Protocol does not provide for the fitting and testing of the mask on the inmate before the execution.

53.   The Protocol does not require a physician to be present during the execution. The Protocol instead provides that "[t]he Warden or his/her designee will contact physicians to determine whether they are willing and available to attend the executions and pronounce the condemned inmate's time of death on the date the execution is scheduled." Protocol § V.G. If no physician is present, it is unclear who is responsible for pronouncing the inmate's time of death, or their training or qualifications for doing so.

54.   The Protocol provides that "[t]he Warden or Assistant Warden will initialize/pressurize the nitrogen hypoxia system in accordance with Section III of Appendix C (ADOC Nitrogen Hypoxia Execution Procedures) utilizing the procedures set forth in that document." Protocol § IX(I)(v).

55.   The Protocol provides that "[t]he Warden or Assistant Warden will conduct a final visual inspection of the nitrogen hypoxia system and verify that it has been initialized/pressurized and that [REDACTION] lockout valves [REDACTION]. Additionally, the Warden or Assistant Warden will perform a final verification that the breathing gas tubing is [REDACTION]." Protocol § X(A)(i).

10

56.     The Protocol provides that "[t]he mask will be placed and adjusted on the condemned inmate's face.  One Execution Team member will monitor the pulse oximeter while the Execution Team Captain verifies that the mask has been properly placed." Protocol § X(A)(v). The Protocol does not define what it means to be "properly placed."  The Protocol also does not explain who is responsible for placing the mask on the inmate, or their training or qualifications for doing so.

57.     The Protocol provides that "[a]fter the mask is placed and fitted onto the condemned inmate's face, the pulse oximeter will be monitored continuously for two minutes." Protocol § X(A)(vi).

58.     The Protocol requires that "[t]he team members inside the execution chamber . . . make a final inspection of the mask.  Once proper placement is verified, [REDACTION]." Protocol § X(A)(xiii).  The Protocol does not describe how "proper placement is verified."

59.     The Protocol requires that "[t]he Warden . . . activate the nitrogen hypoxia system [REDACTION]."  Protocol § X(A)(xiv).

60.     The Protocol then provides that "[a]fter the nitrogen gas is introduced, it will be administered for (1) fifteen minutes or (2) five minutes following a flatline indication on the EKG, whichever is longer." Protocol § X(A)(xv).

61.     This is the first mention of an EKG in the Protocol, which does not otherwise identify anyone responsible for connecting it to the inmate or checking whether it is functioning before the execution.  The Protocol also does not indicate the training levels, if any, of the person responsible for connecting and checking the EKG.

62.     Moreover, the medical definition of death is not based on how long an individual is exposed to a hypoxic environment.  There is no factual or medical basis for picking fifteen

minutes as the stoppage time for administering nitrogen gas. The Protocol thus risks causing significant brain and organ injury without death.

63.    The Protocol also notes that "[i]t is likely that the manufacturers of these products do not know that their publicly available products were procured by ADOC." Protocol § I(D)(vi).

64.    Defendants previously represented to this Court that the Protocol would "cause unconsciousness within seconds" of nitrogen gas flowing into the mask. *Smith* v. *Hamm*, No. 23-cv-00656, ECF No. 66, at 12 (M.D. Ala. Dec. 29, 2023).

65.    Eyewitness accounts from each of the State of Alabama's completed nitrogen gas asphyxiation executions using the Protocol demonstrate that the representations that the inmates would become unconscious "within seconds," and therefore not experience a painful death, were inaccurate. *See id.*

66.    As explained further below, unconsciousness did not occur "within seconds" of nitrogen gas flowing into the mask during the executions of Mr. Smith, Mr. Miller, Mr. Grayson, Mr. Frazier, or Mr. Hunt. Instead, witnesses to the State of Alabama's completed nitrogen gas asphyxiation executions using the Protocol saw signs of prolonged, conscious, and agonizing asphyxiation. The inmates were observed writhing and struggling on the gurney, clenching their fists, lifting their legs, and gasping for air for multiple minutes during the executions.

67.    The Protocol does not provide for what to do in the event an inmate is still conscious "within seconds" of nitrogen gas beginning to flow into the mask, which plainly occurred notwithstanding the State's representations.

68.    The Protocol does not provide for what to do in the event of the expression of fluids or vomit into the mask, which could cause an inmate—strapped to a gurney in a supine position—to choke.

69.     Defendants have the authority to alter, amend, or make exceptions to procedures governing the execution of inmates sentenced to death in the State of Alabama, including the Protocol.

70.     Defendants have not made any changes to the Protocol to account for the conscious asphyxiation observed during the executions of Mr. Smith, Mr. Miller, Mr. Grayson, Mr. Frazier, and Mr. Hunt.

### B.    Prior Executions Using Alabama's Nitrogen Hypoxia Protocol

#### 1.    *The Execution of Kenneth Smith*

71.     In November 2022, Mr. Smith was strapped to a gurney to be executed by lethal injection, but his execution was halted when prison officials failed to effectively insert IV lines into his veins to administer the injection before his death warrant expired.  For four hours, prison staff unsuccessfully attempted to execute Mr. Smith, subjecting him to severe pain and suffering during the botched execution.  Marty Roney, *Nitrogen Gas Execution: Kenneth Smith Convulses for Four Minutes in Alabama Death Chamber*, MONTGOMERY ADVERTISER (Jan. 25, 2024), https://www.montgomeryadvertiser.com/story/news/local/alabama/2024/01/25/four-minutes-of-convulsions-kenneth-smith-executed-with-nitrogen-gas/72358038007/.

72.     The following year, the State decided instead to execute Mr. Smith using the experimental Nitrogen Hypoxia Protocol.  "Having failed to kill Smith on its first attempt, Alabama . . . selected him as its 'guinea pig' to test a method of execution never attempted before." *Smith* v. *Hamm*, 144 S. Ct. 414, 415 (2024) (mem.) (Sotomayor, J., dissenting).

73.     The State represented in court filings that "ADOC's nitrogen hypoxia protocol will rapidly reduce oxygen inside the mask, cause unconsciousness within seconds, and cause death within minutes." *Smith* v. *Hamm*, No. 23-cv-00656, ECF No. 66, at 12 (M.D. Ala. Dec. 29, 2023).

It reiterated that "[i]n all likelihood, hypoxia will cause unconsciousness in a matter of seconds, rendering Smith unable to feel pain." *Id.* at 15.

74.    But the real-world results of Alabama's human experimentation belie the State's representations. Indeed, five media witnesses that the State chose to attend Mr. Smith's execution reported a prolonged period of consciousness, including struggling, writhing, and gasping for air for multiple minutes after the nitrogen gas was turned on.

75.    Marty Roney from the *Montgomery Advertiser* reported that when the curtains opened at 7:53 p.m., Mr. Smith was already "strapped to the gurney cruciform," with his arms and body secured. Marty Roney, *Nitrogen Gas Execution: Kenneth Smith Convulses for Four Minutes in Alabama Death Chamber*, MONTGOMERY ADVERTISER (Jan. 25, 2024), https://www. montgomeryadvertiser.com/story/news/local/alabama/2024/01/25/four-minutes-of-convulsions-kenneth-smith-executed-with-nitrogen-gas/72358038007/. Roney reported that the nitrogen gas appeared to start flowing at 7:57 p.m. *Id.* Mr. Smith "appeared to convulse and shake vigorously for about four minutes after the nitrogen gas apparently began flowing" and "[i]t was another two to three minutes before he appeared to lose consciousness, all while gasping for air to the extent that the gurney shook several times." *Id.*

76.    From 7:57 to 8:01 p.m., Mr. Smith "writhed and convulsed on the gurney," appearing to "be fully conscious when the gas began to flow. He took deep breaths, his body shaking violently with his eyes rolling in the back of his head." *Id.* Mr. Smith also "clenched his fists, his legs shook under the tightly tucked-in white sheet that covered him from his neck down. He seemed to be gasping for air. The gurney shook several times during this time." *Id.*

14

77.    At 8:02 p.m., five minutes after the nitrogen gas appeared to begin flowing, Mr. Smith "appeared to lose consciousness. His chest remained still for about 20 seconds then he took several large gasps for air. There appeared to be saliva or tears on the inside of the facemask." *Id.*

78.    At 8:06 p.m., his gasping slowed. *Id.* At 8:07 p.m., he "appeared to take his last breath." *Id.* Defendant Hamm later said that the nitrogen gas flowed into Mr. Smith's mask for about 15 minutes. *Id.*

79.    Afterwards, Mr. Roney stated that Mr. Smith's execution was "vastly different" from the two prior executions he had witnessed: "The two lethal injections I saw, I saw very little physical movement after we believe the process began. Their head goes down, their eyes roll in the back of their head, and then you look for the chest to stop working. You can always fool yourself in that situation into thinking you're watching someone fall asleep. But there was no mistaking this for what it was." Nicholas Bogel-Burroughs, *A Select Few Witnessed Alabama's Nitrogen Execution. This Is What They Saw*, N.Y. TIMES (Feb. 1, 2024), https://www.nytimes.com /2024/02/01/us/alabama-nitrogen-execution-kenneth-smith-witnesses.html.

