# IN THE UNITED STATES DISTRICT COURT
# FOR THE MIDDLE DISTRICT OF ALABAMA
# NORTHERN DIVISION

| | |
|---|---|
| RICK BELISLE, )<br><br>      Plaintiff, )<br><br>v. )<br><br>JOHN Q. HAMM, in his official capacity )<br>as Commissioner, Alabama Department of )<br>Corrections, )<br><br>TERRY RAYBON, in his official capacity )<br>as Warden, Holman Correctional Facility, )<br>and )<br><br>JOHN DOES 1-100, in their official )<br>capacities, )<br><br>      Defendants. )<br>_____ ) | Case No. _____<br><br>CAPITAL CASE |

## COMPLAINT

Plaintiff Rick Belisle brings this action under 42 U.S.C. § 1983 against Defendants John Q. Hamm, Commissioner of the Alabama Department of Corrections ("ADOC"), Terry Raybon, Warden at William C. Holman Correctional Facility ("Holman"), and John Does 1–100, seeking declaratory and injunctive relief for violations and threatened violations of Mr. Belisle's rights under the Eighth and Fourteenth Amendments to the U.S. Constitution; Article I, Section 15 of the Alabama Constitution; Article III, Sections 42 and 43 of the Alabama Constitution; and Article I, Section 6 of the Alabama Constitution.

## PRELIMINARY STATEMENT

1.      The State of Alabama is using a novel method of execution that State officials call "nitrogen hypoxia."  With this method of execution, as described in ADOC's current execution

1

protocol (the "Protocol"),[1] the condemned is forced to breathe nitrogen gas and, consequently, is deprived of oxygen until he suffocates to death.

2. Since January 2024, only six death row prisoners (five in Alabama and one in Louisiana) have been executed by nitrogen hypoxia. In each of these executions, the condemned prisoner suffered for exponentially longer than the State claimed he would—experiencing the superadded terror and pain of being suffocated. Indeed, eyewitnesses to the executions described seeing the prisoners convulsing, shaking vigorously, and gasping for breaths.

3. Mr. Belisle is a condemned prisoner at Holman and, although no death warrant has been issued yet, is set to be executed by the State of Alabama by nitrogen hypoxia. Mr. Belisle brings this action now to avoid being denied relief on his constitutional claims on timeliness grounds.[2]

4. By bringing this action, Mr. Belisle is not challenging his underlying conviction or his sentence of death. Instead, he challenges the method and means by which Defendants intend to execute him—by nitrogen hypoxia—and seeks declaratory and injunctive relief to prevent Defendants from violating the federal and state prohibitions on cruel and/or unusual punishment, *see* U.S. Const. amends. VIII and XIV, Ala. Const. art. I, § 15; the Non-Delegation Clause, *see* Ala. Const. art. III, §§ 42, 43; and due process, *see* U.S. Const. amend. XIV, Ala. Const. art. I, § 6.

## JURISDICTION AND VENUE

5. This is an action for a declaratory judgment, injunctive relief, and any other relief available from the Court.

---

[1] *See* Ala. Dep't of Corrs. Execution Procedures (Aug. 2023), https://dpic-cdn.org/production/documents/Al_Lethal_Gas_Execution_Protocol_2023_08.pdf?dm=16939384 90.

[2] Mr. Belisle's application to proceed *in forma pauperis* and certified copy of his prison account statement are forthcoming.

2

6. The Court has subject matter jurisdiction under 42 U.S.C. § 1983 and 28 U.S.C. §§ 1331, 1343(a)(3), 1367(a), 2201(a), and 2202.

7. Venue is proper in the Middle District of Alabama under 28 U.S.C. § 1391(b). ADOC is headquartered in this District, and a substantial part of the events giving rise to the claims made herein took place in this District, including the formulation of the Protocol.

**PARTIES**

8. Plaintiff Rick Belisle, a citizen of the United States and of the State of Alabama, is on death row at Holman.

9. In 2003, Mr. Belisle was convicted for the murder of Joyce Gillian Moore and was sentenced to death.

10. In June 2018, after Alabama passed legislation authorizing executions by nitrogen hypoxia but more than five years before ADOC released a Protocol for that method of execution, and the first developed nationwide, Mr. Belisle was statutorily required to elect his method of execution. He elected to be executed by nitrogen hypoxia, while reserving all rights.

11. Defendant John Q. Hamm is sued in his official capacity as the Commissioner of ADOC. ADOC is the department responsible for administering and exercising the direct and effective control over penal and corrections institutions within the State. At all relevant times, Defendant Hamm has been acting under color of state law and as the agent and official representative of ADOC, pursuant to ADOC's official policies and procedures.

12. Defendant Hamm is responsible for procedures governing the execution of condemned people in Alabama, including developing and implementing the Protocol, and approving changes or amendments to it. *See* Protocol § I.A ("Approval authority for changes or amendments to this protocol is the Commissioner of the Alabama Department of Corrections

. . . .").  Defendant Hamm is statutorily charged with providing the materials necessary to execute condemned persons in Alabama.  *See* Ala. Code § 15-18-82(b) ("It shall be the duty of the Department of Corrections of this state to provide the necessary facilities, instruments, and accommodations to carry out the execution.").  Defendant Hamm also is responsible for ensuring that all prisoners committed to ADOC's custody are treated in accordance with the U.S. and Alabama Constitutions.[3]

13.     Defendant Terry Raybon is sued in his official capacity as the Warden of Holman. At all relevant times, Defendant Raybon has been acting under color of state law and as the agent and official representative of Holman and ADOC, pursuant to ADOC's official policies and procedures.

