**IN THE UNITED STATES DISTRICT COURT
FOR THE MIDDLE DISTRICT OF ALABAMA
NORTHERN DIVISION**

IN RE:
ALABAMA NITROGEN HYPOXIA
PROTOCOL LITIGATION

Case No. 2:24-cv-00111-ECM

**CAPITAL CASE**

**PLAINTIFFS' MOTION TO COMPEL THE COLLECTION AND PRESERVATION
OF EVIDENCE FROM THE EXECUTION OF JEFFERY LEE**

**Public Version; Redacted Copy**

**ORAL ARGUMENT REQUESTED**

TABLE OF CONTENTS

PRELIMINARY STATEMENT ........................................................................................... 1

BACKGROUND .............................................................................................................. 4

ARGUMENT .................................................................................................................. 7

I.  THE COLLECTION AND PRESERVATION OF EVIDENCE FROM THE
    LEE EXECUTION IS WARRANTED BECAUSE THE EVIDENCE IS
    HIGHLY RELEVANT TO PLAINTIFFS' CLAIMS ........................................... 7

    A.  The Requested Video Evidence from Mr. Lee's Execution Is Highly
        Relevant to the Evaluation of Consciousness, Respiratory Distress,
        and Pain and Suffering During the Execution ........................................... 7

    B.  Courts Have Authorized the Videotaping of Executions to Preserve
        Evidence for Method of Execution Challenges ........................................ 10

    C.  The Requested EEG Evidence from Mr. Lee's Execution Is Directly
        Relevant to the Evaluation of Consciousness and Pain and Suffering
        During the Execution ............................................................................... 14

    D.  EEG-Based Monitoring Has Been Used During Executions and Has
        Yielded Valuable Data Regarding Consciousness .................................... 16

    E.  The Protocol Already Provides for the Use of Pulse Oximeter and
        EKG Devices During Executions, Which Are Capable of Recording
        and Preserving Evidence .......................................................................... 18

    F.  Preservation and Collection of the Requested Evidence Is Particularly
        Appropriate in Light of Prior Attacks on Eyewitness Accounts of
        Executions and the State's Failure to Record and Preserve Evidence
        During Executions .................................................................................... 20

II. MR. LEE HAS CONSENTED TO, AND ALABAMA LAW AND ADOC
    REGULATIONS DO NOT PROHIBIT, THE REQUESTED COLLECTION
    AND PRESERVATION OF EVIDENCE ............................................................ 23

CONCLUSION ............................................................................................................... 27

## TABLE OF AUTHORITIES

**Page(s)**

**Cases**

*Boyd* v. *Hamm*,
2025 WL 2884410 (M.D. Ala. Oct. 9, 2025)......................................................................7, 8, 20, 21

*Brown v. Beck*,
2006 WL 3914717 (E.D.N.C. Apr. 7, 2006)....................................................................16, 17

*Brown v. Beck*,
2006 WL 8502838 (E.D.N.C. Apr. 17, 2006)..................................................................17

*Bucklew* v. *Precythe*,
587 U.S. 119 (2019)..............................................................................................17

*Dawson* v. *State*,
554 S.E.2d 137 (Ga. 2001).......................................................................................13

*Fierro* v. *Gomez*,
No. C-92-1482-MHP (N.D. Cal. Apr. 21, 1992) ................................................................11, 13

*Frazier* v. *Hamm*,
2025 WL 361172 (M.D. Ala. Jan. 31, 2025) ......................................................................20

*Grayson* v. *Hamm*,
2024 WL 4701875 (M.D. Ala. Nov. 6, 2024).....................................................................7, 21

*Grayson* v. *Hamm*,
No. 2:24-cv-00376-RAH-KFP, ECF No. 68 (M.D. Ala. Sept. 19, 2024) .............23, 24, 25, 26

*Hill, Jr.* v. *Head*,
No. 94-V-216 (Ga. Super. Ct. Mar. 2, 2001) ...................................................................12, 13

*Lee* v. *Lovelace*,
2026 WL 1493098 (M.D. Ala. May 28, 2026) ............................................................. *passim*

*Rowsey* v. *Beck*,
No. 5:04-ct-00004-BO, ECF No. 144 (E.D.N.C. Jan. 22, 2007) ...........................................17

*United States* v. *Silva*,
443 F.3d 795 (11th Cir. 2006) ..................................................................................25

*Smith* v. *Hamm*,
No. 2:23-cv-00656, ECF No. 66 (M.D. Ala. Dec. 29, 2023).....................................................4

*Spain* v. *Mountanos*,
690 F.2d 742 (9th Cir. 1982) ..................................................................................27

*Taylor* v. *Lovelace*,
No. 2:25-cv-00678-ECM, ECF No. 18 (M.D. Ala. Oct. 25, 2025) ...................................7, 21

*Petition of Thomas*,
155 F.R.D. 124 (D. Md. 1994)..............................................................................10, 11, 13

*Walker* v. *Humphrey*,
No. 08-v-1088 (Ga. Super. Ct. July 19, 2011).......................................................12, 23, 24, 25

**Statutes**

Ala. Code § 15-18-83(a) ....................................................................................24, 25

Ala. Code § 15-18-83(b) ........................................................................................26

Ala. Laws Act 2018-353 ...........................................................................................4

**Other Authorities**

*A Georgia Killer Is Executed by Injection*, N.Y. Times (Jan. 25, 2002) ......................................13

ADOC Admin. Regs. 005 ........................................................................................26

Eighth Amendment ....................................................................................... *passim*

Black's Law Dictionary (12th ed. 2024)...........................................................................25

Christen Hammock, *Recording the Pain of Others: Lethal Injection's Visibility Problem*, 167 Univ. Pa. L. Rev. 62, 75 (2018) .......................................................................24

Fed. R. Civ. P. 1 ...................................................................................................3

Fed. R. Civ. P. 26.................................................................................................2, 3

Fed. R. Civ. P. 27.................................................................................................3, 10

Fed. R. Civ. P. 34..............................................................................................2, 3, 10

Fed. R. Civ. P. 37..................................................................................................3

Ivana Hrynkiw, *Alabama Executed Inmate Who Killed Gas Station Clerk for $250 in 1997 Robbery*, AL.COM (Sept. 25, 2025), https://www.al.com/news/2025/09/alabama-inmate-who-killed-gas-station-clerk-for-250-in-1997-set-to-be-executed-thursday.html;.......................................................................6

*Karen Lane*, MONTGOMERY ADVERTISER (June 10, 2025), https://www
.montgomeryadvertiser.com/story/news/crime/2025/06/10/alabama-
complete-fifth-execution-by-nitrogen-hypoxia/84069592007/................................................6

Kim Chandler, *Alabama Carries Out Nation's Third Nitrogen Gas Execution on a
Man for a Hitchhiker's Killing*, ASSOC. PRESS (Nov. 22, 2024),
https://apnews.com/article/death-penaltynitrogen-execution-alabama-
09450359e223a9d38a5fb24e87fcfb45..............................................................................5

Lauren Gill, *"Agony" and "Suffering" as Alabama Experiments With Nitrogen
Executions*, THE INTERCEPT (Oct. 8, 2024),  https://.//10/08/alabama-nitrogen-
gas-execution-alan-miller/ ..............................................................................................5

Mark Dershwitz & Thomas K. Henthorn, *The Pharmacokinetics &
Pharmacodynamics of Thiopental as Used in Lethal Injection*, 35 FORDHAM
URB. L.J. 931, 950 (2008) ..........................................................................................17

Marty Roney, *Nitrogen Gas Execution: Kenneth Smith Convulses for Four
Minutes in Alabama Death Chamber*, MONTGOMERY ADVERTISER (Jan. 25,
2024), https://..com//news/local/alabama/2024/01/25/minutes-of-convulsions--
smith-executed-with-nitrogen-gas/72358038007/ ........................................................5

