**Public Version; Redacted Copy**

# EXHIBIT E

IN THE UNITED STATES DISTRICT COURT
FOR THE MIDDLE DISTRICT OF ALABAMA
NORTHERN DIVISION

| | |
|---|---|
| IN RE:<br>ALABAMA NITROGEN HYPOXIA<br>PROTOCOL LITIGATION | CASE NO. 2:24-cv-00111-ECM<br><br>CAPITAL CASES |

### Declaration of Dr. Mark J. S. Heath, M.D.

I, Mark J.S. Heath, declare as follows:

1.    I am a medical doctor with an active, licensed, full-time medical practice in New York State. I am board-certified in anesthesiology. I practice full time at the New York-Presbyterian/Columbia Hospital in New York City, where I provide anesthesiology care for cardiothoracic surgical procedures. Core features of my daily practice include obtaining both peripheral and central intravenous (IV) access, the administration of large doses of anesthetic agents, and intensive monitoring to ensure that my patients are both safe and fully anesthetized. On average, I conduct these activities on more than one open-heart surgery every working day. I have been practicing within this specialty for 29 years (3 years of residency, 1.5 years of fellowship in cardiothoracic anesthesiology and research, and 25 years as an attending physician).  I hold an appointment as an Assistant Professor of Clinical Anesthesiology at Columbia University in New York City, where I teach medical

1

students, residents, and fellows, primarily regarding the practice of anesthesiology in cardiothoracic cases.

2.    Because of my extensive experience in anesthesiology, I have been called upon to give expert medical opinion in a number of cases involving the use of lethal injection at both the federal and state level, including with the Federal Bureau of Prisons and in the correctional systems of Alabama, Arizona, Arkansas, California, Delaware, Florida, Georgia, Idaho, Kentucky, Louisiana, Maryland, Mississippi, Missouri, Nevada, Ohio, Oklahoma, Virginia, Tennessee, and Texas, among others. I have previously been involved in the federal litigation surrounding the lethal injection of prisoners Doyle Lee Hamm and David Nelson in the state of Alabama, as well as in the cases of other Alabama prisoners.

3.    In my daily practice in the operating room, I am responsible for ensuring that my patients are unconscious during their surgery. To ensure this, I use both observation of the patient and multiple monitoring devices, including: (1) an EEG (ElectroEncephaloGraph) monitor; (2) an EKG monitor; (3) a pulse oximeter, (4) multiple intravascular pressure monitoring catheters, (5) and temperature probes. I am able to assess the level of consciousness by means of these measurements and observations.

4.    EEG monitoring provides a visual presentation of real-time electrical activity in the brain using electrodes attached to the skin surface of the forehead.  Anesthetic

depth is correlated with characteristic frequencies of brain electrical activity, and EEG monitoring provides guidance in adjusting anesthetic drug doses to achieve a given targeted anesthetic depth. I have used intraoperative EEG monitors manufactured by Medtronic (BIS Monitoring System) and Masimo (SedLine Brain Function Monitoring). In addition to depicting EEG waveforms, these devices provide an algorithmically derived value on a scale of 0 to 100 the correlates with anesthetic depth. Masimo SedLine monitors provide a metric called a Patient State index (PSi), and Medtronic BIS monitors provide a metric called BIS (BiSpectral Index). A fully conscious/awake patient typically has a BIS or Psi score between 90 to 100, whereas an unconscious person could have a score as low as 0, which represents electrical silence and an absence of detectable brain cortical activity. A third system is manufactured by GE HealthCare; it, too, relies on algorithmic processing of electrical signals, but I am not personally familiar with its use. The SedLine and BIS systems use electrically conductive sticker sensors (similar to EKG stickers) attached to the skin surface on the forehead region of the face/head. The sensors are on thin plastic leads that traverse to an electrical lead that connects to the monitor.

5.    The use of BIS and SedLine monitors and sensors is not in any way painful or distressing to the person on whom it is attached. The BIS or SedLine sensor attaches to the patient by means of a strip on the forehead. The strip is simple to

apply and easy to use. The use of a BIS monitor and sensor is not more invasive than the use of an EKG or pulse oximeter, *i.e.*, completely non-invasive.

6.      BIS and SedLine monitors are readily obtainable from the same medical device distributors that provide EKG and pulse oximetry monitors.

7.      During visits/inspections I have held and examined the respirator mask that is used by the Alabama DOC to carry out executions by nitrogen hypoxia. During one of these visits a staff officer placed the mask over my face and tightened/adjusted the securing straps in the same fashion that would be performed during an actual execution. Accordingly, I am familiar with the shape, texture, stiffness, and fit of the mask.

8.      Counsel provided me with ████████████████████████ ███████████, identical to that used by the Alabama DOC to carry out executions by nitrogen hypoxia.  I affixed a BIS monitor sensor to the forehead of one of the attorneys on Plaintiffs' legal team, in the same manner that I would do in the operating room and in a manner that I am confident would be effective.  I then placed the mask over the face of that attorney, and tightened/adjusted the securing straps in the same way as was done to me.  When I first placed the BIS monitor sensors on the attorney's forehead, certain of the sensors were under the seal of the mask, and others were outside the seal.  Because the sensor stickers for SedLine and BIS monitors are very thin and flexible I was confident that they would not interfere with

4

the seal of the mask, and my observation confirmed that.  Any effect of a sensor sticker would be comparable or less significant to the effect of natural human hair that any person or prisoner might have.

9.      To be comprehensive, however, I then did two further demonstrations.  I next placed the BIS monitor sensors higher on the attorney's forehead, so that they would be outside the seal of the mask.  And finally, I placed them lower on the forehead so they fell under the mask's seal.  In each of the three placements, I observed that the seal of the respirator mask was not compromised.  And, I would expect based on my extensive experience with placing monitor sensors on patients in my practice that they would work as intended when placed in any of the three positions that we tested.

10.     Finally, I placed the BIS monitor sensors on my own forehead, and one of Plaintiffs' attorneys assisted me in placing the respirator mask on my own head, and strapped it on tightly.  I observed the integrity of the respirator mask seal while the BIS monitor sensors were on my forehead.

11.     While I cannot be certain, I would expect that a BIS or SedLine monitor, when used during the conduct of an execution by nitrogen hypoxia, would be extremely informative about the changes, and the timing of changes, that take place in the electrical activity of the brain during the onset and maintenance of hypoxia.

12.     I hold these opinions to a high degree of medical certainty, and I reserve the right to modify them should the advent of additional information so warrant.

I declare under penalty of perjury that the foregoing is true and correct to the best of my knowledge and belief.

_____
Mark J. S. Heath, M.D.
May 31, 2026