# IN THE UNITED STATES DISTRICT COURT
## FOR THE MIDDLE DISTRICT OF ALABAMA
### NORTHERN DIVISION

| | |
|---|---|
| In Re: | ) |
| Alabama Nitrogen Hypoxia | ) Case No. 2:24-cv-00111-ECM |
| Protocol Litigation | ) |

## DEFENDANTS' OBJECTION TO MOTION TO COMPEL COLLECTION AND PRESERVATION OF EVIDENCE

Less than nine days before Jeffery Lee's scheduled execution and under the guise of collecting and preserving "evidence," Plaintiffs move this Court to authorize their counsel or, alternatively, require Defendants, DE147:7, 32, to install no fewer than four video cameras and to acquire and train the execution team to use "an EEG-based device, such as a Bispectral Index monitoring system ('BIS') or SedLine EEG device," *id.* at 7-8, 32. They claim that Jeffery Lee, who is to be executed next week, has agreed to their motion. DE151.

Plaintiffs have no constitutional or statutory right to create this evidence. Nor do they have that right under the Federal Rules of Civil Procedure. And allowing them to intrude into a judicial execution with multiple video cameras would not only violate Alabama's protocol and severely threaten the security and solemnity of that proceeding but would also chart a course back to the days of executions as public spectacles, which ADOC has valid penological reason to resist. *See* Ex. A, B. As this

motion is untimely, unreasonable, and quite likely a backdoor attempt to stop Jeffery Lee's execution, Defendants oppose it, and this Court should deny it.

## I.    Relevant provisions of the Federal Rules of Civil Procedure

Rule 26(b)(1) provides that discovery may be taken regarding "any nonprivileged matter that is relevant to any party's claim or defense and proportional to the needs of the case," considering the importance of the issues, the importance of the discovery in resolving those issues, and, critically, "whether the burden or expense of the proposed discovery outweighs its likely benefit." However, "Rule 26's expression of the scope and limits of discovery has evolved over the last thirty years or so." *Noble Roman's Inc. v. Hattenhauer Distrib. Co.*, 314 F.R.D. 304, 307 (S.D. Ind. 2016). "Each time the language and/or structure of the 'Discovery Scope and Limits' section of the rule was changed, it was to rein in popular notions that anything relevant should be produced and to emphasize the judge's role in controlling discovery." *Id.*

"While proportionality has always been pertinent to the review of the scope of discovery, the 2015 amendments highlight its significance." *Mannina v. Dist. of Columbia*, 334 F.R.D. 336, 339 n.4 (D.D.C. 2020). Indeed, relocation of the "proportionality factors to Rule 26(b)(1)" was done "to 'encourage judges to be more aggressive in identifying and discouraging discovery overuse' and to make

proportionality considerations unavoidable." *United States ex rel. Shamesh v. CA, Inc.*, 314 F.R.D. 1, 8 (D.D.C. 2016) (citations omitted).

In addition, "the relevance standard of Rule 26 is not without bite, and will not allow exploration of matter which does not presently appear germane on the theory that it might conceivably become so." *Prasad v. George Wash. Univ.*, 323 F.R.D. 88, 91 (D.D.C. 2017) (cleaned up). That is because "[t]he role of discovery…is to find support for properly pleaded claims, not to find the claims themselves." *Torch Liquidating Tr. v. Stockstill*, 561 F.3d 377, 392 (5th Cir. 2009). A party "cannot lead a fishing expedition to find material that might possibly become relevant to an as-yet unpleaded claim." *United States v. All Assets Held at Bank Julius Baer & Co.*, 202 F. Supp. 3d 1, 7 (D.D.C. 2016).

Rule 34(a)(1) "governs the production of documents in civil matters and requires that a party produce documents in response to an RFP when those documents are in the responding party's possession, custody, or control, and the RFP is within the scope of Fed. R. Civ. P. 26(b)." *Donahey v. Caughman*, 3:21-cv-00938, 2022 WL 19333343, at *2 (N.D. Fla. Apr. 13, 2022) (citation modified). "'A document or thing is not in the possession, custody, or control of a party if it does not exist. Production cannot be required of a document no longer in existence ***nor of one yet to be prepared***.'" *Id.* (quoting 8B CHARLES A. WRIGHT, ARTHUR R. MILLER & RICHARD L. MARCUS, FEDERAL PRACTICE AND PROCEDURE § 2210 (3d ed. June 2024 update))

3

(emphasis added); *see also Shcherbakovskiy v. Da Capo Al Fine, Ltd.*, 490 F.3d 130, 138 (2d Cir. 2007) ("[A] party is not obliged to produce, at the risk of sanctions, documents that it does not possess or cannot obtain."); *Advanced Cable Ties, Inc. v. American Elite Molding, LLC*, 3:18-cv-02035, 2019 WL 13280288, at *5 (N.D. Fla. Feb. 7, 2019) ("As a matter of logic and physics, a party cannot be in possession and control of a document that does not exist.").

"Furthermore, a party is not obligated to create documents in response to a request for production." *Advanced Cable Ties*, 2019 WL 13280288, at *5; *see also Leonard v. Martin*, 38 F.4th 481, 490 & n.7 (5th Cir. 2022) (as to Rule 45) ("Accordingly, to the extent that the subpoena requires Turnipseed to do more than simply produce documents already in existence, it imposes an undue burden on him."); *Mir v. L-3 Comms. Integrated Sys., L.P.*, 319 F.R.D. 220, 227 (N.D. Tex. 2016) ("As a general matter, a party cannot invoke Rule 34(a) to require another party to create or prepare a new or previously non-existent document solely for its production.").

