IN THE UNITED STATES DISTRICT COURT
FOR THE MIDDLE DISTRICT OF ALABAMA
NORTHERN DIVISION

| | |
|---|---|
| In Re: | ) |
| Alabama Nitrogen Hypoxia Protocol | )    CASE NO. 2:24-cv-111-ECM |
| Litigation | ) |

## O R D E R

## I.  INTRODUCTION

The Alabama Department of Corrections ("ADOC") is scheduled to execute Jeffery Lee ("Lee") by nitrogen hypoxia between 12:00 a.m. on June 11, 2026, and 6:00 a.m. on June 12, 2026.  Less than ten days before Lee's scheduled execution, the Plaintiffs in this consolidated action moved this Court to compel the Defendants to collect and preserve, or allow the Plaintiffs' counsel to collect and preserve, the following evidence from Lee's execution:  (1) a video recording of Lee's body framed from head to toe with a clear view of Lee's face; (2) video recordings of the front screens of the pulse oximeter and electrocardiogram ("EKG") devices used during the execution; and (3) data from the pulse oximeter and EKG devices used during the execution, including a record of the time at which the nitrogen gas is turned on. (Doc. 147 at 2).  The Plaintiffs further request that the Court order the attachment of an electroencephalograph ("EEG")-based device to Lee's head and the continuous collection and preservation of data recordings from that device. (*Id.* at 3).  The Defendants have agreed to preserve the pulse oximeter data, but they object to the rest of the Plaintiffs' requests. (Doc. 152).  After careful consideration, and for the following reasons, the Court concludes that the Plaintiffs' motion is due to be granted in part and denied in part.

## II.  LEGAL STANDARD

Rule 26(b)(1) provides, as relevant here, that "[p]arties may obtain discovery regarding any nonprivileged matter that is relevant to any party's claim or defense and proportional to the needs of the case, considering the importance of the issues at stake in the action, the amount in controversy, the parties' relative access to relevant information, the parties' resources, the importance of the discovery in resolving the issues, and whether the burden or expense of the proposed discovery outweighs its likely benefit."  And "[w]ithin the scope of Rule 26(b)," a party may request permission to "ent[er] onto designated land or other property possessed or controlled by the responding party [to] inspect, measure, survey, photograph, test, or sample the property or any designated object or operation on it." FED. R. CIV. P. 34(a)(2).

Additionally, this Court may order a party to preserve evidence based on its "inherent power to regulate litigation [and] preserve and protect the proceedings before [it]." *Scarbrough v. Va. Coll., LLC*, 2019 WL 121277, at *1 (N.D. Ala. Jan. 7, 2019) (quoting *Hester v. Bayer Corp.*, 206 F.R.D. 683, 685 (M.D. Ala. 2001)).[1]  In analyzing evidence preservation requests, courts generally use one of two tests. *See Arkin v. Gracey-Danna, Inc.*, 2016 WL 3959611, at *1 (M.D. Fla. July 22, 2016).  In one line of cases, courts apply a streamlined two-prong test which requires the party seeking entry of the preservation order to show that the order is both necessary and not unduly burdensome.

---

[1] Here, and elsewhere in this Order, the Court cites nonbinding authority.  While the Court acknowledges these cases are nonprecedential, the Court finds them persuasive.

*See id.* (citing *Pueblo of Laguna v. United States*, 60 Fed. Cl. 133, 138 (Fed. Cl. 2004)). To satisfy the first prong, the moving party "ordinarily must show that absent a court order, there is significant risk that relevant evidence will be lost or destroyed." *Pueblo of Laguna*, 60 Fed. Cl. at 138 (citation omitted). Other courts use a three-factor balancing test, which considers: (1) "the level of concern the court has for the continuing existence and maintenance of the integrity of the evidence" in the absence of a preservation order; (2) "any irreparable harm likely to result to the party seeking the preservation of evidence" absent a preservation order; and (3) "the capability of an individual, entity, or party to maintain the evidence sought to be preserved, not only as to the evidence's original form, condition or contents, but also the physical, spatial and financial burdens created by ordering evidence preservation." *See Arkin*, 2016 WL 3959611, at *1–2 (explaining the two tests and concluding that the plaintiff made "an adequate showing under either test"). "The difference between these two tests lies in what the moving party must show with respect to the content of the evidence that is in danger of being destroyed. However, the distinction is more apparent than real." *Treppel v. Biovail Corp.,* 233 F.R.D. 363, 370 (S.D.N.Y. 2006).

### III. DISCUSSION

The Defendants have agreed to preserve the pulse oximeter data from Lee's execution, and the Court construes this agreement as a lack of opposition to this portion of the Plaintiffs' motion. Thus, the issues before the Court are whether the Court should (1) require the Defendants to preserve data from the EKG devices used during Lee's

3

execution and to record the time at which nitrogen gas is turned on; (2) require the Defendants, or authorize the Plaintiffs' counsel, to videotape Lee's body and the front screens of the pulse oximeter and EKG devices during Lee's execution; and (3) require the Defendants to use an EEG device during Lee's execution.

Citing Federal Rules of Civil Procedure 26 and 34, the Plaintiffs argue that the Court should authorize their requests because they will yield evidence of the severity and duration of the suffering condemned inmates experience during nitrogen hypoxia executions, which the Plaintiffs claim is critical to their Eighth Amendment claims. They contend that the video recordings would allow expert witnesses to evaluate an inmate's respiratory distress caused by air hunger, that data from an EEG would provide an "objective basis for assessing the consciousness of the condemned," and that data from the EKGs would aid in both determinations. (Doc. 147 at 8). Additionally, they argue that a record of the time when nitrogen gas is turned on is necessary to interpret the pulse oximeter and EKG data as comprehensively as possible. (*Id.* at 24).

