# EXHIBIT 4

KeyCite Red Flag
Reversed and Remanded by Lee v. Commissioner, Alabama Department of Correction, 11th Cir.(Ala.), June 8, 2026

2026 WL 1493098
Only the Westlaw citation is currently available.
United States District Court, M.D. Alabama, Northern Division.

Jeffery LEE, Plaintiff,
v.
Greg LOVELACE, Commissioner, Alabama Department of Corrections, et al., Defendants.

CASE NO. 2:25-cv-680-ECM
|
Signed May 28, 2026

**Attorneys and Law Firms**

Anna Ku Thompson, Pro Hac Vice, Jocelyn A. Wiesner, Kevin Ashley Cline, Pro Hac Vice, Paige Hester Sharpe, Pro Hac Vice, Angelique A. Ciliberti, Arnold & Porter Kaye Scholer LLP, Washington, DC, Caleb Thompson, Arnold & Porter Kaye Scholer LLP, New York, NY, Tommy Huynh, Arnold & Porter Kaye Scholer LLP, San Francisco, CA, for Plaintiff.

Brenton Leigh Thompson, Lauren Ashley Simpson, Polly Spencer Kenny, Talmadge Butts, Alexander Barrett Bowdre, Robert M. Overing, Office of the Attorney General, Montgomery, AL, for Defendants Terry Raybon, Greg Lovelace.

## MEMORANDUM OPINION and ORDER

EMILY C. MARKS, UNITED STATES DISTRICT JUDGE

## I. INTRODUCTION

***1** On December 12, 1998, Jeffery Lee ("Lee") murdered Jimmy Ellis ("Ellis") and Elaine Thompson ("Thompson"). A jury convicted Lee of capital murder. As punishment for his crimes, the State of Alabama will end Lee's life. The question before the Court is whether the nitrogen hypoxia protocol the State plans to use to execute Lee is cruel and unusual in violation of the Eighth Amendment to the United States Constitution.

The Court held a three-day bench trial on that question —the first trial in this Court, and in the entire country, examining the constitutionality of nitrogen hypoxia.[1] This method of execution causes death via oxygen deprivation by replacing the condemned inmate's breathing air with 100% nitrogen.[2] Our bodies need adequate oxygen to function, and an environment with little to no oxygen results in death. And while nitrogen itself is not harmful, nitrogen can kill by displacing the oxygen that would otherwise be present.

Lee claims that the Alabama Department of Corrections' ("ADOC") nitrogen hypoxia protocol ("Protocol") causes inmates to experience prolonged air hunger and feelings of suffocation, which evoke severe anxiety, fear, and physiological distress. Lee does not argue that nitrogen hypoxia is physically painful like a broken bone. Rather, Lee claims that nitrogen hypoxia triggers inmates' survival instincts to breathe oxygen while also preventing them from doing so. The State disagrees,[3] arguing that inmates executed under the Protocol experience only the suffering necessary to carry out a death sentence.

Because the Constitution does not guarantee inmates a painless death, Lee must do more than show a risk of pain —he must show that the Protocol causes *severe* pain, pain that is "well beyond what's needed to effectuate a death sentence." *Bucklew v. Precythe*, 587 U.S. 119, 136–37 (2019). While Lee has shown that executions under the Protocol involve some suffering, on this record he has failed to prove that the Protocol causes more than "the necessary suffering involved in any method employed to extinguish life humanely." *Louisiana ex rel. Francis v. Resweber*, 329 U.S. 459, 464 (1947). Because Lee has not shown that the Protocol cruelly superadds pain, his claim that the Protocol violates the Eighth Amendment fails as a matter of law.

## II. JURISDICTION AND VENUE

The Court has original subject matter jurisdiction over this case pursuant to 28 U.S.C. § 1331. Personal jurisdiction and venue are uncontested, and the Court concludes that venue properly lies in the Middle District of Alabama. *See* 28 U.S.C. § 1391.

### III. PROCEDURAL HISTORY AND BACKGROUND

***2** The Court begins by summarizing Lee's crimes, capital litigation history, and prior lawsuit challenging the ADOC's lethal injection protocol. The Court concludes this section by explaining the Protocol, reciting the relevant procedural history in this case, and summarizing the witness testimony and evidence presented during the three-day bench trial on Lee's Eighth Amendment claim.

#### A. Lee's Capital Litigation History

On the morning of December 12, 1998, Lee walked into a pawn shop and, without warning, began firing his sawed-off shotgun. *Lee v. Thomas*, 2012 WL 1965608, at *1 (S.D. Ala. May 30, 2012). He fired multiple rounds at Ellis, the store's owner, and Ellis' employees, Thompson and Helen King ("King"). *Id.* Ellis and Thompson were killed. *Id.* Lee then tried and failed to dislodge the cash register before fleeing, leaving behind his shotgun and the carnage he had caused. *Id.* Miraculously, King survived the attack and alerted the authorities. *Id.* Lee was apprehended the following day and confessed. *Id.*

Lee was charged with three counts of capital murder—one count apiece for Ellis' and Thompson's murders during the commission of an attempted robbery, and a third count for murdering Ellis and Thompson pursuant to a single scheme or course of conduct—and one count of attempted murder. *Lee v. Comm'r, Ala. Dep't of Corr.*, 726 F.3d 1172, 1177–78 (11th Cir. 2013) (citing ALA. CODE §§ 13A-4-2, 13A-5-40(a)(2), (10), 13A-6-2)). He was convicted on all four counts. *Lee v. Comm'r, Ala. Dep't of Corr.*, 731 F. App'x 885, 886 (11th Cir. 2018) (per curiam). The jury recommended a sentence of life imprisonment without the possibility of parole by a seven-to-five vote. *Lee v. State*, 898 So. 2d 790, 807–08 (Ala. Crim. App. 2001). However, the trial court overrode the jury's recommendation and sentenced Lee to death. [4] *See Lee*, 898 So. 2d at 808.

Lee spent the better part of the following two decades unsuccessfully challenging his convictions in state and federal court. *See Lee*, 726 F.3d at 1188–91, 1228. In 2017, Lee challenged the ADOC's lethal injection protocol, [5] arguing that it violated the Eighth Amendment's prohibition on cruel and unusual punishment. *Lee v. Dunn*, 2017 WL 1483530, at *1 (S.D. Ala. Apr. 24, 2017), *vacated in part by Lee*, 731 F. App'x 885. That claim became moot in 2018, however, when Lee elected to be executed by a new method of execution authorized by the Alabama Legislature: nitrogen hypoxia. (*See* doc. 38 in *Lee v. Dunn*, 1:16-cv-473-WS (S.D. Ala. July 20, 2018)); *see also* ALA. CODE § 15-18-82.1(a). [6]

#### B. The ADOC's Nitrogen Hypoxia Protocol

***3** Executions by all three statutorily authorized methods—electrocution, lethal injection, and nitrogen hypoxia—occur at the Holman Correctional Facility ("Holman") in Atmore, Alabama. [7] *See* ALA. CODE § 15-18-82(b); (doc. 173-7 at 3). Once Alabama's Governor sets an execution timeframe, the ADOC prepares to carry out the inmate's death sentence. [8]

After the execution date is set, the Warden briefs the members of the execution team on the Protocol and provides them with training materials on the hazards associated with nitrogen gas. (Doc. 173-7 at 5–6). Next, the ADOC inspects and calibrates "[a]ll portable [oxygen] monitors and/or gas-measurement devices." (*Id.* at 6–7). The Warden also examines the nitrogen and breathing air tanks and verifies "that the volume of gas in each bank ... exceeds the minimum acceptable thresholds." (*Id.* at 7).

The week of the execution, the execution team meets to "walk through the steps of the procedure." (*Id.* at 8). At least two ADOC officers observe the condemned inmate at all times during this period. (*Id.* at 9). The officers' observations are memorialized in "duty post logs" which chronicle various events, including the inmate's meals, phone calls, and visits. (*Id.* at 9–10; *see, e.g.*, doc. 173-8 (Anthony Boyd's Duty Post Log)). These duty post logs also describe the executions themselves, albeit at a high level of generality. (*See, e.g.*, doc. 173-14 at 9 (Geoffrey West's Duty Post Log)).

On the day of the execution, the Protocol proceeds as follows: The Warden, Assistant Warden, or Execution Team Captain (1) pressurizes the nitrogen hypoxia system, (2) connects an industrial-use respirator mask to the breathing gas tubing, and (3) inspects the oxygen monitors to ensure they are functioning properly. (Doc. 173-7 at 14). The execution team escorts the condemned inmate to the execution chamber and secures him to the gurney. (*Id.* at 15). The condemned inmate is secured to the gurney by a chest and shoulder harness and one or more nylon straps ("chest restraints")—"the same type [of] material that you would make a seat belt out of." (Doc. 147 at 187:14–25; *see also* doc. 173-5 at 20–21, paras. 77–82).

Execution team members attach pulse oximeters, devices that measure the oxygen saturation in the blood, to the condemned inmate on the gurney. (Doc. 173-7 at 15). The mask is secured to the inmate's face and adjusted as necessary. (*Id.* at 16). The Warden then enters the execution chamber and reads the death warrant. (*Id.*). Shortly thereafter, the inmate is given two minutes to make a final statement. (*Id.*). After a series of final safety checks, the execution begins. The Warden activates the nitrogen hypoxia system, starting the flow of ultra-high purity nitrogen gas into the mask, which lasts for the longer of fifteen minutes or five minutes after a flatline indication on the inmate's EKG. (*Id.* at 16–17). Once the nitrogen gas begins to flow, it displaces the breathing air in the mask until the inmate is breathing almost pure nitrogen. (Doc. 173-141 at 5, para. 8). And when the brain is deprived of oxygen for long enough, unconsciousness and death ensue. (*Id.*). Additionally, the mask allows exhaled carbon dioxide to exit via a one-way valve, which eliminates "rebreathing" of carbon dioxide by the inmate. (*Id.* at 6, para. 9).

***4** Lee is scheduled to be the eighth inmate executed by this Protocol. [9] Additionally, in March 2025, the State of Louisiana executed Jessie Hoffman Jr. via nitrogen hypoxia under a substantially similar protocol to Alabama's.

### C. Lee's Nitrogen Hypoxia Challenge

Lee initiated this lawsuit on August 22, 2025, naming as Defendants John Q. Hamm ("Commissioner Hamm"), then-Commissioner of the ADOC, [10] and Terry Raybon ("Warden Raybon"), the Warden of Holman, in their official capacities. (Doc. 1). Lee's sole remaining claim, brought pursuant to 42 U.S.C. § 1983, is that the Protocol facially violates the Eighth Amendment. (Doc. 40 (operative complaint)). And the only alternative method of execution he now proposes is the firing squad. (*Id.* at 20–22; *see also* doc. 98). [11] Lee seeks a declaration that the Protocol is unconstitutional and an injunction prohibiting the ADOC from executing him by nitrogen hypoxia or "any method other than one of the alternatives provided by his attorneys." (Doc. 40 at 23).

On the same day that Lee filed his lawsuit, seven other Alabama death row inmates filed § 1983 actions claiming (among other things) that the Protocol violates the Eighth Amendment. [12] The parties in all eight lawsuits filed joint motions to consolidate the cases for purposes of case management and discovery. (*See, e.g.*, doc. 22). On January 14, 2026, the Court held a hearing on the motions to consolidate. At that hearing, the State notified the Court and Lee's counsel for the first time that Lee was the next person for whom the State would move to set an execution date. At a later status conference, the State represented that it anticipated moving to set Lee's execution date by mid-February. Accordingly, although Lee's case was briefly consolidated with the others (*see* doc. 35), on January 29, 2026, the Court deconsolidated his case and set it on a separate, expedited schedule (*see* doc. 36).

***5** True to its word, on February 9, 2026, the State moved to set Lee's execution. (*See* doc. 106-1). On April 2, 2026, the Alabama Supreme Court granted that motion and authorized Alabama's Governor to set Lee's execution date. (*Id.*). On April 15, 2026, the Governor declared that Lee's execution would take place in the thirty-hour timeframe commencing on June 11, 2026 at 12:00 a.m., and concluding on June 12, 2026 at 6:00 a.m. (Doc. 127-1).

During discovery in *Wilson*, it was brought to the Court's attention that the pulse oximeters used in previous executions retained residual data from those executions. Specifically, the pulse oximeters retained periodic readings of the inmates' blood oxygen saturation levels and pulse rates. And on April 21, 2026—six days before the start of Lee's bench trial—the State filed a notice in *Wilson* notifying the Court that data from what appeared to be prior executions had been extracted from the pulse oximeters. (Doc. 118 in 2:24-cv-111-ECM (M.D. Ala.)). Lee filed a motion to exclude, seeking to preclude the State from offering at trial the pulse oximeter data and any testimony or evidence related to pulse oximeter readings. (Doc. 136).

