# EXHIBIT 5

2026 WL 1651147
Only the Westlaw citation is currently available.
United States Court of Appeals, Eleventh Circuit.

Jeffery LEE, Plaintiff-Appellant,
v.
COMMISSIONER, ALABAMA DEPARTMENT OF CORRECTIONs, Warden, Holman Correctional Facility, Defendants-Appellees.

No. 26-11864
|
Filed: 06/08/2026

Appeal from the United States District Court for the Middle District of Alabama, D.C. Docket No. 2:25-cv-00680-ECM

**Attorneys and Law Firms**

Paige H. Sharpe, Angelique A. Ciliberti, Kevin Cline, Anna Thompson, Alejandra Uria, Jocelyn A. Wiesner, Arnold & Porter Kaye Scholer LLP, Washington, DC, Tommy Huynh, Arnold & Porter Kaye Scholer, LLP, West Palm Beach, FL, for Plaintiff - Appellant.

Talmadge Butts, Polly Spencer Kenny, Lauren Ashley Simpson, Brenton Thompson, Alexander Barrett Bowdre, Robert M. Overing, Office of The Attorney General, Montgomery, AL, for Defendants - Appellees Commissioner, Alabama Department of Corrections, Holman Cf Warden.

Alan E. Schoenfeld, Thomas K. Bredar, Dylan Reichman, Sophie Vigeland, Wilmer Cutler Pickering Hale and Dorr, LLP, New York, NY, for Amicus Curiae American Thoracic Society.

Andrew Tutt, Arnold & Porter Kaye Scholer LLP, Washington, DC, for Amicus Curiae John Stinneford.

Before Jordan, Luck, and Kidd, Circuit Judges.

**Opinion**

PER CURIAM:

***1** Alabama is one of a number of states—the others are Arkansas, Louisiana, Mississippi, and Oklahoma—which currently authorize nitrogen hypoxia as a method of execution. *See* Ala. Code §§ 15-18-82(a), 15-18-82.1(a)–(b). This appeal presents another challenge to the constitutionality of nitrogen hypoxia.

In *Grayson v. Comm'r, Ala. Dep't of Corr.*, 121 F. 4th 894 (11th Cir. 2024), we affirmed the denial of a preliminary injunction to prohibit an execution in Alabama by nitrogen hypoxia. Without determining the merits of the inmate's Eighth Amendment claim, we held that, given the evidence in the record and its factual findings, the district court had not abused its discretion in ruling that the inmate had not shown a substantial likelihood of success on that claim. First, the inmate's expert had testified that the nitrogen hypoxia protocol only inflicted psychological pain, a pain which would exist regardless of the method of execution. Second, the district court had credited the testimony of a state expert that unconsciousness would result within 10 to 40 seconds. Third, the district court rejected the testimony of the inmate's expert that the protocol would result in negative pressure pulmonary edema. *See id.* at 898–900.

We noted in *Grayson*, however, that there "may exist a form of execution that induces psychological terror or pain that is severe enough to support an Eighth Amendment claim." *Id.* at 900 n.3. And we expressed "no view on what the result would have been had the district court's factual findings been different." *Id.* at 901 n.4.

In this case, Jeffery Lee, an Alabama inmate under sentence of death, filed an action under 42 U.S.C. § 1983 in August of 2025, alleging that the nitrogen hypoxia protocol violated the Eighth Amendment. *See generally* D.E. 1. On February 2, 2026, Mr. Lee filed an amended complaint, where he proposed execution by firing squad, similar to Utah's protocol, as an alternative method of execution. *See* D.E. 40. *See also* D.E. 173-40.

One week later, on February 9, 2026, Alabama moved to set his execution. On April 15, 2026, the Governor set Mr. Lee's execution for a 30-hour period beginning on June 11, 2026, at 12:00 a.m., and concluding on June 12, 2026, at 6:00 a.m. *See* D.E. 127-1.

From April 27–29, 2026, the district court held a three-day bench trial on the constitutionality of Alabama's nitrogen hypoxia protocol, the first such trial in the country. The parties introduced voluminous evidence, including testimony from seven lay witnesses and four expert witnesses, and hundreds of exhibits totaling thousands of pages.