80.    Kim Chandler from the *Associated Press* confirmed in her account that, when the nitrogen gas began flowing, Mr. Smith "began to shake and writhe violently, in thrashing spasms and seizure-like movements, at about 7:58 p.m. The force of his movements caused the gurney to visibly move at least once. Smith's arms pulled against the straps holding him to the gurney. He lifted his head off the gurney and then fell back. The shaking went on for at least two minutes." Kim Chandler, *What Happened at the Nation's First Nitrogen Gas Execution: An AP Eyewitness Account*, Assoc. PRESS (Jan. 27, 2024), https://apnews.com/article/death-penalty-nitrogen-gas-alabama-kenneth-smith-54848cb06ce32d4b462a77b1bb25e656.

81.    Ivana Hrynkiw from *AL.com* reported that after the gas started flowing around 7:58 p.m., "Smith visibly shook and writhed against the gurney for around two minutes. His arms thrashed against the restraints. He breathed heavily, slightly gasping, for approximately seven more minutes." Ivana Hrynkiw, *Alabama Executes Kenneth Eugene Smith by New Nitrogen Gas Method for 1988 Murder of Pastor's Wife*, AL.COM (Jan. 25, 2024), https://www.al.com/news/birmingham/2024/01/alabama-to-execute-kenneth-smith-with-untested-nitrogen-gas-tonight.html. Around 8:08 p.m., "Smith appeared to stop breathing." *Id.*

82.    Lauren Layton from *News 19* reported that the gas started around 7:58 p.m. and described Mr. Smith as "writhing and shaking against the gurney for about two minutes. The movements were seizure-like. He lifted his head off the gurney periodically. His eyes rolled back after this." Taylor Mitchell, Logan Sparkman & Lauren Layton, *News 19's Lauren Layton's Account of the Nation's First Nitrogen Hypoxia Execution*, WHNT (Jan. 26, 2024, updated Jan. 30, 2024), https://whnt.com/news/alabama-news/kenneth-eugene-smith/news-19s-lauren-laytons-account-of-the-nations-first-nitrogen-hypoxia-execution/. In addition, the "shaking was followed by several minutes of deep labored breaths. Smith appeared to gulp for air with his mouth open at some points." *Id.*

83.    Lee Hedgepeth from *Tread. by Lee Hedgepeth* reported that around 7:57 p.m., Mr. Smith "began thrashing against the straps, his whole body and head violently jerking back and forth for several minutes." Lee Hedgepeth, *"Never Alone": The Suffocation of Kenneth Eugene Smith*, TREAD. BY LEE HEDGEPETH (Jan. 26, 2024), https://www.treadbylee.com/p/never-alone-the-suffocation-of-kenneth. "Soon, for around a minute, Smith appeared heaving and retching inside the mask. By around 8:00 [p.m.], Smith's struggle against the restraints had lessened, though he continued to gasp for air. Each time he did so, his body lifted against the restraints. Smith's efforts

to breathe continued for several minutes." *Id.* "Around 8:07 p.m., Smith made his last visible effort to breathe." *Id.*

84. Mr. Hedgepeth also noted: "This was the fifth execution that I've witnessed in Alabama, and I have never seen such a violent reaction to an execution." Leah Roemer, *"The World Is Watching": Witnesses Report Kenneth Smith Appeared Conscious, "Shook and Writhed" During First-Ever Nitrogen Hypoxia Execution*, DEATH PENALTY INFO. CTR. (Jan 26, 2024, updated Mar 14, 2025), https://deathpenaltyinfo.org/the-world-is-watching-witnesses-report-kenneth-smith-appeared-conscious-shook-and-writhed-during-first-ever-nitrogen-hypoxia-execution.

85. Mike Sennett, a family member of the victim for whose murder Mr. Smith was executed, said afterward that "he has been unable to get the violence of Mr. Smith's last moments out of his mind. 'With all that struggling and jerking and trying to get off the table, more or less, it's just something I don't ever want to see again.'" Nicholas Bogel-Burroughs, *A Select Few Witnessed Alabama's Nitrogen Execution. This Is What They Saw*, N.Y. TIMES (Feb. 1, 2024), https://www.nytimes.com/2024/02/01/us/alabama-nitrogen-execution-kenneth-smith-witnesses.html. Mr. Sennett had been "told by some people that worked [in the prison system] that he'd take two or three breaths and he'd be out and gone. That ain't what happened. After about two or three breaths, that's when the struggling started." *Id.*

86. This contrasts greatly with Mr. Sennett's observations of the lethal injection execution of Mr. Smith's co-defendant, John Parker. Mr. Sennett said that the execution of Mr. Parker was "like him going to sleep." *Id.*

87. Mr. Smith's wife, Deanna Smith, stated afterwards: "Tonight, I watched my husband jerk and convulse and gasp for air for at least 10 minutes." *Id.*

88.   Attorney Robert Grass, another eyewitness to Mr. Smith's execution, submitted a statement to the Kansas State legislature explaining that, "[a]t a minimum, Mr. Smith did not appear to be unconscious in seconds and dead in minutes as Alabama predicted." K.S. HB 2782, Statement of Robert M. Grass, at 1 (Feb. 15, 2024).[5] Mr. Grass stated that he "saw Mr. Smith strapped to a gurney by restraints across his chest, abdomen, and arms." *Id.* at 2.  Once Defendant Raybon left the execution chamber and the nitrogen gas began to flow, Mr. Smith "appeared to be having convulsions or seizures.  His eyes rolled up.  His legs moved violently up and down several times.  His head thrust forward and back to the gurney several times.  He clenched his fists and his arms and body strained against the gurney restraints. . . . I can say that Mr. Smith writhed for minutes—not seconds." *Id.*

89.   These witnesses did not observe Mr. Smith pass out "in a matter of seconds," as the State had represented would occur.  *Smith* v. *Hamm*, No. 23-cv-00656, ECF No. 66, at 15 (M.D. Ala. Dec. 29, 2023).  Instead, Mr. Smith appeared to remain conscious for a prolonged period as he struggled on the gurney in severe pain.

90.   Despite this evidence of superadded pain, Defendant Marshall claimed that, "What occurred last night was textbook." Kerry Breen, *Nitrogen Gas Execution Was "Textbook" and Will Be Used Again, Alabama Attorney General Says*, CBS NEWS (Jan. 26, 2024), https://www.cbsnews.com/news/nitrogen-gas-execution-alabama-kenneth-eugene-smith-attorney -general/.

---

[5]  *See Miller* v. *Marshall*, No. 24-cv-00197, ECF No. 1-6, at 1 (M.D. Ala. Mar. 29, 2024).  Notably, Kansas' bill implementing nitrogen gas asphyxiation as an execution method in the state did not even progress to a vote before the legislature adjourned without taking it up. *See* Dakin Andone, *Execution by Nitrogen Hypoxia Doesn't Seem Headed for Widespread Adoption as Bills Fall Short and Nitrogen Producers Object*, CNN (June 8, 2024), https://www.cnn.com/2024/06/08/us/nitrogen-hypoxia-execution-adoption-legislation; *see also* K.S. HB 2782, https://legiscan.com/KS/bill/HB2782/2023.

91.    Mr. Smith's autopsy results establish that he suffered from negative pressure pulmonary edema ("NPPE") at the time of his death.

92.    NPPE occurs when a person attempts to breathe while the upper airway is obstructed, causing fluid to be drawn from blood vessels into the alveoli.

93.    An individual experiencing panic and sensing an inability to breathe while also being denied oxygen will experience a constricted airway like an upper airway obstruction. Thus, the method of execution created the NPPE observed in Mr. Smith's autopsy findings.

### 2.    *The Execution of Alan Miller*

94.    Similar to Mr. Smith, Alabama prison officials attempted to execute Mr. Miller by lethal injection in September 2022, but failed when they could not effectively access his veins. Despite the evidence from eyewitnesses of Mr. Smith's conscious suffocation, Alabama again used the Protocol to execute Mr. Miller by nitrogen gas asphyxiation on September 26, 2024. *See* Michelle Watson & Jason Hanna, *Alabama Has Executed Alan Eugene Miller, the Second Inmate Known to Die by Nitrogen Gas*, CNN (Sept. 26, 2024), https://www.cnn.com/2024/09/26/us/alan-eugene-miller-alabama-execution.

95.    Media reports from Mr. Miller's execution reveal that he also writhed on the gurney for multiple minutes after the nitrogen gas began flowing.

96.    Gladys Bautista of *WVTM13* recounted what she saw as a witness to the execution:

> At 6:18 p.m., the gas started to flow. This is when Miller began to take deep breaths. He lifted his head off the gurney several times and struggled against the restraints. He was trembling and shaking. Those movements continued for roughly two minutes.

> At 6:19 p.m., Miller appeared to lose consciousness but the movements continued. Everyone in the room was completely silent.

> At 6:20, Miller gasped, and his head moved.

> At 6:21, Miller took a large gasp for air.

19

> At 6:22, another smaller gasp.
>
> For the next two to three minutes, Miller continued to periodically gasp for air and lift his head from the gurney.
>
> At 6:26, he appeared to take his last breath before becoming completely still.