14.     Defendant Raybon is the statutory executioner of all condemned persons in Alabama.  *See* Ala. Code § 15-18-82 ("The warden of the William C. Holman unit . . . shall be the executioner.").  In that capacity, Defendant Raybon plays a direct role in each execution that takes place at Holman.  Defendant Raybon organizes the execution team.  *See* Protocol § V.  He is responsible for implementing ADOC policies and procedures governing executions, managing the preparations for an execution, and supervising the execution site.  He has specific responsibilities to inventory, inspect, and ensure that the equipment used in executions by nitrogen hypoxia is available and functioning properly. *See id.* §§ V.D.ii, V.D.iv, V.D.v, IX.E.ii, IX.I.v, IX.I.vi, X.A.i, X.A.xii, X.A.xiv, XI.B.iii, XI.B.v.  Defendant Raybon also is responsible for ensuring that all

---

[3] *See, e.g.*, *Farmer v. Brennan*, 511 U.S. 825 (1994) (prison officials have a duty to uphold the Eighth Amendment); *McCarley v. Dunn,* 722 F.Supp.3d 1242, 1255 (N.D. Ala. 2024) ("It is well settled that prison officials must take reasonable measures to guarantee the safety of the inmates" and can be found to violate the Eighth Amendment's prohibition against cruel and unusual punishment); *Wilson v. Dunn*, 618 F.Supp.3d 1253 (N.D. Ala. 2022) (Commissioner of ADOC is required to ensure sufficient prisoner protection pursuant to the Eighth Amendment).

prisoners incarcerated at Holman are treated in accordance with the U.S. and Alabama Constitutions.[4]

15.    Defendants John Does 1–100 are employed by, or contracted with, ADOC to consult with, prepare for, and/or carry out Mr. Belisle's execution.  Mr. Belisle does not know, and the Defendants have not revealed, the identities or positions of John Does 1–100.  They are sued here in their official capacities for the purpose of obtaining declaratory and injunctive relief.

## CASE OR CONTROVERSY

16.    There is a real and justiciable case or controversy between the parties.

17.    Defendants intend to execute Mr. Belisle by nitrogen hypoxia.  Execution by nitrogen hypoxia, as set forth in the Protocol, will subject Mr. Belisle to an objectively intolerable risk of superadded pain.

## EXHAUSTION OF ADMINISTRATIVE REMEDIES

18.    Mr. Belisle has no available administrative remedies.  State law exempts "[t]he policies and procedures of the Department of Corrections for executions of persons sentenced to death . . . from the Alabama Administrative Procedure Act, Chapter 22 of Title 41."  Ala. Code § 15-18-82.1(g).

## FACTUAL ALLEGATIONS

19.    Nitrogen hypoxia is a method of execution that forces the condemned prisoner to breathe nitrogen gas, depriving the prisoner of oxygen and causing asphyxiation.

20.    In September 2014, the Oklahoma House of Representatives invited Professor Michael Copeland—a criminal law professor with no medical background—to speak to the Oklahoma House Judiciary Committee about using nitrogen gas as an alternative to lethal injection

---

[4] *See supra* note 1.

5

in human executions.[5]  Five months later, in February 2015, Oklahoma lawmakers introduced House Bill 1879 to authorize nitrogen hypoxia as a method of execution.  The bill was passed quickly (without expert review), and the Oklahoma governor signed the bill into law just over two months after its introduction.

21.    Since then, four other states have passed legislation permitting nitrogen hypoxia as a method of execution:  Mississippi in 2017, Alabama in 2018, Louisiana in 2024, and Arkansas in 2025.  Only two of those states (Alabama and Louisiana) have used nitrogen hypoxia to execute a condemned prisoner.

22.    The American Veterinary Medical Association has advised that nitrogen gas is "unacceptable" as a euthanasia method in most mammals, because it "create[s] an anoxic environment that is distressing for some species and aversive to [others]."[6]

23.    The U.N. Human Rights Office has expressed serious concerns that the "grave suffering"[7] that nitrogen hypoxia may cause likely "amount[s] to torture under international law."[8]

---

[5] *See* Jack Shuler, *Can Executions Be More Humane?*, The Atlantic (Mar. 20, 2015), www.theatlantic.com/politics/archive/2015/03/can-executions-be-more-humane/388249/.

[6] *AVMA Guidelines for the Euthanasia of Animals*, at 28 (2020), www.avma.org/sites/default/files/2020-02/Guidelines-on-Euthanasia-2020.pdf.  These guidelines are followed by major research universities, including the University of Alabama, Auburn University, and the University of South Alabama.  *See, e.g.*, Univ. of Ala., *Animal Subjects (IACUC)*, https://research.ua.edu/offices/compliance/iacuc/; Auburn Univ., *Regulations & Guidance*, https://cws.auburn.edu/OVPR/pm/compliance/iacuc/regulations; Univ. of S. Ala., *IACUC: Euthanasia of Guinea Pigs, Rabbits, and Swine*, www.southalabama.edu/departments/research/compliance/animalcare/resources/usa.policy.2020.usda.euthanasia.final.draft.pdf.

[7] Press Release, U.N. Hum. Rights, Off. of the High Comm'r, *United States: UN Experts Alarmed at Prospect of First-Ever Untested Execution by Nitrogen Hypoxia in Alabama* (Jan. 3, 2024), www.ohchr.org/en/press-releases/2024/01/united-states-un-experts-alarmed-prospect-first-ever-untested-execution.

[8] *First U.S. Nitrogen-Gas Execution May Constitute Torture—UN Rights Office*, reuters.com (Jan. 16, 2024), www.reuters.com/world/us/first-us-nitrogen-gas-execution-may-constitute-torture-un-rights-office-2024-01-16/.

24.     This is because forced inhalation of nitrogen gas—and the corresponding deprivation of oxygen—causes the condemned prisoner to feel the excruciating and painful sensation of being suffocated to death, *i.e.*, conscious suffocation.

25.     Researchers have studied the effects of low oxygen levels on the human body.  To test the accuracy of pulse oximeters, for example, researchers have conducted controlled laboratory desaturation studies using healthy volunteers.[9]  In these studies, at blood oxygen saturation levels of 60% to 100%, the volunteers reported "symptoms rang[ing] from minimal or mild shortness of breath and visual changes to a full-blown feeling of suffocation."[10]

26.     At blood oxygen saturations of less than 60%, the "majority of people, not yet unconscious, report[ed] significant distress and shortness of breath."[11]

27.     "[B]elow 50% [blood oxygen saturation levels], the cruel nature of administering nitrogen to humans becomes universally apparent. . . .  With sudden loss of an oxygen supply, humans feel significant and distressing shortness of breath.  This is usually accompanied by anxiety, increased heart rate, sweating, sleepiness, visual loss, and a feeling of impending doom as they go in and out of consciousness."[12]

---

[9] Philip E. Bickler & Michael S. Lipnick, *Evidence Against Use of Nitrogen for the Death Penalty*, 331 JAMA 2075, 2075 (2024).

[10] *Id.*

[11] *Id.*

[12] *Hoffman v. Westcott*, No. 3:25-cv-00169-SDD-SDJ (M.D. La. 2025), Mot. for Prelim. Inj., Ex. C, at 77, ECF No. 4-5 (testimony of Philip E. Bickler, MD, PhD & Michael Lipnick, MD before the Kansas House Committee on Judiciary).