*Nation's Fourth Execution Using Nitrogen Gas*, ASSOC. PRESS (Feb. 6, 2025),
https://apnews.com/article/alabama-execution-demetrius-frazier-nitrogen-gas-
e1b391e1e157f2815be1baa248737778..........................................................................5

Sarah Clifton, *Alabama Executes Anthony Todd Boyd by Nitrogen Gas for 1993
Murder and Kidnapping*, MONTGOMERY ADVERTISER (Oct. 23, 2025, updated
Oct. 24, 2025), https://www.montgomeryadvertiser.com/
story/news/local/alabama/2025/10/23/anthony-todd ..................................................6

Sarah Clifton, *Alabama Executes Demetrius Frazier by Nitrogen Gas for 1991
Murder*, MONTGOMERY ADVERTISER (Feb. 6, 2025),
https://www.montgomeryadvertiser./story/news/2025///02/06/alabama-
executes-demetrius-frazier-by-nitrogen-gas-for-1991-murder//................................5

Sarah Clifton, *Alabama Executed Geoffrey Todd West by Nitrogen Gas for 1997
Murder*, MONTGOMERY ADVERTISER (Sept. 25, 2025),
https://www.montgomeryadvertiser.com/story/news/local/alabama/2025
/09/25/geoffrey-todd-west-executed-for-1997-murder/86178167007/...................6

iii

## PRELIMINARY STATEMENT

On June 11–12, 2026, barring intervention by a court or the Governor of the State of Alabama, Defendants will execute Jeffery Lee by nitrogen gas asphyxiation (the "Lee Execution") using the State of Alabama's nitrogen hypoxia protocol (the "Nitrogen Hypoxia Protocol" or "Protocol"). The State intends to execute each of the Plaintiffs in this consolidated action in the same way, and so Plaintiffs have brought challenges under the Eighth Amendment, and on other grounds, to the Protocol. As this Court has recognized, including in recently denying Mr. Lee's challenge, central issues in these method-of-execution cases include the severity and duration of the pain, suffering, and terror that the condemned experiences while being suffocated to death and the duration of consciousness during which the condemned experiences these sensations. Yet, because of evidence collection decisions solely within the purview of Defendants, previous challenges have relied on limited (or no) data about those issues and instead focused on the credibility of third-party accounts and competing expert opinions. Plaintiffs now bring this motion to collect evidence during the Lee Execution that has not previously been available to the Court—including a video recording of the execution and readings from an electroencephalograph ("EEG")-based device that the Court and the parties' experts can later review. As set forth below, the evidence will bear directly on these central issues, other courts have authorized its collection, Mr. Lee has consented to its collection, and the evidence can be collected without delaying the Lee Execution. Plaintiffs are willing to agree to any limitations on the dissemination and use of the evidence, so long as the evidence is available to this Court and Plaintiffs for purposes of this case. Ultimately, Plaintiffs' cases should not be resolved based on a lack of evidence when such evidence can be readily obtained.

On May 28, 2026, this Court denied Mr. Lee's Eighth Amendment challenge to the Protocol. *Lee* v. *Lovelace*, No. 2:25-cv-680-ECM, 2026 WL 1493098 (M.D. Ala. May 28, 2026).

Central to that Opinion was an analysis of the length of time that condemned inmates remain conscious during executions using the Protocol and of the sensations of air hunger that inmates experience during that period of time, including the extent of the pain and suffering that the Protocol causes. *Id.* at *7–9, *12–16, *18–24 ("The parties agree that the Protocol causes some level of air hunger and corresponding emotional suffering and physiological distress. . . . But the parties bitterly dispute both the severity of the air hunger and how long inmates can experience it. . . . The parties also vigorously contest how long it takes inmates to become unconscious under the Protocol, and relatedly, how long they are capable of experiencing suffering. . . . [T]he Court focuses on what the record supports regarding how long inmates remain conscious and capable of feeling air hunger."). As the Court put it, "the central questions are how much, if any, pain does the Protocol cause, and for how long is the condemned inmate conscious to experience that pain." *Lee* v. *Lovelace*, No. 2:25-cv-680-ECM, 2026 WL 1493092, at *1 (M.D. Ala. May 28, 2026). The evidence that the Plaintiffs seek in this motion will help the Court answer precisely those two questions.

Pursuant to Federal Rules of Civil Procedure 1, 26, and 34, Plaintiffs respectfully ask this Court to order Defendants to collect and preserve, or to permit undersigned counsel to collect and preserve, the following evidence of the Lee Execution: (1) a video recording of Mr. Lee's body framed head to toe with a clear view of Mr. Lee's face; (2) video recordings of each of the front screens of the pulse oximeter and electrocardiogram ("EKG") devices used during the execution; and (3) data from the pulse oximeter and EKG devices used by Defendants during the execution (and a record of the time at which the nitrogen gas is turned on during the execution). Plaintiffs further request that this Court order the attachment of an EEG-based device, such as a Bispectral Index monitoring system ("BIS") or SedLine EEG device, to Mr. Lee's head and the

2

continuous collection and preservation of data recordings from that device.  Undersigned counsel for Plaintiffs are prepared to bear all costs associated with the requested relief.

All of this evidence Plaintiffs seek to have collected and preserved is relevant to, and probative of,[1] the key issues of the extent of pain, suffering, and terror caused by air hunger and the duration of the condemned inmate's consciousness while experiencing it.  A video recording would allow the Court, and expert witnesses using a widely accepted method to evaluate respiratory distress caused by air hunger, to determine the extent of pain, suffering, and terror experienced by the condemned.  Data from an EEG-based device would provide an objective basis for assessing the consciousness of the condemned.  Data from the pulse oximeter and EKG devices would aid in both determinations.  Plaintiffs' requests here are neither novel nor intrusive.  Courts have previously authorized the video recording of executions, and the state of North Carolina included the recording of EEG data in its execution protocol in response to the order of a federal court.  Defendants already use pulse oximeter and EKG devices during executions, but do not preserve the data from them.

Counsel for Plaintiffs[2] conferred with counsel for Defendants about the collection and preservation of evidence that Plaintiffs request in this motion.  Counsel for Defendants represented that Defendants will agree to preserve any pulse oximeter data generated during the upcoming Lee Execution.  But, with respect to the other requested evidence, counsel for

---

[1]  The Federal Rules of Civil Procedure encourage the preservation of relevant, probative evidence.  *See, e.g.*, Fed. R. Civ. P. 1, 27, 37(e).  As part of discovery and "within the scope of Rule 26(b)," a party may request permission to "ent[er] onto designated land or other property possessed or controlled by the responding party [to] inspect, measure, survey, photograph, test, or sample the property or any designated object or operation on it."  Fed. R. Civ. P. 34(a)(2).

[2]  Counsel for Mr. Lee join this motion on behalf of their clients in the consolidated litigation.  Their joinder is in no way a concession that the evidentiary record in the *Lee* case is insufficient for purposes of meeting Mr. Lee's burden on his Eighth Amendment challenge.

3

Defendants represented that ███████████████████████████████████████

███████████████████████████████; Defendants will not agree to the videotaping of

Mr. Lee or of the pulse oximeter and EKG devices during the Lee Execution; and Defendants will

not agree to the use of an EEG-based device during the Lee Execution.

## BACKGROUND

In 2018, the Alabama Legislature authorized execution by nitrogen gas

asphyxiation, an untested and novel method. *See* Ala. Laws Act 2018-353 (S.B. 272).  Five years

later, Alabama publicly released a highly redacted version of the Protocol.  ██████████

████████████████████████████████████████████████████████████████

████████████████████████████████████████████.[3]  In January 2024,

Alabama became the first State in the nation to execute a person, Mr. Kenneth Smith, via this

method.