Rule 34(a)(2) governs requests for "entry onto designated land or other property possessed or controlled by the responding party, so that the requesting party may inspect, measure, survey, photograph, test, or sample the property or any designated object or operation on it." The request must state a "reasonable time, place, and manner" for any inspection. *Id.* "In accordance with Rule 26(b), a court

evaluating a request to permit entry under Rule 34 will consider the relevance of the inspection and balance the value of the information sought with the burden of the proposed intrusion." *Quiterio v. QBE Specialty Ins. Co.*, 8:16-cv-01895, 2019 WL 5390865, at *1 (M.D. Fla. Apr. 18, 2019).

## II.    The motion is untimely and prejudicial to Defendants.

Before addressing Plaintiffs' arguments, Defendants note that the motion is grossly untimely and that ordering Defendants to comply would force Defendants to cancel the execution this week.

A recap of the timeline is in order. Plaintiffs (with the exception of David Wilson) and Jeffery Lee filed their complaints on or about August 22, 2025. As the complaints all raised Eighth Amendment claims concerning ADOC's nitrogen hypoxia protocol, and many overlapped in other areas, the parties moved for their cases to be consolidated for case management and discovery purposes. *E.g.*, Joint Motion to Consolidate, *Van Pelt v. Hamm*, 2:25-cv-00671 (M.D. Ala. Sept. 19, 2025), ECF25. This Court took all eight cases and scheduled a motions hearing for January 14, 2026. *E.g.*, Order, *Van Pelt v. Hamm*, 2:25-cv-00671 (M.D. Ala. Dec. 12, 2025, 2025), ECF31. During the hearing, counsel for Defendants informed the court and counsel that the State would be moving for Lee's execution in the near future. The Court dismissed many of the plaintiffs' claims and consolidated the cases under *Van*

*Pelt v. Hamm*. Order, *Van Pelt v. Hamm*, 2:25-cv-00671 (M.D. Ala. Jan. 15, 2026), ECF34.

The Court then ordered a status conference only in *Lee v. Hamm* for January 28 to discuss how that case should proceed in light of the State's forthcoming execution motion. Order, *Van Pelt v. Hamm*, 2:25-cv-00671 (M.D. Ala. Jan. 23, 2026), ECF38. Following that hearing, *Lee* was deconsolidated from *Van Pelt* and scheduled for trial in April 2026. Order, *Van Pelt v. Hamm*, 2:25-cv-00671 (M.D. Ala. Jan. 29, 2026), ECF40.

On February 9, the State filed an execution motion in the Alabama Supreme Court. Exhibit, *Lee v. Hamm*, 2:25-cv-00680 (M.D. Ala. Feb. 9, 2026), ECF47-1. That court granted the motion on April 2. Exhibit, *Lee v. Hamm*, 2:25-cv-00680 (M.D. Ala. Apr. 2, 2026), ECF106-1. On April 15, Governor Ivey scheduled Lee's execution for June 11-12. Exhibit, *Lee v. Hamm*, 2:25-cv-00680 (M.D. Ala. Apr. 15, 2026), ECF127-1.

It should be noted at this point that Lee's counsel also represent five of the consolidated plaintiffs: Rick Belisle, Jimmy Brooks, Jr., Larry George, Kim Van Pelt, and Marcus Williams. In other words, counsel for Plaintiffs were aware:

- on January 14 that the State was planning to move for Lee's execution,

- on February 9 that the State had so moved,

- on April 2 that the Alabama Supreme Court had granted the motion, and

6

- on April 15 that the execution would be June 11-12.

Lee's upcoming execution date should have been a surprise to no one. And yet, Plaintiffs waited until a quarter of midnight on Monday, June 1—practically speaking, nine days before the execution—to file the motion at issue. Granting this motion would require ADOC to purchase several pieces of new equipment, figure out how to set it up without affecting the movement of the execution team or impeding the view of witnesses, and train team members how to use it, now with less than a week until the execution—simply not feasible, even if ADOC were otherwise inclined to comply with the request. If this is not an attempt by Lee's counsel to stay their client's execution after this Court denied relief, then it is certainly untimely.

Chief Judge Huffaker was presented with a similar, though not as egregiously untimely, motion in *Grayson v. Hamm*, 2:24-cv-00376. In that case, death-row inmate Carey Grayson (who, like Lee and Plaintiffs, filed a challenge to ADOC's nitrogen hypoxia protocol) requested permission to videotape the nitrogen hypoxia execution of Alan Miller. The motion was filed September 6, 2024, while Miller was scheduled to be executed September 26. The motion was denied for multiple reasons, but pertinent here:

> The Court also considers Plaintiff's delay in filing the Motion. The Court held a telephone status conference with the parties on August 23, 2024. (Doc. 33.) At that conference, Plaintiff made no mention of his desire to videotape the Miller execution. Instead, Plaintiff waited to file the Motion until three weeks later, in the same month as the scheduled Miller execution—the intended subject of the Motion. The little amount

7

of time that Plaintiff allowed between filing the Motion and Mr. Miller's execution is concerning to the Court, as there appears to be a consistent pattern of unnecessary delay by the Plaintiff.

Ex. C at 6. Here, the "unnecessary delay" is far worse. Plaintiffs could have filed this motion in late January. They could have done so in February after the State sought Lee's execution. Instead, they waited until *nine days* prior to the execution to seek this extraordinary discovery. As the motion is untimely, and as granting the motion would force ADOC to call off the scheduled execution, the Court should deny it.

### III.   Alabama law and ADOC policy prohibit the requested relief.

Should the Court look beyond the untimeliness of the motion, Defendants object because the relief Plaintiffs seek is prohibited by Alabama law and ADOC policy.

Plaintiffs request that this Court order ADOC to do the following (or, in the alternative, allow Plaintiff's counsel to do the following):

1. Video record Lee's body, head to toe, during his execution, with a clear view of his face.

2. Video record the screens of each pulse oximeter and EKG device used during the execution.

3. Collect data from the pulse oximeters and EKG devices used.

4. Record the time the nitrogen begins to flow.

5. Attach an EEG-based device, such as a BIS or SedLine device, to Lee's head, and collect and preserve data recordings from that device.