The Defendants object, arguing that the Plaintiffs' requests are untimely and unduly burdensome. In support of their position, the Defendants offer the affidavit of Greg Lovelace ("Lovelace"), the Commissioner of the ADOC.[2] (*See* doc. 152-2). Lovelace attests as follows:   The ADOC uses two pulse oximeters during nitrogen hypoxia

---

[2] In his affidavit, Lovelace also adopts the September 12, 2024 affidavit of John Q. Hamm ("Hamm"), the former ADOC Commissioner, which was offered in connection with earlier nitrogen hypoxia litigation. (Doc. 152-2 at 1, para. 2; *see also* doc. 152-1 (Hamm's affidavit)). Lovelace further avers that Hamm's affidavit "reflects the current stance of ADOC." (Doc. 152-2 at 1, para. 2).

executions, both of which are in the execution chamber,[3] and a single camera would not capture both pulse oximeter screens.  The EKGs are in the control room, and while a single camera could record both EKG screens, it would require a camera in the control room.  Thus, the Plaintiffs' requests for video recordings would entail the use of four separate cameras:  three in the execution chamber to record Lee's body and the screens of the two pulse oximeters, and a fourth in the control room to record the screens of the EKGs.  The presence of three cameras recording events in the execution chamber would create logistical issues, in part due to the size of the execution chamber,[4] and would pose security risks.  Additionally, EEGs have never been used in Alabama executions, the ADOC does not have an EEG available for execution purposes, and its personnel are not presently trained to use one.  Finally, the EKG devices are not "presently configured to create, store, or print data," and the ADOC "declines" to change the settings on the EKGs. (Doc. 152-2 at 6, para. 14).

In analyzing the Plaintiffs' requests, the Court balances, among other factors, the Plaintiffs' need for the information and the burden the requests would impose on the Defendants.  Regarding the data on the EKGs, the Defendants do not claim that changing the devices' settings would be burdensome.  Considering the totality of the circumstances

---

[3] Lee's execution will occur at Holman Correctional Facility ("Holman").  Executions at Holman entail the use of several rooms, including:  (1) the execution chamber itself; (2) the room from which the Warden activates the nitrogen hypoxia system ("the control room"); and (3) three witness viewing rooms.

[4] The cameras may, for example, obstruct the movements of the execution team members or impede the view of witnesses.

and balancing the respective interests of the parties, the Court concludes that the Defendants must preserve the data on the EKGs. *See Arkin*, 2016 WL 3959611, at *1–2.[5] However, the Court will not require the Defendants to record the time when nitrogen gas is turned on because the Plaintiffs have failed to articulate a sufficiently compelling need for this information in light of other available evidence. *See* FED. R. CIV. P. 26(b)(1).

Further, the Court finds that, on this record, requiring video recordings of Lee's execution and requiring the ADOC to use an EEG device, at this late date, would pose an impermissible burden on the Defendants which outweighs the Plaintiffs' asserted need for the information. *See id.* Neither videotaping nor EEG devices are contemplated by the ADOC's current execution protocol, and the Defendants have articulated numerous logistical and practical difficulties which would result from videotaping and the use of a new device. And the last-minute nature of the Plaintiffs' request exacerbates these difficulties by affording the Defendants limited time to implement substantial changes to their execution procedures. On April 15, the Alabama Governor scheduled Lee's execution for June 11–12, and yet the Plaintiffs inexplicably waited until less than ten days before Lee's execution to seek relief from the Court.[6] Because of this delay, the Defendants would have only a matter of days to, for example, procure an EEG, train ADOC personnel on how to use it, and ensure that it did not compromise the mask fit. Under the circumstances of

---

[5] The Court finds that the Plaintiffs have made an adequate showing under either test used by federal courts to evaluate requests to preserve evidence.

[6] That the Court had not yet ruled on Lee's Eighth Amendment facial challenge to the ADOC's nitrogen hypoxia protocol is not a sufficient reason for the Plaintiffs to have delayed filing this motion.

this case, it would not be reasonable to require the Defendants to take these substantial steps on such a condensed schedule.

In addition to practical difficulties, the Defendants have articulated valid security concerns posed by having multiple video cameras recording events in the execution chamber, surrounding rooms, or both.  Assuming without deciding that the security concerns could be overcome with appropriate measures, there is insufficient time to explore and implement those measures.  Further, the Court is requiring the Defendants to preserve the pulse oximeter and EKG data.  Thus, the Court finds that the Plaintiffs' need for video recordings of the devices is diminished in light of the Plaintiffs' access to this other evidence, which further undermines their request for relief. *See* FED. R. CIV. P. 26(b)(1).

In sum, the Court will require the Defendants to preserve the pulse oximeter and EKG data, including taking the steps necessary to change the EKGs' settings to (1) capture the data and (2) store and/or print the data.  But given the extraordinary and last-minute nature of the Plaintiffs' requests to videotape multiple aspects of Lee's execution and to use a new device not currently contemplated by the ADOC's execution protocol, the Court finds those requests not to be well taken.

## IV.  CONCLUSION

Accordingly, for the reasons stated, it is

ORDERED that the Plaintiffs' motion (doc. 147) is GRANTED IN PART to the extent that the Defendants shall preserve the data on the pulse oximeters and EKGs used during Jeffery Lee's execution, including taking the steps necessary to change the EKGs'

7

settings to (1) capture the data and (2) store and/or print the data.  The Plaintiffs' motion (doc. 147) is DENIED in all other respects.

DONE this 8th day of June, 2026.

/s/ Emily C. Marks
EMILY C. MARKS
UNITED STATES DISTRICT JUDGE

8