At the pretrial conference, the parties agreed to bifurcate the trial as follows: Phase 1 would commence on April 27 and address all matters not related to the pulse oximeter data; and Phase 2, if necessary, would address matters related to the pulse oximeter data and would be set later pending an opportunity for Lee to conduct additional discovery. The parties reserved the right to recall witnesses, call new witnesses, or both during Phase 2. The Court denied Lee's motion to exclude the pulse oximeter evidence without prejudice. (Doc. 142). As discussed further below, the parties submitted evidence regarding the new pulse oximeter data but did not reconvene for additional in-court testimony.

### D. Overview of Trial Evidence

Eleven witnesses testified during the bench trial: seven lay witnesses and four experts. [13] Lee called as experts

three medical doctors: (1) Dr. Richard Schwartzstein ("Dr. Schwartzstein"), an expert in pulmonology, critical care medicine, physiology, hypoxia, dyspnea, [14] and air hunger; (2) Dr. Julie Bastarache ("Dr. Bastarache"), an expert in pulmonology, critical care medicine, and pathology; and (3) Dr. James Williams ("Dr. Williams"), an expert in emergency and family medicine, gunshot wounds, firearms, and ballistics. [15] (Doc. 146 at 10:17–20; *id.* at 129:15–17; doc. 147 at 8:6–10). The State proffered Dr. Joseph F. Antognini ("Dr. Antognini") as an expert in anesthesiology. [16] (Doc. 147 at 251:2–5). Lee filed a motion to exclude Dr. Antognini (doc. 103), which the Court held in abeyance pending the conclusion of trial and ultimately denied (*see* doc. 175).

***6** The Court also admitted hundreds of exhibits totaling thousands of pages, including scientific literature, ADOC records, news articles about prior nitrogen hypoxia executions, witness testimony from prior nitrogen hypoxia litigation, and video demonstrations of Alabama's and Louisiana's nitrogen hypoxia execution systems. Among the exhibits are the pulse oximeter data and expert witness declarations interpreting aspects of the data, which the Court addresses *infra* Section III.E.

The Court does not exhaustively summarize each piece of evidence or each witness's testimony. However, the Court describes the following evidence and testimony: (1) information about nitrogen and oxygen as atmospheric gases, (2) demonstrations of Alabama's and Louisiana's nitrogen hypoxia execution systems, (3) background about different types of pain, (4) background about dyspnea and air hunger, (5) an overview of the experts' opinions on the effects of the Protocol, and (6) an overview of the lay witnesses testimony.

**1. Nitrogen and Oxygen**

Our bodies need oxygen to function. The normal oxygen concentration in the air is around 21%. (Doc. 173-141 at 15, para. 25 (Declaration of Dr. Antognini)). But the most abundant atmospheric gas is nitrogen, comprising approximately 78% of air. (*Id.* at 5, para. 7). Nitrogen itself is not harmful under normal circumstances, but it can kill via displacement of the oxygen that is normally present in our breathing air. (*Id.*).

An oxygen concentration of 6.2% is "just sufficient to maintain consciousness." (*Id.* at 22, para. 40). If the oxygen concentration is less than 5%, "you start to get critically low oxygen levels of inspired gas." (Doc. 146 at 132:15–16 (Dr. Bastarache trial testimony)). An oxygen concentration of 2.1% would "rapidly cause death." (Doc. 173-141 at 16, para. 26). An atmosphere containing 0.8% oxygen is not "supportive of human life," and exposure to an atmosphere with 0.8% oxygen would result in unconsciousness very quickly and death soon thereafter. (Doc. 149 at 17:16–23 (Dr. Antognini trial testimony)).

**2. Demonstrations of Nitrogen Hypoxia Systems**

At trial, the State presented video demonstrations of Louisiana's and Alabama's nitrogen hypoxia systems (doc. 173-198, doc. 173-197), as well as Dr. Antognini's written account of another demonstration of the Alabama system (doc. 173-141 at 11–12, para. 19). The Louisiana video depicts a masked mannequin with an oxygen monitor attached to a tube placed inside the mask, which tracks the decrease in oxygen level after the nitrogen gas is turned on. (*Id.* at 16:6–25; doc. 173-196). The video shows the oxygen level inside the mask rapidly decreasing to 0.8% within one minute after the nitrogen began to flow. (Doc. 149 at 17:1–15; doc. 173-196). [17]

The Alabama video is similar, depicting a mask strapped to a gas tank and an oxygen monitor attached to a tube inside the mask. (Doc. 173-197). Like the Louisiana video, the Alabama video shows the oxygen concentration in the mask quickly plummeting: around twenty-five seconds after the breathing air supply is cut off and nitrogen is turned on, the oxygen concentration is less than 6%. (*Id.*; *see also* doc. 147 at 143:24–144:2 (Houts trial testimony)). Approximately thirty to thirty-three seconds after the nitrogen gas is turned on, the oxygen concentration in the mask is less than 3%. (Doc. 173-197). And thirty-five to forty seconds in, the oxygen concentration is less than 2%. (*Id.*). In the separate demonstration witnessed by Dr. Antognini, "an oxygen monitor was placed in the mask and surrounded by sheets and a towel." (Doc. 173-141 at 11, para. 19). According to Dr. Antognini, this demonstration showed results similar to those in the video: less than twenty-four seconds after nitrogen gas was turned on, the oxygen concentration in the mask was 5%; and approximately forty-two seconds in, the oxygen concentration was 2%. (Doc. 173-141 at 11–12, para. 19).

**3. Types of Pain**

***7** To explain how the medical community understands pain, Dr. Williams testified regarding how pain is processed by the brain. (Doc. 147 at 10:9–13). Dr. Williams defined

pain as a noxious stimulus that is "transmitted to the brain via sensory nerves." (Doc. 173-40 at 5). There are four types of noxious stimuli: (1) mechanical (like a gunshot, stabbing, or pressure); (2) thermal (like placing your hand on a hot stove); (3) chemical (like the reaction to capsaicin in food); and (4) visceral or homeostatic, including nausea, itching, and air hunger. (Doc. 147 at 11:3–12:5). As relevant here, the visceral or homeostatic receptors—"the systems which give the brain input on things such as the state of oxygen in the blood"— can result in "sensations as simple as hunger, air hunger, nausea, cramping, [and] itching." (*Id.* at 11:24–12:5).

**4. Dyspnea and Air Hunger**

Dr. Schwartzstein, a pulmonary and critical care physician and a professor, has treated and studied dyspnea for decades. (Doc. 146 at 7:12–9:19). He has treated over 15,000 dyspneic patients; written numerous articles on dyspnea; and served on the writing committees for multiple "consensus statements" (the official positions by leading medical organizations) on dyspnea. (*Id.* at 7:23–8:18, 9:14–19, 23:5–24:22; 29:17–31:20). Dr. Bastarache, also a pulmonary and critical care physician as well as a professor of pathology, regularly treats dyspnea from hypoxia and studies lung injury and disease. (*Id.* at 127:10–29:14, 175:13–76:14). Based on their training, clinical experience, and research, Dr. Schwartzstein and Dr. Bastarache testified about how hypoxia can cause dyspnea, and how humans experience and respond to dyspnea and air hunger, as follows:

Dyspnea is a symptom generally understood as breathing difficulty or breathing discomfort. (Doc. 146 at 8:12–14 (Dr. Schwartzstein trial testimony)). "With few exceptions, dyspnea will provoke increases in respiratory rate (breathing faster) and tidal volume (the size of the breath) in healthy individuals." (Doc. 173-43 at 7, para. 20 (parentheticals in original)). Although dyspnea shares similar features with pain, dyspnea is "a more holistic discomfort sensation" without a specific source, whereas pain is often associated with "a particular injury to a portion of the body." (Doc. 146 at 11:4–12 (Dr. Schwartzstein trial testimony)). And similar parts of the brain are activated in response to dyspnea as are activated when a person is experiencing pain. (*See id.* at 33:20–23 (Dr. Schwartzstein trial testimony)).

The experience of dyspnea can range from minor to very severe. (*Id.* at 11:11–12 (Dr. Schwartzstein trial testimony)). The most severe form of dyspnea is air hunger, [18] which is "associated with severe gas exchange changes." (Doc. 173-43 at 6, para. 18). Clinical patients and research subjects have described the distressing sensation that accompanies air hunger in numerous ways, including feeling "starved for air" or like your "[b]reaths are too small," feeling like you "[c]annot get enough air," feeling like there is "an elephant on your chest," "like running in a race ... and feel[ing] like you are going to collapse," "a feeling of suffocation," and "a smothering feeling akin to drowning," (Doc. 146 at 19:9–13, 32:11–20, 63:1–5); (doc. 173-82 at 6 ("Patients often describe air hunger as akin to suffocation or drowning ...."); *see also* doc. 173-74 at 9 fig. 6 (research subjects describing hypoxia as air hunger, starved for air, short of breath, and "a feeling of suffocation")). [19]

***8** For many people, air hunger causes extreme emotional distress, panic, anxiety, and fear. (Doc. 146 at 18:18–24, 20:3–14, 22:19–23:2, 29:9–15 (Dr. Schwartzstein trial testimony); *see also* doc. 149 at 70:9–19 (Dr. Antognini agreeing that dyspnea "can cause terror," "panic," and "ranks among the most distressing experiences that human beings can endure")). Dr. Schwartzstein testified that dyspnea is one of the "most severe forms of threat to [one's] very existence," triggering the brain's survival instincts and evoking a primal fear response due to the inability to take in enough air. (Doc. 146 at 11:17–18; *see id.* at 133:14–20 (Dr. Bastarache defining air hunger as "the primal urge to get more air," which corresponds with the body's "extreme physiologic need to get more oxygen"); *id.* at 156:23–24 (Dr. Bastarache testifying that air hunger produces "intense physiologic stress that causes intense suffering")). Indeed, many people find air hunger "worse than pain" because it is associated with the fear of dying. (*Id.* at 28:4–5 (Dr. Schwartzstein trial testimony); *see also* doc. 173-57 at 1 ("Although it shares many similarities with pain, dyspn[ ]ea can be far worse than pain in that it summons a primal fear response.")).

Several factors cause or exacerbate air hunger, including hypercapnia (too much carbon dioxide), hypoxia, and restrictions on the size of one's breath. (Doc. 173-43 at 7, para. 21; *id.* at 9–10, para. 28). Anxiety can also exacerbate air hunger. (*Id.* at 9, para. 27). Several factors can alleviate air hunger, including taking larger breaths and reducing anxiety. (*Id.* at 9–10, paras. 27–30). In the clinical and research settings, mitigating the dyspneic subject's anxiety is possible. In the research setting, for example, researchers can reassure the test subjects that their feelings of air hunger are merely part of the experiment. (Doc. 173-74 at 3). And in the clinical setting, doctors can reassure many patients that the patients' dyspnea is a consequence of their condition and does not

mean they are going to die. (Doc. 173-57 at 17 tbl. 2). In an execution setting, however, such reassurance is not possible because the goal is to cause the inmate's death.

**5. Expert Testimony on the Protocol's Effects**

Except for Dr. Williams, each of the parties' experts testified generally about the effects of nitrogen hypoxia, with particular focus on the time it takes to render an inmate unconscious and any suffering involved. The parties' experts agree that the Protocol creates a hypoxic environment,[20] the Protocol causes some level of air hunger, and air hunger is extremely distressing. But the parties presented conflicting expert testimony about the air hunger's severity, the time to unconsciousness, and (relatedly) how long inmates are able to experience air hunger.

Dr. Antognini, an anesthesiologist, opines that the Protocol renders a condemned inmate unconsciousness in approximately sixty to seventy-five seconds from when the nitrogen is turned on and begins to flow into the mask.[21] (Doc. 149 at 88:11–19). He bases this opinion on his clinical career; his personal experience testing various aspects of the Protocol; demonstrations of the Alabama and Louisiana nitrogen hypoxia systems; and various articles, reports, reviews, and studies. Across the scientific literature on which he relies, hypoxia resulted in unconsciousness in approximately one minute or less. Additionally, he opines that because unconsciousness occurs quickly under the Protocol, "any distress or suffering [from air hunger] ... is going to be very, very brief if at all present"—on the order of ten to twenty seconds. (Doc. 149 at 61:17–19, 109:20). He further claims that any air hunger would only be "mild" and akin to the shortness of breath one might expect to have "on an exercise bike." (*Id.* at 28:16–22, 54:25–55:3). In support, he contends that air hunger results primarily from the buildup of carbon dioxide and not oxygen deprivation, and that the Protocol prevents carbon dioxide buildup because exhaled carbon dioxide exits the mask via a one-way valve.