After weighing the evidence presented, the district court entered an order rejecting Mr. Lee's Eighth Amendment

claim. The district court found that an inmate who is executed under the nitrogen hypoxia protocol "consciously" experiences "severe air hunger and corresponding emotional distress, anxiety, physiological stress, and physical discomfort" for "one to three minutes," but concluded that the protocol does not violate the Eighth Amendment by causing "severe pain or suffering 'well beyond what's needed to effectuate a death sentence.' " *Lee v. Lovelace*, No. 25-cv-680, ___ F. Supp. 3d ___, 2026 WL 1493098, at *22, *25 (M.D. Ala. May 28, 2026). Given its ruling, the district court did not address whether execution by firing squad pursuant to Utah's protocol constitutes a feasible and readily implemented alternative method of execution that significantly reduces a substantial risk of severe pain. *See id.* at *22.

***2** Mr. Lee appealed the district court's judgment, and sought a stay of execution. We expedited briefing and heard oral argument by videoconference on Friday, June 5, 2026.

We hold that, given the district court's factual findings—which are not clearly erroneous—Mr. Lee has shown that the protocol "presents a 'substantial risk of serious harm'—severe pain over and above death itself." *Nance v. Ward*, 597 U.S. 159, 164 (2022) (quoting *Glossip v. Gross*, 576 U.S. 863, 877 (2015)). *See also Nance v. Comm'r, Ga. Dep't of Corr.*, 169 F. 4th 1312, 1318 (11th Cir. 2016) (explaining that the question is whether the method of execution "creates a substantial risk of serious harm, an objectively intolerable risk of harm that prevents prison officials from pleading that they were subjectively blameless for purposes of the Eighth Amendment"). We therefore reverse the district court's judgment and remand for consideration of the firing squad alternative proposed by Mr. Lee.

## I

A jury found Mr. Lee guilty of the 1998 murders of Jimmy Ellis and Elaine Thompson, as well as the attempted murder of Helen King, during a robbery. *See Lee v. State*, 898 So. 2d 790, 807 (Ala. Crim. App. 2001). After the penalty phase of the trial, the jury recommended by a vote of 7 to 5 that he be sentenced to imprisonment for life without the possibility of parole for the murders. *See id.* at 807–808. Under then-governing Alabama law, the trial court exercised its discretion to override the jury's recommendation and sentence Mr. Lee to death. *See id.* at 808.

After exhausting his direct and collateral remedies, *see, e.g., Lee v. Comm'r, Alabama Dep't of Corr.*, 726 F.3d 1172 (11th Cir. 2013), Mr. Lee filed an action under 42 U.S.C. § 1983 challenging Alabama's lethal injection protocol as violative of the Eighth Amendment. *See Lee v. Dunn*, No. 16-473, 2017 WL 1483530 (S.D. Ala. Apr. 24, 2017), *vacated in part*, 731 F. App'x 885 (11th Cir. 2018). That lawsuit became moot in 2018 when Mr. Lee elected to be executed by nitrogen hypoxia, which had recently been authorized by the Alabama Legislature for the first time. *See Lee*, No. 16-473, D.E. 38 (order granting joint motion to dismiss) (S.D. Ala. July 20, 2018).

On August 22, 2025, Mr. Lee filed the present § 1983 action against the Commissioner of Alabama's Department of Corrections challenging Alabama's nitrogen hypoxia protocol. Although Alabama had not yet set his execution date, Mr. Lee explained that he brought his suit "to avoid being denied relief ... on timeliness grounds." D.E. 1 at ¶ 3.

After the district court granted in part and denied in part the Commissioner's motion to dismiss, Mr. Lee filed an amended complaint in February of 2026. He alleged that "[e]xecution by nitrogen hypoxia" induces "conscious suffocation" that "is cruel and unusual because it superadds terror and pain during the execution." D.E. 40 at ¶ 63. He proposed that execution by firing squad similar to Utah's protocol is a feasible and readily implemented alternative method that would significantly reduce the substantial risk of severe pain associated with nitrogen hypoxia. *See id.* at ¶¶ 69–72. *See also* D.E. 173-40. About a week later, the state asked the Alabama Supreme Court to set Mr. Lee's execution date. *See* D.E. 176 at 9. The Alabama Supreme Court granted the motion, and on April 15, 2026, the Governor declared that Mr. Lee's execution would take place during a 30-hour window commencing on June 11, 2026, at 12:00 a.m.[1]