Gladys Bautista, *Witnessing Alan Miller's Execution: A Firsthand Account from Alabama's Death Chamber*, WVTM13 (Sept. 29, 2024), https://www.wvtm13.com/article/alan-miller-execution-alabama-witness-final-words/62415048.

97. The *Montgomery Advertiser's* Mr. Roney, who had also witnessed Mr. Smith's execution, recounted that after the gas began to flow around 6:18 p.m., "Miller took several large gasps and began writhing and flinching. His left hand shook and clenched into a fist several times. He lifted his head from the gurney several times. The gurney shook on two occasions." Marty Roney, *Alabama Executes Alan Eugene Miller with Nitrogen Gas*, MONTGOMERY ADVERTISER (Sept. 26, 2024), https://www.montgomeryadvertiser.com/story/news/crime/2024/09/26/alabama-executes-alan-eugene-miller-with-nitrogen-gas/75360739007/.

98. Another witness, Lauren Gill from *Bolts Magazine*, reported on *X* that the execution "did not go as state officials promised. Miller visibly struggled for roughly two minutes, shaking and pulling at his restraints. He then spent 5–6 min intermittently gasping for air." Lauren Gill (@laurenk_gill), X (Sept. 26, 2024, 8:32 PM), https://x.com/laurenk_gill/status/1839463170080997743?lang=en.

99. Ms. Gill also recounted that she "watched from the witness room as Miller thrashed and jerked on the gurney, shaking and pulling at his restraints." Lauren Gill, *"Agony" and "Suffering" as Alabama Experiments With Nitrogen Executions*, THE INTERCEPT (Oct. 8, 2024), https://theintercept.com/2024/10/08/alabama-nitrogen-gas-execution-alan-miller/. Ms. Gill stated that it was "unclear when the nitrogen gas started, but I saw Miller's stomach rise and fall like he

was breathing normally. It did not appear that he was attempting to hold his breath." *Id.* But "suddenly, Miller started jerking and shaking, struggling against the restraints. While this was happening, he gasped for air and his eyes were open, staring at the ceiling and darting back and forth. This went on for about two minutes before Miller stopped moving. Then, for the next five or six minutes, Miller periodically gasped for breath. Some of the gasps were so large that his head lifted off the gurney. His left hand turned blue." *Id.*

100. Ms. Hrynkiw, from *AL.com*, who had witnessed Mr. Smith's execution as well, reported that Mr. Miller "took deep breaths and lifted his head off the gurney several times at 6:18 p.m. He struggled against the restraints on the gurney, shaking and trembling for about two minutes. Miller then gasped off and on for about six minutes." Ivana Hrynkiw, *Alabama Inmate Alan Miller Executed with Nitrogen Gas Thursday for 1999 Shootings*, AL.COM (Sept. 26, 2024), https://www.al.com/news/2024/09/alabama-inmate-alan-miller-set-to-be-executed-with-nitrogen-gas-thursday-for-1999-shootings.html.

101. Dr. John Muench, a physician who served as Mr. Miller's spiritual advisor, was in the execution chamber. Afterwards, Dr. Muench explained that "[w]e don't see people jerking around like that while they're dying normally." *Alabama Executes Alan Miller*, EQUAL JUST. INITIATIVE (updated Sept. 26, 2024), https://eji.org/news/alan-miller-alabama-execution-2024/. "His face was twisted and he looked like he was suffering." *Id.*

102. After the execution, Dr. Muench also recounted to Ms. Gill how he had begun to minister to Mr. Miller when "Miller's head jerked up" and that "Miller was gray and ashen and his face was twisted." Lauren Gill, *"Agony" and "Suffering" as Alabama Experiments With Nitrogen Executions*, THE INTERCEPT (Oct. 8, 2024), https://theintercept.com/2024/10/08/alabama-nitrogen-gas-execution-alan-miller/. Dr. Muench said, "I knew suddenly this isn't going like we planned,

and his knees started shaking at that point." *Id.* "As Miller writhed on the gurney, Muench said it was obvious that the nitrogen gas had been turned on early. 'I'm sure he was suffering certainly at the beginning of it, when he was gasping for oxygen,' Muench said. 'When he lifted his head up and I could see him, he was definitely gasping.'" *Id.*

103.    As with Mr. Smith, these witnesses did not observe Mr. Miller pass out "in a matter of seconds," but rather he appeared to remain conscious for some time while struggling in pain.

### 3.    *The Execution of Carey Grayson*

104.    Despite these accounts, the State of Alabama conducted yet another nitrogen gas asphyxiation execution using the Protocol on November 21, 2024.  The reports of this execution of Mr. Grayson indicate that it, too, resulted in superadded pain and terror.

105.    The *Associated Press's* Ms. Chandler reported that, once the gas was turned on, Mr. Grayson "rocked his head, shook and pulled on the gurney restraints.  He clenched his fist and appeared to struggle to try to gesture again.  His sheet-wrapped legs lifted off the gurney into the air at 6:14 p.m.  He took a periodic series of more than a dozen gasping breaths for several minutes.  He appeared to stop breathing at 6:21 p.m., and then the curtains to the viewing room were closed at 6:27 p.m." Kim Chandler, *Alabama Carries Out Nation's Third Nitrogen Gas Execution on a Man for a Hitchhiker's Killing*, ASSOC. PRESS (Nov. 22, 2024), https://apnews.com/article/death-penalty-nitrogen-execution-alabama-09450359e223a9d38a5fb24e87fcfb45.

106.    Mr. Roney, of the *Montgomery Advertiser*, reported the following timeline:

> 6:11 p.m.: Grayson put his middle fingers of both hands up.  A woman approached the gurney, and he appeared to calm down.  She spoke a few words to him.  She was later identified as his spiritual advisor.
>
> 6:12 p.m.: The nitrogen appeared to begin flowing.  Grayson's hands were tightly clenched.  He took several deep gasps, shaking his head vigorously. He pulled his arms against the restraints.  He took more deep gasps.
>
> 6:13 p.m.: He took several deep gasps, raising his head off the gurney.

22

6:14 p.m.: He raised his legs from the gurney. He took several deep breaths. His legs lowered about 30 seconds later.

6:15 to 6:17 p.m.: Grayson took several deep breaths. His hands remained tightly clenched.

6:17 p.m.: A corrections officer performed a consciousness check.

6:18 p.m.: Grayson appeared to lose consciousness; his hands relaxed.

6:18 to 6:22 p.m.: He took eight to nine large gasps with several seconds in between each gasp.

6:22 p.m.: He appeared to stop breathing.

6:27 p.m.: The curtain to the death chamber was closed.

Marty Roney, *Alabama Executes Carey Dale Grayson by Nitrogen Gas for Brutal 1999 Murder*, MONTGOMERY ADVERTISER (Nov. 21, 2024), https://www.montgomeryadvertiser.com/story/news/crime/2024/11/21/alabama-executes-carey-dale-grayson-by-gas-for-brutal-1999-murder/76465482007/.

107.    Kent Faulk from *AL.com* reported that, around 6:12 p.m. when the gas began flowing, Mr. Grayson started "gasping and raising, shaking his head left to right. About 6:14 p.m., both of his legs on the gurney raised up. His movements slowed, but he had what appeared to be periodic gasps over the following six minutes when he stopped moving." Kent Faulk, *Alabama Executes Carey Dale Grayson by Nitrogen Gas for 1994 Murder*, AL.COM (Nov. 21, 2024), https://www.al.com/news/2024/11/live-updates-alabama-set-to-execute-carey-dale-grayson-by-nitrogen-gas-for-1994-murder.html.

108.    Once again, the observers did not see Mr. Grayson pass out "in a matter of seconds," but instead he struggled in pain for a period of time after the nitrogen gas was turned on.

### 4.    *The Execution of Demetrius Frazier*

109.    Alabama carried out its fourth nitrogen gas asphyxiation execution using the Protocol on February 6, 2025, when it executed Mr. Frazier. Like those executed pursuant to the Protocol before him, Mr. Frazier struggled and moved in obvious distress for several minutes before succumbing to the nitrogen gas.

110.    Reporting for *AL.com*, Ms. Hrynkiw observed that:

> About 6:11 p.m., Frazier started waving his hands in circles towards his body. About a minute later, his hands stopped moving.
>
> At approximately 6:12 p.m. Frazier clenched his face, and his nostrils flared, while his hands quivered. He appeared to say something, which was inaudible to the three witness rooms. His legs slightly lifted up off the gurney and he gasped.
>
> Then, his head rolled to the right side. Frazier exhibited sporadic gasping and shallow breathing until about 6:20 p.m.
>
> The curtains closed at 6:29 p.m., and his time of death declared seven minutes later at 6:36 p.m.

Ivana Hrynkiw, *Alabama Inmate Demetrius Frazier Executed by Nitrogen Gas for 1991 Birmingham Slaying: 'Let's Go'*, AL.COM (Feb. 6, 2025), https://www.al.com/news/2025/02/alabama-inmate-demetrius-frazier-set-to-die-by-nitrogen-michigan-governor-hasnt-acted.html.