28.     Because of these findings, "it is [now] unethical to even study the effects of very low oxygen levels (<60%) on humans."[13] Put differently, scientists "have stopped using desaturations below 60% due to concerns for study participant safety and comfort."[14]

29.     The introduction of oxygen during an execution by nitrogen hypoxia—for example, with an unproperly sealed mask—can prolong these symptoms.  It can extend the time for the condemned prisoner to reach unconsciousness, prolong the painful sensation of suffocation, intensify the impact of the psychological pain, and increase the likelihood that the prisoner enters a persistent vegetative state or experiences a stroke.[15]

30.     The deprivation of oxygen, moreover, can cause nausea and vomiting.  This is particularly relevant in the execution setting, because the condemned prisoner is strapped to a gurney in the supine position.  Vomiting can thus cause the condemned to choke to death.

**A.      Alabama's Use of Nitrogen Hypoxia to Execute Condemned Prisoners**

31.     On March 22, 2018, Alabama Governor Kay Ivey signed legislation authorizing executions by nitrogen hypoxia.  Death-sentenced prisoners in Alabama were permitted to opt in to execution by nitrogen hypoxia within 30 days of June 1, 2018.[16]  Because ADOC had not yet released a protocol for execution by nitrogen hypoxia, prisoners had to make this election without the ability to review and understand the manner by which they would be put to death.

---

[13] Bickler & Lipnick, *supra* note 9.

[14] *Id.*

[15] Russel D. Ogden et al., *Assisted Suicide by Oxygen Deprivation with Helium at a Swiss Right-To-Die Organization*, 36 J. Med. Ethics 174, 174 (2010).

[16] Ala. Code § 15-18-82.1(b)(2).  Those not sentenced to death prior to July 2, 2018 may opt in to nitrogen hypoxia "within 30 days after the certificate of judgment pursuant to a decision by the Alabama Supreme Court affirming the sentence of death." *Id.*

32.     The adoption of the nitrogen hypoxia litigation came against the backdrop of execution by lethal injection—a form of execution used in the State since 2002 and with a long history of troubles.

33.     Alabama is the only state that "has had to halt an execution in progress since 2017."[17]

34.     Since then, Alabama has been no stranger to botched executions by lethal injection.

35.     On February 22, 2018, Alabama spent nearly three hours attempting to execute Doyle Lee Hamm via lethal injection—despite the fact that Mr. Hamm's veins were compromised by cancer—with the IV Team finally abandoning its attempts to find a vein only after puncturing his bladder.

36.     On September 22, 2022, after nearly two hours trying to set IV lines in Alan Eugene Miller, Alabama halted the execution and, after Mr. Miller brought suit, agreed that any future attempts to execute Mr. Miller would be carried out only via nitrogen hypoxia.

37.     On November 17, 2022, Alabama tried but failed to execute Kenneth Eugene Smith by lethal injection, with the IV Team spending nearly an hour and a half trying to set IV lines and stopping only because of the pending expiration of Mr. Smith's death warrant.

38.     On July 28, 2022, the State of Alabama executed Joe Nathan James, an execution that took more than three hours, making it the longest recorded lethal injection execution in U.S. history.[18]

---

[17] The Associated Press, *Alabama Failed to Complete an Execution by Lethal Injection for a Third Time*, NPR (Nov. 19, 2022), www.npr.org/2022/11/19/1137951509/alabama-fails-lethal-injection-3rd-time-capital-punishment.

[18] Ramon Antonio Vargas, *Alabama Subjected Prisoner to 'Three Hours of Pain' During Execution*, The Guardian (Aug. 15, 2022), www.theguardian.com/us-news/2022/aug/15/alabama-joe-nathan-james-jr-execution.

39.    Given Alabama's long history of botched lethal injection executions, in 2018, Mr. Belisle elected nitrogen hypoxia as his preferred method of execution.  Mr. Belisle explicitly reserved his right to challenge the eventual governing Protocol because the Protocol was then only in the developmental stage.  The expectation at the time was that the administration of nitrogen, like the hundreds of accidental carbon monoxide deaths suffered each year, would cause sleepiness, then induce unconsciousness, and only then result in death.  Indeed, in sponsoring the bill for electing nitrogen hypoxia as a method of execution, then Alabama Senator Trip Pittman stated that the method "is very effective" and "[i]nhaling nitrogen leads to instantaneous unconsciousness and, in a moment or so, death."[19]

40.    In August 2023—well after the statutory opt-in deadline—Alabama released a heavily redacted version of the Protocol.[20]  The Protocol, which remains in effect today, describes ADOC's policies and procedures related to executions by nitrogen hypoxia.  As relevant here, the Protocol omits the safeguards necessary to prevent conscious suffocation during an execution and accordingly violates the constitutional bar on cruel and/or unusual form of punishment:

a.    The Protocol does not provide for use of a sedative before delivering the nitrogen gas.[21]  Without a sedative, the condemned prisoner will experience the painful sensation of suffocation for many minutes before falling unconscious.

---

[19] Andrew J. Yawn, *Death Penalty: Firing Squad Out, Nitrogen Gas In* (Apr. 5, 2017), www.montgomeryadvertiser.com/story/news/2017/04/05/death-penalty-firing-squad-out-nitrogen-gas/100082290/.

[20] *See* Ala. Dep't of Corrs. Execution Procedures (Aug. 2023), *supra* note 1, at 15–17.

[21] *Id.*

b.     The Protocol does not require the use of an individualized mask that is designed to securely affix to the specific prisoner's face, or the use of an exit-bag hood in lieu of a mask altogether.[22]  An individualized mask or exit-bag hood helps to keep oxygen out of the nitrogen delivery system.  If oxygen leaks inside the mask, it will extend the time for the condemned to reach unconsciousness, prolong the feeling of suffocation, and increase the risk of a stroke or falling into a vegetative state.[23]

c.     The Protocol does not account for residual oxygen in the tubing and other parts of the nitrogen hypoxia execution system, which carries the same risks as an improperly sealed mask.

d.     The Protocol allows for the condemned prisoner to make a statement after the mask is placed over the face,[24] but does not outline procedures to ensure that the mask does not become dislodged or the seal broken as a result of the that statement.[25]

e.     The Protocol does not provide for a mechanism to remove the carbon dioxide under the mask as the condemned prisoner exhales.[26]  The inhalation of carbon dioxide can also cause the painful sensation of suffocation.