After the State of Alabama developed the Protocol, Defendants represented that it

would "cause unconsciousness within seconds" of the onset of nitrogen gas flowing into the face

mask, "rendering [the inmate] unable to feel pain." *Smith* v. *Hamm*, No. 2:23-cv-00656, ECF No.

66, at 12, 15 (M.D. Ala. Dec. 29, 2023).  But eyewitness observations of the seven executions that

Defendants have carried out using the Protocol indicate that none of them has proceeded in the

manner Defendants promised.  In each execution carried out using the Protocol, eyewitnesses have

reported that inmates visibly struggled, convulsed, and gasped for air for minutes on end:

---

[3] ████████████████████████████████████████████████████████

████

4

- Mr. Smith writhed so violently that "the gurney shook several times," his eyes rolled back in his head, and he appeared to be "gasping for air."[4] His "legs moved violently up and down several times" throughout the ordeal, and onlookers said he did not "appear[] to lose consciousness" for about five minutes.[5]

- Mr. Alan Miller was visibly "jerking and shaking, struggling against the restraints" for roughly two minutes, gasping so desperately that "his head lifted off the gurney."[6]

- Mr. Carey Grayson appeared to remain conscious for approximately six minutes, during which time he "rocked his head, shook and pulled on the gurney restraints," lifted both of his legs "off the gurney into the air," and "appeared to struggle to try to gesture."[7]

- Mr. Demetrius Frazier "appeared to struggle to breathe," "clench[ed] the muscles in his face," and took "shuddering gasps" for multiple minutes.[8] He also swung his hands and "raised both legs several inches off the gurney."[9]

---

[4] Marty Roney, *Nitrogen Gas Execution: Kenneth Smith Convulses for Four Minutes in Alabama Death Chamber*, MONTGOMERY ADVERTISER (Jan. 25, 2024), https://www.montgomeryadvertiser.com/story/news/local/alabama/2024/01/25/four-minutes-of-convulsions-kenneth-smith-executed-with-nitrogen-gas/72358038007/.

[5] *Id.*; K.S. HB 2782, Statement of Robert M. Grass, at 2 (Feb. 15, 2024).

[6] Lauren Gill, *"Agony" and "Suffering" as Alabama Experiments With Nitrogen Executions*, THE INTERCEPT (Oct. 8, 2024), https://theintercept.com/2024/10/08/alabama-nitrogen-gas-execution-alan-miller/.

[7] Kim Chandler, *Alabama Carries Out Nation's Third Nitrogen Gas Execution on a Man for a Hitchhiker's Killing*, ASSOC. PRESS (Nov. 22, 2024), https://apnews.com/article/death-penalty-nitrogen-execution-alabama-09450359e223a9d38a5fb24e87fcfb45.

[8] Sarah Clifton, *Alabama Executes Demetrius Frazier by Nitrogen Gas for 1991 Murder*, MONTGOMERY ADVERTISER (Feb. 6, 2025), https://www.montgomeryadvertiser.com/story/news/local/alabama/2025/02/06/alabama-executes-demetrius-frazier-by-nitrogen-gas-for-1991-murder/78282236007/.

[9] Kim Chandler, *Alabama Puts Man to Death for a 1991 Murder in the Nation's Fourth Execution Using Nitrogen Gas*, ASSOC. PRESS (Feb. 6, 2025), https://apnews.com/article/alabama-execution-demetrius-frazier-nitrogen-gas-e1b391e1e157f2815be1baa248737778.

- Mr. Gregory Hunt's "entire body began convulsing," he "groaned loudly," and he "continued intermittently gasping" for multiple minutes.[10]

- Mr. Geoffrey West coughed, gasped, "appeared to foam at the mouth," took "choking breaths," and his skin began to turn blue.[11]

- And finally, Mr. Anthony Boyd, in the most recent execution by nitrogen gas asphyxiation using the Protocol, raised his legs off the gurney and took "shuddering, chest-heaving gasps" for minutes on end.[12]  He continued to take "shallow, choke-like breaths that appeared to slightly jolt his head" over fifteen minutes after the nitrogen gas appeared to begin flowing, and he did not flatline until approximately twenty-five minutes after the gas was turned on.[13]  As John Q. Hamm, then-Commissioner of the Alabama Department of Corrections ("ADOC"), acknowledged, Mr. Boyd's execution was the longest yet using the Protocol.

These eyewitness accounts raise grave concerns about executions under the Protocol, but there remains significant dispute between the parties as to whether the Protocol

---

[10]  Alex Gladden, *Alabama Executes Gregory Hunt for 1988 Murder of Karen Lane*, MONTGOMERY ADVERTISER, (June 10, 2025), https://www.montgomeryadvertiser.com/story/news/crime/2025/06/10/alabama-completes-fifth-execution-by-nitrogen-hypoxia/84069592007/.

[11]  Ivana Hrynkiw, *Alabama Executed Inmate Who Killed Gas Station Clerk for $250 in 1997 Robbery*, AL.COM (Sept. 25, 2025), https://www.al.com/news/2025/09/alabama-inmate-who-killed-gas-station-clerk-for-250-in-1997-set-to-be-executed-thursday.html; Sarah Clifton, *Alabama Executed Geoffrey Todd West by Nitrogen Gas for 1997 Murder*, MONTGOMERY ADVERTISER (Sept. 25, 2025), https://www.montgomeryadvertiser.com/story/news/local/alabama/2025/09/25/geoffrey-todd-west-executed-for-1997-murder/86178167007/.

[12]  Sarah Clifton, *Alabama Executes Anthony Todd Boyd by Nitrogen Gas for 1993 Murder and Kidnapping*, MONTGOMERY ADVERTISER (Oct. 23, 2025, updated Oct. 24, 2025), https://www.montgomeryadvertiser.com/ story/news/local/alabama/2025/10/23/anthony-todd-boyd-executed-for-1993-murder-and-kidnapping/ 86850774007/.

[13]  *Id.*

results in superadded pain and suffering, as well as the extent to which those observations should be credited. Indeed, Defendants have criticized—and the Court has questioned—inmates challenging the Protocol for proffering eyewitness observations of nitrogen gas executions as evidence. *See, e.g.*, *Taylor* v. *Lovelace*, No. 2:25-cv-00678-ECM, ECF No. 18, Defs.' Mot. to Dismiss at 20 n.3 (M.D. Ala. Oct. 25, 2025) (asserting that eyewitness accounts are "highly questionable hearsay"); *Grayson* v. *Hamm*, 2024 WL 4701875, at *20 (M.D. Ala. Nov. 6, 2024) (critiquing "hearsay eyewitness accounts of highly questionable value" and "in some respects wrong"); *Boyd* v. *Hamm*, 2025 WL 2884410, at *17 n.34 (M.D. Ala. Oct. 9, 2025) (pointing out that lay witnesses "acknowledged that they do not know when an inmate becomes unconscious").

However, despite the clear relevance and probative value of the requested evidence, Defendants have made the strategic choice not to record or retain any data and information during prior executions. And Defendants have also recently misrepresented what data and information they accidentally collected and preserved during executions.

## **ARGUMENT**

I. **THE COLLECTION AND PRESERVATION OF EVIDENCE FROM THE LEE EXECUTION IS WARRANTED BECAUSE THE EVIDENCE IS HIGHLY RELEVANT TO PLAINTIFFS' CLAIMS**

A. **The Requested Video Evidence from Mr. Lee's Execution Is Highly Relevant to the Evaluation of Consciousness, Respiratory Distress, and Pain and Suffering During the Execution**

Video evidence of the Lee Execution is highly relevant to the Eighth Amendment constitutional issue at the heart of Plaintiffs' lawsuits. For example, video evidence will bear directly on "the severity of the air hunger [the Protocol causes] and how long inmates [remain conscious to] experience it," which this Court has recognized to be the central considerations at issue. *Lee*, 2026 WL 1493098, at *12; *Boyd*, 2025 WL 2884410, at *17 ("A key question [in a

challenge to the Protocol] is how long a person will experience emotional terror and psychological distress when he is executed under [it].").