8

DE147:7-8. Defendants state the following at the outset:

1. The witness rooms are not large, as this Court is aware, and setting up a camera in one to videotape Lee raises logistical and security concerns (discussed below). Setting up a camera in the execution chamber itself raises additional concerns. Defendants will permit neither option.

2. Two pulse oximeters are used during executions, one on each side of the condemned inmate. Defendants have agreed to collect and preserve data from the pulse oximeters and produce it to Plaintiffs' counsel as appropriate. A single camera would not be able to capture both screens, which would necessitate two more cameras in the execution chamber.

3. Two EKG machines are used during executions. These are in the control room rather than the execution chamber. Defendants have never recorded EKG data during executions, nor will they agree to do so. Carrying out a judicial execution is a solemn task, not a scientific experiment or a medical procedure. A single video camera could be used to record both EKG screens, but that would require a camera in the control room—the fourth needed by this point.

4. ADOC has placed clocks in the execution chamber, and the clocks are set to approximately the same time, but they are not atomic clocks, and members of the Execution Team do not synchronize their watches. The Warden has never recorded the time the nitrogen gas is turned on during an execution, and that is not part of the protocol.

5. EEGs have never been used in Alabama executions. ADOC does not have such a device available for execution purposes, nor have its personnel been trained to use one.

### A.   Video recording of Lee's body

Plaintiffs' first request is that this Court "order Defendants to collect and preserve, or…permit undersigned counsel to collect and preserve…a video recording of Mr. Lee's body framed head to toe with a clear view of Mr. Lee's face." DE147:7. They claim that a video could help the Court determine whether the hypoxia protocol superadds pain, *id.* at 13, and could allow their experts to later "make an evaluation

9

of respiratory distress," *id.* at 14. They contend that other courts have permitted video recording of executions, specifically in California in 1992 (N.D. Cal., gas chamber), Maryland in 1994 (D. Md., gas chamber, did not happen), and Georgia in 2001 (state court, electrocution, did not happen) and 2011 (state court, lethal injection). *Id.* at 15-18. They argue that the collection of evidence is warranted where Defendants have criticized eyewitness observations in other litigation. *Id.* at 25-28. They further claim that this case is set apart from *Grayson* because Lee has consented to the recordation sought. *Id.* at 28; *see* DE151. Finally, they claim that any privacy concerns of Defendants' "would be unfounded" because they would consent to restricting access to the recording, DE147:28-29, and that the recording would not violate Alabama law or ADOC regulations, *id.* at 29-31. Defendants vehemently disagree.

### i.    Affidavits from ADOC Commissioners

During *Grayson*, Commissioner John Hamm submitted an affidavit setting forth his problems with the motion to videotape Miller's execution:

- Alabama law places limits on who can attend executions, and the law does not contemplate a videographer. Ex. A ¶3.

- Requiring the Commissioner or his designee to conduct a recording is not in keeping with his duties or the duties of other ADOC employees during an execution. *Id.*

- There are only three viewing rooms at Holman Correctional Facility, including a room for representatives of the victim's family. Placing a camera in the victims' witnesses' room or the Commissioner's room would not be

10

possible due to concerns over privacy and privileged conversations. The third room is for the inmate's witnesses and the media; placing a camera in there would raise space issues, and it would not be appropriate. *Id.* ¶¶4-6.

- The execution protocol does not contemplate the presence of a video camera, and that would create logistical problems. *Id.* ¶¶7-8.

- ADOC "has grave security concerns related to the production of any recording of members of the Execution Team, and support personnel, performing their duties inside of the execution chamber." *Id.* ¶9.[1]

- ADOC has no excess personnel to assign to a videographer for his or her security. *Id.* ¶11.

- "ADOC has consistently prohibited recording equipment at executions," which is set out in an administrative regulation and reiterated in media advisories. *Id.* ¶12; *see* ADOC Administrative Regulation 005 V.H.4 (prohibiting electronic paraphernalia in witness rooms), *available at* https://doc.alabama.gov/docs/AdminRegs/AR005.pdf.

- Execution is "among the most solemn duties performed by the Alabama Department of Corrections," and allowing recording "would severely undermine the solemnity of the occasion," "create significant, unnecessary security risks," and "may deter the families of victims from attending executions." Ex. A ¶13.

---

1. Commissioner Hamm's concerns were well founded. Less than two weeks after he signed his affidavit—and two days before the Miller execution—a hit piece was published naming ADOC personnel who were allegedly members of the Execution Team. Defendants neither confirm nor deny the allegations, but they note that individuals named in the article and their families faced harassment and threats following its publication. Additionally, in recent days, advocates for Lee have placed a billboard in Atmore and have offered funding for execution team members who refuse to participate in Lee's execution. Brendan Kirby, *'Thou Shalt Not Suffocate'—Billboard Near Holman Prison Targets Corrections Workers*, AL.COM (June 5, 2026, 6:38 PM), https://www.wsfa.com/2026/06/05/thou-shalt-not-suffocate-billboard-near-holman-prison-targets-corrections-workers.

Greg Lovelace, who became the Commissioner on May 1 following Commissioner Hamm's retirement, adopted his predecessor's affidavit in its entirety, Ex. B ¶2, and added to the stated concerns:

- Recording Lee's body from inside the execution chamber would necessitate the placement of a camera and tripod on one side of Lee. This would obstruct the view from one of the two witness rooms. *Id.* ¶5.

- ADOC will not permit Plaintiffs' counsel or their designees to serve as the videographer. They are not allowed to set up or record an execution or to be present in the execution chamber. *Id.* ¶8.

- A video camera—much less the four cameras that would be required to accommodate all of Plaintiffs' requests—would be intrusive and cause logistical problems. *Id.* ¶9.

- A camera with a wide view of Lee's body could record members of the Execution Team. Again, "ADOC has grave security concerns related to the production of any recording of members of the execution team and support personnel performing their duties inside of the execution chamber." *Id.* ¶10.