***9** In contrast to Dr. Antognini, Dr. Schwartzstein and Dr. Bastarache opine that inmates executed under the Protocol likely experience severe air hunger and associated emotional suffering and physiological distress. (Doc. 146 at 63:1–7 (Dr. Schwartzstein); *id.* at 156:23–25 (Dr. Bastarache)). They claim that air hunger is severe because of the extent of oxygen deprivation; the human body's primal physiological response to not getting enough oxygen; the associated fear of dying; the inmate's inability to alleviate air hunger; restrictions on the inmate's breathing from the chest restraints; and the occurrence of flash pulmonary edema, a condition triggered by a sudden rise in blood pressure in which the lungs "almost instantaneously" fill with fluid and make it "extremely difficult to breathe," (*id.* at 28:16–22, 54:25–55:3).

Lee's experts further claim that inmates executed under the Protocol remain conscious, and therefore able to experience air hunger, for much longer than Dr. Antognini estimates. Regarding time to unconsciousness, Dr. Bastarache opines that the theoretical "floor," under idealized conditions with a healthy person breathing 100% nitrogen and having no breathing restrictions, is two minutes and eighteen seconds. (*Id.* at 138:3–39:9). But based on her interpretations of eyewitnesses' observations of past executions, Dr. Bastarache estimates that four inmates previously executed under the Protocol remained conscious for between three and seven minutes. (*Id.* at 144:14–51:1). In particular, witnesses observed the inmates making certain movements during the executions, which Dr. Bastarache interprets as "purposeful" movements and thus evidence of consciousness (*id.* at 141:12). Additionally, citing brain imaging data and studies of patients who later developed PTSD attributable to dyspnea experienced during mechanical ventilation, Dr. Schwartzstein opines that the human brain can continue to process "respiratory-related brain suffering"—i.e., distress evoked by dyspnea—even when the person is apparently unconscious or "unawake." (*See id.* at 48:18–24, 55:15–25, 78:20–24, 90:18–92:18). He testified that unconsciousness "does not prevent [a person] from *experiencing* dyspnea and the associated suffering," because the brain continues to process the stimuli. (*Id.* at 95:10–12, 97:20–21 (emphasis added)). He claims that an inmate's brain likely continues processing dyspnea-related stimuli for three to five minutes after the inmate is "unawake." (*Id.* at 53:15–17).

**6. Lay Witnesses**

The seven lay witnesses who testified were: (1) Sarah Clifton ("Clifton"), a reporter for the Montgomery Advertiser; (2) Commissioner Hamm; (3) Charles Williams ("Williams"), Deputy Commissioner of the ADOC; (4) James Houts ("Houts"), a former Alabama Assistant Attorney General; (5) Warden Raybon; (6) Warden Brandon McKenzie ("Warden McKenzie"), a member of the ADOC's execution team; and (7) Warden Fitzgerald Clemons ("Warden Clemons"), another member of the ADOC's execution team. (Doc. 146 at 191:18–22, 216:7–11, 244:23–45:2; doc. 147 at 128:4–21, 159:12–19, 171:2–17, 210:22–11:7).

Clifton testified live about her observations as a media witness to the past nitrogen hypoxia executions of Frazier, West, and Boyd, including her observations of the inmates' movements during the executions. (Doc. 146 at 191:25–192:16). The Court also received affidavit testimony and news articles detailing witnesses' observations of past nitrogen hypoxia executions, including their observations of the inmates' movements. (*See, e.g.*, docs. 173-19, 173-31, 173-88, 173-129, 173-130). The other lay witnesses provided background information regarding the ADOC's adoption of the Protocol and testimony regarding their own observations of nitrogen hypoxia executions. (*See, e.g.*, doc. 146 at 246:5–255:3). For example, Warden McKenzie testified about pulse oximeter readings he personally observed during past executions. Additionally, Houts, Warden McKenzie, and Warden Clemons testified that they each had been strapped to the gurney under execution conditions in terms of the tightness of the straps, and that the straps did not restrict their ability to breathe deeply. (*See, e.g.*, doc. 147 at 221:5–24).

### E. Pulse Oximeter Data

***10** After the bench trial, the parties offered additional exhibits—including the pulse oximeter data and updated declarations from Dr. Bastarache and Dr. Antognini—but did not seek to reconvene for further in-court testimony. The pulse oximeter data appear to show blood oxygen saturation readings from three past nitrogen hypoxia executions, although it is not clear which executions. (*See* doc. 173-139 at 70–79, 113–20, 215–24). All three data points show the same pattern: oxygen saturation levels plunge rapidly—within thirty seconds—then continue to decline gradually for several minutes before measurements completely cease.

Although the Court cannot, on this record, determine which executions these data represent, the Court finds it noteworthy that they consistently show a rapid decline in oxygen saturation levels. Beyond that general trend, however, the Court gives no weight to the pulse oximeter data—including Warden McKenzie's testimony about pulse oximeter readings he personally observed during past executions—because the parties have not provided the necessary context for the data's interpretation, particularly at what oxygen saturation level consciousness ceases, whether and at what level consciousness begins fading, and how any continuum of consciousness might impact the inmates' experience of any distress. *Cf. Boyd*, 2025 WL 2884410, at *7 & n.37 (relaying expert's testimony that "consciousness fades for most people around 50% oxygen saturation, and that some people can lose consciousness before they feel any distress"; and observing that, because "consciousness 'starts to fluctuate" ' when the oxygen saturation level drops below 50%," inmates may not be fully conscious the entire period after nitrogen begins to flow). [22] For this reason, neither the data nor the related exhibits have impacted the Court's analysis or conclusion.

## IV. LEGAL STANDARDS

### A. Bench Trial

"In an action tried on the facts without a jury ... the court must find the facts specially and state its conclusions of law separately." FED. R. CIV. P. 52(a)(1). In a bench trial, "it is the exclusive province of the judge ... to assess the credibility of witnesses and to assign weight to their testimony." *Childrey v. Bennett*, 997 F.2d 830, 834 (11th Cir. 1993); *see also Sidman v. Travelers Cas. & Surety*, 841 F.3d 1197, 1201 (11th Cir. 2016) (explaining, in the bench trial context, that "the district court has the advantage of observing the witnesses and evaluating their credibility firsthand," and that "[t]he credibility of a witness is in the province of the factfinder" (alteration in original) (first quoting *Fischer v. S/Y NERAIDA*, 508 F.3d 586, 592 (11th Cir. 2007), then quoting *Crystal Ent. & Filmworks, Inc. v. Jurado*, 643 F.3d 1313, 1320 (11th Cir. 2011))). Additionally, "[a] trial judge sitting without jury is entitled to great latitude concerning the admission or exclusion of evidence." *Wright v. Sw. Bank*, 554 F.2d 661, 663 (5th Cir. 1977). [23]

### B. Eighth Amendment Method of Execution Claims

***11** Capital punishment is unquestionably constitutional. *See Bucklew*, 587 U.S. at 129. And states are permitted to carry out executions by any method that is not "cruel and unusual." U.S. CONST. amend. VIII. When a federal court evaluates whether a state's method of execution violates the Constitution, it may not act as a "board[ ] of inquiry charged with determining 'best practices' for executions" or "intrude on the role of state legislatures in implementing their execution procedures," and it must refrain from becoming "embroil[ed] ... in ongoing scientific controversies beyond [its] expertise." *See Baze v. Rees*, 553 U.S. 35, 51 (2008) (plurality op.).

"The cruelty against which the Constitution protects a convicted man is cruelty inherent in the method of punishment, not the necessary suffering involved in any method employed to extinguish life humanely." *Resweber*, 329 U.S. at 464. Cruelty "implies ... something inhuman and

barbarous[ ]—something more than the mere extinguishment of life." *In re Kemmler*, 136 U.S. 436, 447 (1890). It requires the "superadd[ition]" of "terror, pain, or disgrace" to death. *Wilkerson v. Utah*, 99 U.S. 130, 135 (1878); *cf. Baze*, 553 U.S. at 48 ("What each of the forbidden punishments had in common was the deliberate infliction of pain for the sake of pain—'superadd[ing]' pain to the death sentence through torture and the like." (alteration in original) (quoting *Wilkerson*, 99 U.S. at 135)). The United States Supreme Court has provided instructive examples of cruelty: drawing and quartering, public dissection, burning at the stake, crucifixion, breaking on the wheel, flaying, scourging, starving, gibbeting, or rending asunder with horses. *See Bucklew*, 587 U.S. at 131; *In re Bonner*, 151 U.S. 242, 258 (1894); *In re Kemmler*, 136 U.S. at 446; *Wilkerson*, 99 U.S. at 135; *Baze*, 553 U.S. at 95–96 (Thomas, J., concurring); *see also id.* at 50 (plurality op.) (reasoning that "a series of abortive attempts at electrocution" would likely run afoul of the Eighth Amendment (citing *Resweber*, 329 U.S. at 471 (Frankfurter, J., concurring))).

"It's instructive, too, to contrast the modes of execution the Eighth Amendment was understood to forbid with those it was understood to permit[ ] ... [a]t the time of the Amendment's adoption ...." *Bucklew*, 587 U.S. at 132. Among those permitted methods was hanging, which was "no guarantee of a quick and painless death." *Id.* Hanging more often than not caused death from "loss of blood flow to the brain, which could produce unconsciousness usually within seconds, or suffocation, which could take several minutes." *Id.* Even though "hanging could and often did result in significant pain," it was not cruel in the constitutional sense because it was not intended to cause pain, and the risks were considered unfortunate but inevitable—necessarily concomitant to the act of carrying out capital punishment. *See id.* (citations omitted). The same unfortunate but inevitable risks attend execution by firing squad. *See Wilkerson*, 99 U.S. at 134–35. And electrocution. *See Resweber*, 329 U.S. at 463–64; *In re Kemmler*, 136 U.S. at 446–47, 449. And lethal injection. *See Bucklew*, 587 U.S. at 147–49; *Glossip v. Gross*, 576 U.S. 863, 878 (2015); *Baze*, 553 U.S. at 62.[24] In short, "what unites the punishments the Eighth Amendment was understood to forbid, and distinguishes them from those it was understood to allow, is that the former were long disused (unusual) forms of punishment that intensified the sentence of death with a (cruel) 'superadd[ition]' of 'terror, pain, or disgrace.' " *Bucklew*, 587 U.S. at 133 (parentheticals and alteration in original) (quoting *Baze*, 553 U.S. at 48).

***12** To show that the ADOC's nitrogen hypoxia protocol is cruel and unusual, Lee must first show that the Protocol poses "a 'substantial risk of serious harm,' an 'objectively intolerable risk of harm' that prevents prison officials from pleading that they were 'subjectively blameless for purposes of the Eighth Amendment.' " *Glossip*, 576 U.S. at 877 (quoting *Baze*, 553 U.S. at 50).[25] "Simply because an execution may result in pain, either by accident or as an inescapable consequence of death, does not establish the sort of 'objectively intolerable risk of harm' that qualifies as cruel and unusual." *Baze*, 553 U.S. at 50 (quoting *Farmer v. Brennan*, 511 U.S. 825, 846 (1994)). Instead, Lee must show that the Protocol "presents a risk that is '*sure or very likely* to cause serious illness and needless suffering,' and give[s] rise to 'sufficiently *imminent* dangers.' " *Glossip*, 576 U.S. at 877 (emphases in original) (quoting *Baze*, 553 U.S. at 50). To prevail, Lee must also "show a feasible and readily implemented alternative method of execution that would significantly reduce a substantial risk of severe pain." *Bucklew*, 587 U.S. at 134. But if the Protocol does not present a substantial risk of severe pain, the State "may use it regardless of the proposed alternatives." *Nance v. Comm'r, Ga. Dep't of Corr.*, 169 F.4th 1312, 1318 (11th Cir. Mar. 19, 2026). After all, "[a]n 'alternative method' cannot 'reduce a substantial risk of severe pain' when there was no substantial risk in the first place." *Id.*

In sum, Lee must show by a preponderance of the evidence that the Protocol (1) creates a substantial risk of severe pain and (2) "there is an alternative that is feasible, readily implemented, and in fact significantly reduces a substantial risk of severe pain." *Id.* (quoting *Barber v. Governor of Ala.*, 73 F.4th 1306, 1318 (11th Cir. 2023)). Lee's claim "faces an exceedingly high bar," *see Barr v. Lee*, 591 U.S. 979, 980 (2020) (per curiam), and the United States Supreme Court has "yet to hold that a State's method of execution qualifies as cruel and unusual," *Bucklew*, 587 U.S. at 133.

## V. DISCUSSION

The Court must determine whether this record supports the conclusion that the Protocol causes severe suffering well beyond what is necessary to extinguish human life, thus rendering it cruel and unusual in violation of the Eighth Amendment. *See Bucklew*, 587 U.S. at 132, 134. Even without a showing of physical pain, Lee may succeed if the Protocol "induces psychological terror or pain that is severe enough to support an Eighth Amendment claim,"

Grayson v. Comm'r, Ala. Dep't of Corr., 121 F.4th 894, 900 n.3 (11th Cir. 2024), because the Founders broadly understood pain to encompass psychological terror or disgrace, *see* Bucklew, 587 U.S. at 130 ("[A] reader at the time of the Eighth Amendment's adoption would have understood" the word "cruel" to mean "[d]isposed to give pain to others, in body or mind." (second alteration in original) (quoting 1 NOAH WEBSTER, AN AMERICAN DICTIONARY OF THE ENGLISH LANGUAGE (1828))).