***3** Following discovery, the district court held a three-day bench trial, at which it heard the testimony of eleven witnesses, admitted hundreds of exhibits totaling thousands of pages, and viewed video demonstrations of the nitrogen hypoxia systems of Alabama and Louisiana. *See Lee*, 2026 WL 1493098, at *6. Mr. Lee called three experts, two of whom were Dr. Richard Schwartzstein and Dr. Julie Bastarache. Dr. Schwartzstein was admitted as an expert in pulmonology, critical care medicine, physiology, hypoxia, dyspnea, and air hunger. Dr. Bastarache was admitted as an expert in pulmonology, critical care medicine, and pathology. For its part, the Commissioner called Dr. Joseph F. Antognini,

an expert in anesthesiology. *See id.* at *5. We summarize the evidence and the district court's findings of fact below. [2]

### A

"Nitrogen hypoxia, as set out in Alabama's protocol, causes death by introducing 'pure nitrogen gas ... to the condemned inmate through an industrial-use respirator mask until the inmate is declared dead.' " *Grayson*, 121 F.4th at 896. The parties generally agree on how Alabama's nitrogen hypoxia protocol is carried out.

As the district court explained, the execution team escorts the inmate to the execution chamber. *See Lee*, 2026 WL 1493098, at *3. They then secure the inmate to the gurney with a chest and shoulder harness made of nylon straps, attach pulse oximeters, and secure a mask to the inmate's face. *See id*. After the death warrant is read and the inmate makes his final statement, the warden activates the nitrogen hypoxia system, which causes ultra-high purity nitrogen gas to flow into the mask. *See id*. The nitrogen gas displaces breathable air until the inmate is breathing almost pure nitrogen. *See id*. The mask allows exhaled carbon dioxide to exit via a one-way valve, which prevents the inmate from rebreathing carbon dioxide. *See id*. When the brain is deprived of oxygen for long enough, unconsciousness and death ensue. *See id*.

Mr. Lee is scheduled to be the eighth inmate in Alabama executed by nitrogen hypoxia. In March of 2025, Louisiana executed Jessie Hoffman, Jr. via a nitrogen hypoxia protocol similar to Alabama's. *See id.* at *4.

### B

The district court credited the following opinions of Dr. Schwartzstein and/or Dr. Bastarache regarding severe air hunger caused by the nitrogen hypoxia protocol.

- Inmates executed under the nitrogen hypoxia protocol "likely experience severe air hunger, which evokes distress and anxiety." *Id.* at *14. Specifically, the district court credited Dr. Bastarache's opinion that "air hunger triggers the body's 'extreme physiologic need to get more oxygen' and produces 'intense physiologic stress that causes intense suffering.' " *Id.* (record citations omitted). "Because the inmate cannot respond to his 'basic survival instincts' to address the air hunger, a 'vicious cycle of increasing air hunger and panic symptoms' can occur." *Id.* (record citations omitted).

- "Unlike pain, which is normally localized to a specific body part, air hunger is 'a holistic discomfort sensation,' and individuals struggle to distract themselves from their dyspnea." *Id.* at *15 (record citation omitted). "Because it evokes a fear of dying, air hunger can be worse than pain." *Id.*

- "[A]t a partial pressure of oxygen (PO2) below 60 mm Hg ..., a person's drive to breathe 'takes off,' making him or her 'desperate to try to do something to correct the hypoxemia.' " *Id.* (record citations omitted). Given that the goal of the nitrogen hypoxia protocol "is to take the inmate's PO2 all the way down to 0 mm Hg," the protocol "evokes an 'incredibly strong stimulus' to breathe." *Id.* And, "while only a minor factor, the inmate's awareness that he cannot alleviate his dyspnea ... would exacerbate his anxiety and the air hunger itself." *Id.*

***4** • "[F]our inmates executed under the [p]rotocol had flash pulmonary edema, which would have exacerbated their dyspnea." *Id.* "[F]lash pulmonary edema is a condition triggered by extreme distress in which the lungs 'almost instantaneously' fill with fluid, making it 'extremely difficult to breathe.' " *Id.* "Of the inmates executed under the [p]rotocol who have had autopsies performed ..., all four had evidence of flash pulmonary edema caused by a sudden rise in blood pressure," which is "an abnormal autopsy finding." *Id.* "Flash pulmonary edema indicates severe physiological stress; exacerbated the inmates' dyspnea; and would have occurred 'very early on in the executions' while the inmates were conscious and 'when air hunger was occurring and reaching its peak[.]' " *Id.*

- "[H]ypoxia causes dyspnea even when carbon dioxide levels are normal and, therefore, the lack of carbon dioxide buildup in the mask does not eliminate or reduce the possibility of severe air hunger." *Id.* at *16.