111.    Sarah Clifton from the *Montgomery Advertiser* reported the following timeline confirming these observations:

> 6:10: Raybon closed Frazier's mask. Seconds later, he appeared to say something inaudible. He appeared to move his fists in a slow, inward pumping motion, then appeared to open his fists with palms outstretched, followed by moving his hands in what seemed to be circular motions, as if imitating air flow. About thirty second[s] later, his hands continued this apparent motion, but appeared to move more rigidly, occasionally off sync.
>
> 6:11: Frazier's breathing appeared to get heavier. He seemed to quiver and twitch.

24

6:12: Frazier appeared to struggle to breathe and seemed to clench the muscles in his face.

6:13: Frazier appeared to breathe sporadically, with seemingly inconsistent amounts of time between breaths, and apparently slightly shuddering. Frazier's legs appeared to tense and raise a few inches off of the gurney, with his head seemingly lolling to the side. His arms seemed to tighten and fists clenched.

6:14: Frazier's breath appeared to slow down, though still slightly shuddering.

Between 6:13 and 6:17: His time between breaths appeared to be inconsistent, but his breaths appeared to come in shuddering gasps.

6:18: Frazier seemed to twitch slightly and shudder, with another shuddering breath apparently coming about 15 seconds later.

From 6:18 to 6:20: There appeared to be very little, if any, physical movement. If Frazier was breathing, it was imperceptible.

6:20: Frazier appeared to take his last, shuddering breath.

Between 6:21 and 6:23: Frazier appeared to have no perceptible movement.

6:24: Frazier's fists seemed to loosen slightly.

Between 6:24 and 6:29: No perceptible movement was apparent.

Sarah Clifton, *Alabama Executes Demetrius Frazier by Nitrogen Gas for 1991 Murder*, MONTGOMERY ADVERTISER (Feb. 6, 2025), https://www.montgomeryadvertiser.com/story/news/local/alabama/2025/02/06/alabama-executes-demetrius-frazier-by-nitrogen-gas-for-1991-murder/78282236007/.

112.    Likewise, Ms. Chandler from the *Associated Press* reported that "Frazier was strapped to a gurney with a blue-rimmed gas mask covering his entire face. The execution began at about 6:10 p.m. after a corrections officer did a final check of the mask. Frazier moved his outstretched palms in a swirling circular movement for the first minute or two. At 6:12 p.m., he stopped circling his hands. He appeared to grimace, quiver on the gurney and take a gasping

breath. A minute later, he raised both legs several inches off the gurney and then lowered them. His breathing slowed at 6:14 p.m. to a series of sporadic breaths. He had no visible movement by about 6:21 p.m." Kim Chandler, *Alabama Puts Man to Death for a 1991 Murder in the Nation's Fourth Execution Using Nitrogen Gas*, ASSOC. PRESS (Feb. 6, 2025), https://apnews.com/article /alabama-execution-demetrius-frazier-nitrogen-gas-e1b391e1e157f2815be1baa248737778.

113. Mr. Frazier thus also did not pass out "in a matter of seconds," but strained for air for a prolonged period while strapped to the gurney.

### 5.     *The Execution of Gregory Hunt*

114. Alabama went forward with its fifth nitrogen gas asphyxiation execution using the Protocol when it executed Mr. Hunt on June 10, 2025. As was the case with Mr. Smith, Mr. Miller, Mr. Grayson, and Mr. Frazier, Mr. Hunt showed visible signs of struggle and distress for minutes after the nitrogen gas began to flow, before he was pronounced dead.

115. Ms. Chandler, of the *Associated Press*, observed that "[a]t 5:57 p.m. Hunt briefly shook, gasped and raised his head off the gurney. He let out a moan at about 5:59 p.m. and raised his feet. He took a series of four or more gasping breaths with long pauses in between, and made no visible movements after 6:05 p.m." Kim Chandler, *Alabama Executes a Man by Nitrogen Gas for the Beating Death of a Woman in 1988*, ASSOC. PRESS (June 10, 2025), https://apnews.com /article/execution-alabama-nitrogen-gas-1799b231099c2e260bee7f55b97fa31f.

116. Alex Gladden, another media witness to Mr. Hunt's execution, from the *Montgomery Advertiser* reported the following timeline:

> 5:52 p.m. The curtains to the death chamber were opened. Hunt was wrapped in a white sheet and strapped to a gurney. A mask was affixed to his face.
>
> 5:54 p.m. Hunt declined to give any last words. He made what appeared to be a peace sign with his left hand.

5:56 p.m. Hunt began taking deep breaths.

5:57 p.m. He began gasping and lifted his head. His entire body began convulsing.

5:59 p.m. Hunt turned his head and then lifted his head. Hunt's head fell back, and he groaned loudly.

6[:00] p.m. Hunt moved his head and gasped. He continued intermittently gasping for the next several minutes.

6:04 p.m. Hunt appeared to take his last breath.

6:19 p.m. Hunt had remained still for the past 15 minutes. His left fist remained clenched. The curtains to the death chamber were closed.

Alex Gladden, *Alabama Executes Gregory Hunt for 1988 Murder of Karen Lane*, MONTGOMERY ADVERTISER, (June 10, 2025), https://www.montgomeryadvertiser.com/story/news/crime/2025/06/10/alabama-completes-fifth-execution-by-nitrogen-hypoxia/84069592007/.

117.    Savannah Tryens-Fernandes from *AL.com* provided the following account:

At 5:57 p.m. Hunt's breathing became labored and he lifted his head up. A minute later, his legs began moving.

At 5:59 p.m. Hunt's body began shaking and his head and legs lifted off the gurney. He appeared to groan, then fell back down shortly after and his breath became more shallow.

A prison official spoke to Hunt at 6:01 p.m. but he did not appear to give a reply.

At 6:02 [p.m.] Hunt took a small gasp of air. He gasped infrequently a few times, with his hands curled into fists, until all movements stopped at 6:05 p.m.

Ivana Hrynkiw & Savannah Tryens-Fernandes, *Alabama Executes Gregory Hunt for Brutal 1988 Walker County Murder*, AL.COM (June 11, 2025), https://www.al.com/news/2025/06/gregory-hunt-set-to-die-by-nitrogen-gas-in-alabama-for-brutal-1988-walker-county-murder.html.

118.    Once more, the witnesses to Mr. Hunt's execution did not see him lose consciousness "in a matter of seconds." Instead, he struggled and writhed, gasping for air for some time after the nitrogen gas started flowing.

### C.    Louisiana's Execution of Jesse Hoffman, Jr. By Nitrogen Gas Asphyxiation

119.    In the first nitrogen gas asphyxiation execution outside the State of Alabama, Louisiana executed Mr. Hoffman on March 18, 2025. As in each Alabama execution using the Protocol, Mr. Hoffman exhibited clear signs of severe, prolonged distress.

120.    John Simerman, a media witness to Mr. Hoffman's execution from the *New Orleans Times-Picayune* and *NOLA.com*, reported that, at 6:22 p.m., Mr. Hoffman's "breathing became uneven. His chest rose and he made a jerking motion. A minute later, Hoffman's body shook and his fingers twitched. He appeared to pull at the arms of the table [his] hands began to clench. His head stayed turned to his right. His breathing slowed." John Simerman, *Jessie Hoffman's Final Moments Inside Louisiana's Execution Chamber at Angola*, NOLA.COM, (Mar. 19, 2025), https://www.nola.com/news/courts/jessie-hoffman-death-penalty-execution-nitrogen/article_4de95cb8-047c-11f0-91cc-d7c36246ff44.html. "At 6:26 p.m., Hoffman's head moved inside the mask. Less than a minute later, a few seconds before 6:27 p.m., he jerked slightly." *Id.* Mr. Simerman described that, after the execution, "Hoffman's face had been made visible for the first time, the mask used to kill him now removed. His head was tilted back, teeth exposed in a grimace, as the curtains slowly descended once more." *Id.*

121.    Andrew Greenstein from *Louisiana Radio Network* compiled a timeline based on the accounts of both media witnesses—Mr. Simerman and Gina Swanson of WDSU-TV New Orleans. That timeline was reported as follows:

> 6:20 – Curtain opens. Hoffman is already strapped to the gurney with the gas mask covering his face and a plush gray blanket covering his body. His hands were visible. Along with Hoffman, there were three other people in

the room: Hoffman's spiritual advisor, Warden Darrell Vannoy and Chief of Operations Seth Smith.  Vannoy asked Hoffman if he had any last words, and Hoffman nodded no.

6:21 – The remaining hole on Hoffman's mask is plugged in, and the nitrogen gas starts flowing.  Hoffman starts twitching, his eyes start blinking, and his chest was moving up and down.

6:22 – Hoffman starts breathing heavily.

6:23 – Hoffman's hands clench up and his body starts convulsing.

6:24 – Hoffman's breathing becomes more shallow, based on the movement of the blanket.

6:27 – Hoffman's body slightly twitches for the last time.  Hoffman's head is tilted to the right side.

6:40 – Curtain closes.

. . .

6:52 – Curtain reopens.  The gas mask is removed from Hoffman's face, and his mouth is slightly open.  Vannoy announces that Hoffman was pronounced dead at 6:50.