---

[22] *Id.*

[23] Ogden, *supra* note 15, at 174 ("Oxygen deprivation with a face mask is not acceptable because leaks are difficult to control and it may not eliminate rebreathing.  These factors will extend time to unconsciousness and time to death.").

[24] *See* Ala. Dep't of Corrs. Execution Procedures (Aug. 2023), *supra* note 1, at 15–17.

[25] *Id.*

[26] *Id.*

f.     The Protocol does not provide for a mechanism to address the expression of fluids or vomit into the mask, which could cause the condemned prisoner—in the supine position—to choke.[27]

g.     The Protocol does not require a physician, who could stop the execution based on the risk of vomiting or other complications, to be on site during the execution. The Protocol instead states that the "Warden or his/her designee will contact physicians to determine whether they are willing and available to attend the executions and pronounce the condemned inmate's time of death on the date the execution is scheduled." Protocol § V.G.

h.     The Protocol does not specify the purity of the nitrogen or the minimum amount of nitrogen that will be available for uninterrupted use. Less than 100% pure nitrogen can prolong the time for the prisoner to reach unconsciousness. The premature exhaustion of the nitrogen supply could result in a failed execution and put the prisoner in a persisted vegetative state.

i.     The Protocol provides no limits on the time a prisoner being executed may suffer, as it provides that the nitrogen gas should be "administered for (1) fifteen minutes or (2) five minutes following a flatline indication on the EKG, whichever is longer."[28] The risk of prolonged suffering is heightened by the fact that there is no prescribed amount of nitrogen gas

---

[27] *Id.*

[28] *Id.*

12

that is consistently sufficient to cause death, such that the length of the time a person must suffer while being executed remains uncertain.

41.    In addition, the Protocol instructs execution staff to place the inmate on a gurney,[29] and witness accounts confirm that inmates have been strapped down.  Experts have explained that when the chest strap on the gurney is "tightened as intended [it] will undoubtedly impair chest wall and corresponding lung expansion.  In this situation, as the N2 inspirate stimulates the [carotid bodies] to exert their powerful drive to breathe, evoking a pronounced elevation in motor drive to the inspiratory muscles, the desired lung expansion will not be possible, further compounding dyspnoea and air hunger.  Eyewitness reports from all executions attest to the prisoners undergoing a prolonged period—several minutes—of severe respiratory distress including gasping, choking, retching, and moaning as they invariably fought against their restraints."[30]

42.    In January 2024, the State of Alabama executed Kenneth Smith—the first ever execution by nitrogen hypoxia.

43.    Before the execution, the Alabama Attorney General represented that "[i]n all likelihood, hypoxia will cause unconsciousness *in a matter of seconds*, rendering Smith unable to feel pain."[31]  The Attorney General further posited:  "ADOC's nitrogen hypoxia protocol will

---

[29] *Id.*

[30] Damian M. Bailey et al., *Physiology of Nitrogen: A Life or Death Matter*, Experimental Physiology, 10 (2025), https://physoc.onlinelibrary.wiley.com/doi/10.1113/EP092946.

[31] *Smith v. Hamm,* No. 2:23-cv-00656 (M.D. Ala. Dec. 29, 2023), Post-Hr'g Br. in Opp'n to Mot. For Prelim. Inj., at 15, ECF No. 66 (emphasis added); *see Smith v. Hamm*, No. 23A688 (U.S. 2024), Opp'n to App. for Stay of Execution Pending Pet. for Writ of Cert. & Br. in Opp'n, at 22 ("The State's method *will* rapidly lower the oxygen level in the mask, ensuring unconsciousness in seconds.") (emphasis in original).

rapidly reduce oxygen inside the mask, cause unconsciousness *within seconds*, and cause death *within minutes.*"[32]

44.     But eyewitnesses to the execution reported that Mr. Smith started "to convulse and shake vigorously for *about four minutes*. . . .  It was *another two to three minutes* before he appeared to lose consciousness, all while gasping for air to the extent the gurney shook several times."[33]  Mr. Smith was declared dead *twenty-seven minutes* after ADOC initiated the flow of gas.[34]

45.     Prior to Mr. Smith's execution, prison personnel also told the victim's son Mike Sennett that Mr. Smith would "take two or three breaths and he'd be out and gone."[35]  However, according to Mr. Sennett:  "That ain't what happened.  After about two or three breaths, that's when the struggling started.  Other people kept saying he was trying to raise himself up. . . .  With all that struggling and jerking and trying to get off that table, more or less, it's just something I don't ever want to see again."[36]

46.     Mr. Sennett—who also attended the execution of Mr. Smith's co-defendant, John Parker, by lethal injection—contrasted the two executions.  He described the execution of Mr. Parker as "like him going to sleep."[37]

---

[32] *Id.* at 12 (emphasis added).

[33] Marty Roney, *Nitrogen Gas Execution: Kenneth Smith Convulses for Four Minutes in Alabama Death Chamber*, Montgomery Advertiser (Jan. 25, 2024), www.montgomeryadvertiser.com/story/news/local/alabama/2024/01/25/four-minutes-of-convulsions-kenneth-smith-executed-with-nitrogen-gas/72358038007/ (emphasis added).

[34] *Id.*

[35] Nicholas Bogel-Burroughs, *A Select Few Witnessed Alabama's Nitrogen Execution.  This Is What They Saw*, N.Y. Times (Feb. 1, 2024), www.nytimes.com/2024/02/01/us/alabama-nitrogen-execution-kenneth-smith-witnesses.html.

[36] *Id.*

[37] *Id.*

14

47.     Media witness Lee Hedgepeth recounted that Mr. Smith's head moved back and forth violently in the minutes after the execution began.  Though having witnessed four lethal injection executions, Mr. Hedgepeth stated that he had "never seen such a violent reaction to an execution."[38]

48.     Autopsy results confirm that Mr. Smith suffered during the execution.  The autopsy report found edema (or fluid) in the lungs.  When a person experiences panic and then attempts to breathe while the upper airway is obstructed, it can cause fluid to be drawn from blood vessels into the alveoli in the lungs.  Such "negative pressure" pulmonary edema occurs when a person is *conscious*, typically taking between three to five minutes of forced inspiratory efforts to cause any significant pulmonary edema.