First, a video recording of an execution by nitrogen gas asphyxiation will assist the trier of fact in determining whether the Protocol superadds pain to a death sentence. It is common sense that directly observing the suffering of the person being suffocated to death is relevant to determining the level of pain that person is experiencing. This sort of direct observation has not before been available to the Court and is of a qualitatively different nature than any other evidence. The direct evidence would also eliminate the need for the Court to rely on, and for the parties to litigate, the probative value of, eyewitness accounts.

Expert testimony before this Court has confirmed the importance of visual observation. *Boyd*, No. 2:25-cv-00529-ECM, ECF Nos. 83, 84, Hr'g Tr. on Mot. for Prelim. Inj., at 117:10–15 (M.D. Ala. Sept. 4–5, 2025) (the "*Boyd* Hearing Transcript" or "*Boyd* Hr'g Tr.") (Dr. Brian McAlary testifying—based on his "observations" of Mr. Grayson's execution, among other things—regarding his opinions as to Mr. Grayson's consciousness during the execution). In Mr. Lee's trial on his challenge to the Protocol (the "*Lee* Trial"), significant evidence was adduced concerning the need to observe inmates during an execution in order to determine consciousness, respiratory distress, and pain and suffering. Dr. Richard Schwartzstein, an expert in the physiology of respiratory dyspnea testified, for example, regarding "signs of respiratory distress that may indicate the presence of dyspnea" and explained that such signs would be "something that we observe. So it's some action or visible element of the patient that we're observing that gives us information about underlying symptoms that they're having or pathophysiologic processes occurring in the patient. . . . [W]e look at a patient who is demonstrating various things to us that are equivalent, that we notice when we have patients who can communicate to us, that is

8

associated, for example, with shortness of breath or air hunger." *Lee*, No. 2:25-cv-00680-ECM, ECF No. 146, Trial Tr., at 46:13–47:7 (M.D. Ala. May 27, 2026) (the "*Lee* Trial Transcript" or "*Lee* Trial Tr."). Dr. Julie Bastarache, an expert in pulmonology and critical care medicine similarly testified that "[d]etermining loss of consciousness is a visual clinical determination, so the only way to determine when someone loses consciousness is to observe them or read a report of someone who has observed them and described what's going on." *Id.* at 140:17–21.

The State's medical expert, Dr. Joseph Antognini, likewise agreed during the *Lee* Trial that, without observation, "there's no way you can tell at what point [individuals] become unconscious vis-à-vis their exposure to nitrogen." *Lee* Trial Tr., ECF No. 149, at 77:19–22; 90:13–16 (agreeing that watching "an execution by nitrogen hypoxia would be helpful to [Dr. Antognini's] opinions as to when an inmate loses consciousness").

A trained expert could make an evaluation of respiratory distress, the observed signs of dyspnea, by watching a video recording of an execution conducted under the Protocol. Plaintiffs attach as Exhibit A a declaration from Dr. Margaret L. Campbell, PhD RN ("Campbell Decl."), an expert in detecting respiratory distress. Ex. A ¶¶ 1–6. As Dr. Campbell explains, dyspnea can be observed by watching for signs of respiratory distress. *Id.* ¶ 7. Such respiratory distress occurs in response to an asphyxial threat, which causes multiple brain areas to activate and generate particular, observable behaviors. *Id.* ¶¶ 10–13. Signs of respiratory distress include, among other things, rapid breathing rate, paradoxical breathing, activation of muscles in the chest and abdomen, accessory muscle use, nasal flaring, grunting, elevated heart rate, restlessness, attempts to sit up if supine, and a fearful facial display. *Id.* ¶¶ 7, 11–13. Dr. Campbell has developed an observational paradigm, the Respiratory Distress Observation Scale ("RDOS"), to guide the evaluation and measurement of observed signs of respiratory distress where the

9

individual is unable to provide a self-report of symptoms, in order to determine the level of respiratory distress the person is experiencing. *Id.* ¶¶ 8–9. RDOS is widely used in clinical and non-clinal settings in the United States and around the world and has been tested to demonstrate scientific reliability and validity. *Id.* ¶¶ 9, 14. RDOS can be used in-person while observing an individual within ten feet to score his or her level of respiratory distress. *Id.* ¶ 17. RDOS can also be used to score an individual's level of respiratory distress based on a video recording of their body, framed head to toe, along with a synchronized continuous heart rate reading from pulse oximeter or EKG devices. *Id.* ¶¶ 18–21.

Collecting video evidence of the Lee Execution, along with the collection of accompanying synchronized heart-rate data, would allow experts such as Dr. Campbell (or others trained to use RDOS) to continuously analyze Mr. Lee's level of respiratory distress throughout the duration of the execution.

In sum, video recording the Lee Execution is warranted to provide direct evidence of the central issue before the Court regarding "the severity of the air hunger [the Protocol causes] and how long inmates [remain conscious to] experience it." *Lee,* 2026 WL 1493098, at *12.

**B.   Courts Have Authorized the Videotaping of Executions to Preserve Evidence for Method of Execution Challenges**

Federal and state courts have previously authorized the kind of narrowly tailored preservation of video evidence of an execution that Plaintiffs seek here to preserve evidence for anticipated method-of-execution challenges.

In *Petition of Thomas*, 155 F.R.D. 124, 126 (D. Md. 1994), the district court granted a prospective habeas petitioner's application, pursuant to Rules 27 and 34, to videotape the cyanide

10

gas execution of a condemned inmate for use in an anticipated Eighth Amendment challenge.[14] The court reasoned that "evidence regarding the length of consciousness and level of pain and suffering of an individual exposed to lethal gas is likely to be relevant to [an] Eighth Amendment inquiry." *Id.* at 126.  The State of Maryland opposed, insisting that the Warden "maintains a privilege in the area of the gas chamber during the conduct to the execution," and that to allow videotaping "would be to infringe upon the 'confidentiality' surrounding such proceedings." *Id.* at 126–27.  The court rejected that justification, finding that any asserted "confidentiality right" did not outweigh the petitioner's "right of access for the purpose of collecting and preserving critical discovery" and that "[a]uthentic privacy interests asserted in the execution process would not be disturbed by the proposed discovery." *Id.* at 127.

In *Fierro* v. *Gomez*, No. C-92-1482-MHP (N.D. Cal. Apr. 21, 1992) (order enabling video recording of execution) (attached as Ex. B), the court ordered—the day before an execution—that petitioner's representative, with the condemned inmate's consent, be permitted to video record the cyanide gas execution to preserve evidence other death row inmates anticipated would be relevant to a future method-of-execution challenge.  The court noted that the defendants "ha[d] contested the reliability of eyewitness reports and recollections concerning the pain and suffering experienced by prisoners executed by lethal gas"—arguing that such accounts "are not competent evidence to the fact that death by lethal gas is slow, painful, and torturous"—and that the plaintiffs' medical experts "ha[d] expressed skepticism about the time estimates [to] loss of consciousness made by [state] correctional staff members." *Id.* at 2.  Because "[e]vidence critical to [the] claim that execution by lethal gas is torturous, painful and cruel [would] be irretrievably

---

[14]   The order became moot, and the execution was not ultimately filmed, because Maryland switched its method of execution from lethal gas to lethal injection before the execution.

lost unless the impending execution [wa]s video tape recorded," the court concluded that such recording was "necessary to preserve material evidence not otherwise available from any other source." *Id.* at 3. The court placed several conditions on the video recording and made clear that prison officials remained "authorized to exercise appropriate security measures, but may not do anything to interfere with" the court's video recording order. *Id.* at 3–4.