- ADOC lacks the manpower to provide security to a videographer. *Id.* ¶11.

- ADOC prohibits recording equipment at executions and makes that clear in media advisories. *Id.* ¶12.

- As Commissioner Hamm stated, execution is one of ADOC's most solemn duties. "The presence of multiple video cameras on tripods in the chamber creates exactly the opposite image: one of reality TV, a media circus, or a scientific experiment. It would also create significant, unnecessary security risks and may deter the families of victims from attending executions." *Id.* ¶16.

### ii. Video recording an execution is not authorized, and Defendants have legitimate logistic, security, and solemnity concerns.

In *Grayson*, Chief Judge Huffaker found that videotaping Miller's execution from a witness room would violate Alabama law, which "*expressly* limits those individuals allowed to witness an execution," Ex. C at 3 (citing ALA. CODE § 15-18-83(a)), and ADOC regulations, *id.* (citing AR 005). "Thus, by both Alabama law and ADOC regulation, no party or person has access or a right to do what Plaintiff proposes here." *Id.* at 4. He noted as well that "to allow such relief here, would likely encourage condemned inmates to make future requests to have their own—or other condemned inmates'—executions videotaped under the guise of the Eighth Amendment." *Id.* at 4 n.2. This is precisely the situation before the Court now. Plaintiffs take issue with Chief Judge Huffaker's interpretation of Alabama law, claiming that a video camera would not make a person not permitted by statute to be "present," and allege that the Court could prevent prohibited individuals, such as Plaintiffs, from viewing the recording. DE147:29-30. They further claim that they wish to place a camera in the ***execution chamber***, not in a witness room, which is not specifically prohibited by AR 005. *Id.* at 30-31.

Defendants' concerns with security and solemnity within the witness rooms during an execution, which Plaintiffs touch upon, *id.* at 31, extend to the execution chamber itself, which is a more restricted space. The only people allowed in the

13

execution chamber during an execution are the Warden, members of the Execution Team, and the inmate's spiritual advisor. There is no provision in Alabama law, ADOC administrative regulations, or the execution protocol permitting a videographer (or for Plaintiffs' counsel—some of whom, again, are also Lee's counsel) in the execution chamber, nor is it reasonable to ask ADOC staff to make such a recording.[2]

Further, as the Commissioners set forth, there are logistical and security concerns to placing a video camera in either the witness rooms or the execution chamber. If a camera is in a witness room, facing the inmate, it will likely capture members of the Execution Team and might capture either people sitting in the opposite witness room or people sitting in the same room (in the glare from the window glass).[3] This could dissuade certain witnesses from attending, and it could create security risks to members of the Execution Team. Even if this Court were to place restrictions on the recording, leaks happen, and ADOC refuses to put its people's safety at risk so that Plaintiffs' experts can make guesses about what they see in a video months after the fact. Placing a camera in the execution chamber would require a tripod, which could impede the view from a witness room or get in the way of the Execution Team;

---

2. For the record, Defendants will not permit a spiritual advisor to make a video recording of an execution.
3. There would, of course, not be a room opposite the camera if it were placed in the Commissioner's viewing room, but that would produce a view of Lee looking at his feet instead of a side profile, which could be achieved from the other witness rooms.

adding this camera to the other two in the chamber necessitated by Plaintiffs' request would be unwieldy at best, and certainly not conducive to preserving the dignity and solemnity of the occasion. One camera would be bad, but three would give the chamber the appearance of a television studio. As for the suggestion that Plaintiffs' counsel could serve as the videographer, *see* DE147:7, Defendants have legitimate security reasons to keep counsel out of the execution chamber, and Lee has designated none of them as witnesses to his execution.[4]

### iii.   The decisions of other courts permitting recordation are not binding upon this Court, and *Grayson* is more relevant.

Finally, Plaintiffs direct the Court to four instances in which courts in other states authorized the recordation of executions. *Id.* at 15-18. None of those decisions cited are binding upon this Court, and Defendants suggest that the *Grayson* decision is more helpful here. As Chief Judge Huffaker noted:

> [F]ederal courts have long given considerable deference to substantial governmental interests, such as security and safety inside a prison. *Rice v. Kempker*, 374 F.3d 675, 680–81 (8th Cir. 2004) ("[S]ubstantial governmental interests involving the safety and security of the prison, a set of interests of the sort that long has been given considerable deference by federal courts."); *see also Turner v. Safley*, 482 U.S. 78, 84–85 (1987) ("Running a prison is an inordinately difficult undertaking that requires expertise, planning, and the commitment of resources, all of

---

4. Lee's witnesses are two attorneys from the Federal Defenders for the Middle District of Alabama, who represented him in his execution litigation and authored his clemency petition. None of Lee's § 1983 counsel (or any of Plaintiffs' other counsel) are on his approved visitation or witness list.

which are peculiarly within the province of the legislative and executive branches of government.").

Ex. C at 4. Carrying out an execution in a maximum-security facility, all while managing the safety of witnesses to that execution and the security of the facility overall, creates a host of logistical problems, which would be exacerbated by adding video cameras. Chief Judge Huffaker continued:

> The fact that "ADOC has grave security concerns related to the production of any recording of members of the Execution Team, and support personnel, performing their duties inside of the execution chamber" cannot be understated, especially since many of these individuals agree to serve on the execution team with the understanding that the proceedings will not be recorded and that their identities will be protected at all costs. Security concerns not only exist for the individuals involved and present at the execution proceeding, but security concerns also arise for the maximum-security facility and its other staff (not involved in the execution). And further, the additional burden of accommodating an additional person and his equipment would only add to that existing concern.

*Id.* at 4-5 (citation modified).