The parties agree that the Protocol causes some level of air hunger and corresponding emotional suffering and physiological distress. (Doc. 146 at 63:1–2 (Dr. Schwartzstein opining that "it is highly likely that individuals succumbing to th[e] [P]rotocol will experience severe air hunger"); *id.* at 156:19–20 (Dr. Bastarache stating that the Protocol's "forced nitrogen hypoxia causes extreme air hunger"); doc. 149 at 73:19–20 (Dr. Antognini acknowledging that "there could be a few seconds where [air hunger] might occur" during a nitrogen hypoxia execution)). But the parties bitterly dispute both the severity of the air hunger and how long inmates can experience it. *Cf.* Bucklew, 587 U.S. at 137 ("[T]he relevant question isn't how long it will take for [the inmate] to die, but how long he will be capable of feeling pain.").

***13** Lee does not argue that air hunger entails physical pain like a broken bone—though, again, he need not establish the occurrence of physical pain to prevail. Instead, he claims that air hunger causes emotional suffering and physiological distress, producing a "more holistic discomfort sensation" that shares similar features with pain, (doc. 146 at 11:4–14 (Dr. Schwartzstein trial testimony)), but that air hunger is also "worse than pain" because it is associated with the fear of dying, (*id.* at 28:13–15 (Dr. Schwartzstein trial testimony); (*see also* doc. 173-57 at 1 ("Although it shares many similarities with pain, dyspnea can be far worse than pain in that it summons a primal fear response.")). Dr. Williams explains that although "[p]ain is a specific type of noxious stimulus," the body may experience something "extremely noxious" that results in bodily discomfort without experiencing what we might traditionally call pain. (Doc. 147 at 12:12–25; *see id.* at 13:1–6 (explaining that if a person eats very hot food, they may have "the experience of chemical burning, which is extremely uncomfortable, but most of us would not actually describe that as pain")). Lee elaborates that the Protocol causes emotional suffering and physiological distress because the inability to take in sufficient oxygen activates the body's survival instincts to try to get more air, which cannot be satisfied—the Protocol produces an urgent need for the very thing it takes away. (*See, e.g.*, doc. 146 at 133:15–20). Because nitrogen hypoxia triggers inmates' physiological need to breathe oxygen while also preventing them from doing so, Lee claims that this method of execution is unique, and uniquely distressing, and constitutes cruel and unusual punishment.

Lee further claims that inmates experience air hunger for six to twelve minutes—although inmates are unconscious or "unawake" for three to five minutes of that time.[26] (*See* doc. 146 at 53:12–17). By contrast, Dr. Antognini claims that the Protocol induces unconsciousness in sixty to seventy-five seconds from when the nitrogen gas begins to flow into the mask, and that any air hunger would be mild. (Doc. 149 at 28:16–22, 88:11–19).

To determine whether the Protocol causes unconstitutional suffering, the Court must resolve certain factual disputes and make credibility determinations, which require further examination of the expert witnesses' testimonies. Then, the Court sets forth its findings of fact and conclusions of law.

### A. Severity of Air Hunger

The State claims that any air hunger induced by the Protocol would only be "mild" and akin to the shortness of breath one might expect to have "on an exercise bike." (Doc. 149 at 28:19–22, 54:25–55:3 (Dr. Antognini trial testimony)). In support, the State relies on Dr. Antognini's opinions that air hunger is primarily caused by carbon dioxide buildup, and because the mask eliminates carbon dioxide buildup via the one-way exhalation valve, inmates executed under the Protocol do not experience more than mild air hunger. (*See id.* at 4:17–21, 33:23–34:10, 43:24–44:9). Lee claims that an inmate's air hunger is severe because of the total oxygen deprivation; the activation of the body's basic survival instinct to breathe more oxygen and the physiological response to the inability to do so; the associated fear of dying; the inmate's inability to alleviate air hunger; restrictions on the inmate's breathing from the chest restraints; and the occurrence of flash pulmonary edema. Based on Dr. Schwartzstein and Dr. Bastarache's opinion, Lee further claims lack of oxygen alone causes air hunger even when carbon dioxide levels are normal, and thus the lack of carbon dioxide buildup in the mask does not eliminate the possibility of severe air hunger. (*See* doc. 146 at 36:5–37:6, 45:3–22 (Dr. Schwartzstein trial testimony); *see also* doc. 173-74 (S.H. Moosavi et al., *Hypoxic and Hypercapnic Drives to Breathe Generate Equivalent Levels of Air Hunger in Humans*, 94 J. APPLIED

PHYSIOL. 141 (2003) (hereinafter, the "Moosavi study")); doc. 173-42 at 1 (Dr. Bastarache rebuttal report)).

***14** Below, the Court explains why it credits Lee's experts that inmates executed under the Protocol likely experience severe air hunger. But the Court begins by addressing one factor upon which Lee relies which, on this record, does not contribute to or exacerbate air hunger: the chest restraints.

On this record, the Court does not credit Dr. Schwartzstein's opinion that the chest restraints prevent inmates from breathing deeply, thus exacerbating their feelings of breathlessness. (Doc. 146 at 55:24–56:10, 86:21–87:7; doc. 173-43 at 9–10, para. 28). The Court did find credible his testimony that restrictions on a person's ability to take deep breaths may exacerbate air hunger. But Houts, Warden McKenzie, and Warden Clemons all testified consistently that they have been strapped to the gurney under execution conditions in terms of tightness, and they were not restricted in their abilities to breathe deeply. (Doc. 147 at 149:23–150:9 (Houts trial testimony); *id.* at 187:14–188:17 (Warden McKenzie trial testimony); *id.* at 221:5–222:3 (Warden Clemons trial testimony)). By contrast, Dr. Schwartzstein acknowledged that, while he has seen photographs of individuals strapped to the gurney (doc. 146 at 26:20–27:1), he has not seen or examined the chest restraints in person or been strapped to the gurney (*id.* at 99:7–17). Thus, considering the testimony of Houts, Warden McKenzie, and Warden Clemons, which is based on their firsthand experience and which the Court finds credible, the Court finds that the chest restraints used in executions under the Protocol do not restrict inmates from breathing deeply—which Dr. Schwartzstein said was a significant factor exacerbating dyspnea. Thus, the Court finds that the chest restraints do not contribute to or exacerbate any air hunger the inmates may experience.

Notwithstanding this finding, the Court credits Dr. Schwartzstein and Dr. Bastarache's opinion that inmates executed under the Protocol likely experience severe air hunger, which evokes distress and anxiety.[27] (Doc. 146 at 56:24–57:1, 63:1–7 (Dr. Schwartzstein trial testimony); *id.* at 156:19–25 (Dr. Bastarache trial testimony)). Dr. Schwartzstein's opinion is based, among other things, on his experience studying dyspnea for forty years and treating more than 15,000 dyspneic patients. The Court finds persuasive Dr. Schwartzstein's opinion that air hunger "involves activation of brain regions dedicated to basic survival instincts, which include the need to breathe adequately," and that when an individual's breathing is inadequate, "severe distress, anxiety and panic are normal and expected human sensations" because the individual fears death is imminent. (Doc. 173-43 at 7, para. 22 (emphasis omitted)). Dr. Bastarache echoes this view, explaining that air hunger triggers the body's "extreme physiologic need to get more oxygen" and produces "intense physiologic stress that causes intense suffering." (Doc. 146 at 133:14–20, 156:19–25). Because the inmate cannot respond to his "basic survival instincts" to address the air hunger, a "vicious cycle of increasing air hunger and panic symptoms" can occur. (Doc. 173-43 at 10, para. 29 (Dr. Schwartzstein report) (quotation marks omitted)).

***15** Unlike pain, which is normally localized to a specific body part, air hunger is "a holistic discomfort sensation," and individuals struggle to distract themselves from their dyspnea. (Doc. 146 at 11:4–12). Because it evokes a fear of dying, air hunger can be worse than pain. And unlike "anticipatory anxiety" about something bad that will happen in the future, air-hunger-induced anxiety is evoked by the underlying problem—shortness of breath—and cannot be treated with anti-anxiety medication. (*See id.* at 56:21–57:7 (Dr. Schwartzstein trial testimony)).

The total oxygen deprivation in these executions also supports the Court's finding that air hunger is severe. Dr. Schwartzstein opines that, at a partial pressure of oxygen ($PO_2$) below 60 mm Hg (which corresponds to a blood oxygen saturation below 90%), a person's drive to breathe "takes off," making him or her "desperate to try to do something to correct the hypoxemia." (Doc. 146 at 42:11–43:2, 43:17–44:6; *see also* doc. 173-81 at 81 fig. 5-8, 110 fig. 6-6). The Court thus credits Dr. Schwartzstein's view that the Protocol evokes an "incredibly strong stimulus" to breathe (doc. 146 at 44:18–23), given that the goal is to take the inmate's $PO_2$ all the way down to 0 mm Hg.[28] Dr. Schwartzstein further opines that, while only a minor factor, the inmate's awareness that he cannot alleviate his dyspnea, given the execution context, would exacerbate his anxiety and the air hunger itself. (Doc. 173-43 at 9, para. 27; doc. 146 at 86:11–20, 87:3–7).

The Court also credits Dr. Bastarache's opinion, given her training and experience, that four inmates executed under the Protocol had flash pulmonary edema, which would have exacerbated their dyspnea. (Doc. 146 at 153:1–13, 155:5–15). As indicated above, flash pulmonary edema is a condition triggered by extreme distress in which the lungs "almost instantaneously" fill with fluid, making it "extremely difficult to breathe." (*Id.* at 155:5–156:2). Dr. Bastarache opines as

follows: Of the inmates executed under the Protocol who have had autopsies performed (Smith, Miller, Grayson, and Boyd), all four had evidence of flash pulmonary edema caused by a sudden rise in blood pressure. (*Id.* at 153:1–13, 155:13–15; doc. 173-41 at 4, para. 5). Pulmonary edema is an abnormal autopsy finding. (Doc. 146 at 153:10–13; doc. 173-41 at 4, para. 5). Flash pulmonary edema indicates severe physiological stress; exacerbated the inmates' dyspnea; and would have occurred "very early on in the executions" while the inmates were conscious and "when air hunger was occurring and reaching its peak," because when consciousness is lost, heart rate and blood pressure are low. (Doc. 146 at 155:19–156:25 (Dr. Bastarache trial testimony); doc. 173-41 at 4, para. 6 (Dr. Bastarache report); *cf.* doc. 149 at 27:7–8 (Dr. Antognini opining that pulmonary edema can cause shortness of breath and air hunger "in an awake person"); *id.* at 98:18–21 (Dr. Antognini acknowledging that "a sudden severe rise in blood pressure can be explained by a sudden extreme level of physiological stress")). [29] Dr. Bastarache, who has been to dozens of autopsies and reviewed hundreds of autopsy reports (doc. 146 at 128:11–14), methodically explained the different types of pulmonary edema and credibly explained how the four inmates' autopsies showed evidence of flash pulmonary edema (*see* doc. 146 at 153:4–155:15). [30]

***16** Finally, the Court credits Dr. Schwartzstein and Dr. Bastarache's opinion that hypoxia causes dyspnea even when carbon dioxide levels are normal and, therefore, the lack of carbon dioxide buildup in the mask does not eliminate or reduce the possibility of severe air hunger. The Court bases this finding on Dr. Schwartzstein's and Dr. Bastarache's expertise, their extensive experience studying dyspnea and treating dyspneic patients, and the scientific literature. According to Dr. Schwartzstein, the opinion that dyspnea is primarily caused by carbon dioxide buildup—an opinion Dr. Antognini espouses—used to be the prevailing view, but more recent research has altered that understanding. (*See id.* at 36:5–37:2 (Dr. Schwartzstein trial testimony); doc. 173-74 at 1 ("There is a commonly held notion, prevalent in the altitude literature, that dyspnea does not accompany hypoxia.")). [31] Additionally, in Dr. Schwartzstein's experience, the "vast majority of patients who are short of breath have normal or low levels of carbon dioxide." (Doc. 146 at 36:7–8). And in Dr. Bastarache's clinical experience, providing supplemental oxygen is a common treatment for air hunger, and in her over twenty years of experience, "[a] near universal feature of hypoxic patients is that when their supplemental oxygen is removed, they become panicked, breathless, voice distress over 'not getting enough air,' and plead for their supplemental oxygen to be replaced even if their carbon dioxide levels are normal." (Doc. 173-42 at 1, para. 1). For these reasons, the Court finds that the Protocol likely causes severe air hunger.