- "Several factors can alleviate air hunger, including taking larger breaths and reducing anxiety. In the clinical and research settings, mitigating the dyspneic subject's anxiety is possible. In the research setting, for example, researchers can reassure the subjects that the air hunger is merely part of the experiment, and this reassurance helps the subjects tolerate the discomfort of air hunger. And in the clinical setting, doctors can reassure many patients that the patients' dyspnea is a consequence of

> their condition and that it does not mean they are going to die. In an execution setting, such reassurance is not possible because the goal is to cause the inmate's death." *Id.* at *25.

Mr. Lee and the Commissioner "vigorously contest[ed]" how long it takes an inmate being executed by nitrogen hypoxia to become unconscious and how long he is capable of experiencing suffering. *See id*. at *16. Dr. Antognini opined that inmates are rendered unconscious within 60 to 75 seconds after the nitrogen gas is turned on, while Dr. Bastarache posited that four inmates previously executed by nitrogen hypoxia remained conscious for three to seven minutes. *See id.*

Ultimately, after considering the conflicting evidence, the district court found that an inmate who is executed under the protocol "experiences severe air hunger and corresponding emotional distress, anxiety, physiological stress, and physical discomfort" for "not significantly more than one to three minutes." *Id.* at *25. It explained that "air hunger causes extreme emotional distress, panic, anxiety, and fear because breathing is essential to human life. Patients often describe air hunger as akin to suffocation or drowning." *Id.* at *24 (internal quotation marks omitted). [3]

### C

After making these factual findings, the district court concluded that Alabama's nitrogen hypoxia protocol does not cause needless suffering and therefore does not violate the Eighth Amendment. *See id*. Although the protocol "likely causes severe air hunger—the most severe form of breathing discomfort—for one to three minutes," that "pain, anxiety, and dread" is primarily a result of inmates "know[ing] they are going to die" and "their body's survival instincts" kicking in. *See id.* at *22–23. Thus, the district court reasoned, the nitrogen hypoxia protocol does not cause suffering "well beyond what's needed to effectuate a death sentence." *Id.* at *22 (quoting *Bucklew v. Precythe*, 587 U.S. 119, 136–37 (2019)). *See also id.* at *23 ("[T]he physiological discomfort caused by the Protocol does not violate the Constitution.").

***5** Because it concluded that the nitrogen hypoxia protocol did not cause needless suffering in violation of the Eighth Amendment, the district court did not reach Mr. Lee's proposed alternative of execution by firing squad. *See id.* at *25. *See also Nance,* 169 F.4th at 1318 ("If the planned method does not present a substantial risk of serious harm, the officials may use it regardless of the proposed alternatives.").

## II

In an appeal from a bench trial, we review factual findings for clear error and legal conclusions de novo. *See Dish Network, LLC v. Fraifer*, 171 F.4th 1344, 1351 (11th Cir. 2026).

Under clear error review, a factual "finding that is 'plausible' in light of the full record—even if another is equally or more so—must govern." *Cooper v. Harris*, 581 U.S. 285, 293 (2017). "This standard does not entitle us to overturn a finding simply because we are convinced that we would have decided the case differently." *Glossip*, 576 U.S. at 881 (internal quotation marks and brackets omitted).

Once the relevant underlying facts are determined, whether a method of execution violates the Eighth Amendment presents a question of law. *See Grayson v. Warden, Comm'r, Ala. Dep't of Corr.*, 869 F.3d 1204, 1239 (11th Cir. 2017). *Accord Bucklew v. Precythe*, 883 F.3d 1087, 1094 (8th Cir. 2018) ("[W]hether a method of execution 'constitutes cruel and unusual punishment is a question of law.' ") (citation omitted), *aff'd*, 587 U.S. 119 (2019).

## III

Under governing Supreme Court precedent,

> [t]he Eighth Amendment "does not demand the avoidance of all risk of pain in carrying out executions." To the contrary, the Constitution affords a "measure of deference to a State's choice of execution procedures" and does not authorize courts to serve as "boards of inquiry charged with determining 'best practices' for executions." The Eighth Amendment does not come into play unless the risk of pain associated with the State's method is "substantial when compared to a known and available alternative."