Andrew Greenstein, *Reporters Detail Timeline of Jessie Hoffman Execution*, LA. RADIO NETWORK, (Mar. 19, 2025), https://louisianaradionetwork.com/2025/03/19/reporters-detail-time line-of-jessie-hoffman-execution/.

122.    As Mr. Hoffman struggled to breathe and convulsed on the gurney, the witnesses to his nitrogen gas asphyxiation execution in Louisiana thus saw him experience similar pain and suffering as those who have been executed in Alabama using the Protocol.

## D.    Alabama's Nitrogen Hypoxia Protocol Inflicts Cruel and Unusual Punishment and Results in Superadded Pain During Executions

123.    Defendant Hamm has claimed that journalist witness accounts, such as those described above, of writhing, shaking, gasping, and distress "could have been the kind of involuntary movements that naturally occur upon death." *Wilson* v. *Hamm*, No. 24-cv-00111, ECF No. 16, at 11 (M.D. Ala. Apr. 16, 2024).  For example, without any support, Defendant Hamm

29

claimed that, as to Mr. Grayson's "[f]irst movements, he was doing all that . . . in my opinion and other staff that was all show." Taylor Pollock, *"Society Failed This Man as a Child, and My Family Suffered": Daughter of Murdered Hitchhiker Speaks After Execution*, WBRC6 NEWS (Nov. 22, 2024), https://www.wbrc.com/2024/11/22/society-failed-this-man-child-my-family-suffered-daughter-murdered-hitchhiker-speaks-after-execution/.    But this is an inaccurate explanation of the grotesque writhing movements observed during the executions of Mr. Smith, Mr. Miller, Mr. Grayson, Mr. Frazier, and Mr. Hunt, as well as Mr. Hoffman.

124.    Experts who have studied asphyxiation, i.e., oxygen deprivation, have found that "[a]t saturations less than 60% [of oxygen], the majority of people, not yet unconscious, report significant distress and shortness of breath.  These feelings of extreme stress are an important reason why it is unethical to even study the effects of very low oxygen levels (<60%) on humans." Dr. Philip E. Bickler & Dr. Michael S. Lipnick, *Evidence Against Use of Nitrogen for the Death Penalty*, 24 J. Am. Med. Ass'n 2075, 2075 (June 25, 2024); *Hoffman* v. *Westcott*, No. 25-cv-00169, ECF No. 4-5, at 74 (M.D. La. Feb. 26, 2025).  "[B]elow 50% [blood oxygen saturation levels], the cruel nature of administering nitrogen to humans becomes universally apparent. . . . With sudden loss of an oxygen supply, humans feel significant and distressing shortness of breath.  This is usually accompanied by anxiety, increased heart rate, sweating, sleepiness, visual loss, and a feeling of impending doom as they go in and out of consciousness.  Muscle twitching and seizures can occur." *Hoffman* v. *Westcott*, No. 25-cv-00169, ECF No. 4-5, at 77 (M.D. La. Feb. 26, 2025) (testimony of Dr. Bickler and Dr. Lipnick before the Kansas House Committee on Judiciary).

125.    While "[s]upporters of nitrogen asphyxia for capital punishment claim that the method is fast, predictable, and painless, . . . it is clear from eyewitness accounts . . . that the method is none of these things." Dr. Bickler & Dr. Lipnick, *Evidence Against Use of Nitrogen for*

the Death Penalty, 24 J. Am. Med. Ass'n, at 2076. Indeed, "[w]hen faced with an impending, forced withdrawal of oxygen, humans are likely to breathe irregularly or breath hold, [two] of many factors that will likely cause prolonged, significant shortness of breath, anxiety, increased heart rate, sweating, visual loss, muscle twitching, seizures, and a feeling of impending doom as consciousness fluctuates." *Id.*

126.    Dr. Jonathan Groner, a professor at The Ohio State University College of Medicine, commented: "The theory is that that if you just get rid of all the oxygen, just breathing pure nitrogen, you won't feel that intense pressure, like you're holding your breath, right?  It doesn't really work out that way." Michelle Watson & Jason Hanna, *Alabama Has Executed Alan Eugene Miller, the Second Inmate Known to Die by Nitrogen Gas*, CNN (Sept. 26, 2024), https://www.cnn.com/2024/09/26/us/alan-eugene-miller-alabama-execution.

127.    Other experts in the field have explained the following regarding asphyxiation: "dyspnoea or air hunger are primary symptoms and drive a rapid elevation of sympathetic activity to the heart, blood vessels and adrenal glands that are so profoundly disturbing that they are responsible for people seeking medical care for their relief." Damian M. Bailey, Vaughan G. Macefield & David C. Poole, *Physiology of Nitrogen: A Life or Death Matter*, Experimental Physiology, at 10 (June 20, 2025), https://physoc.onlinelibrary.wiley.com/doi/10.1113/EP092946.

128.    The severe deprivation of oxygen can also cause nausea and vomiting.

129.    The Protocol instructs execution staff to place the inmate on a gurney, and witness accounts confirm that inmates have been strapped down.

130.    Experts have explained that when the chest strap on the gurney is "tightened as intended [it] will undoubtedly impair chest wall and corresponding lung expansion.  In this situation, as the $N_2$ inspire stimulates the [carotid bodies] to exert their powerful drive to breathe,

31

evoking a pronounced elevation in motor drive to the inspiratory muscles, the desired lung expansion will not be possible, further compounding dyspnoea and air hunger. Eyewitness reports from all executions attest to the prisoners['] undergoing a prolonged period—several minutes—of severe respiratory distress including gasping, choking, retching, and moaning as they invariably fought against their restraints." Bailey et al., *Physiology of Nitrogen: A Life or Death Matter*, at 10.

131.    Alabama State Senator Trip Pittman asserted in an interview that executions by nitrogen gas asphyxiation are "instantaneous. You basically black out. There is no time for pain or anything else. In fact, nitrous oxide is a way of reducing pain for reducing [sic] surgeries." Ralph Chapoco, *Alabama Legislator Seeks to Eliminate Nitrogen Gas Executions*, ALA. REFLECTOR (Mar. 14, 2024), https://alabamareflector.com/2024/03/14/alabama-legislator-seeks-to-eliminate-nitrogen-gas-executions/ (quoting State Senator Trip Pittman). The Senator, however, apparently mistook nitrous oxide ($N_2O$), "laughing gas" used as an anesthetic in medical procedures and which includes oxygen, for nitrogen ($N_2$), an inert gas that contains no oxygen and is not an anesthetic. His statement is also belied by the eyewitness accounts of prolonged writhing and gasping during nitrogen gas asphyxiation executions.[6]

132.    Moreover, experts have stated that officials who believe that inmates will experience a "euphoric death" from nitrogen gas asphyxiation may be "confused with the euphoric irrationality caused by nitrogen narcosis typically experienced by scuba divers, likely attributable to the anaesthetic effect of breathing $N_2$ at high partial pressures (i.e., hyperbaria)." Bailey et al.,

---

[6]    *See also* Ralph Chapoco, *Alabama Legislator Seeks to Eliminate Nitrogen Gas Executions*, ALA. REFLECTOR (Mar. 14, 2024), https://alabamareflector.com/2024/03/14/alabama-legislator-seeks-to-eliminate-nitrogen-gas-executions/ ("This is death by asphyxiation. This is choking someone to death with a gas. . . . Why anyone would think that would be something pleasant or painless is really beyond my understanding." (quoting Dr. Joel Zivot. an anesthesiologist at Emory University Hospital)).

*Physiology of Nitrogen: A Life or Death Matter*, at 11. According to experts, "this is an entirely separate condition with concurrent neurological symptoms resembling those associated with alcohol, nitrous oxide (laughing gas), marijuana and benzodiazepine drug intake." *Id.* Moreover, "molecular and cellular mechanisms responsible for nitrogen narcosis are widely debated," and "significant symptoms are only present when divers typically descend to 30 m (4 atmospheres) and beyond, which equates to a [partial pressure] $P_{N2}$ of 2374 mmHg (0.781 x 760 x 4), more than three times higher than that achieved by breathing pure $N_2$ at 1 atmosphere ([partial pressure] $P_{N2}$ = 1000 x 760 = 760 mmHg)." *Id.*

133.    Dr. Philip E. Bickler, a medical expert with decades of experience in the field, has testified that "[t]he sensations associated with being exposed to conditions where there is no oxygen in the environment produces a feeling of suffocation, of extreme breathlessness, anxiety, increased heart rate, the flight-or-fight response, all of that. Very similar to drowning." *Hoffman v. Westcott*, No. 25-cv-00169, ECF No. 87, at 227:5–10 (M.D. La. Mar. 10, 2025). Dr. Bickler further testified that nitrogen is "not an anesthetic" and thus does not relieve pain—instead, "it elicits this massive sympathetic nervous system response, so it produces a terror response, if you will. So it's quite the opposite of what I—of what we perceive that the States had intended with this method." *Id.* at 234:20–235:4. Upon examining evidence and eyewitness accounts from four nitrogen gas asphyxiation executions in Alabama, Dr. Bickler concluded that "the duration of the suffering was much longer than I would consider humane," and "the suffering was longer than apparently the advocates for the method predicted." *Id.* at 262:20–24.