49.     Eyewitnesses to the four other nitrogen gas executions that ADOC carried out reported similar observations.

50.     On September 26, 2024, ADOC executed Alan Eugene Miller by nitrogen gas.  Mr. Miller reportedly "shook and trembled on a gurney for *about two minutes*, with his body at times pulling against restraints. . . .  The shaking and trembling was followed by *about six minutes* of periodic gulping breaths before he became still . . . ."[39]   One of the witnesses to Mr. Miller's execution stated that Mr. Miller's "face was twisted and he looked like he was suffering."[40]

---

[38] Nicholas Bogel-Burroughs & Abbie VanSickle, *Alabama Carries Out First U.S. Execution by Nitrogen*, N.Y. Times (Jan. 25, 2024), www.nytimes.com/2024/01/25/us/alabama-nitrogen-execution-kenneth-smith.html.

[39] Michelle Watson & Jason Hanna, *Alabama Has Executed Alan Eugene Miller, the Second Inmate Known to Die by Nitrogen Gas*, CNN (Sept. 26, 2024), www.cnn.com/2024/09/26/us/alan-eugene-miller-alabama-execution/index.html (emphasis added).

[40] Lauren Gill, *"Agony" and "Suffering" as Alabama Experiments with Nitrogen Executions*, BOLTS (Oct. 8, 2024), https://boltsmag.org/alabama-nitrogen-executions/.

51.    On November 21, 2024, ADOC executed Carey Dale Grayson by nitrogen gas. During the ***approximately six minutes*** that it took for Mr. Grayson to lose consciousness, he "tightly clenched his hands, took deep gasps, shook his head vigorously and pulled against his restraints."[41] Media reports described Mr. Grayson's body "twitch as he appeared to let out a brief yell" and his "legs [rising] into the air for about 30 seconds before lowering back down to the gurney."[42]

52.    On February 6, 2025, ADOC used nitrogen gas to execute Demetrius Terrence Frazier. Media reported that, once the nitrogen gas flowed, Mr. Frazier "appeared to struggle to breathe and seemed to clench the muscles in his face. . . . [Mr.] Frazier's legs appeared to tense and raise a few inches off of the gurney, with his head seemingly lolling to the side. His arms seemed to tighten and fists clenched."[43] These visible struggles lasted approximately ***ten minutes*** after the gas began to flow.[44]

53.    And on June 10, 2025, ADOC executed Gregory Hunt by nitrogen gas. According to media reports, approximately a minute into the execution, Mr. Hunt "began gasping and lifted

---

[41] Marty Roney et al., *Carey Dale Grayson Executed in Alabama in Hiker's Murder; 3rd Nitrogen Gas Execution in US*, USA Today (Nov. 21, 2024), www.usatoday.com/story/news/nation/2024/11/21/carey-dale-grayson-execution-alabama-nitrogen-gas/76489211007/.

[42] Asher Redd, *Carey Dale Grayson Dxecuted by Nitrogen Hypoxia*, WKRG News (Nov. 22, 2024), www.wkrg.com/alabama-news/carey-dale-grayson-executed-by-nitrogen-hypoxia/.

[43] Sarah Clifton, *Alabama Executes Demetrius Frazier by Nitrogen Gas for 1991 Murder*, USA Today (Feb. 6, 2025), www.usatoday.com/story/news/local/alabama/2025/02/06/alabama-executes-demetrius-frazier-by-nitrogen-gas-for-1991-murder/78282236007/; *see also* Ivana Hrynkiw, *Alabama Inmate Demetrius Frazier Executed by Nitrogen Gas for 1991 Birmingham Slaying: "Let's Go,"* Al.com (Feb. 6, 2025), www.al.com/news/2025/02/alabama-inmate-demetrius-frazier-set-to-die-by-nitrogen-michigan-governor-hasnt-acted.html.

[44] Greta Cross, *'A Monster': Demetrius Frazier Executed by Nitrogen Gas in Alabama for Woman's 1991 Murder*, USA Today (Feb. 6, 2025), www.usatoday.com/story/news/nation/2025/02/06/demetrius-frazier-execution-death-penalty-pauline-brown-nitrogen-gas/78290700007/.

16

his head.  His entire body began convulsing."[45]  Two minutes later, Mr. Hunt's head "fell back, and he groaned loudly."[46]  He continued to move his head and gasp "intermittently . . . for the next several minutes," taking his final breath approximately *eight minutes* after ADOC is believed to have started the nitrogen gas.[47]

54.  The demonstrated problems with execution by nitrogen hypoxia—and the conscious suffocation that it inflicts—are not limited to Alabama.  On March 18, 2025, the State of Louisiana (which had drafted its execution protocol and designed its nitrogen gas delivery system after Alabama's) executed Jessie Hoffman, Jr. by nitrogen hypoxia.  The observations were no different than in Alabama.  According to eyewitness reports, *about four minutes* after the introduction of the nitrogen gas, Mr. Hoffman began twitching, clenching his hands, moving his head, and attempting to move his arms.  Mr. Hoffman inhaled nitrogen gas for *nineteen minutes* before being pronounced dead.[48]

**C.   This Action**

55.  In August 2003, Mr. Belisle was convicted and sentenced to death.

56.  Before ADOC released the Protocol for execution by nitrogen hypoxia, Mr. Belisle was required by statute, Ala. Code § 15-18-82.1(b)(2), to choose between lethal injection or nitrogen hypoxia as his preferred method of execution.

---

[45] Alex Gladden, *Alabama Executes Gregory Hunt for 1988 Murder of Karen Lane*, Montgomery Advertiser (June 10, 2025), www.montgomeryadvertiser.com/story/news/crime/2025/06/10/alabama-completes-fifth-execution-by-nitrogen-hypoxia/84069592007/.

[46] *Id.*

[47] *Id.*

[48] James Finn & John Simeran, *Louisiana Executes Jessie Hoffman with Nitrogen Gas*, The Times-Picayune (Mar. 18, 2025), www.nola.com/news/courts/jessie-hoffman-nitrogen-gas-louisiana-execution-death-penalty/article_be325356-03bb-11f0-8525-a3855f3523b9.html.

57. On June 28, 2018, Mr. Belisle opted in to execution by nitrogen hypoxia without understanding the manner in which he would be executed. At the time, Mr. Belisle believed that an unknown method could not be worse than the well-documented suffering associated with the ADOC's lethal injection protocol.

58. In electing death by nitrogen hypoxia, Mr. Belisle expressly reserved his rights to future challenges to the yet-unreleased nitrogen hypoxia execution protocol.

## FIRST CAUSE OF ACTION

**Alabama's Nitrogen Hypoxia Protocol Violates the
Constitutional Prohibition on Cruel and Unusual Punishment,
U.S. Const. Amends. VIII and XIV**

59. Mr. Belisle re-alleges and incorporates by reference the allegations set forth above.

60. At all relevant times, Defendants have acted under color of state law.

61. The Eighth Amendment to the U.S. Constitution, as applicable to the State through incorporation into the Due Process Clause of the Fourteenth Amendment, prohibits "cruel and unusual punishments." U.S. Const. amend. VIII.