In *Walker* v. *Humphrey*, No. 08-v-1088 (Ga. Super. Ct. July 19, 2011) (order granting motion to preserve evidence) (attached as Ex. C), a Georgia state court also authorized the video recording of an execution in order to preserve evidence for an Eighth Amendment method-of-execution challenge to Georgia's lethal injection protocol. In *Walker*, the petitioner requested a court order authorizing the recording of another inmate's execution, as well as the presence of a qualified expert in the execution chamber to monitor his physiological reaction to the injection. *Id.* at 1. The court acknowledged the need to preserve "pertinent evidence" and noted that eyewitnesses "often have varying recollections regarding the details of what happened." *Id.* at 3. The fact that the state proceeded to "attack[] the conclusions suggested by witnesses . . . tend[ed] to underscore the potential relevance of the evidence the petitioner [sought] to gather." *Id.* at 3–4. Furthermore, evidence relating to the execution was, in large part, "solely available through channels of access controlled by the [Warden]," and the state refused to provide this information to the petitioner absent a court order. *Id.* at 2, 5. The court found that the video evidence was "likely to be relevant to a determination regarding whether the method of execution" was unconstitutional and that video recording the execution thus served "the interest of a full and fair presentation of evidence." *Id.* at 5–6.

Another Georgia state court also authorized the video recording of an execution that was scheduled to be conducted by electrocution. *See Hill, Jr.* v. *Head*, No. 94-V-216 (Ga.

12

Super. Ct. Mar. 2, 2001) (order granting motion to preserve evidence) (attached as Ex. D).  Relying on its "powers to regulate discovery as to relevant issues," the court found that, "in the interest of a full and fair presentation of evidence on the issue of the cruelty of electrocution," the request to video record the execution should be granted.  *Id.* at 4–6.[15]

The same reasoning as in these cases applies here, where "the reliability of eyewitness reports and recollections concerning the pain and suffering experienced by prisoners executed by [nitrogen] gas" has also been called into question.  *See Fierro*, Ex. B, at 2.  Just as the court noted in *Thomas*, "evidence regarding the length of consciousness and level of pain and suffering of an individual exposed to [nitrogen] gas is likely to be relevant to [the] Eighth Amendment inquiry" at the heart of Plaintiffs' challenges to the Protocol here.  *See* 155 F.R.D. at 126.

Moreover, Plaintiffs have an even stronger basis for the requested relief than in the federal district court video recording cases discussed above because, unlike the pre-habeas petitioner in *Thomas* or the pre-suit petitioners in *Fierro*, they have active civil litigation challenging the Protocol as unconstitutional.  And the requested evidence "will be irretrievably lost unless the impending execution is video tape recorded."  *Fierro*, Ex. B, at 3.

---

[15]    The inmate was ultimately executed by lethal injection instead, after the Georgia Supreme Court held that "future use of electrocution as a means of executing death sentences in Georgia would violate the prohibitions against cruel and unusual punishment" in Georgia's constitution.  *See Dawson* v. *State*, 554 S.E.2d 137, 139 (Ga. 2001); *see also A Georgia Killer Is Executed by Injection*, N.Y. Times (Jan. 25, 2002), https://www.nytimes.com/2002/01/25/us /a-georgia-killer-is-executed-by-injection.html.  The execution was thus not ultimately filmed.

**C.** **The Requested EEG Evidence from Mr. Lee's Execution Is Directly Relevant to the Evaluation of Consciousness and Pain and Suffering During the Execution**

The collection and preservation of data from an EEG-based device during the Lee Execution is also clearly relevant to Plaintiffs' Eighth Amendment constitutional challenges because it provides objective evidence of consciousness.

To explain the value of EEG evidence, Plaintiffs attach as Exhibit E a declaration from Dr. Mark J. S. Heath ("Heath Decl."), an expert in anesthesiology. Ex. E ¶ 1. As part of Dr. Heath's medical practice providing anesthesiology care during cardiothoracic surgical procedures, he is responsible for ensuring that patients are unconscious for the duration of the surgery. *Id.* ¶ 3. To do this, Dr. Heath uses both direct visual observation of the patient and multiple monitoring devices, including, among others, an EEG monitor and pulse oximeter and EKG devices. *Id.* An EEG monitoring device uses electrodes attached to the skin surface of the forehead to provide a visual representation of real-time electrical activity in the brain, as well as an algorithmically derived value on a scale of zero to one hundred. *Id.* ¶ 4. This electrical activity and numerical reading data provide information on the patient's level of consciousness, allowing Dr. Heath to regulate the patient's anesthetic depth during the surgical procedure. *Id.* A fully conscious/awake patient typically has an EEG reading between ninety and one hundred, while an unconscious person could have a score as low as zero. *Id.*

Dr. Heath is familiar with multiple EEG monitors, including devices manufactured by Medtronic (BIS Monitoring System) and Masimo (SedLine Brain Function Monitoring). *Id.* ¶ 5. These systems use thin, flexible, and electrically conductive sticker sensors (which are similar to EKG stickers) attached to the skin surface of the individual's forehead region. *Id.* ¶ 4. The sensors are on thin plastic leads with an electrical lead that connects to the monitor. *Id.* The sensors are simple to apply and easy to use. *Id.* ¶ 5. BIS and SedLine monitors and sensors are

14

readily available from the same medical device distributors that sell pulse oximeter and EKG devices. *Id.* ¶ 6. BIS and SedLine monitors and sensors are not in any way painful or distressing to the person to whom they are attached and the devices are not more invasive than a pulse oximeter or EKG device (*i.e.*, they are completely non-invasive). *Id.* ¶ 5.

Dr. Heath has visited the execution chamber at William C. Holman Correctional Facility in Atmore, Alabama and has inspected the mask that is used to carry out nitrogen gas asphyxiation executions using the Protocol. *Id.* ¶ 7. In connection with his inspection of the mask, Dr. Heath tried it on and a staff member tightened and adjusted the securing straps on the mask in the same fashion that would be performed in preparing for an execution. *Id.*

Dr. Heath has obtained ███████████████ mask identical to that used by ADOC to carry out executions using the Protocol. *Id.* ¶ 8. He attached BIS monitor sticker sensors to the forehead of a subject, in three separate placement positions, and then put the mask over the face of the subject and tightened it in the same way as ADOC personnel attached it to him. *Id.* In one position of the sticker sensors, they were located outside the seal of the mask. *Id.* ¶ 9. In another position of the sticker sensors, they were located partly under the seal of the mask and partly outside of the seal. *Id.* In the third position of the sticker sensors, they were located under the mask's seal. *Id.* In each of the three placement positions of the sticker sensors, Dr. Heath observed and confirmed that they do not interfere with or compromise the seal of the mask. *Id.* ¶ 8. Based on his experience, Dr. Heath expects that the sticker sensors would work as intended to gather EEG data when placed in any of the three forehead positions. *Id.* ¶ 9.

Dr. Heath also attached the BIS monitor sticker sensors to his own forehead, placed the mask on his head, and strapped it on tightly. *Id.* ¶ 10. He observed that the seal of the mask maintained its integrity while the sticker sensors were on his forehead. *Id.*

15

Furthermore, based on his extensive experience with EEG monitoring devices, Dr. Heath expects that the use of an EEG monitor during a nitrogen gas asphyxiation execution under the Protocol would record data and information that would be relevant and useful to evaluating the changes, and timing of changes, that take place in the electrical activity of the brain during the execution, including with respect to electrical activity in the brain that is correlated with consciousness. *Id.* ¶ 11.[16]

The requested EEG evidence, alongside pulse oximeter and EKG data, would thus be directly relevant to determining the how long inmates remain conscious during an execution under the Protocol.