Chief Judge Huffaker's citation to *Rice* is also instructive. In that case, a church and two ministers argued that the Missouri Department of Corrections' policy prohibiting cameras in the execution chamber violated their First Amendment right of public access. The district court agreed but found that the infringement was legitimate in light of the Department's penological concerns. 374 F.3d at 677-78. The Eighth Circuit found that there we no First Amendment infringement, as "neither the public nor the media has a First Amendment right to videotape, photograph, or make

16

audio recordings of government proceedings that are by law open to the public." *Id.* at 678. The court of appeals found that prison policies banning recording equipment at executions were no different than court rules excluding cameras and other recording devices from proceedings that are otherwise open to the public. *Id.* at 679-80. The court relied, in part, on the Fifth Circuit's decision in *Garrett v. Estelle*, 556 F.2d 1274, 1280 (5th Cir. 1977), that the court would not "frustrate the official policy of the State of Texas by requiring" access to media for filming executions; there is no First Amendment right to make such a recording. The Eighth Circuit concluded that even if they were to agree with the district court that the Department's media policy burdened the plaintiffs' First Amendment rights, the policy was reasonably related to legitimate penological interests, and there was not a less-burdensome alternative available. *Id.* at 681.

Plaintiffs cite *In re Thomas*, 155 F.R.D. 124 (D. Md. 1994), but their case is more akin to *Campbell v. Blodgett*, 982 F.2d 1356 (9th Cir. 1993). There, the Ninth Circuit held that the district court did not abuse its discretion in denying Campbell's motion to videotape the execution of Westley Allan Dodd, a death-row inmate who was scheduled to be executed by hanging in Washington. *Id.* at 1357-60. The court of appeals first found no abuse of discretion in the district court's determination that the order Campbell sought would raise "serious questions of comity in the notion of forcing the State to contravene its established policy against recording executions

17

and ordering it to allow a particular person to attend and record an execution." *Id.* at

1358. The court agreed that "[i]n this situation comity is not only an appropriate

concern, it is a highly weighty one," reasoning:

> Campbell asks that we order the State to open to his agent the most
> serious of all state legal proceedings against its citizens, the taking of a
> human life. He asks that we order the State to permit him to create a
> permanent audiovisual record of the event, to engage in conduct during
> the event necessary to allow the creation of the video and audiotapes,
> and to make whatever technical arrangements (placement of cameras,
> microphones, etc.) necessary to do the job in a meaningful way.

*Id.*

Second, the Ninth Circuit concluded that the district court did not abuse its

discretion in considering the condemned prisoner's privacy interests or in finding

that "there could be no guarantee against the intentional or inadvertent release of the

recording to the public." *Id.* at 1358-59. The court identified one critical distinction

between attending an execution and recording it:

> Mere presence at and observation of an event is an intrusion of a differ-
> ent magnitude than the creation of a permanent audiovisual record of
> that event. Regardless how we shape an order and regardless what con-
> tempt sanctions we may threaten, *we simply cannot guarantee that no
> duplicate will be made or that this tape will not appear on CNN some-
> day*.

*Id.* at 1359 (emphasis added).[5] Further highlighting the unseemliness of recording

an execution, the court observed that "Dodd's privacy and dignity during the actual

---

5. Here, again, Defendants direct the Court's attention to the hit piece published
   shortly before the Miller execution. There was a confidentiality order in that case

execution may be affected by the placement of cameras and microphones," *id.*, an issue that would be no less problematic here, regardless of Lee's apparent acquiescence to recordation.

Third, the Ninth Circuit concluded that the district court did not abuse its discretion in finding that "the evidentiary value of the recording was dubious and that it was unnecessary for an informed ruling on whether hanging constitutes cruel and unusual punishment in violation of the Eighth Amendment," *id.*, reasoning:

> Neither Campbell nor the dissent explain what it is that a videotape of the hanging would show at an evidentiary hearing, if one were ordered. There was evidence in the record to show that no relevant evidence would be obtained by videotaping the execution. Campbell fails to identify what it is that would be learned by watching Dodd's execution or how it would shed any light on whether hanging violates the Eighth Amendment. Both Campbell and the dissent offer numerous conclusory statements about irreplaceable evidence and best evidence, but evidence of what?
>
> So far as we can determine, the relevant issues in Campbell's claim of cruel and unusual punishment are: 1) how much time elapses before unconsciousness; 2) how much time elapses before death; 3) cause of death or unconsciousness; and 4) sensations of pain and suffering before unconsciousness. At best, a videotape of the execution could shed light on the duration issue, but so too could a witness or timing device…. A videotape could not shed light on the third issue, nor the fourth.

much like the one in the present litigation, but the authors still published the names of ADOC employees. While Defendants do not suggest that Plaintiffs' counsel had anything to do with the 2024 disclosure or that they would intentionally violate the confidentiality order, Defendants note that an inadvertent disclosure of an execution video could have severe repercussions for members of the Execution Team or witnesses captured in the recording.

19

*Id.*

That reasoning is pertinent here. A video of Lee's execution would not conclusively reveal the moment that he lost consciousness, the level of oxygen in the mask at that point, Lee's blood-oxygen saturation, or the level of discomfort Lee was experiencing (if any).[6] Plaintiffs offer the Court a declaration from nursing professor Margaret L. Campbell claiming that she has developed a scale to determine whether someone is experiencing respiratory distress and that she could apply that scale to a video of the execution, DE147-1, but Defendants should not be obligated to violate state law and their own regulations, and create risks to the security and solemnity of Lee's execution, to produce a video so that someone who might be called as Plaintiffs' expert can draw speculative conclusions.[7]

Therefore, the Court should deny the motion as to videotaping Lee.

---

6. As this Court noted, if Lee's expert Dr. Richard Schwartzstein is to be credited, then loss of consciousness does not truly matter, as the "unawake" brain continues to process distress from dyspnea. Mem. Op. at 19, *Lee v. Lovelace*, 2:25-cv-00680 (M.D. Ala. May 28, 2026), ECF176.