**B. Duration of Air Hunger**

The parties also vigorously contest how long it takes inmates to become unconscious under the Protocol, and relatedly, how long they are capable of experiencing suffering. In earlier cases, the time component was based on the time to unconsciousness because no one argued that an unconscious person can feel pain. *See, e.g., Boyd*, 2025 WL 2884410, at *17 ("A key question is how long a person will experience emotional terror and psychological distress when he is executed under the Protocol. Resolving this question depends on how long it will take for the inmate to become unconscious, as no party contends that an unconscious person can feel pain or distress."). Here, however, Lee contends that the relevant time extends beyond apparent unconsciousness based on Dr. Schwartzstein's opinion that people can experience dyspnea even while apparently unconscious or "unawake." (*But cf.* doc. 147 at 41:7–16 (Dr. Williams' testimony that people do not experience pain after losing consciousness, whether they are rendered unconscious by a loss of blood flow to the brain or by anesthesia); doc. 149 at 27:7–10 (Dr. Antognini opining that a person who has pulmonary edema while unconscious will not experience sensations of shortness of breath or air hunger)).

Based on his opinion that inmates are rendered unconscious within approximately sixty to seventy-five seconds after the nitrogen gas is turned on, Dr. Antognini claims that "any distress or suffering" from air hunger "is going to be very, very brief if at all present because of the rapid onset of unconsciousness." (Doc. 149 at 61:17–19, 88:11–19). While Dr. Bastarache posits a theoretical "floor" of two minutes and eighteen seconds to unconsciousness, she claims that four inmates previously executed under the Protocol remained conscious for between three and seven minutes. (*See* doc. 146 at 145:1–8 (Smith), 146:16–19 (Miller), 148:21–23 (Grayson), 150:15–19 (Hunt)). Citing brain imaging studies and studies of hospital patients who later developed PTSD attributable to the dyspnea experienced during mechanical ventilation, Dr. Schwartzstein opines that the human brain can continue to process "respiratory-related brain suffering"—i.e., distress evoked by dyspnea—even when the person is apparently unconscious or "unawake," and that the brain likely continues processing these stimuli for three to five minutes after the inmate is no longer "awake." (*See* doc.

146 at 47:8–20, 48:15–49:13, 53:15–17, 78:20–24). Thus, considering Dr. Bastarache's and Dr. Schwartzstein's opinions together, Lee contends that inmates executed under the Protocol experience dyspnea-induced suffering for six to twelve minutes.

***17** The Court first addresses Dr. Schwartzstein's view on the unconscious experience of suffering and explains why, on this record, any unconscious experience of dyspnea does not rise to the level of an Eighth Amendment violation.

**1. Unconscious Brain Processing of Dyspnea**

Dr. Schwartzstein uses terms like "consciousness" and "experiences" in ways that are unfamiliar to an ordinary English speaker. According to him, an "unawake" person "experiences" and is "conscious." (*See, e.g.*, doc. 146 at 48:18–21 (Dr. Schwartzstein explaining that when he says "not awake," he means "colloquially unconscious")); *id.* at 51:23–24 (Dr. Schwartzstein noting that patients still experience dyspnea "in the unawake state")). Dr. Schwartzstein's view is premised upon his definitions of "experience" and "consciousness" as the "processing of stimuli by the brain"—specifically here, the brain's "processing" of dyspnea while unawake but before the onset of death. (*Id.* at 48:20–22 ("[I]f they're not awake, colloquially unconscious – we cannot exclude respiratory-related brain suffering.")). In support, Dr. Schwartzstein cites studies of ventilated, sedated hospital patients who later "woke up" and suffered from mental health issues, including PTSD, attributable to the dyspnea experienced during mechanical ventilation. (*See id.* at 49:4–13; doc. 173-43 at 10–11, paras. 32–33; *see also* doc. 173-82; doc. 173-57). He further relies on data from brain imaging, which he says shows that "adverse experiences are processed by the brain even when the patient is unconscious from sedation." (Doc. 173-57 at 5). And under Dr. Schwartzstein's definitions, the movements of a person who is unawake or anesthetized and reacts to a stimulus in a controlled manner (i.e., by rolling over or flinching) are "purposeful" movements which evidence brain processing of stimuli. (*See* doc. 146 at 48:22–24; *see also* doc. 173-43 at 12, para. 37)

The Court does not suggest that Dr. Schwartzstein's opinion is, in the clinical context, incorrect, unworthy of credence, or lacking in value. But, on this record, three to five minutes of unconscious brain suffering (*see* doc. 146 at 53:15–17) is merely "an inescapable consequence of death" that would attend virtually every other method of execution and, therefore, does not amount to a significant experience of pain or suffering, *see Baze*, 553 U.S. at 50.[32] And for purposes of this Opinion, a person who is "unawake" is unconscious, and a person who is unconscious does not experience or perceive dyspnea of a constitutionally relevant kind.

**2. Time to Unconsciousness**

***18** Having addressed the issue of unconscious brain suffering, the Court focuses on what the record supports regarding how long inmates remain conscious and capable of feeling air hunger. Considering all of the evidence in this case, the Court finds that, more likely than not, inmates lose consciousness in not significantly more than one to three minutes after nitrogen begins to flow into the mask. This timeframe considers both the data on which Dr. Antognini relies, including the hypoxia system demonstrations and literature which consistently shows hypoxia resulting in unconsciousness in one minute or less, and Dr. Bastarache's two minute and eighteen second baseline, with a reasonable margin to account for variability among individuals. Even if consciousness may persist for slightly longer than three minutes in some instances, which the Court doubts, the record does not support a finding that consciousness persists for five, six, or seven minutes. The Court examines Dr. Antognini's and Dr. Bastarache's opinions on time to unconsciousness in more detail below.

*a. Dr. Antognini on Time to Unconsciousness*

In addition to his clinical training and experience, Dr. Antognini bases his opinions regarding time to unconsciousness on: (1) the demonstrations of Louisiana's and Alabama's nitrogen hypoxia systems (docs. 173-198; doc. 173-41 at 11–12, para. 19); (2) the Ernsting study of three subjects inhaling nitrogen gas (doc. 173-162); (3) case reports of suicides using inert gas (docs. 173-165, 173-166, 173-167); and (4) studies of hypoxia in pilots (doc. 173-161).[33] The demonstration of Louisiana's system shows that the oxygen level inside the mask rapidly decreased to 0.8% oxygen within one minute after nitrogen began to flow. (Doc. 149 at 17:1–15; doc. 173-198). A person subjected to a 0.8% oxygen environment "would become unconscious very quickly from that, and if it's sustained, they would die." (Doc. 149 at 17:16–23). Like Louisiana's, the Alabama demonstration shows the oxygen concentration in the mask quickly plummeting: less than twenty-four seconds after the breathing air supply is cut off and nitrogen is turned on, the oxygen concentration is less than 6%, which is "just sufficient

to maintain consciousness.” (Doc. 173-41 at 11–12, para. 19 (Dr. Antognini discussing ADOC demonstration); *id.* at 22, para. 40; *see also* doc. 146 at 132:15–16 (Dr. Bastarache testifying that an oxygen concentration of less than 5% is “where you start to get critically low oxygen levels of inspired gas”)). And forty-two seconds after the nitrogen gas is turned on, the concentration is 2%, which would rapidly cause death. (Doc. 173-141 at 11–12, para. 19; *id.* at 16, para. 26 (Dr. Antognini declaration)).

In addition to the demonstrations, Dr. Antognini relies on studies and reports of several real-world examples of hypoxia causing unconsciousness relatively quickly. In the Ernsting study, three healthy male subjects were instructed the empty their lungs of air, after which nitrogen began to flow, and they then were instructed to breathe as deeply as possible. (Doc. 173-162 at 1–2). The subjects lost consciousness in seventeen to twenty seconds, during which they exhibited convulsions. (*Id.* at 4, 10). Further, the suicide case reports involved subjects breathing inert gas, including nitrogen and helium; some of the subjects were directed to empty their lungs of air and then take a deep breath of the gas. (*See, e.g.*, doc. 173-167 at 3–4). Time until loss of consciousness ranged from ten to fifty-five seconds. (*See* doc. 173-166 at 4; doc. 173-167 at 4 tbl. 3). And in the pilot studies, military pilots lost consciousness in approximately five to six seconds at high altitudes. (*See* doc. 173-161 at 5–6; *see also* doc. 149 at 35:16–20 (Dr. Antognini trial testimony explaining that rapid decompression could occur “in the order of five, six, [or] seven seconds”)).

Regarding movements observed in past nitrogen hypoxia executions, Dr. Antognini testified that “[i]t's hard to know ... if some of these movements are just spontaneous movement even before the nitrogen starts,” and that “there can be a lot of movement associated with the decreased oxygen” after the inmate becomes unconscious. (Doc. 149 at 19:16–21). He explains that when the brain and spinal cord are not getting enough oxygen, their neurons start “fir[ing] off,” which causes twitching and other movements, such as leg raising. (*Id.* at 19:21–20:3). He opines that unconscious movement when a person is dying is “common,” and he was “not surprised” that movements have been observed during hypoxia executions. (*Id.* at 20:3–7). He did not, however, offer an opinion about how long any inmate had remained conscious during past executions under the Protocol. (*See id.* at 89:8–11 (Dr. Antognini agreeing that he “cannot tell the precise moment when any individual inmate became unconscious during execution by nitrogen hypoxia”)).

*b. Dr. Bastarache on Time to Unconsciousness*

***19** In formulating her opinion that the baseline minimum time to unconsciousness is two minutes and eighteen seconds, Dr. Bastarache's analysis proceeds in three steps: (1) the amount of time it takes, after the nitrogen gas is turned on, for oxygen to be purged from the mask; plus (2) the amount of time it takes for the inmate to exchange the oxygen in his lungs with 100% nitrogen; plus (3) the amount of time it takes for blood to circulate and deliver oxygen throughout the body. (*See* doc. 146 at 130:11–24, 138:3–8).

Dr. Bastarache calculates that Step 1 takes thirty-three seconds based on Dr. Antognini's testing of the ADOC's nitrogen hypoxia system, represented in a chart, and her general knowledge that an oxygen concentration in the air of less than 5% (compared to the norm of 21%) is “really where you start to get to critically low oxygen levels of inspired gas.” (*See id.* at 132:15–16; *see also* doc. 173-141 at 11). In Step 2, Dr. Bastarache estimates that it will take approximately forty-five seconds for the lungs of an older inmate—in his 50s, 60s, or 70s—to displace any residual oxygen present when the Protocol begins and to completely fill with nitrogen. (Doc. 146 at 133:23–34:10). In Step 3, because oxygen is delivered to the body by blood circulation, Dr. Bastarache estimates that it will take several circulatory cycles—totaling another sixty seconds—for the oxygen in the blood to reach a level where the inmate would lose consciousness. (*Id.* at 136:8–137:2). In her view, these three time intervals are additive and largely do not overlap. (*Id.* at 135:12–36:2; 137:10–19). [34]

Based on her review and analysis of eyewitness accounts of four earlier executions (Smith's, Miller's, Grayson's, and Hunt's), Dr. Bastarache opines that inmates have remained conscious for between three and seven minutes, and that, accordingly, inmates in future executions would likely also remain conscious for between three and seven minutes. (*See, e.g.*, doc. 146 at 146:16–19, 148:21–23). As explained above, her three-to-seven-minute estimate is based on her interpretations of reports of the inmates' movements after nitrogen apparently began flowing into the mask, including reports from media witnesses and from Dr. McAlary. She interprets certain reported movements as “purposeful” and thus evidence of consciousness. (Doc. 146 at 141:12). She testified that she interprets lay witnesses' observations “every day” when treating patients. (*Id.* at 128:20–29:5). Her

methodology consisted of reviewing the reports from prior executions, noting when the author estimated that nitrogen began to flow, and then identifying which of the inmate's movements as described by the author were "purposeful." (*Id.* at 140:24–42:1). In particular, she looked for movements such as rolling, attempting to sit up to breathe, legs lifting up, lifting of the head, clenching of the fists, and pulling against the restraints. (*Id.* at 141:2–14, 144:18–25, 146:2–11).

***20** Based on her review of the witness accounts, she estimates that Smith was conscious for four minutes, Miller for seven minutes, Grayson for "[b]etween three and five minutes," and Hunt for "approximately six minutes." (Doc. 146 at 143:20–145:8; 146:16–19; 148:21–23; 150:15–19). Regarding Smith's execution, she relies on a media witness's report that, in the four minutes after nitrogen apparently began flowing, Smith made movements such as writhing and convulsing, shaking, and clenching his fists and legs, which she considers purposeful movements. (*Id.* at 144:18–25; *see* doc. 173-31). For Miller's, she similarly relies on a media witness's report, which indicated that Miller exhibited what she deems purposeful movements—lifting his head from the gurney and struggling against his restraints—for approximately seven minutes. (Doc. 146 at 146:2–19; *see* doc. 173-129). For Grayson's, she cites Dr. McAlary's report that Grayson lifted both legs off the gurney around three minutes after nitrogen apparently began flowing, which she considers a purposeful movement. (Doc. 146 at 148:4–23; *see* doc. 173-19). And for Hunt's, she cites a media witness's report that Hunt's body shook approximately two minutes after nitrogen gas presumably began to flow, that he lifted his feet into the air approximately two minutes later, and that his "left fist was balled tightly" another two minutes after that, all of which she considers purposeful. (Doc. 146 at 150:10–14; *see* doc. 173-88).