*Bucklew*, 587 U.S. at 134 (citations omitted).

To succeed on a method-of execution claim, an inmate must satisfy two requirements. First, he "must establish that the ... method of execution presents a 'substantial risk of serious harm'—severe pain over and above death itself." *Nance*, 597 U.S. at 164 (quoting *Glossip*, 576 U.S. at 877). Second,

he " 'must identify an alternative method that is feasible, readily implemented, and in fact significantly reduces' the risk of harm involved." *Id.* (quoting *Glossip*, 576 U.S. at 877) (brackets omitted). *See Bucklew*, 587 U.S. at 136 ("Distinguishing between constitutionally permissible and impermissible degrees of pain ... is a *necessarily* comparative exercise. To decide whether the State has cruelly 'superadded' pain to the punishment of death isn't something that can be accomplished by examining the State's proposed method in a vacuum, but only by 'compar[ing]' that method with a viable alternative."). "Where a prisoner claims a safer alternative to the State's ... protocol, he cannot make a successful challenge by showing a 'slightly or marginally safer alternative.' " *Price v. Comm'r, Ala. Dep't of Corr.*, 920 F.3d 1317, 1326 (11th Cir. 2019) (quoting *Glossip*, 576 U.S. at 877). Nevertheless, he may identify "an alternative method that is not [currently] authorized" by state law. *See Nance*, 597 U.S. at 163–64, 173. *See also Bucklew*, 587 U.S. at 139–40.

***6** The district court found that the nitrogen hypoxia protocol causes one to three minutes of "severe air hunger and corresponding emotional distress, anxiety, physiological stress, and physical discomfort." *Lee*, 2026 WL 1493098, at *25.

> Air hunger involves activation of brain regions dedicated to basic survival instincts, which include the need to breathe adequately. When breathing is insufficient, severe distress, anxiety, and panic are normal and expected human sensations that, under typical circumstances, highly motivate an individual to improve [his] breathing immediately or face imminent death.

*Id.* at *24. "Many people find air hunger worse than pain because it is associated with the fear of dying." *Id.*

### A

The parties challenge some of the district court's factual findings. Mr. Lee, for example, asserts that the district court should have found, based on the expert testimony he presented, that inmates subjected to execution by nitrogen hypoxia could remain conscious for three to seven minutes. The Commissioner, for his part, attacks the district court's finding that the protocol causes an inmate to experience air hunger and associated distress for not significantly more than one to three minutes. *See* Brief for Appellant at 26; Brief for Appellee at 35.

We discern no clear error in any of the district court's factual findings. As noted, a finding that is plausible, even if another is equally or more so, must govern. *See Cooper*, 581 U.S. at 293. And we cannot "overturn a finding simply because we are convinced that we would have decided the case differently." *Glossip*, 576 U.S. at 881 (internal quotation marks and brackets omitted).

A district court in a bench trial is not required to accept an expert's opinion even if unimpeached. *See, e.g., Eason v. Weaver*, 484 F.2d 459, 460 (5th Cir. 1973). And, like a jury, when a district court performs the role of factfinder it "is not required to accept 'all or none' of a witness'[ ] testimony; rather, [it] may accept those portions of a witness'[ ] testimony which it considers credible and reject other portions which it finds to be improbable." *Rixey v. W. Paces Ferry Hosp., Inc.*, 916 F.2d 608, 616 (11th Cir. 1990). The district court here did not err, much less clearly err, in accepting some of the expert testimony and in rejecting other aspects of that same testimony. *See United States v. Stein*, 964 F.3d 1313, 1322 (11th Cir. 2020) ("Our case law is ... unambiguous: the district court frequently must choose between dueling experts, and if that decision is reasonably based on evidence found in the record, the choice is not clear error.").

### B

Based upon the district court's factual findings, we hold that Alabama's nitrogen hypoxia protocol "presents a 'substantial risk of serious harm'—severe pain over and above death itself." *Nance*, 597 U.S. at 164. Mr. Lee has therefore satisfied the first prong of the *Glossip* Eighth Amendment standard. [4]

***7** As intended, the protocol causes death by introducing pure nitrogen gas through a respirator mask until the inmate is declared dead. The district court found that an inmate executed under the protocol suffers one to three minutes of "severe air hunger and corresponding emotional distress, anxiety, physiological stress, and physical discomfort." *Lee*, 2026 WL 1493098, at *25. This mental distress, physiological suffering, and physical discomfort, the district court found, will likely take place. There is, in other words, a substantial

risk of serious harm. The risk is not conjectural, speculative, or doubtful.