134.    The United Nations' Office of the High Commissioner on Human Rights has expressed serious concern that the "grave suffering which execution by" nitrogen gas asphyxiation may cause "amount[s] to torture." U.N. Human Rights, Office of the High Comm'r, *United States:*

33

*UN Experts Alarmed at Prospect of First-Ever Untested Execution by Nitrogen Hypoxia in Alabama* (Jan. 3, 2024), www.ohchr.org/en/press-releases/2024/01/united-states-un-experts-alarmed-prospect-first-ever-untested-execution; *First U.S. Nitrogen-Gas May Constitute Torture—UN Rights Office*, REUTERS (Jan. 16, 2024), www.reuters.com/world/us/first-us-nitrogen-gas-execution-may-constitute-torture-un-rights-office-2024-01-16/. It has thus called for a ban on executions by nitrogen gas asphyxiation. U.N. Human Rights, Office of the High Comm'r, *United States: Experts Call for Urgent Ban on Executions by Nitrogen Gas in Alabama* (Nov. 20, 2024), https://www.ohchr.org/en/press-releases/2024/11/united-states-experts-call-urgent-ban-executions-nitrogen-gas-alabama.

135.   Nitrogen gas asphyxiation has not even been approved as an acceptable method of euthanasia for nearly all animals. The "American Veterinary Medical Association has banned the use of nitrogen as a method of euthanasia in dogs and most other animals because of the variable and distressing responses to nitrogen breathing." Dr. Bickler & Dr. Lipnick, *Evidence Against Use of Nitrogen for the Death Penalty*, 24 J. Am. Med. Ass'n, at 2075. In addition, "the American Veterinary Medical Association euthanasia guidelines states that nitrogen asphyxiation can be an acceptable method of euthanasia under certain conditions for pigs but not for other mammals because it creates 'an anoxic environment that is distressing for some species.'" Bailey et al., *Physiology of Nitrogen: A Life or Death Matter*, at 7 (quoting Steven Leary et al., *AVMA Guidelines for the Euthanasia of Animals: 2020 Edition*, Am. Veterinary Med. Ass'n, at 28 (2020), https://www.spandidos-publications.com/var/AVMA_euthanasia_guidelines_2020.pdf); *see also* Leary et al., *AVMA Guidelines for the Euthanasia of Animals: 2020 Edition*, at 28 ("[G]radual displacement methods using $N_2$ or Ar, alone or mixed with other gases, may result in exposure to

hypoxic conditions prior to loss of consciousness. Loss of consciousness will be preceded by open-mouth breathing and hyperpnea, which may be distressing for nonavian species.").

136.   When Ms. Gill of *Bolts Magazine*, a witness to Mr. Miller's execution by nitrogen gas asphyxiation, described what she had seen to Gail Van Norman, an anesthesiology professor at the University of Washington, Prof. Van Norman said the following:

> [Prof. Van Norman] told me that Miller's reaction was "entirely predictable" and sounded consistent with the reactions of animals suffocated with nitrogen during scientific studies.
>
> "Yeah, he was awake," she said. "The textbook says that when you do this to a mammal, they're going to suffocate, they're going to know it's happening. They're going to try to escape it. They're going to struggle, they're going to shake, they're going to lose their coordination, and they're going to die a horrible death." That's why, Van Norman explained, the American Veterinary Medical Association says that most mammals should not be euthanized with nitrogen.
>
> It didn't matter that Miller wanted to cooperate, she said, because nobody actually knows if humans are capable of breathing deeply while being suffocated by nitrogen gas. "Even if they're capable of it, and they do breathe deeply, I have no reason to believe that it will go any differently," Van Norman told me. "You'll still see the gasping, you'll still see shaking, jerking, discoordination."

Lauren Gill, *"Agony" and "Suffering" as Alabama Experiments With Nitrogen Executions*, THE INTERCEPT (Oct. 8, 2024), https://theintercept.com/2024/10/08/alabama-nitrogen-gas-execution-alan-miller/.

137.   Thus, in sum, as the eyewitness observations of the executions and the analysis of medical professionals regarding nitrogen gas asphyxiation indicate, Mr. Smith, Mr. Miller, Mr. Grayson, Mr. Frazier, and Mr. Hunt evidently experienced prolonged, conscious asphyxiation—and resulting terror, pain, and suffering—during their executions pursuant to the Protocol.

138.   Defendants have refused to adjust the Protocol, however, in response to its results during these executions.

139.    Depriving a conscious person of oxygen creates a "constitutionally unacceptable risk of suffocation." *Baze*, 553 U.S. at 53.

140.    As adopted and implemented, the State of Alabama's Nitrogen Hypoxia Protocol evidently results in superadded pain and suffering in violation of the United States Constitution, including the Eighth Amendment's bar on "cruel and unusual punishments."

141.    In particular, the Protocol's lack of sufficient safeguards to prevent conscious suffocation violates the United States Constitution, including the Eighth Amendment's bar on "cruel and unusual punishments."

142.    Defendants' failure to modify the Protocol to account for the conscious suffocation observed during Mr. Smith's, Mr. Miller's, Mr. Grayson's, Mr. Frazier's, and Mr. Hunt's executions shows that the Protocol is either designed to inflict superadded pain and suffering, or else that the State is deliberately indifferent to evidence that the Protocol results in superadded pain and suffering.

143.    There is a substantial likelihood that, if Mr. Taylor is executed using the Protocol, he will be deprived of oxygen while he remains conscious for a prolonged period of time until he dies—and thus experience the "constitutionally unacceptable" risk of conscious suffocation, and its superadded pain and suffering—as occurred during the prior executions using the Protocol.

### E.    Mr. Taylor's Proposed Alternative Methods of Execution

144.    To satisfy the Eighth Amendment's pleading requirement, set forth in *Baze* v. *Rees*, 553 U.S. 35 (2008), and *Glossip* v. *Gross*, 576 U.S. 863 (2015), inmates sentenced to death are required to provide an alternative method of execution that is "feasible, readily implemented, and

in fact significantly reduce[s] a substantial risk of severe pain," *Baze*, 553 U.S. at 52; *see also*

*Glossip*, 576 U.S. at 877.[7]

145.    Mr. Taylor sets forth below two readily available and feasible alternative execution

methods,[8] which, as compared to the Protocol, significantly reduce his substantial risk of severe

pain and suffering.[9]

### 1.    *Alternative Method One: Alternative Nitrogen Gas Asphyxiation Protocol*

146.    After an execution time frame is set, a competent physician will conduct a medical

exam. This exam will determine if the inmate suffers from any upper airway obstruction issues or

any anxiety disorders, including claustrophobia. The exam will also include a mask fitting

according to the manufacturer's specifications.

147.    On the day of the execution, the inmate will be placed on the gurney in the

execution chamber.[10]

148.    At the start of the execution, IV lines will be connected to the inmate consistent

with lethal injection executions.

---

[7]    Mr. Taylor objects to the requirement that he provide an alternative method to execute him. That said, he recognizes that it is required under the current law for him to maintain this action and thus does so without prejudice to his objection.

[8]    To the extent Defendants may assert that any of these alleged alternative methods of execution is unavailable or not feasible and readily implemented, Mr. Taylor reserves the right to conduct discovery of Defendants on available alternatives and to amend this pleading to offer additional or other proposed alternative methods of execution.

[9]    Mr. Taylor pleads that, if the alternative methods of execution were administered and functioned properly, they would significantly reduce his substantial risk of severe pain and suffering. Mr. Taylor reserves any and all potential claims that his rights could be violated by maladministration of any such alternative method and notes that the constitutional inquiry is fact-intensive, with review of each proposed alternative execution protocol needed. *Cf. Smith* v. *Hamm*, 2023 WL 4353143, at *8 (M.D. Ala. July 5, 2023) ("And as the Eleventh Circuit has previously indicated, Eighth Amendment method-of-execution claims are fact dependent." (citing *Arthur* v. *Thomas*, 674 F.3d 1257, 1261 (11th Cir. 2012)). He further does not waive his position that capital punishment itself violates the Eighth Amendment to the United States Constitution.

[10]    All steps in this proposal that occur in the execution chamber will be done in a way that permits the statutory witnesses to observe.

149. EKG leads will be connected to the inmate, and an EKG machine will remain in sight of the witnesses. The EKG will be monitored throughout the process.

150. The inmate shall then be allowed to make a final statement.

151. Before and after the final statement, the inmate shall be allowed to be ministered to by his or her spiritual advisor, according to the previously approved plan.

152. Following the final statement, the inmate will receive an intravenous injection of midazolam sufficient to render the inmate unconscious. The preparation and administration of the dose should follow the ADOC's protocol for injecting midazolam during a lethal injection.

153. Midazolam, an analgesic and sedative, is a controlled substance and is readily available in pharmacies throughout Alabama.

154. Five minutes after administration of the midazolam is complete, a member of the execution team will conduct a consciousness check identical to the consciousness check employed in ADOC's lethal injection protocol.[11]

155. In the unlikely event the inmate is still conscious after the first dose of midazolam, a second, identical dose will be administered, followed by a five-minute wait and another consciousness check.