62. Punishments are unconstitutionally cruel "when they involve torture or a lingering death," *In re Kemmler*, 136 U.S. 436, 447 (1890), or "involve the unnecessary and wanton infliction of pain," *Rhodes v. Chapman*, 452 U.S. 337, 346 (1981). The U.S. Constitution thus forbids "forms of punishment that intensif[y] the sentence of death with a (cruel) superadd[ition] of terror, pain, or disgrace." *Bucklew v. Precythe*, 587 U.S. 119, 133 (2019) (citation and internal quotation omitted) (alterations in original). To establish that a method of execution "superadds" pain to the death sentence, a condemned prisoner must show a feasible and readily implemented alternative method that would significantly reduce a substantial risk of severe pain. *Id*. at 134.

18

63.      Punishments are unusual if they are (1) new or foreign to the common law system, or (2) traditional punishments that have fallen out of usage.  *Id.* at 130-31 (citing John F. Stinneford, *The Original Meaning of "Unusual":  The Eighth Amendment as a Bar to Cruel Innovation*, 102 Nw. Univ. L. Rev. 1739, 1745–46 (2008)).

64.      Execution by nitrogen hypoxia, in particular the accompanying conscious suffocation, is cruel and unusual because it superadds terror and pain during the execution.  A condemned prisoner remains conscious for several minutes, experiencing the terror and painful sensation of suffocation before he passes.  *See Baze v. Rees*, 553 U.S. 35, 53 (2008) (describing the "constitutionally unacceptable risk of suffocation"); *see also Bucklew*, 587 U.S. at 147 ("[T]he record evidence even allows the possibility that nitrogen could ***increase*** the risk of pain." (emphasis added)).  The Eleventh Circuit has acknowledged that "a substantial risk of conscious suffocation can create an Eighth Amendment problem regardless of the method of execution being used . . . ."  *Grayson* v. *Comm'r*, 121 F.4th 894, 898 (11th Cir. 2024).

65.      The Protocol does not contain policies and procedures to ensure that oxygen does not leak into the mask, that all oxygen is removed from the tubing in the nitrogen delivery system before use, or that carbon dioxide does not build up inside the mask.  The lack of these safeguards can prolong the time for the prisoner to reach unconsciousness, further extending the painful sensation of suffocation and increasing the risk that the condemned prisoner enters into a persistent vegetative state or suffers a stroke.

66.      The Protocol does not specify the purity of the nitrogen gas or provide for a minimum amount of nitrogen gas that will be available for uninterrupted use.  Using less than 100% pure nitrogen gas can also extend the time for the prisoner to reach unconsciousness.  And

19

the premature exhaustion of the nitrogen supply increases the risk that the prisoner enters into a persistent vegetative state or suffers a stroke.

67.     The Protocol does not contain policies and procedures to halt the execution if the prisoner vomits in the mask and starts choking. Nor does the Protocol require an on-site physician, who can step in if there are complications.

68.     Execution by nitrogen hypoxia is also unusual. Forced inhalation of nitrogen gas has been used for human executions a total of six times ever—all within the last twenty months, and all with eyewitness descriptions of immense pain and suffering.

69.     Accordingly, executing Mr. Belisle by forced inhalation of nitrogen gas, as described in the Protocol, violates the prohibition on cruel and unusual punishment. U.S. Const. amends. VIII, XIV.

70.     To satisfy the Eighth Amendment's pleading requirement set forth in *Glossip v. Gross*, 576 U.S. 863 (2015), courts require a plaintiff to propose feasible, readily implemented alternative methods of execution that would significantly reduce a substantial risk of severe pain. Mr. Belisle objects to this requirement as a matter of law. Without waiver of this objection, Mr. Belisle proposes the following alternative methods of execution that are feasible, readily implementable, and would significantly reduce the substantial risk of severe pain associated with ADOC's Protocol as it pertains to nitrogen hypoxia.

71.     ***Method one:  Alternative nitrogen gas protocol with midazolam.*** On the day of the execution, the IV team shall set intravenous lines in the condemned prisoner consistent with the Protocol's lethal injection instructions. After being ministered to by his spiritual advisor, if one is designated, and being allowed to make a final statement, the condemned prisoner shall

20

receive an intravenous injection of 500 mg of midazolam.[49]  Midazolam is a short-acting benzodiazepine frequently used for anesthesia induction, seizure management, and procedural sedation.  The drug is routinely used as an anesthesia to produce loss of consciousness before and during surgery.

72.     Midazolam is a controlled substance that can be obtained from a pharmacy.  ADOC possesses and/or can obtain midazolam for use in executions.  Indeed, ADOC used midazolam in the execution of James Osgood earlier this year.[50]  (Mississippi and Oklahoma also used midazolam to execute three condemned persons earlier this year:  Wendell Arden Grissom on March 20, 2025; John Hanson on June 12, 2025; and Richard Gerald Jordan on June 25, 2025.)[51]

73.     Five minutes after the administration of midazolam, a member of the execution team shall conduct a "consciousness check" consistent with the Protocol's lethal injection instructions.[52]

a.     If the condemned prisoner is conscious after the first dose of midazolam, a second, identical dose will be administered, followed by a five-minute wait and another consciousness check.

---

[49] The preparation and administration of the dose should follow ADOC's protocol for injecting midazolam during a lethal injection.

[50] *See* Death Penalty Info. Ctr., *Execution List 2025*, https://deathpenaltyinfo.org/executions/2025 (last visited July 3, 2025) (noting Alabama executed James Osgood on April 24, 2025 using three drugs "beginning with midazolam").  Alabama also used midazolam in three executions in 2024: Jamie Ray Mills on May 30, 2024; Keith Edmund Gavin on July 18, 2024; and Derrick Ryan Dearman on October 17, 2024.  *See* Death Penalty Info. Ctr., *Execution List 2024*, https://deathpenaltyinfo.org/executions/2024 (last visited July 3, 2025).

[51] *Id.*

[52] That check consists of calling out the condemned prisoner's name loudly three times.  If no response is observed, the execution team member brushes the eyelid of the prisoner.  If no response is observed, the execution team member performs a trapezius pinch.  If no response is observed, the condemned prisoner is deemed unconscious.

b.     If the condemned remains conscious after a second consciousness check, the execution will be postponed for a full medical assessment and determination of what, if anything, went wrong.