### D.    EEG-Based Monitoring Has Been Used During Executions and Has Yielded Valuable Data Regarding Consciousness

EEG devices are a proven valuable tool for measuring consciousness, and their use here would likewise generate evidence directly relevant to whether, and for how long, the Protocol subjects condemned persons to conscious suffocation. Thus, collection of EEG data during the Lee Execution would provide additional evidence relevant to the method-of-execution challenges before this Court.

The use of EEG-based monitoring technology, such as BIS or SedLine devices, during executions is not novel. North Carolina incorporated a BIS monitor into its execution protocol beginning in 2006 and used it in multiple lethal injection executions to determine when condemned inmates lost consciousness. The use of a BIS monitor in North Carolina arose directly out of federal court litigation challenging the State's lethal injection protocol. In *Brown v. Beck*,

---

[16]   At the *Lee* Trial, Dr. James Williams also testified that at least one study of rats has shown that EEG readings can provide "an extremely precise end point for us to measure for the onset of unconsciousness and for brain death." *Lee* Trial Tr., ECF No. 147, at 33:9–25.

No. 5:06-CT-3018-H, 2006 WL 3914717, at *8 (E.D.N.C. Apr. 7, 2006), the district court permitted the execution of Willie Brown to proceed only on the condition that Mr. Brown was "in all respects unconscious *prior to* and *at the time of* the administration of any pancuronium bromide or potassium chloride."   In response, the North Carolina Department of Corrections revised its execution protocol to include the use of a BIS monitor to monitor Mr. Brown's consciousness throughout the execution process.  *See Brown* v. *Beck*, No. 5:06-CT-3018-H, 2006 WL 8502838, at *3 (E.D.N.C. Apr. 17, 2006), *aff'd*, 445 F.3d 752 (4th Cir. 2006).  Under the revised protocol, the execution team would not administer the lethal injection until "total unconsciousness of the plaintiff has been verified through the use of the BIS monitor."  *Id.*  The court found that the BIS monitor "has been used reliably for a decade and is used in many anesthesia procedures across the country to determine an individual's level of consciousness" and provided a sufficient "independent check" on Mr. Brown's consciousness.  *Id.*

The BIS data proved highly informative regarding the precise question at issue here: whether and when the inmate lost consciousness during the execution.  *Cf. Bucklew* v. *Precythe*, 587 U.S. 119, 137 (2019) ("[T]he relevant question isn't how long it will take for [the inmate] to die, but how long he will be capable of feeling pain.").  In each execution in which the BIS monitor was used, including those of Brown and Samuel Flippen, the BIS value fell to within the range of zero to ten, indicating a total absence of electrical activity in the brain.  *See* Mem. in Supp. of Defs.' Mot. for Summ. J., *Rowsey* v. *Beck*, No. 5:04-ct-00004-BO, ECF No. 144, at 16 (E.D.N.C. Jan. 22, 2007); Mark Dershwitz & Thomas K. Henthorn, *The Pharmacokinetics & Pharmacodynamics of Thiopental as Used in Lethal Injection*, 35 FORDHAM URB. L.J. 931, 950 (2008).  In each instance, the use of the BIS monitor was straightforward and did not interfere with

17

the execution.  As Dr. Heath's declaration makes clear, the same would be true here.  *See* Ex. E, Heath Decl. ¶¶ 8–10.

E.    **The Protocol Already Provides for the Use of Pulse Oximeter and EKG Devices During Executions, Which Are Capable of Recording and Preserving Evidence**

Plaintiffs request that pulse oximeter and EKG data, which the Defendants already generate during executions under the Protocol but do not fully retain, be fully collected and preserved.  The Protocol expressly provides for the use of pulse oximeter and EKG devices during nitrogen gas asphyxiation executions to monitor the condemned individual, the oxygen saturation level in the individual's blood, and the individual's heart rate.  *See* Protocol § X(A)(iii), (v)–(vi), (xv).  ██████████████████

████████████████████████████████████

████████████████████████████████████

████████████████████████████████████

██████████████████████████    ████████████

████████████████████████████████████

████████████████████████████████████

████████████████████████████████████

████████████████████████████████████

████████████    ████████████████████████

██████████████████████████

Like a video recording of a nitrogen hypoxia execution and EEG data, the data and readings that the pulse oximeter and EKG devices generate during executions is directly relevant to Defendants' claims.  Data from these devices would clearly help the parties, their experts, and the Court understand what a condemned individual experiences during an execution and at what

point he loses consciousness, based upon changes in his blood oxygen saturation and heart rate. In her declaration, Dr. Campbell states that pulse oximeter and EKG data would assist her in making an evaluation of respiratory distress under RDOS. Ex. A, Campbell Decl. ¶ 20. Likewise, in his declaration, Dr. Heath states that he uses a pulse oximeter and EKG as tools to determine whether a patient is conscious. Ex. E, Heath Decl. ¶ 3. The data would thus squarely bear upon "the severity of the air hunger [the Protocol causes] and how long inmates [remain conscious to] experience it." *Lee*, 2026 WL 1493098, at *12.

As this Court noted in *Lee*, while declining to give weight to limited pulse oximeter data presented to the Court in that case, "the parties have not provided the necessary context for the data's interpretation." *Id.* at *10 (explaining that the Court had not been provided with the context and explanation to enable evaluation and interpretation of potentially relevant pulse oximeter data from prior executions, "particularly at what oxygen saturation level consciousness ceases, whether and at what level consciousness begins fading, and how any continuum of consciousness might impact the inmates' experience of any distress"). Providing the necessary context for the pulse oximeter data requires that the data be preserved in the first place. And, in order to fully interpret this data as comprehensively as possible, the necessary context includes a record of what time the nitrogen gas is turned on. Defendants should be required to record this information as well.

For these reasons, the Court should order that the front screen of the pulse oximeter and EKG devices be video-recorded during the duration of the Lee Execution to provide full, continuous evidence of the data and readings that they generate. Defendants also should be

required to preserve the data that these devices generate during the execution[17] and record the time at which the nitrogen gas is turned on during the execution.

> **F.      Preservation and Collection of the Requested Evidence Is Particularly Appropriate in Light of Prior Attacks on Eyewitness Accounts of Executions and the State's Failure to Record and Preserve Evidence During Executions**

This is not the first case to challenge the constitutionality of the Protocol on the grounds that it causes prolonged conscious suffocation and cruelly superadds pain and severe distress to a death sentence. *See, e.g., Lee*, 2026 WL 1493098; *Boyd*, 2025 WL 2884410; *Frazier* v. *Hamm*, 2025 WL 361172 (M.D. Ala. Jan. 31, 2025). Two aspects of those prior litigations, in particular, significantly bolster the need for the highly relevant evidence Plaintiffs seek in this application.

*First*, the available evidence of what actually happens to inmates within the execution chamber—observations from eyewitnesses to prior executions—has repeatedly been criticized as unreliable hearsay. As in *Thomas*, *Fierro*, and *Walker*, Defendants here have attacked the eyewitness accounts of prior nitrogen gas executions and argued that they should not be credited.

For instance, during the *Boyd* Hearing, Defendants' counsel expressly contested the reliability of lay eyewitness accounts regarding the length of time it takes for inmates to lose consciousness, including during the testimony of Mr. Robert Grass, counsel for Kenneth Smith, who witnessed Mr. Smith's execution:

---

[17]    Counsel for Defendants represented that Defendants will agree to preserve any pulse oximeter data generated during the upcoming Lee Execution. Given that Defendants previously misunderstood and misrepresented whether pulse oximeter data was recorded during prior executions, Plaintiffs request that the Court order Defendants to collect and preserve the data that the pulse oximeter devices generate during the execution so that Defendants are bound by the Court's order.

[Counsel]:  And you don't know when Mr. Smith lost consciousness, do you?

[Mr. Grass]:  I do not.

[Counsel]:  And you don't know whether his movements were conscious or unconscious movements, do you?

[Mr. Grass]:  I do not.