7. Defendants note that this Court has thrice considered testimony from a medical professional who actually witnessed an execution. Anesthesiologist Dr. Brian McAlary witnessed the Grayson execution as a "friend" of the inmate (despite never having met him) and opined on his observations in *Frazier v. Hamm*, 2:24-cv-00732, and *Boyd v. Hamm*, 2:25-cv-00529; his testimony from those cases was introduced as trial exhibits in *Lee*.

**B.    Video recording of the pulse oximeter and EKG screens, and the generation and production of pulse oximeter and EKG data.**

Plaintiffs also request that this Court "order Defendants to collect and pre-serve, or…permit undersigned counsel to collect and preserve…video recordings of each of the front screens of the pulse oximeter and electrocardiogram ("EKG") de-vices used during the execution," as well as "data from the pulse oximeter and EKG devices used[.]" DE147:7. Here, they claim that a video of Lee, plus "accompanying synchronized heart-rate data," would allow an expert to analyze his distress during the execution. *Id.* at 15. They also request that a video recording of all of the devices be made "to provide full, continuous evidence of the data and readings that the gen-erate." *Id.* at 19.

As noted above, Defendants have agreed to preserve any pulse oximeter data generated during the Lee execution and to produce it as is appropriate.[8] Ex. B ¶15. While the EKG machines might be able to generate and record data, Defendants have never set them to do so, nor do Defendants have any intention to generate such data.

---

8. Plaintiffs ask this Court to order such preservation, "[g]iven that Defendants pre-viously misunderstood and misrepresented whether pulse oximeter data was rec-orded during prior executions." *Id.* at 25 n.17. Defendants object to Plaintiffs' mischaracterization of Defendants' discovery response in *Lee*, which is still be-fore the Court in that case. Defendants' intention is to take the pulse oximeters from Holman to Montgomery following the execution and have their IT personnel retrieve the data as expeditiously as possible so that it is preserved.

### i.   Affidavit from Commissioner Lovelace

Commissioner Lovelace addressed Plaintiffs' requests as to the pulse oximeters and EKG machines in his affidavit, Ex. B:

- Two video cameras on tripods would have to be placed in the execution chamber—beyond the camera needed to video record Lee's body—to capture both pulse oximeter screens. Given the glare produced by the overhead lights on the screens, achieving the appropriate angle would be difficult. *Id.* ¶6.

- The camera on the left pulse oximeter could impede the work of the Execution Team Captain. Moreover, the movements of the Captain could block the camera's view. *Id.*

- The cameras could also impede the movement of the Warden. *Id.*

- The EKG monitors are in the control room, so a fourth camera would have to be placed there. "There are limited conversations at times during executions; the Warden, as the statutory executioner, must be allowed to speak freely without recordation." *Id.* ¶7. A camera in the control room would raise "grave security concerns." *Id.* ¶10.

- Videographers are not contemplated under Alabama law or ADOC regulations. Serving in that role is not part of the duties of the Commissioner or his designees. Plaintiffs' counsel will not be permitted in the execution chamber or the control room. *Id.* ¶8.

- Video cameras would be intrusive and would cause logistical problems. *Id.* ¶9. There is also no additional personnel to assign to a videographer. *Id.* ¶11.

- "ADOC has consistently prohibited recording equipment at executions. The prohibition is set out in an Administrative Regulation and restated each execution in the published Media Advisory." *Id.* ¶12.

- "ADOC has a penological interest in not creating additional records for a judicial execution. Judicial executions are not scientific experiments or studies, nor are they medical procedures. ADOC's EKG machines used for

executions are not presently configured to create, store, or print data. ADOC declines to change the settings on the EKG machines, to purchase, train, and create data on an EEG machine, or to annotate the time the nitrogen begins to flow." *Id.* ¶14.

- Finally, recording an execution "would severely undermine the solemnity of the occasion. The presence of multiple video cameras on tripods in the chamber creates exactly the opposite image: one of reality TV, a media circus, or a scientific experiment. It would also create significant, unnecessary security risks and may deter the families of victims from attending executions." *Id.* ¶15.

### ii. Video recording an execution is not authorized, and Defendants have legitimate logistic, security, and solemnity concerns.

As discussed above concerning video recording Lee's body during his execution, *supra* III.A.ii, recordation is not permitted by Alabama statute or ADOC regulation. Defendants will not fully repeat those arguments here in the interest of space, but they are just as relevant to the recordation of execution equipment as they are to the recordation of the inmate.

In terms of security, not only would placing two additional cameras on tripods in the execution chamber get in the way of the work of the execution team but placing one in the control room would create security issues concerning any conversations the Warden, as statutory executioner, has. Moreover, video recording the equipment would clearly reveal the make and model of the devices. Defendants previously marked the manuals for these devices as highly confidential and have a legitimate security interest in keeping the details out of the public eye so as not to (1) expose

23

the manufacturers to undue pressure from anti-death-penalty activists or (2) potentially threaten ADOC's ability to procure and have serviced the equipment needed for executions. While Plaintiffs' counsel may make assurances that they will restrict access to these recordings, Defendants note that leaks have happened in prior litigation.

Again, Defendants are willing to produce the data generated and stored by the pulse oximeters during the upcoming execution. But Defendants have not previously caused the EKG machines to generate and store data, and they will not do so now. As noted above, "a party is not obligated to create documents in response to a request for production." *Advanced Cable Ties*, 2019 WL 13280288, at *5. Executions are solemn events, not scientific experiments, and Defendants should not be compelled to make changes to their own equipment simply because Plaintiffs want them to create data.

Therefore, the Court should deny the motion as to videotaping the pulse oximeters and EKG machines and compelling Defendants to generate and produce EKG data.

### C.    Noting the time the nitrogen begins to flow.

Plaintiffs request that this Court "order Defendants to collect and preserve, or…permit undersigned counsel to collect and preserve…a record of the time at which the nitrogen gas is turned on during the execution." DE147:7. They claim that

24

this information is needed "in order to fully interpret" data from the pulse oximeters" as comprehensively as possible." *Id.* at 24.