When asked why, in her view, these four inmates remained conscious for longer than her theoretical baseline, Dr. Bastarache explained that many factors can increase the time it takes for a person exposed to a hypoxic environment to lose consciousness. One factor is the variability among individuals. "Each patient is going to have a different experience in time to loss of consciousness. People vary in their sensitivity to hypoxia, their sensitivity to hypercarbia, [and] the time it takes for them to pass out after getting hypoxic. So there's a lot of individual variability." (Doc. 146 at 138:14–18; *see also id.* at 173:10–11 ("[T]here's a wide variability in people's response to hypoxia.")). Additionally, she asserts that because the oxygen concentration in the mask never reaches 0%, an inmate will continue to breathe some minimal oxygen during the execution, thereby extending the time beyond her theoretical estimate. (*Id.* at 171:3–13). Further, she opines that the ADOC's use of chest restraints can increase the time to unconsciousness *if* the inmate cannot take full breaths. (*Id.* at 151:24–25 ("[I]f the inmates aren't able to breathe deeply, that would also prolong the time [to unconsciousness].")).

*c. Discussion on Time to Unconsciousness*

The Court has not excluded Dr. Antognini's opinions for the reasons explained in its separate Opinion (*see* doc. 175), and the Court finds the data underlying his opinions helpful to the extent they illustrate how human beings react to hypoxia. (*See generally* docs. 173-159; 173-162, 173-165, 173-166, 173-167). And the data consistently show unconsciousness from hypoxia occurring in approximately one minute or less. Nonetheless, the Court questions some of the data on which Dr. Antognini relies because he does not adequately explain how he extrapolated from the data in those studies to reach his conclusions about nitrogen hypoxia executions. Regarding the pilot studies, he acknowledges that the low barometric pressures at high altitudes accelerate the hypoxia process, and that Holman (where executions occur) is at sea level. (*See* doc. 149 at 81:6–82:1). However, he did not explain whether or to what extent he accounted for this distinction in forming his opinion. Further, regarding the Ernsting studies and suicide case reports, he did not articulate whether or to what extent he accounted for the fact that the subjects received breathing instructions and took deep breaths of the inert gas, despite his acknowledging that inmates in the execution context are "not given any instructions, in terms of inhaling or exhaling." (*Id.* at 79:13–15). And he also acknowledges that the subjects in the suicide case reports were voluntarily ending their lives, which differs from the execution context. (*Id.* at 79:16–18). While extrapolation is permitted, the expert must provide a sufficient basis for the extrapolation. *Arthur v. Comm'r, Ala. Dep't of Corr.*, 840 F.3d 1268, 1311–12 (11th Cir. 2016) (citing *Glossip*, 576 U.S. at 883), *abrogated in part by, Bucklew*, 587 U.S. 119, *as recognized in, Nance v. Comm'r, Ga. Dep't of Corr.*, 981 F.3d 1201 (2020). As indicated above, the Court does find the studies on which he relies relevant and helpful to the extent that they demonstrate, relatively consistently, how the human body reacts to low oxygen environments. While the Court finds his opinions worthy of some weight, these unanswered questions create

some doubt about the reliability of his sixty to seventy-five second figure.

***21** But the Court also has concerns about aspects of Dr. Bastarache's opinions—in particular, her conclusion that inmates have remained conscious for three to seven minutes after nitrogen gas began to flow, which she justifies based on (1) restrictions on inmates' ability to breathe deeply; (2) the fact that the oxygen concentration in the mask is not 0%; and (3) the inherent variability among individuals. As the Court explained above and specifically finds below, the record in this case does not support a finding that the chest restraints prevent inmates from breathing deeply during a nitrogen hypoxia execution. Thus, while the Court has no reason to doubt Dr. Bastarache's opinion that inability to breathe deeply could extend the time to unconsciousness, the record does not establish that inmates *are* unable to breathe deeply due to the chest straps—thus, in this case, the inmates' inability to breathe deeply does not help explain her proffered prolonged time to unconsciousness.

As for the oxygen concentration in the mask, it is undisputed that the oxygen concentration reaches 2%, and likely lower. Dr. Bastarache did not explain the extent to which an oxygen concentration of 2% would prolong the time to unconsciousness, nor did she opine that it could account for several additional minutes of consciousness. Given this evidence and the undisputed evidence that an oxygen concentration of 2.1% would rapidly cause death, on this record the Court is skeptical that a 2% (versus 0%) oxygen concentration would significantly prolong the time to unconsciousness beyond her baseline of two minutes and eighteen seconds—and certainly not to five, six, or seven minutes.

That leaves the variability among individuals. According to Dr. Bastarache, different people respond to hypoxia differently (*see* doc. 146 at 172:23–73:11), which Dr. Antognini does not refute. Moreover, Dr. Bastarache testified that hypoxia and loss of consciousness will occur faster in someone with an underlying lung disease than a young, healthy person, based on the "reserves" in the body of a healthy versus unhealthy person. (*Id.* at 189:5–22).

To recap, Dr. Bastarache offers conclusions about the time to unconsciousness in past executions based on witnesses' observations about inmates' movements, in conjunction with her two minute and eighteen second theoretical baseline, which is based on her knowledge, training, and experience. The Court acknowledges that Dr. Bastarache has ample experience interpreting lay witness observations about patients. But in the clinical setting, Dr. Bastarache is *also* able to physically observe her patients, so her conclusions are not solely informed by lay observations. And even if they were, Dr. Bastarache did not testify that she frequently makes *consciousness determinations* based purely on lay observations. Additionally, the State presented conflicting expert testimony from Dr. Antognini that inmates can be expected to exhibit twitching and movement—including leg raising—after becoming unconscious because the brain's and spinal cord's neurons are "fir[ing] off" due to decreased oxygen. (Doc. 149 at 19:19–20:3).

Considering the unchallenged evidence about near-zero oxygen levels and her theoretical baseline, the Court finds that Dr. Bastarache has not adequately supported her opinion that consciousness persisted for five, six, or seven minutes while inmates breathed nearly 100% nitrogen gas. The Court acknowledges her testimony that the inmates' "purposeful" movements are evidence of prolonged consciousness, and the State did not directly rebut her testimony about time to unconsciousness for these inmates. Nonetheless, the Court does not find her opinion on this point plausible in light of the record as a whole and the other uncontested evidence. *See* *Mims v. United States*, 375 F.2d 135, 140 & n.2 (5th Cir. 1967) (observing that "questions of the credibility and weight of expert opinion testimony are for the trier of fact, and that such testimony is ordinarily not conclusive even where it is uncontradicted," and collecting cases); *Negron v. City of Miami Beach*, 113 F.3d 1563, 1570 (11th Cir. 1997) (observing that "the district court as factfinder was free to reject [the] expert testimony, even if it was uncontradicted" (citing *Gregg v. U.S. Indus., Inc.*, 887 F.2d 1462, 1469–70 (11th Cir. 1989))). Moreover, the prolonged times to unconsciousness which Dr. Bastarache identifies—five, six, and seven minutes—are far afield from much of the data Dr. Antognini cites on time to unconsciousness in hypoxic environments. While not dispositive, Dr. Antognini's data are relevant and inform the Court's consideration of the prolonged times to unconsciousness posited by Dr. Bastarache. Even if Dr. Antognini's sixty-to-seventy-five second figure is not exactly right, it does not follow that this record supports figures of five, six, or seven minutes.

***22** In sum, the Court does find Dr. Bastarache's baseline figure plausible, as it concretely describes the mechanism by which consciousness is lost under the Protocol. However, she did not provide a sufficient basis for the Court to find that

inmates are likely to remain conscious for as many as five, six, or even seven minutes while breathing nearly 100% nitrogen gas.

Having resolved these factual disputes and explained its findings, the Court now turns to the legal issue of whether the Protocol causes unconstitutional suffering.

### C. Whether the Protocol Causes Unconstitutional Suffering

To prevail on his method of execution claim, Lee must show by a preponderance of the evidence that the Protocol (1) creates a substantial risk of severe pain, and (2) "there is an alternative that is feasible, readily implemented, and in fact significantly reduces a substantial risk of severe pain." *See* *Nance*, 169 F.4th at 1318 (quoting *Barber*, 73 F.4th at 1318). Even without a showing of physical pain, Lee may succeed if the Protocol "induces psychological terror or pain that is severe enough to support an Eighth Amendment claim." *Grayson*, 121 F.4th at 900 n.3. But "[p]sychological pain or mental suffering is a likely result of being sentenced to death and anticipating the execution." *In re Ohio Execution Protocol Litig.*, 881 F.3d 447, 450 (6th Cir. 2018) (citation omitted). The Protocol does not implicate the Eighth Amendment unless it very likely causes "*needless* suffering," *Baze*, 553 U.S. at 50 (emphasis added), or "cruelly *superadds* pain to the death sentence," *Bucklew*, 587 U.S. at 134 (emphasis added).

After careful consideration, the Court finds that Lee has failed to show that the ADOC's nitrogen hypoxia execution protocol causes severe pain or suffering "well beyond what's needed to effectuate a death sentence." *See* *id.* at 136–37. Because Lee has failed to show that the Protocol poses a substantial risk of severe pain, the Court pretermits discussion of his proposed alternative method of firing squad.

As discussed above, the evidence shows that the Protocol likely causes severe air hunger—the most severe form of breathing discomfort—for one to three minutes. As Dr. Schwartzstein and Dr. Bastarache explain, air hunger results in profound physiological discomfort and distress, as well as anxiety, fear, and dread. In evaluating whether the air hunger induced by the Protocol cruelly superadds pain beyond that required to extinguish life, *see* *Resweber*, 329 U.S. at 464, the Court is mindful of the clinical context from which Dr. Schwartzstein's and Dr. Bastarache's opinions arise. When treating patients in a clinical setting, the goal is to minimize pain, alleviate discomfort, and prevent death. But in an execution, the goal is to *cause* death—and because the Constitution does not guarantee inmates a painless death, *Bucklew*, 587 U.S. at 132, all executions presume a risk of some pain, *see* *Resweber*, 329 U.S. at 464; *Boyd*, 2025 WL 2884410, at *20 (citing *Bucklew*, 587 U.S. at 132). The Court acknowledges that patients have described air hunger as "the worst thing that could ever happen to you" and "worse than pain." (Doc. 146 at 28:2–9; doc. 173-51 at 1). But air hunger is "the worst thing" and "worse than pain" because it is associated with the fear of death, which doctors can take steps to avoid for their patients but which is the very goal of an execution. (*See* 173-51 at 1 at 2–3 (patients describing air hunger: "*Scared. I thought the world was going to end, like in a box .... I'm going to die. I might not make it*" and "[*W*]*hen the shortness of breath was at its extreme, I thought I was going to die and saw a coffin beside me.*" (emphases in original))). Although physicians might find the air hunger induced by the Protocol problematic if reported by one of their patients, it does not necessarily follow that it is unconstitutionally cruel pain in the execution context.

***23** Yes, the Protocol causes air hunger and corresponding emotional pain, anxiety, and dread. Inmates executed under the Protocol will know they are going to die, and their body's survival instincts will kick in, attempting to take in more oxygen while knowing they are unable to do so. The Court also acknowledges Dr. Schwartzstein's testimony that the anxiety caused by the Protocol is evoked by the underlying problem—air hunger—and thus is unique and separate from the baseline anxiety associated with an imminent execution. (Doc. 146:15–47:16). But the anxiety evoked by air hunger remains inextricably intertwined with the fear of dying—and in the execution setting, the *fact* of dying and the inmate's conscious awareness that he *is* dying. Again, this view is underscored by some of the patients' descriptions of air hunger summarized in the medical literature, discussed *supra.* For Eighth Amendment purposes, the anxiety evoked by air hunger—lasting not significantly more than one to three minutes—is more an "inescapable consequence of death," *Baze*, 553 U.S. at 50, than " 'superadd[ed]' pain well beyond what's needed to effectuate a death sentence," *Bucklew*, 587 U.S. at 136–37.[35] As the Court stated previously:

> Every person condemned to die likely experiences feelings of angst, anxiety, stress, or panic. For hundreds of years, condemned inmates—regardless of the execution method—have been placed in the unenviable position of confronting their final moments. On death row, a condemned inmate arguably endures psychological pain

> from the date his sentence is imposed until the moment of his execution. Every method of execution also inevitably includes several steps signaling that death is imminent. The condemned inmate eats a last meal, says goodbye to loved ones, is escorted to the execution chamber, and utters his final words. It is no accident that the Protocol refers to these actions as "last" and "final." The condemned inmate's psychological and emotional pain likely increase as each step is complete ....
>
> Psychological and emotional pain are thus unavoidable consequences of capital punishment under any method of execution, past or present. Walking to the gallows, feeling the electric chair's straps tighten, having a target affixed to one's chest, or being secured to a gurney each evokes strong feelings that death is imminent and results in corresponding psychological and emotional pain.