The Eighth Amendment does not "guarantee a prisoner a painless death." *Bucklew*, 587 U.S. at 132. Yet at the Founding, "cruel" was "often defined to mean ... '[d]isposed to give pain to others, in body or mind[.]' " *Id.* at 130 (quoting 1 Noah Webster, An American Dictionary of the English Language (1828) (first set of brackets in original)).

In our view, the overall suffering described by the district court, which lasts for one to three minutes, presents a substantial risk of serious harm over and above death itself. Counting to 60 or 180 seconds is not a quick exercise, and constitutionally speaking, that timeframe is intolerable given the suffering that would likely take place under Alabama's nitrogen hypoxia protocol. Such suffering, we believe, is over and above the mental distress that typically accompanies the knowledge of impending death by execution.

The Fifth Circuit's 2-1 decision in *Hoffman v. Westcott*, 131 F.4th 332 (5th Cir. 2025), does not call for a different result.

In *Hoffman*, Louisiana appealed a preliminary injunction that prevented state officials from executing an inmate through nitrogen hypoxia. The Fifth Circuit vacated the preliminary injunction. It held that the inmate failed to meet the two requirements demanded under Supreme Court precedent—namely, that the method of execution "presents a risk that is '*sure or very likely* to cause serious illness and needless suffering,' " *id.* at 335 (quoting *Glossip*, 576 U.S. at 877), and that the State could use "a feasible and readily implemented alternative method of execution that would significantly reduce a substantial risk of severe pain" which it "has refused to adopt without a legitimate penological reason," *id.* (quoting *Bucklew*, 587 U.S. at 134).

As to the first requirement, the Fifth Circuit explained that "the district court heard expert testimony from both parties that nitrogen hypoxia is painless." *Id.* at 336. With respect to the second requirement, the Fifth Circuit concluded that "experts for both parties agreed that death by firing squad"—Mr. Hoffman's proposed alternative means of execution—would "be *more* painful than execution by nitrogen hypoxia." *Id.* [5]

Here, in contrast, the district court found that nitrogen hypoxia causes an inmate to suffer "profound physiological discomfort and distress"—in addition to mental distress—through severe air hunger, *see Lee*, 2026 WL 1493098 at *22, and physiological distress is at least partly physical. *See* Webster's Third New World Dictionary (Unabridged) 1707 (2012) (defining "physiological" in part as "characteristic of or appropriate for an organism's healthy or normal functioning"); The American Heritage Dictionary of the English Language 1325 (4th ed. 2009) (defining "physiological" in part as "[b]eing in accord with or characteristic of the normal functioning of a living organism"); 2 Shorter Oxford English Dictionary 2194 (5th ed. 2002) (defining "physiological" in part as "[p]ertaining to the material universe or to natural science; physical"). The district court here also did not make any findings about the firing squad as an alternative method of execution.

### C

***8** Under the second prong of *Glossip*, Mr. Lee must also identify an alternative method that "is feasible, readily implemented, and in fact significantly reduces the risk of harm involved." *Nance*, 597 U.S. at 164 (quotations and brackets omitted). He asserts that execution by firing squad pursuant to the Utah protocol is a feasible, readily implementable, and less painful alternative within the meaning of the Eighth Amendment. As noted, an "inmate seeking to identify an alternative method of execution is not limited to choosing among those presently authorized by a particular State's law." *Bucklew*, 587 U.S. at 139–40. *Cf. Nance v. Comm'r, Ga. Dep't of Corr.*, 59 F. 4th 1149, 1155–56 (11th Cir. 2023) (holding that a Georgia inmate set for execution by lethal injection sufficiently pled that the firing squad was an alternative method of execution, but not addressing whether the state had a "legitimate penological reason" for refusing to use the firing squad and allowing district court to address that issue on remand).