156. If the inmate remains conscious after a second consciousness check, the execution will be postponed for a full medical assessment and determination of what, if anything, went wrong.

---

[11] That check consists of calling out the inmate's name loudly three times. If no response is observed, the execution team member brushes the eyelid of the inmate. If no response is observed, the execution team member performs a trapezius pinch. If no response is observed, the inmate is deemed unconscious.

157.    If the inmate is deemed unconscious, the execution team will place the mask securely on the inmate. Once the mask is secure, the execution will then proceed as provided in the Protocol.

158.    Once the EKG indicates the inmate is dead, the leads should be verified as working correctly to confirm.

159.    After the physician pronounces the time of death, the nitrogen flow should be turned off and the leads removed. After a 60-second wait, the mask can be removed.

### 2.    *Alternative Method Two: Medical-Aid-In-Dying Method Through Oral Dose of Secobarbital or DDMP II Drug Cocktail*

160.    After an execution time frame is set, a competent physician will conduct a direct laryngoscopy to evaluate whether the inmate is able to swallow safely either a 10 gram dose of secobarbital, or a drug cocktail known to medical professionals as "DDMP II" containing 1 gram of diazepam, 50 milligrams of digoxin, 15 grams of morphine sulfate, and 2 grams of propranolol.

161.    On the day of the execution, the inmate will be placed on the gurney in the execution chamber.[12]

162.    EKG leads will be connected to the inmate, and an EKG machine will remain in sight of the witnesses. The EKG will be monitored throughout the process.

163.    The inmate shall then be allowed to make a final statement.

164.    Before and after the final statement, the inmate shall be allowed to be ministered to by his or her spiritual advisor, according to the previously approved plan.

165.    Following the final statement, the inmate will then receive, injected orally, either a 10 gram dose of secobarbital, or a dose of DDMP II.

---

[12]    All steps in this proposal that occur in the execution chamber will be done in a way that permits the statutory witnesses to observe.

166.    Secobarbital, a sedative, is a controlled substance and is readily available in pharmacies throughout Alabama.

167.    Diazepam, commonly known as Valium, is a controlled substance and is readily available in pharmacies throughout Alabama.

168.    Digoxin, which may be used to treat heart conditions, is not a controlled substance and is readily available in pharmacies throughout Alabama.

169.    Morphine sulfate, an analgesic, is a controlled substance and is readily available in pharmacies throughout Alabama.

170.    Propranolol, a beta blocker, is not a controlled substance and is readily available in pharmacies throughout Alabama.

171.    Once the EKG indicates the inmate is dead, the leads should be verified as working correctly to confirm.

172.    After the physician pronounces the time of death, the leads should be removed.

173.    Dr. Charles David Blanke, an Oregon physician who specializes in end-of-life care, discussed secobarbital and the DDMP II drug cocktail in an affidavit filed before another district court in Alabama. *Hamm* v. *Dunn*, No. 17-cv-02083, ECF No. 15-3, Affidavit of Dr. Charles David Blanke (N.D. Ala. Jan. 16, 2018). He stated that he has prescribed both of these in end-of-life care and that they reliably result in death. *Id.* at 1–2. Dr. Blanke also stated that complications with these methods are "extremely rare," and that patients who ingest secobarbital or DDMP II lose consciousness within about five minutes and die within about twenty-five minutes. *Id.* at 1. Dr. Blanke also testified that secobarbital and the drugs that form the DDMP II mixture are readily available in the United States. *Id.*

174.    After hearing evidence, the United States District Court for the Northern District of Alabama previously determined that secobarbital and the DDMP II drug cocktail were proposed alternative methods of execution to lethal injection that "significantly reduce[] a substantial risk of severe pain." *Hamm v. Dunn*, 302 F. Supp. 3d 1287, 1300 (N.D. Ala. 2018), *reversed on other grounds, Hamm v. Comm'r*, 2018 WL 2171185 (11th Cir. 2018); *cf. Wilson v. Hamm*, 2025 WL 794447, at *8 (M.D. Ala. Mar. 12, 2025) (finding that plaintiff had "plausibly alleged" oral ingestion of secobarbital or DDMP II as "readily available alternative method[s] of execution which would significantly reduce the substantial risk of serious harm posed by the Protocol").

## CLAIMS FOR RELIEF

### Claim One:
### (Declaratory and Injunctive Relief)
### Violation of Mr. Taylor's Right to be Free from Cruel and Unusual Punishment
### Under the Eighth and Fourteenth Amendments to the United States Constitution
### (Against All Defendants)

175.    Mr. Taylor incorporates, repeats, and realleges here the foregoing paragraphs of this Complaint, as though fully set forth below.

176.    Mr. Taylor challenges Alabama's Nitrogen Hypoxia Protocol under the Eighth Amendment to the United States Constitution, which is applicable to the State of Alabama through the Fourteenth Amendment. *See Robinson* v. *California*, 370 U.S. 660, 666 (1962); *see also Glossip*, 576 U.S. at 876.

177.    The Eighth Amendment prohibits the infliction of "cruel and unusual punishments." U.S. Const. amend. VIII.

178.    The Eighth Amendment bars states from using "methods [of punishment] that are cruel and unusual," including "punishments in which terror, pain, or disgrace [are] superadded to the penalty of death." *Bucklew* v. *Precythe*, 587 U.S. 119, 130 (2019) (internal quotations omitted); *see also In re Kemmler*, 136 U.S. 436, 447 (1890) ("Punishments are cruel when they

involve torture or a lingering death . . . . It implies there [sic] something inhuman and barbarous . . . something more than the mere extinguishment of life."); *Wilkerson v. Utah*, 99 U.S. 130, 136 (1878) ("[I]t is safe to affirm that punishments of torture . . . and all others in the same line of unnecessary cruelty, are forbidden" by the Eighth Amendment.). Indeed, "punishments the Eighth Amendment was understood to forbid" are those that were "long disused (unusual) forms of punishment that intensified the sentence of death with a (cruel) superadd[ition] of terror, pain, or disgrace." *Bucklew*, 587 U.S. at 133 (internal citations and quotations omitted).

179.    To constitute a cruel and unusual punishment under the Eighth Amendment, an execution method must present a "substantial" or "objectively intolerable" "risk of serious harm." *Baze*, 553 U.S. at 50 (quoting *Farmer* v. *Brennan*, 511 U.S. 825, 842 (1994)).

180.    In order to prevail on an Eighth Amendment claim, "the conditions presenting the risk must be '*sure or very likely* to cause serious illness and needless suffering,' and give rise to 'sufficiently *imminent* dangers.'" *Id.* (quoting *Helling* v. *McKinney*, 509 U.S. 25, 33, 34–35 (1993)). The risk of harm must be high enough to "prevent[] prison officials from pleading that they were 'subjectively blameless for purposes of the Eighth Amendment.'" *Id.* (quoting *Farmer*, 511 U.S. at 842).

181.    The Eighth Amendment only "come[s] into play [if] the risk of pain associated with the State's method is substantial when compared to a known and available alternative." *Bucklew*, 587 U.S. at 134 (citation and internal quotation omitted).

182.    As a result, when a State has chosen an execution method that "cruelly superadds pain to the death sentence," an inmate must establish that there is a "feasible and readily implemented alternative method of execution that would significantly reduce a substantial risk of severe pain and that the State has refused to adopt without a legitimate penological reason." *Id.*

183.    Conscious suffocation violates the Eighth Amendment's prohibition on "cruel and unusual punishment" because it superadds pain and suffering. *Baze*, 553 U.S. at 53 (explaining that depriving a conscious person of oxygen creates a "constitutionally unacceptable risk of suffocation"); *see Bucklew*, 587 U.S. at 147 ("[T]he record evidence even allows the possibility that nitrogen could *increase* the risk of pain."). And the Eleventh Circuit has acknowledged that "a substantial risk of conscious suffocation can create an Eighth Amendment problem regardless of the method of execution being used." *Grayson v. Comm'r*, 121 F.4th 894, 898 (11th Cir. 2024).

184.    A punishment is unusual if it is new or foreign to the common law system, or is a punishment that has fallen out of usage. John F. Stinneford, *The Original Meaning of "Unusual": The Eighth Amendment as a Bar to Cruel Innovation*, 102 Nw. Univ. L. Rev. 1739, 1745–46 (2008).

185.    Alabama's Nitrogen Hypoxia Protocol creates a substantial risk of unconstitutional superadded pain and terror, through conscious suffocation during executions.

186.    Indeed, the State of Alabama's recent executions of Mr. Smith, Mr. Miller, Mr. Grayson, Mr. Frazier, and Mr. Hunt demonstrate that the Protocol inflicts death by nitrogen gas asphyxiation that is agonizingly painful. As observers of Mr. Smith's execution witnessed, he struggled, writhed, and pulled against his restraints for several minutes, followed by additional minutes of deep breathing and gasping. And this was not an outlier—the four executions that have taken place using the Protocol since Mr. Smith's execution resulted in similar observations from those in attendance, with all executed individuals clearly experiencing prolonged agony and tortured breathing.