74.     If the execution team is satisfied the condemned prisoner is unconscious, the designated execution team member(s) shall place the mask securely on the condemned and proceed as provided in the Protocol.

75.     ***Method Two:  Alternative nitrogen gas protocol following inducement of unconsciousness with sevoflorane.***  After allowing the condemned to be ministered to by his spiritual advisor, if one is designated, and make his final statement, designated execution team member(s) shall place a mask securely on the condemned.  Designated execution team member(s) shall then administer an anesthetic dose of sevoflurane to be inhaled through the mask to produce unconsciousness.  Five minutes into the sevoflurane administration, designated execution team member(s) shall conduct a consciousness check.  Sevoflurane should be administered until loss of consciousness is achieved.  After designated execution team member(s) confirm that the condemned has become unconscious, designated execution team member(s) shall cease sevoflurane administration and immediately proceed as provided in the Protocol, administering nitrogen through the mask to induce hypoxia.

76.     Sevoflorane has the same mechanism of action as barbiturate drugs.  It is widely used in medical, dental, and veterinary practices to produce unconsciousness via inhalation.  The equipment required for administration is available from online vendors, and medical expertise is not required to operate it.

22

**SECOND CAUSE OF ACTION**

**Alabama's Nitrogen Hypoxia Protocol Violates the**
**Constitutional Prohibition on Cruel or Unusual Punishment,**
**Ala. Const. Art. I, § 15**

77.     Mr. Belisle re-alleges and incorporates by reference the allegations set forth above.

78.     The Alabama Constitution prohibits the "inflict[ion]" of "cruel or unusual punishment." Ala. Const. art. I, § 15.

79.     Section 15 is broader—and thus more protective—than the federal Eighth Amendment.  Whereas the federal Eighth Amendment prohibits "cruel *and* unusual punishments." U.S. Const. amend. VIII (emphasis added), the Alabama Constitution prohibits "cruel *or* unusual punishment," Ala. Const. art I, § 15 (emphasis added).[53]

80.     Indeed, the Alabama Supreme Court has interpreted Article I, § 15, as to methods of execution, holding they are "*neither* unusual *nor* cruel, within the meaning of the [Alabama] Constitution . . . so long as the death inflicted is speedy, and without undue pain or torture." *Lee v. State*, 150 So. 164, 166 (Ala. 1933) (citing, inter alia, *In re Storti*, 60 N.E. 210 (Mass. 1901) (emphases added);[54] *Turnipseed v. State*, 6 Ala. 664, 665, 1844 WL 301 (Ala. 1844) (interpreting similar language prohibiting the "inflict[ion]" of "cruel or unusual punishment" on an enslaved person and stating that "the statute makes two offences, or rather does not require that the punishment inflicted upon a slave shall be both *cruel* and *unusual* to subject the offender to sanctions: it is enough if the proof show it to be either the one or the other." (emphases in original)); *see also State v. Mata*, 745 N.W. 2d 229, 277-78 (Neb. 2008) (holding Article I, § 9, of the

---

[53] The first four Alabama Constitutions omitted the term "unusual" altogether.

[54] *Storti* upheld electrocution against a state constitutional challenge "*because it is instantaneous*." 60 N.E. at 211 (emphasis added).

23

Nebraska Constitution prohibited execution by electrocution because "a conscious prisoner would suffer excruciating pain from the electrical burning" inherent in the method, which would "unquestionably inflict intolerable pain unnecessary to cause death *in enough executions* so as to present a substantial risk that any prisoner will suffer unnecessary and wanton pain" (emphasis added)).

81.     None of the executions under the Protocol has been "speedy." *Lee*, 160 So. at 166. They have all resulted in more than a minute—and often several minutes—of conscious suffocation.

82.     This conscious suffocation, moreover, constitutes "undue pain or torture." *Lee*, 160 So. at 166; *cf. Carroll v. State*, 215 So. 3d 1135, 1170 (Ala. Crim. App. 2015) (no abuse of discretion in finding heinous, atrocious, or cruel aggravating circumstance present, in part, because the victim "would have been experiencing the feeling of suffocation" as a result of a punctured lung), *vacated on other grounds*, *Carroll v. Alabama*, 581 U.S. 958 (2017) (mem.).

83.     Accordingly, executing Mr. Belisle by forced inhalation of nitrogen gas, as described in the Protocol, violates the prohibition on cruel or unusual punishment under the Alabama Constitution. Ala. Const. art. I, § 15.

### THIRD CAUSE OF ACTION

**The Alabama Legislature Has Improperly Delegated Legislative Authority
in Violation of the Non-Delegation Doctrine, Ala. Const. Art. III, §§ 42, 43**

84.     Mr. Belisle re-alleges and incorporates by reference the allegations set forth above.

85.     The Alabama Constitution divides the power of the state government into "three distinct branches: legislative, executive, and judicial." Ala. Const. art. III, § 42.

86.     The purpose of separation of powers is "to ensure that the government of the State of Alabama may be a government of laws and not individuals. It condemns the usurpation of the

24

power of one branch of government by the other, and has been described as a restriction . . . on the ability of one branch of government to invade the discretion and power vested in another branch." *Ex parte Jackson Hosp. & Clinic, Inc.*, --- So. 3d ---, 2024 WL 4401995, at *11 (Ala. 2024) (quotation marks and citations omitted).  Thus, legislative power rests exclusively in the Legislature, Ala. Const. art. III, § 43, and cannot be delegated away.  *See Folsom v. Wynn*, 631 So. 2d 890, 894 (Ala. 1993) ("It is settled law that the Legislature may not constitutionally delegate its powers, whether the general power to make the law or the powers encompassed within that general power." (citations omitted)); *see also Monroe v. Harco, Inc.*, 762 So. 2d 828, 831 (Ala. 2000) ("Each branch within our tripartite governmental structure has distinct powers and responsibilities, and our Constitution demands that these powers and responsibilities never be shared.").

87.    Nevertheless, the Legislature may "delegat[e] the power to execute and administer the laws, so long as the delegation carries ***reasonably clear standards*** governing the execution and administration." *Folsom*, 631 So. 2d at 894 (emphasis added); *Mistretta v. United States*, 488 U.S. 361, 372 (1989) ("So long as [the legislature] shall lay down by legislative act an intelligible principle to which the person or body authorized to [exercise the delegated authority] is directed to confirm, such legislative action is not a forbidden delegation of legislative power." (internal quotation marks and citation omitted) (alterations is original)).  But when the delegated authority is unfettered, it contravenes the mandate of Article III.