*Boyd* Hr'g Tr. at 21:1–6; *see also id.* at 24:15–17; 31:3–14; 42:25–43:12; 58:19–59:11; 64:11–22; 91:23–93:1.  Defendants' counsel did the same in the *Lee* Trial.  *See, e.g.*, *Lee* Trial Tr., ECF No. 146, at 214:4–15.  And Defendants have already begun attacking such evidence in the consolidated actions.  *See, e.g.*, *Taylor*, No. 2:25-cv-00678-ECM, ECF No. 18, Defs.' Mot. to Dismiss at 20, 21 n.3 (characterizing the eyewitness accounts of prior nitrogen gas executions as "mistaken" and "highly questionable hearsay").

Moreover, this Court has also questioned prior plaintiffs' reliance on eyewitness observations and the reliability of such accounts.  *See Boyd*, 2025 WL 2884410, at *17 n.34 ("To the extent [Boyd] relies on lay witnesses' observations of the executions, those witnesses acknowledged that they do not know when an inmate becomes unconscious."); *Grayson*, 2024 WL 4701875, at *20 (characterizing "what eyewitnesses observed during the Smith execution" as "conflicting and inconsistent . . . and in some respects wrong"); *id.* (commenting that "inferences taken from hearsay eyewitness accounts of highly questionable value" in part formed the basis for Dr. McAlary's opinions); *id.* at *22 (highlighting Dr. McAlary's "reliance upon highly questionable hearsay witness accounts"); *see also Lee*, 2026 WL 1493098, at *21 (emphasizing that, while Dr. Bastarache has experience interpreting lay witness observations, when doing so in the clinical setting she "is *also* able to physically observe her patients, so her conclusions are not solely informed by lay observations.  And even if they were, Dr. Bastarache did not testify that she frequently makes *consciousness determinations* based purely on lay observations.").  Granting

21

Plaintiffs' motion here would remedy these concerns, as the parties, their experts, and, most importantly, the Court, would be able to see an execution by nitrogen gas asphyxiation and additional evidence that goes to the determination of consciousness, without needing to rely on purportedly unreliable eyewitness statements.

*Second*, it has become clear that ADOC and Defendants' recordkeeping, or lack thereof, with respect to data and information regarding executions using the Protocol materially impairs Plaintiffs' ability to evaluate and challenge it and the Court's ability to adjudicate those challenges. For example, despite the ability to do so, ADOC and Defendants do not document the real-time pulse oximeter and EKG outputs from the inmate during the execution or specific times when certain actions are taken during executions pursuant to steps in the Protocol. ███████

██████████████████████████████████████████

████████████████████████████████████████. Despite this, Defendants have made the litigation decision not to collect and preserve that data.

Moreover, with respect to the pulse oximeter devices, Defendants' representations that the devices did not retain any recorded data turned out to be false. *See Lee*, No. 2:25-cv-00680-ECM, ECF Nos. 141 at 1–17 (April 23, 2026 Pretrial Conference Transcript), 139 at 1–2 (April 24, 2026 Order to Show Cause). ███████████████████

██████████████████████████████████████████

███████   ██████████████████████████████████

████████████████████████

ADOC and Defendants' failure to record and preserve highly relevant, material evidence particularly impairs Plaintiffs' ability to litigate their challenges to the Protocol because

such information is "solely available through channels of access controlled by the [Warden]" and within Defendants' possession. *See Walker*, Ex. C, at 5.

Accordingly, ordering the collection and preservation of the requested evidence will preserve relevant factual evidence to assist the Court, and expert witnesses that Plaintiffs or Defendants may proffer, in determining "the severity of the air hunger [the Protocol causes] and how long inmates [remain conscious to] experience it." *Lee*, 2026 WL 1493098, at *12.

## II.    MR. LEE HAS CONSENTED TO, AND ALABAMA LAW AND ADOC REGULATIONS DO NOT PROHIBIT, THE REQUESTED COLLECTION AND PRESERVATION OF EVIDENCE

The Court in *Grayson* exercised its discretion to deny a similar motion to video record an execution on several grounds. None of them is a barrier to granting Plaintiffs' motion here.

*First*, the *Grayson* court was concerned with infringing on the condemned inmate's "privacy and dignity," given that he had not provided "a signed document with [his] own signature" "expressly" attesting that he "knowingly and willingly consented to have his execution videotaped." No. 2:24-cv-00376-RAH-KFP, ECF No. 68, at 6 (M.D. Ala. Sept. 19, 2024). But here, Mr. Lee has consented to the collection and preservation of all the evidence requested in this motion. Mr. Lee's consent has been reduced to a declaration, which Plaintiffs will promptly file with the Court once Mr. Lee's attorneys receive the signed copy from Mr. Lee, which they are expecting imminently. Therefore, the "privacy and dignity" concerns in *Grayson* are not applicable here.

Defendants have not raised their own privacy concerns, and such concerns would be unfounded. With respect to privacy, Alabama law already permits the presence of media observers at an execution, and those media observers dutifully report their observations to the public. Plaintiffs are prepared to consent to any restrictions regarding access to the video recording

23

that Defendants propose and the Court orders, so long as counsel and the Court have sufficient access to the recording for purposes of this case.  Such restrictions might include, for example, restricting viewing of the video to a location designated by the State or at the courthouse.[18]

*Second*, the court in *Grayson* denied the video recording motion in part because of its determination that the requested relief would violate Alabama law and ADOC regulations.  No. 2:24-cv-00376-RAH-KFP, ECF No. 68.  Granting Plaintiffs' motion here, however, would not violate Alabama law or ADOC regulations.

In *Grayson*, the court interpreted Alabama law as "expressly limit[ing] those individuals allowed *to witness* an execution to those performing or assisting in the execution itself, the Commissioner of the Alabama Department of Corrections and legal counsel, medical personnel, a spiritual advisor, the prison's chaplain, reporters approved by the warden, up to six 'relatives or friends' requested by the condemned, and up to eight family members of the victim." *Grayson*, No. 2:24-cv-00376-RAH-KFP, ECF No. 68, at 3 (citing Ala. Code § 15-18-83(a)) (emphasis omitted and added).  The law, however, states that only those enumerated individuals

---

[18]  *See, e.g.*, Christen Hammock, *Recording the Pain of Others: Lethal Injection's Visibility Problem*, 167 Univ. Pa. L. Rev. 62, 75 (2018) ("As soon as [the videographer] walked out of the execution chamber, DOC officials took the videotape, put it in an envelope, and placed it under seal at a Fulton County courthouse, where it remains.").  To the extent Defendants are concerned about capturing images of the execution team on video, even in light of Plaintiffs' willingness to agree to any security measures with respect to the video recording, there are practical ways to protect against such disclosure.  *See Walker*, No. 08-V-1088, Mem. of L. in Supp. of Pet.'s Mot. to Compel, at 25 (Ga. Super. Ct. July 14, 2011) ("Just as videographers can record court proceedings without showing the faces or other identifying characteristics of jurors and minor witnesses, a videographer can record Georgia's execution procedures without showing the faces of individuals involved.").  Moreover, the need for this material evidence that goes to the crux of this case outweighs any purported "burden of accommodating" the video equipment in the execution chamber.  *Grayson*, ECF No. 68, at 5; *see also Walker*, Ex. C, at 5 ("[I]t is appropriate for such restrictions to yield to a capital petitioner's reasonably specific request to preserve potential evidence.").  Pictures of the execution chamber also reveal that there is sufficient space to accommodate Plaintiffs' request.  *See, e.g.*, *Grayson*, No. 2:24-cv-00376-RAH-KFP (M.D. Ala. Sept. 6, 2024), ECF No. 50-4.