Defendants counter that this is not part of the protocol, that they should not be compelled to generate data, and that in any event, the clocks and watches are not perfectly synchronized.

### i.    Affidavit from Commissioner Lovelace

Commissioner Lovelace addressed Plaintiffs' request as to the nitrogen gas timing in his affidavit, Ex. B:

- "ADOC has a penological interest in not creating additional records for a judicial execution. Judicial executions are not scientific experiments or studies, nor are they medical procedures.…ADOC declines to change the settings on the EKG machines, to purchase, train, and create data on an EEG machine, or to annotate the time the nitrogen begins to flow." *Id.* ¶14.

### ii.    Defendants should not be obligated to generate data that itself may not be entirely accurate.

At the outset, nothing in ADOC's execution protocol calls for the recordation of the moment that the nitrogen gas is turned on, and Plaintiffs should not be permitted to force Defendants to generate data. *Advanced Cable Ties*, 2019 WL 13280288, at *5.

What has come out in prior litigation is that the execution logs contain time notations of various codes given during the procedure. The first code "means Warden Raybon has initiated the nitrogen system and turned the breathing air off and the nitrogen on." *Boyd v. Hamm*, 2:25-cv-00529, 2025 WL 2884410, at *9 (M.D. Ala.

25

Oct. 9, 2025). The Warden turns the gas on "within seconds" after giving the code, though he does not give the code precisely as he is turning on the gas—there is a delay. *Id.* Logs from previous hypoxia executions, which have been produced to Plaintiffs, offer times by hour and minute, not by second. Moreover, the clocks are standard digital clocks and not, for example, consumer "atomic clocks" that synchronize automatically with a national clock, and so Defendants cannot guarantee that they are perfectly synchronized. Members of the Execution Team do not synchronize their watches prior to an execution, particularly not down to the second. Therefore, any time notations—such as those of the Warden (hypothetically) recording the time the nitrogen is engaged and those of the member of the Team keeping the log—could have time discrepancies. To the extent that Plaintiffs offer to have one of their counsel stand in the control room during an execution and note the time, Defendants will not permit this as a security risk.

Defendants offered evidence in *Lee* of how quickly the oxygen concentration within the mask begins to fall. As this Court found:

> [A]round twenty-five seconds after the breathing air supply is cut off and nitrogen is turned on, the oxygen concentration [in the mask] is less than 6%. Approximately thirty to thirty-three seconds after the nitrogen gas is turned on, the oxygen concentration in the mask is less than 3%. And thirty-five to forty seconds in, the oxygen concentration is less than 2%.

Mem. Op at 12-13, *Lee*, 2:25-cv-00680. But there is no way of knowing precisely what the oxygen concentration in the mask is at any point during an execution, as

there is not an oxygen monitor attached to the mask.[9] Still, based upon the time notated for the first code in the execution log, it should be possible for Plaintiffs to approximate when nitrogen began to flow during Lee's execution.

Therefore, the Court should deny the motion as to notating the time the nitrogen gas is turned on.

**D.    Using an EEG.**

Finally, Plaintiffs request that this Court "order the attachment of an EEG-based device, such as a Bispectral Index monitoring system ("BIS") or SedLine EEG device, to Mr. Lee's head and the continuous collection and preservation of data recordings from that device." DE147:7-8. They claim, using a declaration from anesthesiologist Dr. Mark Heath, DE147-5, that EEG devices "provide a visual representation of real-time electrical activity in the brain." DE147:19. These devices obtain data via electrodes stuck to the head. *Id.* Allegedly, Dr. Heath acquired a mask like the one used pursuant to ADOC's protocol and found what he deemed suitable positions for a BIS monitor's electrode stickers. *Id.* at 20. He claims that an EEG monitor "would record data and information that would be relevant and useful to evaluating the changes, and timing of changes, that take place in the electrical

---

9. In *Lee*, Defendants offered the Court video demonstrations from Alabama and Louisiana in which an oxygen monitor was placed inside the mask, either fully or via a tube. *Id.* at 12. Those are not possible to replicate during an execution; placing a monitor onto the inmate's face would be inappropriate, and connecting one via a tube would create a gap in the mask's seal.

activity of the brain during the execution, including with respect to electrical activity in the brain that is correlated with consciousness." *Id.* at 21. Plaintiffs further argue that North Carolina "incorporated a BIS monitor into its execution protocol beginning in 2006," following federal litigation concerning that state's lethal injection protocol. *Id.*

Defendants counter that the use of an EEG monitor is not part of ADOC's protocol, nor has it ever been part of the protocol. ADOC does not possess an EEG monitor for use in executions, and its personnel have not been trained in the use of such a device. Defendants should not be compelled to generate data. Finally, as for North Carolina—which has not carried out an execution since 2006—that state was not compelled to use a BIS monitor, and there are different concerns with lethal injection than there are with nitrogen hypoxia.

### i. Affidavit from Commissioner Lovelace

Commissioner Lovelace addressed Plaintiffs' request as to an EEG monitor in his affidavit, Ex. B:

- ADOC does not own a suitable device that could be used for executions. *Id.* ¶13.

- Execution Team members are not trained to use such a device. *Id.*

- ADOC would need to "validate" Dr. Heath's assertions concerning the use of an EEG monitor with the full-face mask. *Id.*

- "[G]iven the configuration of the execution chamber and the control room, setting up an EEG machine in an appropriate position could prove problematic." *Id.*

- Further, "ADOC has a penological interest in not creating additional records for a judicial execution. Judicial executions are not scientific experiments or studies, nor are they medical procedures.…ADOC declines to change the settings on the EKG machines, to purchase, train, and create data on an EEG machine, or to annotate the time the nitrogen begins to flow." *Id.* ¶14.

### ii.   Defendants should not be obligated to adopt new medical equipment and generate data not contemplated by the protocol.

At the outset, nothing in ADOC's execution protocol calls for the use of an EEG monitor, and Plaintiffs should not be permitted to force Defendants to generate data. *Advanced Cable Ties*, 2019 WL 13280288, at *5.