*Boyd*, 2025 WL 2884410, at *20–21 (citations omitted).

True, the Protocol also causes profound and holistic physiological discomfort—although Lee does not claim that it causes physical pain like a broken bone. The physiological discomfort may feel "like an elephant on your chest," "like a boa constrictor," "like running in a race when you had to stop suddenly and feel like you are going to collapse," or even like "suffocation." (*See* doc. 146 at 19:7–12, 32:11–20, 63:1–5). But on this record, this experience, lasting one to three minutes, is similar to that associated with hanging, which has been considered constitutional for over a century. *See In re Ohio Execution Protocol Litig.*, 946 F.3d at 290 (reaching a similar conclusion in a challenge to Ohio's lethal injection protocol); *see also Bucklew*, 587 U.S. at 132 (explaining that hanging often caused death by suffocation, "which would take several minutes," but its use "was virtually never questioned" (citing and quoting STUART BANNER, THE DEATH PENALTY: AN AMERICAN HISTORY 46–47, 170)). Thus, the Court concludes that the physiological discomfort caused by the Protocol does not violate the Constitution.

It bears repeating that "[t]he Eighth Amendment 'does not demand the avoidance of all risk of pain in carrying out executions.' " *Bucklew*, 587 U.S. at 134 (quoting *Baze*, 553 U.S. at 47). On this record, nitrogen hypoxia does not superadd "terror, pain, or disgrace" to the death sentence. *Wilkerson*, 99 U.S. at 135. It is not like drawing and quartering, public dissection, burning at the stake, crucifixion, breaking on the wheel, flaying alive, scourging, starving, gibbeting, rending asunder with horses, or execution in installments—methods that involve severe pain or suffering "well beyond what's needed to effectuate a death sentence." *See Bucklew*, 587 U.S. at 136–37. Instead, it is like hanging, firing squad, electrocution, and lethal injection, involving only the "necessary suffering involved in any method employed to extinguish life humanely." *See Resweber*, 329 U.S. at 464.

***24** The Court grants that Lee has shown by a preponderance of the evidence that the ADOC's nitrogen hypoxia execution protocol causes air hunger and corresponding anxiety and physiological distress. Physicians likely would be troubled by this outcome in a clinical setting. But this Court is evaluating the constitutionality of a method of execution, where the relevant legal question is whether the Protocol presents "the sort of 'objectively intolerable risk of harm' that qualifies as cruel and unusual" in violation of the Eighth Amendment under the standard articulated by the Supreme Court. *See Baze*, 553 U.S. at 50. On this record, Lee has failed to clear this high bar. Because he has failed to show that the Protocol cruelly superadds pain, Lee has not established that the Protocol violates the Eighth Amendment.

## VI. FINDINGS OF FACT AND CONCLUSIONS OF LAW [36]

### A. Findings of Fact

In an execution under the Protocol, approximately twenty-five seconds after the breathing air supply is cut off and nitrogen is turned on, the oxygen concentration in the mask is less than 6%. An oxygen concentration of 6.2% is "just sufficient to maintain consciousness." (Doc. 173-141 at 22, para. 40). An oxygen concentration of less than 5% is "where you start to get critically low oxygen levels of inspired gas." (Doc. 146 at 132:15–18).

Approximately thirty to thirty-three seconds after the nitrogen gas is turned on, the oxygen concentration in the mask is less than 3%. And thirty-five to forty seconds in, the concentration is less than 2%. An oxygen concentration of 2.1% would rapidly cause death.

Dyspnea is a medical term for breathing difficulty or breathing discomfort. "With few exceptions, dyspnea will provoke increases in respiratory rate (breathing faster) and tidal volume (the size of the breath) in healthy individuals." (Doc. 173-43 at 7, para. 20). Although dyspnea shares similar features with pain, dyspnea is not physical

pain like a broken bone; instead, it is a "more holistic discomfort sensation" without a specific source, whereas pain is associated with a particular injury to a part of the body. (Doc. 146 at 11:1–19).

The experience of dyspnea can range from minor to very severe. The most severe form of dyspnea is "air hunger," the sensation of needing to take in more air. For many people, air hunger causes extreme emotional distress, panic, anxiety, and fear because breathing is essential to human life. "Patients often describe air hunger as akin to suffocation or drowning." (Doc. 173-82 at 6). Air hunger "involves activation of brain regions dedicated to basic survival instincts, which include the need to breathe adequately. When breathing is insufficient, severe distress, anxiety and panic are normal and expected human sensations that, under typical circumstances, highly motivate an individual to improve their breathing immediately or face imminent death." (Doc. 173-43 at 7, para. 22) (emphasis omitted). Many people find air hunger "worse than pain" because it is associated with the fear of dying. (*See* doc. 146 at 28:10–18; *see also* doc. 173-57 at 2 ("Although it shares many similarities with pain, dyspnea can be far worse than pain in that it summons a primal fear response.")).

Several factors cause or exacerbate air hunger, including hypercapnia (too much carbon dioxide), hypoxia (too little oxygen), and restrictions on the size of one's breath. Anxiety can also exacerbate air hunger. Oxygen deprivation alone, while carbon dioxide levels are normal, can cause air hunger. The chest restraints used in executions under the Protocol do not restrict an inmate's ability to breathe deeply and, therefore, do not contribute to or exacerbate any air hunger the inmate experiences.

***25** Several factors can alleviate air hunger, including taking larger breaths and reducing anxiety. In the clinical and research settings, mitigating the dyspneic subject's anxiety is possible. In the research setting, for example, researchers can reassure the subjects that the air hunger is merely part of the experiment, and this reassurance helps the subjects tolerate the discomfort of air hunger. And in the clinical setting, doctors can reassure many patients that the patients' dyspnea is a consequence of their condition and that it does not mean they are going to die. In an execution setting, such reassurance is not possible because the goal is to cause the inmate's death.

Once $PO_2$ in the blood dips below 60 mm Hg, which corresponds to a blood oxygen saturation level of 90% on a pulse oximeter, the drive to breathe "takes off" and there is a "very strong stimulus" to breathe, making the person "desperate to try to do something to correct the hypoxemia." (Doc. 146 at 43:17–44:6). Because the goal to take the inmate's $PO_2$ all the way down to 0 mm Hg, the Protocol will evoke an "incredibly strong stimulus" to breathe. (*Id.* at 44:20–23). In terms of the concentration of oxygen in the air, dyspnea and air hunger begin when the oxygen concentration is below 15%.

An inmate who is executed under the Protocol experiences severe air hunger and corresponding emotional distress, anxiety, physiological stress, and physical discomfort. An inmate executed under the Protocol consciously experiences air hunger and associated distress for not significantly more than one to three minutes. Even if consciousness may persist for slightly longer than three minutes in some instances, the record does not support a finding that consciousness persists for five, six, or seven minutes.

### B. Conclusions of Law

While a person's brain may continue to process dyspnea for three to five minutes while the person is unconscious, on this record, this unconscious brain processing is not cognizable under the Eighth Amendment because it is merely an "inescapable consequence of death." *See Baze*, 553 U.S. at 50.

Lee has failed to show by a preponderance of the evidence that the ADOC's nitrogen hypoxia execution protocol causes severe pain or suffering "well beyond what's needed to effectuate a death sentence." *See Bucklew*, 587 U.S. at 136–37. Because Lee has failed to show that the Protocol cruelly superadds pain, the Court need not consider Lee's proposed alternative method of firing squad. It also follows that, on this record, Lee has failed to show by a preponderance of the evidence that the ADOC's nitrogen hypoxia protocol violates the Eighth Amendment.

## VII. CONCLUSION

The extinguishment of human life results in suffering. Murder victims often endure a brutal end while their families suffer unimaginable loss. As a result, the people, through their representatives, permit the State of Alabama to impose the ultimate punishment for capital crimes. Americans continue to passionately advocate for and against the death penalty.


© 2026 Thomson Reuters. No claim to original U.S. Government Works.

If history is any guide, these hotly contested debates will continue regardless of a State's chosen method of execution. Although hotly contested in the public square, the "question of capital punishment belongs to the people and their representatives, not the courts, to resolve." *Bucklew*, 587 U.S. at 150. Thus, the Court's inquiry is a limited one: whether Lee has shown by a preponderance of the evidence that the Protocol "presents a risk that is 'sure or very likely to cause serious illness and needless suffering,' and gives rise to sufficiently imminent dangers.' " *Glossip*, 576 U.S. at 877 (emphases omitted) (quoting *Baze*, 553 U.S. at 50).

Although this Court held the first bench trial in the entire country examining the constitutionality of nitrogen hypoxia, the Court does not write on a clean slate. The United States Supreme Court "has never invalidated a State's chosen procedure for carrying out a sentence of death as the infliction of cruel and unusual punishment." *Baze*, 553 U.S. at 48. Time and time again, the Supreme Court "tells us that the Eighth Amendment does not guarantee a prisoner a painless death." *See Bucklew*, 587 U.S. at 132. While Lee establishes that death by nitrogen hypoxia involves some suffering, he fails to show that the Protocol is cruel and unusual in violation of the Eighth Amendment.

***26** Accordingly, the Court DECLARES and ORDERS as follows:

1. Lee has not shown by a preponderance of the evidence that the ADOC's nitrogen hypoxia execution protocol violates the Eighth Amendment;

2. Judgment is entered in favor of the State and against Lee;

3. Costs are taxed as paid.

A separate Final Judgment will be entered.

**All Citations**

Slip Copy, 2026 WL 1493098

## Footnotes

1 The undersigned presided over two earlier Eighth Amendment challenges to this nitrogen hypoxia protocol without the benefit of a trial. *See Frazier v. Hamm*, 2025 WL 361172 (M.D. Ala. Jan. 31, 2025); *Boyd v. Hamm*, 2025 WL 2884410 (M.D. Ala. Oct. 9, 2025).

2 Our normal breathing air comprises 78% nitrogen, 21% oxygen, and 1% other gases.

3 Because the Defendants are state officials sued in their official capacities, this Opinion refers to them as "the State."

4 The Alabama Legislature has since amended the Alabama Code to make a jury's sentencing verdict binding on the trial court. *See* ALA. CODE §§ 13A-5-45, 13A-5-46, and 13A-5-47 But because Lee was charged, convicted, and sentenced to death for capital murder before April 11, 2017, his jury's sentencing verdict was merely advisory. *See* ALA. CODE § 13A-5-47.1 ("Sections 13A-5-45, 13A-5-46, and 13A-5-47 shall apply to any defendant who is charged with capital murder after April 11, 2017, and shall not apply retroactively to any defendant who has previously been convicted of capital murder and sentenced to death prior to April 11, 2017.").

5 When Lee was convicted and sentenced, electrocution was Alabama's default method of execution. In July 2002, the Alabama Legislature amended Alabama Code § 15-18-82 to make lethal injection the default method. *See* 2002 Alabama Laws Act 2002-492; *Ziegler v. State*, 886 So. 2d 127, 148–49 (Ala. Crim. App. 2003). The change "applie[d] to all persons ... on Alabama's death row." *Turner v. State*, 924 So. 2d 737, 783 (Ala. Crim. App. 2002) (citation omitted). Thus, even an inmate like Lee, convicted and sentenced before July

2002, would be executed by lethal injection unless he "affirmatively elect[ed] to be executed by electrocution." ALA. CODE § 15-18-82.1(a) (2002); *see also* *Turner*, 924 So. 2d at 783.

6 "When Alabama added nitrogen hypoxia as an alternative method of execution, it did not ... have a protocol in place for nitrogen-hypoxia executions." *See* *Woods v. Comm'r, Ala. of Corr.*, 951 F.3d 1288, 1291 (11th Cir. 2020). In August 2023, approximately five years after Alabama authorized nitrogen hypoxia as an execution method, the ADOC finalized and released a redacted, publicly available version of the Protocol. (Doc. 40 at 10, para. 39).

7 During discovery, Lee moved to compel "inspection of the nitrogen hypoxia delivery system ... , the control room from which the delivery of nitrogen hypoxia is initiated, the nitrogen storage area, and any other equipment and locations associated with nitrogen hypoxia executions." (Doc. 70 at 1). The Court granted Lee's motion. (Doc. 79). The undersigned attended the parties' inspection at Holman and observed several key rooms, including the control room, the execution chamber, the viewing rooms, and the nitrogen tank storage room. (*See id.*; *see also* doc. 173-7).

8 In Alabama, once a death sentence is imposed, the Attorney General must move the Alabama Supreme Court to authorize the Commissioner of the ADOC to carry out the execution, which is only then set "within a time frame set by the governor." ALA. R. APP. P. 8(d)(1).