The district court, as noted, did not address whether Mr. Lee had shown that the firing squad was a feasible and readily implemented alternative method that would significantly reduce the risk of harm. Mr. Lee asks us to resolve that issue now, but we are not equipped to do so. As an appellate tribunal, it is not our "role to find facts," *United States v. Barnette*, 10 F.3d 1553, 1558 (11th Cir. 1994), and we cannot therefore make findings with respect to feasibility given the conflicting testimony on matters that might affect that issue (e.g., the risk of failure with the firing squad, and whether the need for volunteer marksmen from the correctional staff amounts to a valid penological reason to reject that method).

*Compare* Br. for Appellant at 50–52, *with* Br. for Appellee at 39–46. Nor are we able to make factual determinations about what pain, if any, an inmate will suffer if executed by firing squad. Mr. Lee seems to grudgingly recognize some of these problems, as he alternatively requests a remand to the district court to address the firing squad. *See* Reply Br. of Appellant at 12 ("To the extent this Court doubts whether Mr. Lee met his burden of identifying an alternative method of execution, the appropriate remedy is to remand for further proceedings, not to dismiss [the] Eighth Amendment claim.").

We therefore remand the case to the district court with instructions to immediately address the second prong of *Glossip.* And because we cannot make a determination about likelihood of success on that prong on this record, we deny without prejudice Mr. Lee's current motion for a stay of his execution.

### IV

Under the facts found by the district court, Alabama's nitrogen hypoxia protocol "presents a 'substantial risk of serious harm'—severe pain over and above death itself." *Nance*, 597 U.S. at 164 (quoting *Glossip*, 576 U.S. at 877). As a result, Mr. Lee has satisfied the first prong of *Glossip*, and we reverse the district court's judgment in favor of the Commissioner.

Given the parties' disputes on prong two of *Glossip*, some of which are factual, the district court will now need to determine in the first instance whether Mr. Lee has demonstrated that the firing squad is an alternative method of execution that "is feasible, readily implemented, and in fact significantly reduce[s]" the risk of harm posed by nitrogen hypoxia. *See id.* If Mr. Lee files a motion for stay of execution, the district court will have to rule on that as well.

Given the impending execution window for Mr. Lee, we order the clerk to issue the mandate immediately (i.e., along with the filing of this opinion). That way the district court will reacquire jurisdiction right away. *See United States v. Sears*, 411 F.3d 1240, 1241 (11th Cir. 2005) ("Issuance of the mandate g[ives] the district court jurisdiction over the case again.").[6]

***9 REVERSED AND REMANDED.**

**All Citations**

Not Reported in Fed. Rptr., 2026 WL 1651147

## Footnotes

1 As the district court explained, a number of other Alabama inmates also filed a similar action challenging the nitrogen hypoxia protocol. Their cases were initially consolidated with Mr. Lee's, but when the state indicated that it was going to move to set an execution date for Mr. Lee, his case was deconsolidated. *See Lee*, 2026 WL 1493098, at *4.

2 We thank the district court for its comprehensive order. Given time constraints, we do not summarize all of the evidence presented at the bench trial.

3 Dr. Schwartzstein opined that a person being executed by nitrogen hypoxia continues to suffer pain for three to five minutes after becoming unconscious. The district court did not address whether that opinion was persuasive or not. *See id.* at *17. Instead, it declined to consider the opinion because, in its view, an unconscious person "does not experience or perceive dyspnea of a constitutionally relevant kind." *Id.* At oral argument, counsel for Mr. Lee asserted (without waiving any argument in his brief) that this Court could grant him relief without addressing that ruling. We agree, and express no view on the alleged unconscious suffering.

4 Mr. Lee challenges the district court's order allowing the testimony of Dr. Antognini, the Commissioner's expert, on the ground that he did not sufficiently explain the extrapolation underlying some of his opinions.

 © 2026 Thomson Reuters. No claim to original U.S. Government Works. 

*See Gen. Elec. Co. v. Joiner*, 522 U.S. 136, 146 (1997). Given our resolution on the first prong of *Glossip*, we need not address this issue.

5 The dissent in *Hoffman* believed that the majority had failed to address the district court's findings that inmates executed by nitrogen hypoxia faced conscious terror and a sense of suffocation for 35 to 40 seconds on the low end and conscious psychological suffering for three to five minutes if they held their breath. *See id.* at 337 (Haynes, J., dissenting).

6 If we issued a published opinion in this case, we could not expedite the issuance of the mandate without providing “reasonable notice” to the other members of this Court. *See* 11th Cir. R. 41-2.

End of Document

© 2026 Thomson Reuters. No claim to original U.S. Government Works.