187.    Alabama's Protocol thus fails to take sufficient steps to prevent the substantial, almost certain risk of pain and suffering associated with the conscious deprivation of oxygen that use of the Protocol evidently involves.

188.    The Protocol does not contain any provision for sedation prior to the administration of nitrogen gas.

189.    The Protocol does not contain any safeguards against the risk that the inmate will vomit during the execution and choke.

190.    The Protocol also does not contain safeguards against the risk of asphyxiation-induced injury, which would leave the inmate brain dead, but still alive.

191.    Inadequate delivery of nitrogen gas or delivery of insufficiently pure nitrogen gas has a high risk of causing asphyxiation-induced brain injury instead of death.  Moreover, if the flow of nitrogen gas were to stop during an execution while an inmate were still alive, it could result in permanent brain damage from oxygen deprivation or a stroke.

192.    Causing such injury and leaving the inmate alive violates the Eighth Amendment.

193.    Moreover, the Protocol does not require that the mask be properly fitted to Mr. Taylor.

194.    A mask that does not fit properly will continue to allow oxygen to enter Mr. Taylor's system, prolonging the nitrogen gas asphyxiation process and the amount of time needed for Mr. Taylor to lose consciousness, thus increasing the amount and duration of pain and terror from conscious asphyxiation in violation of the Eighth Amendment.

195.    The Protocol also does not account for residual oxygen that may remain in the tubing and other parts of the nitrogen execution system.  The more oxygen that is present in the

nitrogen gas delivery system, the longer it will take to induce nitrogen gas asphyxiation and the longer period of consciousness during the process.

196.   This residual oxygen in the system thus increases the risk of a long, painful, terrifying execution in violation of the Eighth Amendment.

197.   Mr. Taylor's feasible and readily implemented alternative methods of execution, described above, would lower the substantial risk of superadded pain and psychological terror associated with the conscious deprivation of oxygen that occurs under Alabama's Protocol.

198.   Alabama's Nitrogen Hypoxia Protocol is an unconstitutional, unusual punishment because it is new to the common law system and amounts to human experimentation.   Execution by nitrogen gas asphyxiation has been carried out a total of six times in human history, all within the previous 20 months.

199.   Mr. Taylor has thus established a valid claim for violation of the Eighth and Fourteenth Amendments, which requires an order declaring the Protocol unconstitutional under the Eighth and Fourteenth Amendments to the United States Constitution and prohibiting Defendants from executing Mr. Taylor using the Protocol. Mr. Taylor will suffer irreparable harm absent an injunction.

**Claim Two:**
**(Declaratory and Injunctive Relief)**
**Violation of Mr. Taylor's Right to be Free from Cruel or Unusual Punishment**
**Under Article I, Section 15 of the Alabama Constitution**
**(Against All Defendants)**

200.   Mr. Taylor incorporates, repeats, and realleges here the foregoing paragraphs of this Complaint, as though fully set forth below.

201.   Mr. Taylor challenges Alabama's Nitrogen Hypoxia Protocol under Article I, Section 15 of the Alabama Constitution.

202. Section 15 prohibits the "inflict[ion]" of "cruel or unusual punishment." Ala. Const. art. I, § 15; *see Lee* v. *State*, 150 So. 164, 166 (Ala. 1933) (requiring "the punishment of death" to be "speedy, and without undue pain or torture," to be permissible under Section 15).

203. As explained above, Alabama's Nitrogen Hypoxia Protocol inflicts death by nitrogen gas asphyxiation that is agonizingly painful and psychologically terrifying, including in that it evidently results in conscious suffocation. This constitutes an unconstitutionally cruel punishment under the Alabama Constitution.

204. As explained above, Alabama's Nitrogen Hypoxia Protocol inflicts death in an unusual manner that is new to the common law system and amounts to human experimentation, as it has been carried out only six times in human history. It thus amounts to an unconstitutionally unusual punishment under the Alabama Constitution.

205. Mr. Taylor has thus established a valid claim for violation of Article I, Section 15 of the Alabama Constitution, which requires an order declaring the Protocol unconstitutional under Article I, Section 15 of the Alabama Constitution and prohibiting Defendants from executing Mr. Taylor using the Protocol. Mr. Taylor will suffer irreparable harm absent an injunction.

**Claim Three:**
**(Declaratory and Injunctive Relief)**
**Violation of Mr. Taylor's Right to Due Process**
**Under the Fourteenth Amendment to the United States Constitution**
**(Against All Defendants)**

206. Mr. Taylor incorporates, repeats, and realleges here the foregoing paragraphs of this Complaint, as though fully set forth below.

207. The Fourteenth Amendment's Due Process Clause provides Mr. Taylor with a procedural due process right to notice and an opportunity to be heard before being deprived "of life, liberty, or property." *See* U.S. Const. amend. XIV, § 1; *Grady* v. *Baker*, 404 F. App'x 450,

46

453 (11th Cir. 2010) (stating that "[p]rocedural due process 'entitles an individual to notice and some form of hearing before state action may finally deprive him or her' of a liberty interest" and a violation of that right may form the basis of a § 1983 claim).

208.    Because the State of Alabama plans to deprive Mr. Taylor of his life using the Protocol, he has a constitutionally protected due process interest in notice of the full, unredacted Protocol—including any modifications thereto—and an opportunity to be heard with respect to it.

209.    The version of the Protocol ADOC released publicly on August 25, 2023 is very substantially redacted. *See Smith* v. *Hamm*, No. 22-cv-00497, ECF No. 104-2 (M.D. Ala. Aug. 25, 2023).

210.    Mr. Taylor has never received an unredacted copy of the Protocol.

211.    Nor did ADOC seek any public input on the Protocol between the time that inmates were permitted to opt in to execution by nitrogen gas asphyxiation in June 2018 and the release of the redacted Protocol on August 25, 2023.

212.    Defendants thus plan to execute Mr. Taylor by means of a Protocol that is largely secret. While the conscious asphyxiation that the Protocol causes is apparent from the prior executions that have used it, details of the Protocol that contribute to that result are hidden from scrutiny.

213.    In failing to provide Mr. Taylor with an unredacted copy of the Protocol, Defendants have effectively prevented him from challenging it by withholding facts and information that are necessary to investigate, support, and pursue potential claims. Mr. Taylor cannot determine whether redacted aspects of the Protocol violate federal or state law, constitute cruel and unusual punishment, or present an avoidable risk of superadded pain and suffering. Nor

47

can he effectively consult experts to investigate these issues without knowing the complete protocol by which the State plans to execute him.

214.   Without providing Mr. Taylor an unredacted copy of the Protocol—including any modifications thereto—and the opportunity to challenge it fully and fairly, Defendants are infringing on Mr. Taylor's constitutional right to due process of law.

215.   Defendants are also interfering with Mr. Taylor's full reservation of the right to challenge any subsequently implemented protocol governing his execution at the time he opted in to execution by nitrogen gas asphyxiation in June 2018.

216.   Mr. Taylor has thus established a valid claim for violation of the Fourteenth Amendment's Due Process Clause, which requires an order directing Defendants to disclose to him an unredacted copy of the Protocol and provide timely notice of any modifications thereto.[13]

### PRAYER FOR RELIEF

For the foregoing reasons, Plaintiff Jarrod Taylor respectfully requests that this Court:

1)   Enter an order declaring Alabama's Nitrogen Hypoxia Protocol unconstitutional under the Eighth and Fourteenth Amendments to the United States Constitution;

2)   Enter an order declaring Alabama's Nitrogen Hypoxia Protocol unconstitutional under Article I, Section 15 of the Alabama Constitution;

3)   Enter an order enjoining Defendants, and anyone acting on their behalf, from executing Mr. Taylor using Alabama's Nitrogen Hypoxia Protocol;

---

[13]   Mr. Taylor brings his present claims based on the redacted version of the Protocol ADOC released publicly on August 25, 2023. He reserves his right to amend his claims if and when an unredacted copy of the Protocol is provided to him.

48

4)      Enter an order enjoining Defendants, and anyone acting on their behalf, from executing Mr. Taylor using any method other than one of the alternatives provided for by his attorneys;

5)      Enter an order directing Defendants to provide Mr. Taylor, through his undersigned counsel, with an unredacted copy of Alabama's Nitrogen Hypoxia Protocol and timely notice of any modifications thereto; and

6)      Grant such other and further relief as this Court deems just and proper.

Dated this 21st day of August 2025.

Respectfully submitted,

Justin D. Lerer

**Paul, Weiss, Rifkind, Wharton & Garrison LLP**

Andrew J. Ehrlich (NY Bar No. 4103909)
(*pro hac vice* admission pending)
Justin D. Lerer (NY Bar No. 4182812)
(*pro hac vice* admission pending)
Kyle T. Sieber (NY Bar No. 5755798)
(*pro hac vice* admission pending)
Natalie A. Reynolds (NY Bar No. 6097885)
(*pro hac vice* admission pending)

1285 Avenue of the Americas,
New York, NY 10019
(212) 373-3000
aehrlich@paulweiss.com
jlerer@paulweiss.com
ksieber@paulweiss.com
nreynolds@paulweiss.com

*Attorneys for Plaintiff Jarrod Taylor*