88.    The Alabama Legislature delegated to "the Department of Corrections of this state [the duty] to provide the necessary facilities, instruments, and accommodations to carry out [] execution[s]." Ala. Code § 15-18-82(b).  The statute further explains that "[a] death sentence shall

be executed by lethal injection, unless the person sentenced to death affirmatively elects to be executed by electrocution or nitrogen hypoxia." Ala. Code § 15-18-82.1(a).

89. But neither statutory provision contains any standards to guide ADOC in carrying out an execution by nitrogen hypoxia. They nowhere define "nitrogen hypoxia," nor is the term easily understood by a reasonable person.

90. The statute does not discuss the mechanics of death by nitrogen hypoxia or expectations regarding implementation of the method. For example, the statute does not explain (a) the purity or concentration of nitrogen gas to use, (b) the flow rate of the nitrogen gas, or (c) the equipment to deliver the nitrogen gas (a standard respirator mask, an individualized respirator mask, a hood, or a chamber). *Cf. Hobbs v. Jones*, 412 S.W.3d 844, 854 (Ark. 2012) (Arkansas's execution statute violated the separation of powers doctrine, because it "provides no guidance and no general policy with regard to the procedures for the [Department of Corrections] to implement lethal injections"). Each of these factors impacts the time it takes for the prisoner to reach unconsciousness.

91. Similarly, the statutes contain no safeguards to protect prisoners from arbitrary decision-making and abuses of discretion. All decisions related to executions are left to the discretion of ADOC, which means that executive officials can decrease the flow of the gas, use less than 100% pure nitrogen gas, or use substandard equipment. ADOC, accordingly, does not control whether a particular prisoner will experience a quick death versus prolonged pain and suffering. *Id.* ("It is evident to this court that the legislature has abdicated its responsibility and passed to the executive branch, in this case the [Arkansas Department of Corrections] the unfettered discretion to determine all protocols and procedures . . . for a state execution.").

92. Because ADOC has unfettered discretion in conducting every death sentence, without standards or limitations, the Court should hold Sections 15-18-82 and 15-18-82.1 as an unconstitutional violation of Ala. Const. art. III, §§ 42 and 43.

### **FOURTH CAUSE OF ACTION**

**Alabama Code § 15-18-82.1 Is Unconstitutionally Vague
in Violation of the Due Process Clause, U.S. Const.
amend. XIV and Ala. Const. Art. I, § 6**

93. Mr. Belisle re-alleges and incorporates by reference the allegations set forth above.

94. The Due Process Clause provides that no State "deprive any person of life, liberty, or property, without due process of law." U.S. Const. amend. XIV; *see also* Ala. Const. art. I, § 6 (similar).

95. Due process prohibits the enforcement of impermissibly vague and indefinite statutes. *See Friday v. Ethanol Corp.*, 539 So. 2d 208, 213 (Ala. 1988) ("For [the statute] to constitute a deprivation of due process, it must be so vague and indefinite as really to be no rule or standard at all." (quoting *Exxon Corp. v. Busbee*, 644 F.2d 1030, 1033 (5th Cir. 1981) (internal quotation marks omitted) (alteration in original)); *Op. by the Justices*, 30 So. 2d 14, 17 (Ala. 1947) ("It is a well recognized rule of law that in the enactment of statutes reasonable precision is required. Indeed, one of the prime requisites of any statute is certainty, and legislative enactment may be declared by the courts to be inoperative and void for certainty in meaning."). The Legislature must "establish minimal guidelines to govern law enforcement. Where the legislature fails to provide such minimal guidelines, a [ ] statute may permit a standardless sweep [that] allows policemen, prosecutors, and juries to pursue their personal predilections." *Kolender v. Lawson*, 461 U.S. 352, 358 (1983) (quotation marks and citations omitted) (alterations in original).

96. The "degree of vagueness that the Constitution tolerates—as well as the relative importance of fair notice and fair enforcement—depends in part on the nature of the enactment."

27

*Vill. of Hoffman Estates v. Flipside, Hoffman Estates, Inc.*, 455 U.S. 489, 498 (1982). Given the nature of the penalty here—the administration of a death sentence—Section 15-18-82.1 must be stated with more "clarity and precision." *LabMD, Inc. v. FTC*, 894 F.3d 1221, 1235 (11th Cir. 2018) ("[G]iven the severity of the civil penalties a district court may impose for the violation of a cease and desist order, the order's prohibitions must be stated with clarity and precision.").

97. Alabama Code § 15-18-82.1 is unconstitutionally vague, because it contains no definition, guidelines, or standards for executions by nitrogen hypoxia. Without minimal guidelines, ADOC has "unbridled discretion . . . to discriminate unjustly between different cases of the same kind" when carrying out an execution by nitrogen hypoxia. *Op. by the Justices*, 30 So. 2d at 18.

98. The Court should thus hold Section 15-18-82.1 as an unconstitutional violation of the Due Process Clause, U.S. Const. amend. XIV and Ala. Const. art. I § 6.

### PRAYER FOR RELIEF

WHEREFORE, Mr. Belisle respectfully requests that this Court grant the following relief:

1. Issue an order declaring the Protocol unconstitutional to the extent it provides for executions by nitrogen hypoxia and enjoining Defendants Hamm and Raybon from executing Mr. Belisle via nitrogen hypoxia;

2. Issue an order enjoining Defendants Hamm and Raybon from executing Mr. Belisle using any method other than one of the alternatives provided by his attorneys; and

3. Grant such other relief as this Court deems proper and just.

Respectfully submitted,

/s/ Angelique A. Ciliberti
Angelique A. Ciliberti (ASB: 1504T44C)
Paige H. Sharpe (*pro hac vice* forthcoming)
District of Columbia Bar No. 482433
Anna K. Thompson (*pro hac vice* forthcoming)
District of Columbia Bar No. 989038
Kevin A. Cline (*pro hac vice* forthcoming)
District of Columbia Bar No. 495865
**ARNOLD & PORTER KAYE SCHOLER LLP**
601 Massachusetts Ave. NW
Washington, DC 20001
Tel.: (202) 942-5000
Fax: (202) 942-5999
angelique.ciliberti@arnoldporter.com
paige.sharpe@arnoldporter.com
anna.thompson@arnoldporter.com
kevin.cline@arnoldporter.com

*Counsel for Plaintiff Rick Belisle*

Dated: August 22, 2025