"may *be present* at an execution"—in other words, only those individuals are permitted to observe the execution in person.  Ala. Code § 15-18-83(a) (emphasis added); s*ee* Black's Law Dictionary (12th ed. 2024) (defining "present" as "[i]n attendance; not elsewhere.").[19]  The statutory language is not ambiguous and should be given its plain meaning.  *See United States* v. *Silva*, 443 F.3d 795, 798 (11th Cir. 2006) ("If the statute's meaning is plain and unambiguous, there is no need for further inquiry." (internal quotations omitted)).

Video recording the Lee Execution as Plaintiffs request would not require the attendance—in the execution chamber or witness rooms—of any individuals not permitted to "be present" during it.  *See Walker*, Ex. C, at 4–5 (citing a similar statutory provision under Georgia law about who "shall be present at the execution of a convicted person" and describing it as governing in-person attendance).[20]  Nor would video recording the Lee Execution require the involvement of any individuals prohibited from witnessing an execution.[21]  And this Court could set any reasonable restrictions Defendants request to ensure that those prohibited individuals could not later view the recording.

Similarly, the Court noted in *Grayson* that ADOC regulations provide that "[e]lectronic, photographic, mechanical, or artistic paraphernalia will not be permitted in the

---

[19]   Because this limited universe of individuals who "may be present at an execution," Ala. Code § 15-18-83(a), does not permit Plaintiffs' experts or the Court, for example, to attend, video recording is the only way to allow those individuals to observe an execution.

[20]   Even if this statutory provision were ambiguous, the context of the surrounding provisions makes clear that "being present" under the statute concerns who is authorized to be in the execution chamber and witness rooms during the execution.  The provisions that list the categories and numbers of witnesses contemplate in-person presence.  *See, e.g.*, Ala. Code § 15-18-83(a)(1) ("The executioner and any persons necessary *to assist in conducting the execution*." (emphasis added)); *id.* § 15-18-83(a)(6) ("Such newspaper reporters *as may be admitted* by the warden." (emphasis added)); *id.* § 15-18-83(b) (prohibiting "prison authorities" from allowing "convict[s]" to witness the execution).

[21]   Alabama law only specifically prohibits "convict[s]" from "witness[ing]" an execution.  Ala. Code § 15-18-83(b).

25

execution *witness room*."   *Grayson*, No. 2:24-cv-00376-RAH-KFP, ECF No. 68, at 3 (citing ADOC Admin. Regs. 005, § V(H)(4) (Dec. 19, 2024)).   But Plaintiffs do not seek to place an electronic device in the witness room.   Rather, the requested relief contemplates setting up inside the *execution chamber* video cameras focused on Mr. Lee and on the pulse oximeter and EKG devices and the attachment of an EEG device to Mr. Lee's head.   The requested relief thus does not run afoul of ADOC's prohibition on the introduction of devices into the witness room.

It is understandable that ADOC regulations strictly control who and what is permitted in the witness room, a place of solemn observation at which the families of the victim and the condemned are both in attendance.   Nothing in the relief requested would detract from the solemnity of that observation.   The regulatory language cited in *Grayson* regarding access to the witness room is part of the ADOC regulation on media access.   The regulation cites "security and privacy interests of the Department, its staff, and the inmates confined in the ADOC institutions," ADOC Admin. Regs. 005, § II, and "disruption of security or operational routines," *id.* § V(A). None of those concerns is implicated here.   As discussed above, the video recording will focus exclusively on Mr. Lee, who has consented to all the relief requested.   Moreover, any privacy or security concerns relating to the recording are completely vitiated because Plaintiffs are willing to agree to any limitations on the dissemination and use of the evidence, so long as the evidence is available to this Court and Plaintiffs for purposes of this case.   And the Protocol already calls for the use of pulse oximeter and EKG devices in the execution chamber during execution.   Plaintiffs simply seek to collect and preserve additional evidence in a professional, even clinical, manner that does not implicate any of the concerns stated in the regulations.

In sum, neither Alabama law nor ADOC regulations prohibit Plaintiffs' requested relief.   Even if they did, "a court, in enforcing federal law, may order state officials to take actions

26

despite contravening state laws." *Spain* v. *Mountanos*, 690 F.2d 742, 746 (9th Cir. 1982). Here, in the interest of upholding the Eighth Amendment and providing Plaintiffs with the ability to obtain necessary, relevant evidence to fully litigate their Eighth Amendment challenges, the Court would be justified in granting the requested relief even if it were prohibited under Alabama law or ADOC regulations, which it is not.

## CONCLUSION

For the foregoing reasons, Plaintiffs respectfully request that this Court grant their motion and order Defendants to collect and preserve or to permit undersigned counsel to collect and preserve evidence from the Lee Execution, specifically (1) a video recording of Mr. Lee's body framed head to toe with a clear view of Mr. Lee's face; (2) video recordings of each of the front screens of the pulse oximeter and EKG devices used during the execution; (3) the collection and preservation of data by the pulse oximeter and EKG devices used by Defendants during the execution (and a record of the time at which the nitrogen gas is turned on during the execution); and (4) the attachment of an EEG-based device, such as a BIS or SedLine device, to Mr. Lee's head and the continuous collection and preservation of data recordings from that device. Plaintiffs further request that the Court order the parties to meet and confer regarding the implementation of its order, and order such provisions as it deems fit to ensure the security of the video recording.

27

Dated: June 1, 2026

Respectfully submitted,

*/s/ David K. Kessler*

David K. Kessler (*pro hac vice*)
Justin D. Lerer (*pro hac vice*)
Kyle T. Sieber (*pro hac vice*)

**Paul, Weiss, Rifkind, Wharton & Garrison LLP**
1285 Avenue of the Americas,
New York, NY 10019
(212) 373-3000
dkessler@paulweiss.com
jlerer@paulweiss.com
ksieber@paulweiss.com

Andrew J. Ehrlich (*pro hac vice*)

**Brief Ehrlich, P.C.**
355 Riverside Drive, 5W
New York, NY 10025
(917) 405-7928
ajehrlich@gmail.com

*Attorneys for Plaintiff Jarrod Taylor*

*/s/ Bernard E. Harcourt*

Bernard E. Harcourt (ASB-4316-A31B)

**Columbia Law School**
435 West 116th Street
New York, New York 10027
Telephone: (212) 854-1997
Fax: (212) 854-7946
Email: beh2139@columbia.edu

*Attorney for Plaintiff David Wilson*

28

*/s/ Samuel R. Diamant*

J. Andrew Pratt (ASB-3507-J)
Joshua Toll (*pro hac vice*)
Kathryn Lehman (*pro hac vice*)
Samuel R. Diamant (*pro hac vice*)

**King & Spalding LLP**
1180 Peachtree Street, NE, Suite 1600
Atlanta, GA 30309
(404) 572-4600
apratt@kslaw.com
jtoll@kslaw.com
klehman@kslaw.com
sdiamant@kslaw.com

*Attorneys for Plaintiff Mark Jenkins*

*/s/ Paige H. Sharpe*

Angelique A. Ciliberti (ASB: 1504T44C)
Paige H. Sharpe (*pro hac vice*)
Anna K. Thompson (*pro hac vice*)
Kevin A. Cline (*pro hac vice*)

**Arnold & Porter Kaye Scholer LLP**
601 Massachusetts Ave. NW
Washington, DC 20001
(202) 942-5000
angelique.ciliberti@arnoldporter.com
paige.sharpe@arnoldporter.com
anna.thompson@arnoldporter.com
kevin.cline@arnoldporter.com

*Attorneys for Plaintiffs Kim Van Pelt,
Rick Belisle, Jimmy Brooks, Jr., Larry
George, and Marcus Williams*

29

**<u>CERTIFICATE OF SERVICE</u>**

I hereby certify that on June 1, 2026, I electronically filed the foregoing redacted version with the Clerk of the Court using CM/ECF system, which will send notification of such filing to counsel of record, and served the unredacted version on counsel of record by email.

*/s/ David K. Kessler*

David K. Kessler