Defendants do not presently possess an appropriate device for use in executions. They have not tested such a device for placement in the execution chamber and for use with the mask, and though Dr. Heath has made assertions, Defendants would need to verify such. Nor is the Execution Team trained to use these devices. Compelling Defendants to use an EEG monitor would effectively stop Lee's scheduled execution.

As for North Carolina, that situation is distinguishable. The issue before the district court was the inmate's claim that the lethal injection protocol failed to ensure he was unconscious before the second drug was administered. *Brown v. Beck*, 5:06-ct-03018, 2006 WL 3914717, at *1 (E.D.N.C. Apr. 7, 2006). North Carolina used a

29

three-drug protocol, the one approved by the Supreme Court in *Baze v. Rees*, 553 U.S. 35 (2008), two years later: sodium thiopental, a short-acting barbiturate, pancuronium bromide, a paralytic, and potassium chloride, which causes a heart attack. *Id.* The inmate was concerned that he might not be adequately anesthetized prior to the administration of the second and third drugs, which, he contended, might result in him "experienc[ing] excruciating pain as a result of the conscious asphyxiation caused by pancuronium bromide and the painful burn and cardiac arrest caused by the injection of potassium chloride." *Id.* at *2. The district court denied a preliminary injunction

> on the condition that there are present and accessible to Plaintiff throughout the execution personnel with sufficient medical training to ensure that Plaintiff is in all respects unconscious *prior to* and *at the time of* the administration of any pancuronium bromide or potassium chloride. Should Plaintiff exhibit effects of consciousness at any time during the execution, such personnel shall immediately provide appropriate medical care so as to insure Plaintiff is immediately returned to an unconscious state.

*Id.* at *8. North Carolina purchased a BIS monitor to use during the execution and prepared to administer additional sodium thiopental if the inmate was not unconscious following the initial bolus dose. *Brown v. Beck*, 5:06-ct-03018, 2006 WL 8502838, at *2 (E.D.N.C. Apr. 17, 2006). Part of their plan involving having "a licensed registered nurse and a licensed physician" monitor the inmate's consciousness. *Id.* at *3. The district court was satisfied with this solution:

30

> This court was initially concerned, like plaintiff, that improper techniques or other errors would lead to failed administration of sodium pentothal, rendering plaintiff paralyzed but able to perceive pain at later stages of the execution. One set of solutions to this problem would have involved additional medically trained personnel being present. However, in the judgment of this court, defendants have come up with a different, but still satisfactory, solution. Under the revised protocol, defendants will not administer lethal drugs until *after* total unconsciousness of the plaintiff has been verified through use of the BIS monitor. Thus, plaintiff's concerns about human error are greatly mitigated by the use of this independent check on plaintiff's level of consciousness before the potentially pain-inducing injections of pancuronium bromide and potassium chloride begin.

*Id.*

Alabama took seriously the claims that the second and third drugs in the lethal injection cocktail might cause pain if the inmate were not rendered unconscious by the first drug. For example, inmate Thomas Arthur was scheduled to be executed on September 27, 2007, but Governor Riley granted him a forty-five-day reprieve to allow ADOC to add a consciousness check to its lethal injection protocol. This check involves calling the inmate's name, stroking his eyelashes, and pinching his arm; if the correctional officer believes he may still be conscious, then the inmate is given a second dose of the first drug. *See Arthur v. Allen*, 1:07-cv-00722, 2007 WL 4105113, at *1-2 (S.D. Ala. Nov. 15, 2007). And that was sufficient. ADOC was not obligated to adopt a BIS monitor like North Carolina did because the two states approached an issue with equally valid solutions. North Carolina adopted the BIS monitor for Brown's execution in April 2006, executed one more inmate that August,

and has not had an execution since. Alabama has employed the same consciousness check since 2007 in its lethal injection executions, and though the consciousness check has been challenged as insufficient, it has withstood judicial scrutiny for the best part of two decades.

But lethal injection and nitrogen hypoxia raise different concerns. There is no paralytic used in hypoxia executions, as is evidenced by the reports of inmate movement, nor is there a drug like potassium chloride, which is alleged to cause a burning sensation. It is important to ensure that the inmate is unconscious during a lethal injection so that he does not feel potentially painful effects from the second and third drugs, but there is no corresponding noxious stimulus in a hypoxia execution. Instead, Plaintiffs want Defendants to adopt new equipment and generate data—in effect, to bring executions one step closer to medical procedures or scientific experiments—in order to provide their own experts with data. Defendants have no obligation to do so, and the fact that North Carolina employed a BIS monitor in two executions, for very different reasons, does not compel this Court to order Defendants to do likewise.

Therefore, the Court should deny the motion as to EEG monitoring.

## CONCLUSION

Plaintiffs' motion is untimely, their requests are unreasonable, and granting the motion would compel ADOC to cancel Lee's execution this week. For the reasons stated above, this Court should deny the motion.

Respectfully submitted on June 8, 2026.

Steve Marshall
*Attorney General*

**/s/ Lauren A. Simpson**
Lauren A. Simpson
*Deputy Attorney General*

Polly S. Kenny
Brenton L. Thompson
*Assistant Attorneys General*

Office of the Attorney General
501 Washington Avenue
Montgomery, AL 36130-0152
(334) 242-7300
Lauren.Simpson@AlabamaAG.gov

33

## CERTIFICATE OF SERVICE

I hereby certify that on June 8, 2026, I electronically filed the foregoing with the Clerk of the Court using CM/ECF system, which will send notification of such filing to counsel of record.

/s/ *Lauren A. Simpson*
Lauren A. Simpson
*Deputy Attorney General*

ADDRESS OF COUNSEL:

Office of the Attorney General
Capital Litigation Division
501 Washington Avenue
Montgomery, AL 36130
(334) 242-7300
Lauren.Simpson@AlabamaAG.gov