9 The others were Kenneth Smith ("Smith"), Alan Miller ("Miller"), Carey Grayson ("Grayson"), Demetrius Frazier ("Frazier"), Gregory Hunt ("Hunt"), Geoffrey West ("West"), and Anthony Boyd ("Boyd").

10 While this case was pending, Hamm retired from his position as Commissioner of the ADOC. (*See* doc. 144 at 1). On May 1, 2026, Greg Lovelace became the Commissioner of the ADOC and was substituted as a named Defendant pursuant to Federal Rule of Civil Procedure 25(d). (*Id.*).

11 Lee originally raised other claims arising under the federal and Alabama constitutions. (*See* doc. 1). The Court dismissed those claims on the State's motion. (Doc. 33). Likewise, Lee's original and amended complaints identified medical-aid-in-dying as an alternative method of execution (doc. 1 at 21, para. 72; doc. 40 at 22, para. 72), but he filed a notice prior to trial withdrawing that method as an alternative (doc. 98). The Court construed that notice (doc. 98) as containing a motion to amend the operative complaint (doc. 40), which the Court granted (*see* doc. 172).

12 *Van Pelt v. Hamm*, 2:25-cv-671-ECM; *Belisle v. Hamm*, 2:25-cv-673-ECM; *Brooks v. Hamm*, 2:25-cv-674-ECM; *George v. Hamm*, 2:25-cv-675; *Jenkins v. Hamm*, 2:25-cv-676-ECM; *Williams v. Hamm*, 2:25-cv-677-ECM; and *Taylor v. Hamm*, 2:25-cv-678-ECM. These seven cases have since been consolidated with another § 1983 method of execution case, *Wilson v. Hamm*, 2:24-cv-111-ECM ("*Wilson*"), and recaptioned *In Re: Alabama Nitrogen Hypoxia Protocol Litigation*, 2:24-cv-111-ECM (M.D. Ala.).

13 The parties also stipulated to the admission of Dr. Brian McAlary's ("Dr. McAlary") declaration testimony from two previous nitrogen hypoxia lawsuits. (Doc. 128 at 2); *see* *Frazier*, 2025 WL 361172; *see also* *Boyd*, 2025 WL 2884410. Dr. McAlary is a board-certified anesthesiologist who witnessed Grayson's execution by nitrogen hypoxia. (*See* doc. 173-19 at 2–4, paras. 1–18).

14 As explained further below, dyspnea is breathing difficulty or breathing discomfort, the most severe form of which is air hunger.

15 Dr. Williams testified regarding the firing squad, Lee's proposed alternative method of execution. Specifically, Dr. Williams testified to a reasonable degree of medical certainty that execution by firing squad (1) causes a quick and painless death and (2) is feasible and readily implemented. (Doc. 147 at 8:15–23). But because

 © 2026 Thomson Reuters. No claim to original U.S. Government Works. 

Lee fails to show that the Protocol poses a substantial risk of severe pain, the Court pretermits discussion of Dr. Williams' opinions on the firing squad.

16 The State also sought to offer Dr. Antognini as an expert "in the field of general medicine." (Doc. 147 at 251:2–4).

17 The oxygen level inside the mask reached 0.8% despite a "gap" in the mask seal caused by the tube attached to the oxygen monitor (*see* doc. 149 at 18:3–5), which would not be present in an execution under the Protocol.

18 Because air hunger is a form of dyspnea, this Opinion occasionally uses those terms interchangeably.

19 One accepted medical definition of suffocation is "death from deprivation of oxygen, either from a lack of the gas in a breathable environment or from obstruction of the external air passages." (Doc. 149 at 74:17–75:1).

20 Dr. Schwartzstein noted that the Protocol causes "hypoxemia," or "low oxygen levels in the blood." (*See* doc. 146 at 8:19–22). Dr. Schwartzstein noted that hypoxemia and hypoxia "are often used interchangeably." (*See id.* at 8:22–9:2). While the Court uses the term hypoxia, the Court understands the terms hypoxia and hypoxemia to mean the same thing when used by the experts.

21 Elsewhere, Dr. Antognini estimates it takes sixty to seventy seconds. (Doc. 149 at 12:25–13:1).

22 Besides Dr. Antognini's statement that consciousness is "a continuum," (doc. 149 at 66:9–11), on which he did not elaborate, the Court heard no expert testimony in this case about whether consciousness fluctuates during a nitrogen hypoxia execution. Moreover, as discussed *infra* note 26, the Court heard little evidence about whether the level of air hunger remains consistent or varies during the execution.

23 In *Bonner v. City of Prichard*, 661 F.2d 1206, 1209 (11th Cir. 1981) (en banc), the Eleventh Circuit adopted as binding precedent all decisions of the former Fifth Circuit handed down prior to the close of business on September 30, 1981.

24 Cyanide gas was also not free from unfortunate risks—yet multiple federal courts upheld the constitutionality of this execution method. The Fifth Circuit's decision in *Gray v. Lucas*, though nonbinding, is instructive. 710 F.2d 1048 (5th Cir. 1983), *cert. denied*, 463 U.S. 1237 (1983). That court, accepting "as proven" that execution by cyanide gas caused more than seven minutes of physical pain, held that "the pain and terror from death by cyanide gas is [not] so different in degree or nature from that resulting from other traditional modes of execution as to implicate the [E]ighth [A]mendment." *Id.* at 1061. The Fourth Circuit reached a similar conclusion. *See Hunt v. Nuth*, 57 F.3d 1327, 1337–38 (4th Cir. 1995), *cert. denied*, 516 U.S. 1054 (1996); *see also id.* at 1338 (collecting cases, and corresponding denials of certiorari, in which courts held lethal gas not violative of the Eighth Amendment). The Ninth Circuit disagreed and held that execution by cyanide gas was unconstitutional, but thereafter, the State of California amended its statute to allow inmates to choose execution by lethal injection instead; consequently, the Supreme Court vacated the Ninth Circuit's judgment and remanded in light of the amended statute. *See Fierro v. Gomez*, 77 F.3d 301, 306–08 (9th Cir. 1996), *cert. granted, judgment vacated*, 519 U.S. 918 (1996).

25 That Lee brings a facial challenge rather than an as-applied challenge does not change the applicable substantive rule of law. *See Bucklew*, 587 U.S. at 138–39. "Rather than requiring differing substantive rules, 'classifying a lawsuit as facial or as-applied affects the extent to which the invalidity of the challenged law must be demonstrated and the corresponding 'breadth of the remedy.' " *Boyd*, 2025 WL 2884410, at *15 (quoting *Bucklew*, 587 U.S. at 138). Lee insists that the Defendants cannot defeat his claim by merely identifying one hypothetical scenario in which an execution under the Protocol would be constitutional—but the Defendants have not made that argument here. Instead, Lee's framing only shifts the Court's focus from what is likely

 © 2026 Thomson Reuters. No claim to original U.S. Government Works. 

to happen to *Lee* under the Protocol (i.e., as applied) to what is substantially likely to happen to *any inmate* executed under the Protocol (i.e., facial). The Court analyzes his claim accordingly.

26 Dr. Bastarache opines that air hunger begins ten to twelve seconds after the nitrogen gas is turned on. (Doc. 146 at 133:10–13). She further testified that the Protocol causes "extreme air hunger that lasts up to minutes, during minutes of consciousness," (*id.* at 156:20–21), from which one could infer that air hunger persists at the same severity until the inmate becomes unconscious. Aside from this testimony, the Court fails to discern record evidence as to whether the level of air hunger remains constant or fluctuates after the nitrogen begins to flow. *But cf. Boyd*, 2025 WL 2884410, at *7 (expert testifying that "consciousness fades for most people around 50% oxygen saturation, and that some people can lose consciousness before they feel any distress"). Based on this record, and because it does not alter the Court's conclusion, the Court assumes without deciding that the level of air hunger is the same throughout.

27 The Court affords less weight to Dr. Antognini's opinion that any air hunger induced by the Protocol would *only* be "mild" and akin to the shortness of breath one might expect to have "on an exercise bike" because he did not persuasively support his opinion. (Doc. 149 at 28:19–22, 54:25–55:3). To the extent his opinion was based on the premise that air hunger is primarily caused by carbon dioxide buildup (which is not expected to occur under the Protocol), the Court rejects this view for the reasons explained *infra* pages 33–34. Further, the other data on which he relied, such as the Occupational Safety and Health Administration ("OSHA") reports, case reports of inert gas suicides, and the Ernsting study, did not consider whether and to what extent the subjects experienced dyspnea. (*See, e.g.*, docs. 173-186, 173-187 (OSHA reports); docs. 173-165, 173-166, 173-167 (inert gas suicide reports); doc. 173-162 (Ernsting study)).

28 Further, in the Moosavi study, subjects who were exposed to hypoxic conditions corresponding to 75% to 90% blood oxygen saturation reported, on average, mild air hunger when allowed to breathe freely (10% to 15% on the scale used) and moderate air hunger (around 40% on the scale used) when breathing was restricted. (Doc. 173-74 at 4–12). These hypoxic conditions were much less severe than those experienced in executions under the Protocol.

29 Dr. Shante Hill, the pathologist who autopsied Smith, testified in prior litigation that pulmonary edema is "expected in cases of asphyxia or hypoxia" and is a very common finding in autopsies. (Doc. 173-143 at 7:11–8:10). Further, Dr. Antognini asserts that "[p]ulmonary edema at autopsy is common and is a non-specific finding in a variety of causes of death." (Doc. 173-141 at 20, para. 36). However, neither Dr. Hill nor Dr. Antognini offered an opinion about flash pulmonary edema. Additionally, Dr. Hill did not offer an opinion about whether pulmonary edema can exacerbate dyspnea, nor did she address the autopsies of Miller, Grayson, or Boyd. For these reasons, the Court assigns less weight to Dr. Hill's and Dr. Antognini's opinions on these issues.

30 Dr. Bastarache does not claim that flash pulmonary edema causes traditional physical pain.

31 Dr. Schwartzstein relies on the Moosavi study (doc. 173-74), which Dr. Antognini does not address. In that study, which sought to study humans' relative responses to hypoxia and hypercapnia, sixteen subjects underwent experiments in which they breathed either through a mouthpiece or a face mask. (*Id.* at 1–2). The subjects were exposed, at different times, to hypoxic gas mixtures and hypercapnic gas mixtures. (*Id.* at 2). The study found that, when ventilatory drive was the same, "both the quality and intensity of air hunger were the same" with hypoxia and hypercapnia. (*Id.* at 9).

32 The Supreme Court has not squarely addressed whether the brain's processing of suffering during a period of unconsciousness, or "unconscious brain suffering," is cognizable under the Eighth Amendment. The Court does not suggest that inflicting abuse upon an unconscious inmate during an execution would be constitutionally permissible. *See Wilkerson*, 99 U.S. at 135. Yet absent actions by the State

superadding disgrace in such a manner, it is questionable whether unconscious brain suffering can qualify as unconstitutional pain or suffering.

But here, even if unconscious brain suffering without any actions that superadd disgrace could amount to constitutionally cognizable pain, the unconscious brain suffering that Dr. Schwartzstein says occurs under the Protocol is not "well beyond what's needed to effectuate a death sentence," *Bucklew*, 587 U.S. at 136–37, so it is not cruel in the constitutional sense, *cf.* *Baze*, 553 U.S. at 50 (excluding suffering that is "an inescapable consequence of death").

Additionally, the Court finds noteworthy that Dr. Williams—another of Lee's experts—testified that people *do not* experience pain after losing consciousness. (Doc. 147 at 41:9–16). While not dispositive, the Court is also mindful that it should not become "embroil[ed] ... in ongoing scientific controversies beyond [its] expertise." *See* *Baze*, 553 U.S. at 51.

33 While this is not an exhaustive list of materials upon which Dr. Antognini relies, these are the materials the Court finds most probative.

34 Dr. Antognini disagrees with this analysis, contending that Steps 1 and 2 have substantial overlap because the oxygen in the lungs "is decreasing during that 30-second period when the mask is beginning to fill with the nitrogen." (Doc. 149 at 11:1–12:1). He further disagrees with Step 3, explaining that the "red blood cell that she talks about is coming down, going up to the brain and then coming back down, there's blood behind it that ... has less oxygen in it. It's picking up less oxygen from the lungs and then getting into the brain." (*Id.* at 12:13–17). In contrast to Dr. Bastarache, he contends that these three steps are "happening all at the same time." (*Id.* at 12:19).

35 The Court's conclusion is the same when accounting for the several minutes of unconscious respiratory-related brain suffering identified by Dr. Schwartzstein. *See also* discussion *supra* note 32.

36 To the extent that any findings of fact may constitute conclusions of law, they are adopted as such, and to the extent that any conclusions of law may constitute findings of fact, they are adopted as such.

End of Document

© 2026 Thomson Reuters. No claim to original U.S. Government Works.