**IN THE UNITED STATES DISTRICT COURT**
**FOR THE MIDDLE DISTRICT OF ALABAMA**
**NORTHERN DIVISION**

***In re. Alabama Nitrogen Hypoxia Protocol Litigation***

| | | |
|---|---|---|
| DAVID P. WILSON, | ) | |
| | ) | |
| Plaintiff | ) | Case No. 2:24-cv-00111-ECM |
| | ) | |
| v. | ) | |
| | ) | |
| GREG LOVELACE, Commissioner of the | ) | *** DEATH PENALTY CASE *** |
| Alabama Department of Corrections, | ) | |
| | ) | |
| Defendant. | ) | |

## SECOND AMENDED COMPLAINT

### Introduction

1. The State of Alabama has a bad track record of botched executions. In the modern death penalty era, since the resumption of executions after *Gregg v. Georgia*, 428 U.S. 153 (1976), there have been six failed executions in which the person survived and walked out of the execution chamber.[1] Three out of the six were carried out by the State of Alabama. To put that in perspective, Alabama conducted only 5% of the total completed and attempted executions in the modern era,

[1] The six men who survived execution since *Gregg* are Romell Broom (OH, 2009), Alva Campbell (OH, 2017), Doyle Lee Hamm (AL, 2018), Alan Miller (AL, 2022), Kenneth Smith (AL, 2022), and Thomas Eugene Creech (ID, 2024).

but is responsible for half of the failed executions.[2] Since 2018, there have been fourteen botched executions in the United States, eight of which were carried out by the State of Alabama.[3] Thus, whereas Alabama is responsible for about fourteen percent of all executions since 2018,[4] it accounts for over half of the botched executions and 75% of the failed executions in that period. By any metric, the State of Alabama is the least competent state at carrying out executions in this country.

2. Despite that and the many warnings, extensive federal litigation, and international opposition, the State of Alabama engaged in human experimentation on Thursday, January 25, 2024, and executed a man, Mr. Kenneth Smith, by means of a nitrogen gas-mask asphyxiation method that had never been used before in human history. The State of Alabama then followed up that act with three additional executions by the same method: Mr. Alan Eugene Miller on September 26, 2024; Mr. Carey Dale Grayson on November 21, 2024; and Mr. Demetrius Terrence Frazier on February 6, 2025. Far from confirming the state's original representations about the nitrogen asphyxiation protocol, each execution has instead reinforced the fact that Alabama's new nitrogen asphyxiation protocol is a cruel and unusual form of punishment that involves superadded pain, terror, psychological distress, and disgrace.

---

[2] "Executions Overview," Death Penalty Information Center (March 18, 2025), available at https://deathpenaltyinfo.org/executions/executions-overview. Since 1977, there have been 1619 attempted and 1613 completed executions, of which 82 and 79 respectively were carried out by the State of Alabama.

[3] *See* "Botched Executions," Death Penalty Information Center (Dec. 6, 2022), available at https://deathpenaltyinfo.org/executions/botched-executions (these include, by definition, failed executions; Plaintiff maintains in his complaint that the four nitrogen asphyxiation executions carried out by the State of Alabama were botched, and thus includes them in the tally of botched executions.)

[4] *See* "Execution Database," Death Penalty Information Center (March 19, 2025), available at https://deathpenaltyinfo.org/database/executions. Since 2018, there have been 152 completed and attempted executions in the United States, twenty-one of which were carried out by the State of Alabama.

**A. The Execution of Kenneth Smith**

3. Prior to the execution, representatives of the State of Alabama claimed that the new method would render Mr. Smith unconscious within seconds. In pleadings filed with the United States Supreme Court, the Eleventh Circuit, and this Court, the Alabama Attorney General made repeated representations that the nitrogen gas protocol would work *within seconds*: "The State's method will rapidly lower the oxygen level in the mask, ensuring unconsciousness in seconds." Opposition to Application for a Stay of Execution Pending Petition for Writ of Certiorari and Brief in Opposition at 22, *Smith v. Hamm*, No. 23A688 (U.S. 2024). The Attorney General assured the federal courts that death would immediately ensue "within minutes": "ADOC's nitrogen hypoxia protocol will rapidly reduce oxygen inside the mask, cause unconsciousness within seconds, and cause death within minutes." Defendants' Post-Hearing Brief in Opposition to Plaintiff Smith's Motion for a Preliminary Injunction at 12, *Smith v. Hamm*, No. 2:23-cv-00656 (M.D. Ala., Dec. 29, 2023), ECF No. 66. The Alabama Attorney General depended on Mr. Smith losing consciousness immediately to argue that the procedure was constitutional: "In all likelihood, hypoxia will cause unconsciousness in a matter of seconds, rendering Smith unable to feel pain." *Id*. at p. 15.

4. In stark contrast to the Attorney General's representations, the five media witnesses chosen by the Alabama Department of Corrections and present at Mr. Smith's execution recounted a prolonged period of consciousness marked by shaking, struggling, and writhing by Mr. Smith for several minutes after the nitrogen gas started flowing.

5. Marty Roney of the *Montgomery Advertiser* reported that "Kenneth Eugene Smith appeared to convulse and shake vigorously for about four minutes after the nitrogen gas apparently began flowing through his full-face mask in Alabama's death chamber. It was another two to three minutes before he appeared to lose consciousness, all while gasping for air to the extent that the

gurney shook several times." Marty Roney, "Nitrogen gas execution: Kenneth Smith convulses for four minutes in Alabama death chamber," Montgomery Advertiser (Jan. 25, 2024), https://www.montgomeryadvertiser.com/story/news/local/alabama/2024/01/25/four-minutes-of-convulsions-kenneth-smith-executed-with-nitrogen-gas/72358038007/. From 7:57 to 8:01pm, "Smith writhed and convulsed on the gurney. He appeared to be fully conscious when the gas began to flow. He took deep breaths, his body shaking violently with his eyes rolling in the back of his head. […] Smith clenched his fists, his legs shook under the tightly tucked-in white sheet that covered him from his neck down. He seemed to be gasping for air. The gurney shook several times during this time." *Id*. At 8:02 p.m., "Smith appeared to lose consciousness. His chest remained still for about 20 seconds then he took several large gasps for air. There appeared to be saliva or tears on the inside of the facemask." *Id*. It was not until 8:06 that "Smith's gasping appeared to slow down." *Id*. And at 8:07 p.m. "Smith appeared to take his last breath." *Id*. The curtains closed at 8:15 p.m. *Id*.

6. Ivana Hrynkiw of *AL.com* reported that "The gas appeared to start flowing at approximately 7:58 p.m. Smith visibly shook and writhed against the gurney for around two minutes. His arms thrashed against the restraints. He breathed heavily, slightly gasping, for approximately seven more minutes. […] At 8:01 p.m., a correctional officer in the execution chamber leaned over Smith and examined his face, before stepping away and walking back to his post. Smith appeared to stop breathing at 8:08 p.m. […] The curtain closed to the execution at 8:15 p.m." Ivana Hrynkiw, "Alabama Executes Kenneth Eugene Smith by New Nitrogen Gas Method for 1988 Murder of Pastor's Wife," AL.com (Jan. 25, 2024, 11:00 a.m. (published); Jan. 26, 2024, 12:42 p.m. (updated)), https://www.al.com/news/birmingham/2024/01/alabama-to-execute-kenneth-smith-with-untested-nitrogen-gas-tonight.html.

7. Following the execution, Hrynkiw made a public statement, corroborating her written account, saying that "Following the flow of nitrogen gas, Smith laid on the gurney and shook for about two minutes shaking and writhing on that gurney, the gurney did move several times there. Following that shaking on the gurney, there were several minutes, about—between five and seven minutes according to media witnesses of heavy breathing on the gurney. […] At about 8:08, movement appeared to stop and there was no perceptible breathing from Kenneth Smith. The curtains to the execution viewing room closed at 8:15pm Central Time, and Governor Ivey pronounced death at 8:25 Central Time. […] Also, the Alabama Attorney General's office had said in prior court filings that they expected him to lose consciousness pretty quickly after that gas began to flow. But media witnesses saw that Kenneth Smith appeared to be conscious for several minutes after that gas began to flow, again, before he proceeded to shake and writhe on that gurney for about two minutes. Again, that got—that two minutes of shaking and writhing on the gurney was followed by about five to seven minutes of heavy breathing." Transcript of video, Ivana Hrynkiw, "Witness describes final moments of Alabama prisoner Kenneth Smith killed with nitrogen gas," YouTube (Jan. 25, 2024), available at https://youtu.be/X6MVEWMcdrM?si=nZkGt3FWOEVdd6HR.

8. Kim Chandler of the *Associated Press* reported that "The execution took about 22 minutes from the time between the opening and closing of the curtains to the viewing room. Smith appeared to remain conscious for several minutes. For at least two minutes, he appeared to shake and writhe on the gurney, sometimes pulling against the restraints. That was followed by several minutes of heavy breathing, until breathing was no longer perceptible." Kim Chandler, "Alabama Executes a Man with Nitrogen Gas, the First Time the New Method Has Been Used," Assoc. Press (Jan. 26, 2024), https://apnews.com/article/nitrogen-execution-death-penalty-alabama-699896815486f019f804a8afb7032900.

9. Ralph Chapoco of the *Alabama Reflector* reported that “Smith convulsed for two minutes, with seven minutes of heavy breathing as he took large breaths.” Ralph Chapoco, “Kenneth Eugene Smith executed by nitrogen gas for 1988 murder-for-hire scheme,” Alabama Reflector (Jan. 25, 2024), https://alabamareflector.com/2024/01/25/kenneth-eugene-smith-executed-by-nitrogen-gas-for-1988-murder-for-hire-scheme/.

10. Lauren Layton of WHNT recounted, like her colleagues, that the gas began flowing around 7:58, at which point “Smith began writhing and shaking. His eyes rolled back. This was followed by several minutes of deep breaths until breaths weren’t visible by witnesses anymore.” Lauren Layton, “News 19’s Lauren Layton’s account of the nation’s first nitrogen hypoxia execution,” WHNT (January 26, 2024), https://whnt.com/news/alabama-news/kenneth-eugene-smith/news-19s-lauren-laytons-account-of-the-nations-first-nitrogen-hypoxia-execution/. “It’s kind of hard to say if it went to plan, because we’ve seen state officials say [Smith] could lose consciousness within seconds, and death [could occur] within minutes […] Now, from curtain open to curtain close, it was about 22 minutes. But did he lose consciousness within seconds? No, he didn’t,” Layton said. Lauren Layton, “Witness describes Alabama’s first execution by nitrogen gas,” WJTV (Jan. 26, 2024), https://www.wjtv.com/news/witness-describes-alabamas-first-execution-by-nitrogen-gas/.

11. In addition to the official media witnesses selected by the Alabama Department of Corrections, Mr. Smith invited Lee Hedgepeth, a political reporter based in Alabama, to witness his execution along with his family and lawyer. Mr. Hedgepeth corroborated his colleagues’ accounts, reporting that “Around 7:57, Smith began to react to the nitrogen flowing into the mask covering his face. He began thrashing against the straps, his whole body and head violently jerking back and forth for several minutes. [...] Soon, for around a minute, Smith appeared heaving and retching inside the mask. By around 8:00, Smith’s struggle against the restraints had lessened,

though he continued to gasp for air. Each time he did so, his body lifted against the restraints. Smith's efforts to breathe continued for several minutes […] Around 8:07 p.m., Smith made his last visible effort to breathe." Lee Hedgepeth, "'Never Alone': The suffocation of Kenneth Eugene Smith," Tread by Lee Hedgepeth (Jan. 26, 2024), https://www.treadbylee.com/p/never-alone-the-suffocation-of-kenneth.

12. Mr. Hedgepeth also spoke with reporters in the aftermath of Mr. Smith's execution. "Once the execution began within a couple of minutes, Kenny began to violently push against the straps, his head began to move back and forth violently. This was the fifth execution that I've witnessed in Alabama, and I have never seen such a violent reaction to an execution," Mr. Hedgepeth told the BBC. Transcript of video, "BBC News, Alabama carries out first US nitrogen gas execution on Kenneth Eugene Smith," BBC News, YouTube (Jan. 26, 2024), https://www.youtube.com/watch?v=qe8gIvhmjOQ. "Within seconds of Mr. Smith giving his final remarks, we saw him begin violently shaking, thrashing against the straps that held him down. This was the fifth execution that I've witnessed in Alabama and I've never seen such a violent execution or a violent reaction to the means of execution. So we saw him thrash against the straps holding him onto the gurney for probably four or five minutes. After that, he gasped for breath for probably an additional ten minutes or so. That included some dry heaving into the mask […] So what we saw last night was, you know, a more violent execution than I've ever witnessed in the four previous executions that I have been at out here in Alabama," Mr. Hedgepeth told MSNBC. MSNBC, "'Violently shaking, thrashing:' Witness details first ever nitrogen gas execution," YouTube (Jan. 26, 2024), https://www.youtube.com/watch?v=MgcymCOriGs.

13. The media outlet *The New York Times* compiled and reviewed all the media witness accounts, as well as accounts by the families, friends, and supporters of Mr. Smith and Elizabeth Sennett, and concluded that once the nitrogen gas began to flow, Mr. Smith struggled and remained

conscious for several minutes. *See* Nicholas Bogel-Burroughs, "A Select Few Witnessed Alabama's Nitrogen Execution. This Is What They Saw," New York Times (Feb. 1, 2024), https://www.nytimes.com/2024/02/01/us/alabama-nitrogen-execution-kenneth-smith-witnesses.html. The *New York Times* reported that:

> Marty Roney, a longtime reporter for The Montgomery Advertiser, had witnessed two previous executions. This time, he said, the dimly lit viewing room had a strong scent of disinfectant as five journalists and Mr. Smith's family members were led in. His job, in part, would be to keep track of the elapsed time, if he could.
>
> > "The room is probably 8 by 12 [feet], with 13 folding chairs — it's tight. There is a large glass window in front of the media room that lets you look into the death chamber. The five of us [reporters] decided to divvy up duties. … My job was, if I found the clock, I would keep the clock."
>
> In another witness room sat two sons of the murder victim, Mike and Chuck Sennett, as well as their wives, a friend and another relative of Ms. Sennett's.
>
> Mike Sennett said there were also two people he did not know; he thought they were prison officials from another state. In 2010, the family attended the lethal injection execution of John Parker, who was also convicted in his mother's murder.
>
> > "We went down for the Parker execution and it was like him going to sleep. We didn't know what to expect with this. My anxiety was just building all day long, wondering what's going to happen."
>
> Kim Chandler, a reporter with The Associated Press, wrote an account of what she saw when the curtains were pulled back at 7:53 p.m.
>
> > "Smith, wearing a tan prison uniform, was already strapped to the gurney and draped in a white sheet. A blue-rimmed respirator mask covered his face from forehead to chin. It had a clear face shield and plastic tubing that appeared to connect through an opening to the adjoining control room."
>
> Another media witness, Ralph Chapoco of The Alabama Reflector, wrote that Mr. Smith seemed to be trying to reassure his relatives.
>
> > "From the moment the curtain opened and throughout the time that corrections staff read the death warrant, Kenneth Eugene Smith never took his eyes off his supporters or the members of his family.

> … He scanned their faces one by one, smiled at each of them and several times made a sign with his fingers which meant 'I love you.' He would look into the eyes of one person, smile, then move onto the next person, smile and then move on to the next person."

**The gas begins flowing**

Mr. Smith remained conscious for several minutes, according to the five media witnesses, including Mr. Roney.

> "For four minutes, he was gasping for air. He appeared to be conscious. He was convulsing, he was writhing, the gurney was shaking noticeably."

Mr. Roney said that he tried to count the seconds between Mr. Smith's gasps.

> "We're not allowed watches. There is no second hand on the clock. It's a digital clock that's on military time. I'm sitting there, 'one Mississippi, two Mississippi,' between his breaths."

He said the execution was vastly different than the two he had witnessed before.

> "The two lethal injections I saw, I saw very little physical movement after we believe the process began. Their head goes down, their eyes roll in the back of their head, and then you look for the chest to stop working. You can always fool yourself in that situation into thinking you're watching someone fall asleep. But there was no mistaking this for what it was."

[…] The media witnesses said Mr. Smith's breathing was no longer visible at 8:08 p.m.

[…] As Mr. Smith continued to shake, Mr. Sennett said he began to think, "How long is this going to take?"

> "We were told by some people that worked [in the prison system] that he'd take two or three breaths and he'd be out and gone. That ain't what happened. After about two or three breaths, that's when the struggling started. Other people kept saying he was trying to raise himself up. Yeah, he was. I'd probably try and do the same, try and get off the table."

Mr. Sennett says he has been unable to get the violence of Mr. Smith's last moments out of his mind.

> "With all that struggling and jerking and trying to get off that table, more or less, it's just something I don't ever want to see again."

**The curtains close**

The curtains to the media witness room were closed at 8:15 p.m. […]

Mr. Chapoco found it difficult to turn to the task of writing an article.

> "Trauma has a way of playing tricks on a person's mind. I knew what I experienced. I could even visualize it. For some reason, however, I could not string a series of coherent thoughts together. … Frankly, I underestimated the impact [the] execution would have, believing I could place it in the back of my mind."

Bogel-Burroughs, "A Select Few Witnessed Alabama's Nitrogen Execution. This Is What They Saw," New York Times (Feb. 1, 2024).

14. Even the victim's son, Mr. Sennett, described the "struggling and jerking and trying to get off that table" as "something I don't ever want to see again." *Id.*

15. Despite Attorney General Steve Marshall's proclamation of a "textbook" execution of Mr. Smith (he was not present), the media witnesses and others, including Mr. Smith's family and Elizabeth Sennett's sons, watched as Mr. Smith remained conscious for many minutes after the nitrogen gas started flowing, struggled and writhed on the gurney, convulsed, dry heaved and retched into his mask, gasped for breath, and was finally pronounced dead 22 minutes later. What the witnesses saw was a far cry from the peaceful and dignified passing that the Attorney General represented to the Court and the public prior to the execution, whereby Mr. Smith would be rendered unconscious and unable to feel pain before he died. Instead, he not only remained conscious for a lengthy period of time, but struggled and writhed on the gurney, and gasped for oxygen in obvious distress.

**B. The Execution of Alan Miller**

16. Despite the evidence of a first botched execution by nitrogen gas, the State of Alabama conducted a second execution using the nitrogen gas mask protocol on September 26,

2024. The media accounts reveal that it too was botched and resulted in superadded pain, terror, psychological distress, and disgrace in violation of the Eighth and Fourteenth Amendments.

17. All of the media witnesses confirm that when the nitrogen gas began to flow, Mr. Miller began to writhe and struggle against the restraints for two minutes, and then gasped for air for another six minutes.

18. Marty Roney of the Montgomery Advertiser reported that when the nitrogen gas began flowing at 6:18 p.m., "Miller took several large gasps and began writhing and flinching. His left hand shook and clenched into a fist several times. He lifted his head from the gurney several times. The gurney shook on two occasions." Marty Roney, "Alabama executes Alan Eugene Miller with nitrogen gas," Montgomery Advertiser (Sept. 26, 2024), https://www.montgomeryadvertiser.com/story/news/crime/2024/09/26/alabama-executes-alan-eugene-miller-with-nitrogen-gas/75360739007/.

19. Following that, Roney described a man gasping in pain for breath for six minutes. Roney reported:

> 6:20 p.m. Miller's head moved on the gurney and he gasped for breath.
>
> 6:21 p.m. Miller took a large gulp for air.
>
> 6:22 p.m. Miller took a smaller gasp.
>
> 6:23 p.m. Miller took a small gasp, and then 24 seconds later he gasped and his head rose from the gurney.
>
> 6:24 p.m. Miller gasped and his head rose slightly from the gurney.
>
> 6:25 p.m. He gasped for breath, and gasped again 17 seconds later.
>
> 6:26 p.m. Miller appeared to take his last breath.

Roney, "Alabama executes Alan Eugene Miller with nitrogen gas."

20. Another media witness, Gladys Bautista of WVTM13, reported that after the gas began flowing, Mr. Miller "began to take deep breaths. He lifted his head off the gurney several

times and struggled against the restraints. He was trembling and shaking. Those movements continued for roughly two minutes." Gladys Bautista, "Witnessing Alan Miller's execution: A firsthand account from Alabama's death chamber," WVTM13 (September 27, 2024), at https://www.wvtm13.com/article/alan-miller-execution-alabama-witness-final-words/62415048.

21. Following that, Bautista reported that Mr. Miller gasped for air for six minutes. Bautista described Mr. Miller's actions as follows:

> At 6:20, Miller gasped, and his head moved.
>
> At 6:21, Miller took a large gasp for air.
>
> At 6:22, another smaller gasp.
>
> For the next two to three minutes, Miller continued to periodically gasp for air and lift his head from the gurney.
>
> At 6:26, he appeared to take his last breath before becoming completely still.

Bautista, "Witnessing Alan Miller's execution."

22. Kim Chandler of the Associated Press reported that Mr. Miller "shook and trembled on the gurney for about two minutes with his body at times pulling against the restraints. That was followed by about six minutes of periodic gulping breaths before he became still." Kim Chandler, "Alabama puts man convicted of killing 3 to death in the country's second nitrogen gas execution," Assoc. Press (Sept. 26, 2024), apnews.com/article/alabama-nitrogen-execution-alan-miller-29d624a776d5daa265f376a79ae2f86b.

23. Ivana Hrynkiw of AL.com similarly reported that once the gas began flowing around 6:16 p.m., Mr. Miller "took deep breaths and lifted his head off the gurney several times at 6:18 p.m. He struggled against the restraints on the gurney, shaking and trembling for about two minutes. Miller then gasped off and on for about six minutes." Ivana Hrynkiw, "Alabama inmate Alan Miller executed with nitrogen gas Thursday for 1999 shootings," Al.com (Sept. 26, 2024),

al.com/news/2024/09/alabama-inmate-alan-miller-set-to-be-executed-with-nitrogen-gas-thursday-for-1999-shootings.html.

24. Another witness, Lauren Gill of Bolts Magazine, reported on X that "I was a witness for Alabama's execution of Alan Miller by nitrogen gas tonight. Again, it did not go as state officials promised. Miller visibly struggled for roughly two minutes, shaking and pulling at his restraints. He then spent the next 5-6 min intermittently gasping for air." Lauren Gill (@laurenk_gill), X (Sept. 26, 2024, 8:32 PM), https://x.com/laurenk_gill/status/1839463170080997743.

**C. The Execution of Carey Dale Grayson**

25. Despite the consistencies between Mr. Miller's and Mr. Smith's executions, and the obvious evidence of struggle and superadded pain, terror, psychological distress, and disgrace present during both executions, the State of Alabama executed Mr. Grayson on November 21, 2024 with the same nitrogen asphyxiation protocol.

26. Media witnesses present at Mr. Grayson's execution included Associated Press reporter Kim Chandler, who observed that after gas began flowing, Mr. Grayson "rocked his head, [and] shook and pulled on the gurney restraints. He clenched his fist and appeared to struggle to try to gesture again. His sheet-wrapped legs lifted off the gurney into the air at 6:14 p.m. He took a periodic series of more than a dozen gasping breaths for several minutes. He appeared to stop breathing at 6:21 p.m., and then the curtains to the viewing room were closed at 6:27 p.m." Kim Chandler, "Alabama carries out nation's third nitrogen gas execution on a man for a hitchhiker's killing," Assoc. Press (Nov. 22, 2024), https://apnews.com/article/death-penalty-nitrogen-execution-alabama-09450359e223a9d38a5fb24e87fcfb45.

27. Reporter Marty Roney of the *Montgomery Advertiser* was also present at Mr. Grayson's execution and reported the following timeline:

> 6:11 p.m.: Grayson put his middle fingers of both hands up. A woman approached the gurney, and he appeared to calm down. She spoke a few words to him. She was later identified as his spiritual advisor.
>
> 6:12 p.m.: The nitrogen appeared to begin flowing. Grayson's hands were tightly clenched. He took several deep gasps, shaking his head vigorously. He pulled his arms against the restraints. He took more deep gasps.
>
> 6:13 p.m.: He took several deep gasps, raising his head off the gurney.
>
> 6:14 p.m.: He raised his legs from the gurney. He took several deep breaths. His legs lowered about 30 seconds later.
>
> 6:15 to 6:17 p.m.: Grayson took several deep breaths. His hands remained tightly clenched.
>
> 6:17 p.m.: A corrections officer performed a consciousness check.
>
> 6:18 p.m.: Grayson appeared to lose consciousness; his hands relaxed.
>
> 6:18 to 6:22 p.m.: He took eight to nine large gasps with several seconds in between each gasp.
>
> 6:22 p.m.: He appeared to stop breathing.
>
> 6:27 p.m.: The curtain to the death chamber was closed.

Marty Roney, "Alabama executes Carey Dale Grayson by nitrogen gas for brutal 1999 murder," Montgomery Advertiser (Nov. 21, 2024), https://www.montgomeryadvertiser.com/story/news/crime/2024/11/21/alabama-executes-carey-dale-grayson-by-gas-for-brutal-1999-murder/76465482007/.

**D. The Execution of Demetrius Terrence Frazier**

28. The State of Alabama carried out its fourth and latest nitrogen asphyxiation execution on February 6, 2025, when it executed Mr. Demetrius Terrence Frazier. Like Mr. Smith, Mr. Miller, and Mr. Grayson, Mr. Frazier struggled and moved in obvious distress for several minutes before succumbing to the gas.

29. Ivana Hrynkiw of Al.com reported:

> The curtain over the viewing window into the execution chamber opened at 6:05 p.m. and after the prison warden read Frazier's death warrant, Frazier gave a last statement […]
>
> After his last words, a guard in the execution chamber checked the seal on the gas mask.
>
> About 6:11 p.m., Frazier started waving his hands in circles towards his body. About a minute later, his hands stopped moving.
>
> At approximately 6:12 p.m. Frazier clenched his face, and his nostrils flared, while his hands quivered. He appeared to say something, which was inaudible to the three witness rooms. His legs slightly lifted up off the gurney and he gasped.
>
> Then, his head rolled to the right side. Frazier exhibited sporadic gasping and shallow breathing until about 6:20 p.m.
>
> The curtains closed at 6:29 p.m., and his time of death declared seven minutes later at 6:36 p.m.

Ivana Hrynkiw, "Alabama inmate Demetrius Frazier executed by nitrogen gas for 1991 Birmingham slaying: 'Let's go'," Al.com (Feb. 6, 2025), https://www.al.com/news/2025/02/alabama-inmate-demetrius-frazier-set-to-die-by-nitrogen-michigan-governor-hasnt-acted.html.

30. Media witness Sarah Clifton of the *Montgomery Advertiser* reported a timeline that corroborated this account:

> 6:10: Raybon closed Frazier's mask. Seconds later, he appeared to say something inaudible. He appeared to move his fists in a slow, inward pumping motion, then appeared to open his fists with palms outstretched, followed by moving his hands in what seemed to be circular motions, as if imitating air flow. About thirty second later, his hands continued this apparent motion, but appeared to move more rigidly, occasionally off sync.
>
> 6:11: Frazier's breathing appeared to get heavier. He seemed to quiver and twitch.
>
> 6:12: Frazier appeared to struggle to breathe and seemed to clench the muscles in his face.

> 6:13: Frazier appeared to breathe sporadically, with seemingly inconsistent amounts of time between breaths, and apparently slightly shuddering. Frazier's legs appeared to tense and raise a few inches off of the gurney, with his head seemingly lolling to the side. His arms seemed to tighten and fists clenched.
>
> 6:14: Frazier's breath appeared to slow down, though still slightly shuddering.
>
> Between 6:13 and 6:17: His time between breaths appeared to be inconsistent, but his breaths appeared to come in shuddering gasps.
>
> 6:18: Frazier seemed to twitch slightly and shudder, with another shuddering breath apparently coming about 15 seconds later.
>
> From 6:18 to 6:20: There appeared to be very little, if any, physical movement. If Frazier was breathing, it was imperceptible.
>
> 6:20: Frazier appeared to take his last, shuddering breath.
>
> Between 6:21 and 6:23: Frazier appeared to have no perceptible movement.
> 6:24: Frazier's fists seemed to loosen slightly.
>
> Between 6:24 and 6:29: No perceptible movement was apparent.
>
> 6:29: The drapes were drawn, closing off the view to the execution chamber.

Sarah Clifton, "Alabama executes Demetrius Frazier by nitrogen gas for 1991 murder," Montgomery Advertiser (Feb. 6, 2025), https://www.montgomeryadvertiser.com/story/news/local/alabama/2025/02/06/alabama-executes-demetrius-frazier-by-nitrogen-gas-for-1991-murder/78282236007/.

**E. Pain and physical and psychological distress**

31. Defendant and Alabama Attorney General Steve Marshall have claimed that during these executions by nitrogen gas asphyxiation, the witness accounts of writhing, jerking, struggling, gasping, and distress were the result of involuntary body spasms that occur after consciousness is lost. For instance, regarding the execution of Kenneth Smith, Defendant asserts that the writhing, shaking, and struggling were "the kind of involuntary movements that naturally

occur upon death." Doc. 16, at p. 11. This explanation of the violent exertions of the gassed individual is medically untenable and factually false.

32. Loss of oxygen leading to death is a gradual phenomenon referred to by medical experts as a decline in blood-oxygen saturation. When oxygen levels drop below 60% saturation, medical experts who have studied oxygen deprivation (a/k/a hypoxia) report that "the majority of people, not yet unconscious, report significant distress and shortness of breath. These feelings of extreme stress are an important reason why it is unethical to even study the effects of very low oxygen levels (<60%) on humans." Philip E. Bickler and Michael S. Lipnick, "Evidence Against Use of Nitrogen for the Death Penalty," 331, no. 24 J. Am. Med. Ass'n 2075, 2075 (2024).

33. Experts studying hypoxia have discovered that "below 50%, the cruel nature of administering nitrogen to humans becomes universally apparent. . . . Based on personal knowledge of these often unpublished/unpublicised and even classified experiments, the effects of sudden oxygen deprivation can be shocking. With sudden loss of an oxygen supply, humans feel significant and distressing shortness of breath. This is usually accompanied by anxiety, increased heart rate, sweating, sleepiness, visual loss, and a feeling of impending doom as they go in and out of consciousness." *Hoffman v. Westcott* (M.D. La. 2025), Motion for Preliminary Injunction, Exhibit C., Doc. 4-5, (Exhibit 3, Testimony of Philip E. Bickler, MD, PhD & Michael Lipnick, MD before the Kansas House Committee on Judiciary), at p. 77.

34. Upon examining evidence from the first four nitrogen executions in Alabama, a medical expert concluded that "the duration of suffering was much longer than I would consider humane," and moreover, "the suffering was longer than apparently the advocates for the method predicted." *Hoffman v. Westcott* (M.D. La. 2025), Doc. 87, Transcript of Preliminary Injunction Hearing, at 68. In the case of Kenneth Smith, medical experts report that "One cannot know how long and to what extent Smith consciously experienced extreme distress, but *available evidence*

*and eyewitness accounts strongly suggests that he did*." Bickler and Lipnick, "Evidence Against Use of Nitrogen for the Death Penalty," at p. 2075 (emphasis added).

35. The medical evidence overwhelmingly demonstrates that the writhing, shaking, and struggling are not simply the kind of involuntary movements that occur naturally after consciousness is lost, but evidence of pain and physical and psychological distress.

**F. A Torturous Method**

36. For over a decade, scientific literature had demonstrated that gas asphyxiation through a gas-mask method is not a humane way to kill a person. In Switzerland, the right-to-die organization Dignitas has experimented with assisted suicide by oxygen-deprivation with helium delivered via a face mask. Their results were published in 2010 and were available as Alabama was developing and implementing their own nitrogen mask protocol. The study found that "[o]xygen deprivation with a face mask is not acceptable because leaks are difficult to control and it may not eliminate rebreathing. These factors will extend time to unconsciousness and time to death." Russel D. Ogden et al., *Assisted suicide by oxygen deprivation with helium at a Swiss right-to-die organization*, 36 J. Med. Ethics 174, 174 (2010). The study also found that there was "wide variation" in the amount of time each individual took to die, attributed to the fit of the mask on each person. *Id.*

37. It should not come as a surprise that no state in this country permitting medical aid-in-dying authorizes doctors to use asphyxiation to help their patients die. Instead, all states that have legalized medical-aid-in-dying only permit doctors to prescribe lethal drugs to patients who qualify for the procedure. "States with Medical Aid in Dying," ProCon.org (August 9, 2023), https://euthanasia.procon.org/states-with-legal-physician-assisted-suicide/ .

38. Veterinarians do not allow nitrogen asphyxiation for mammals. The American Veterinary Medical Association (AVMA) has published guidelines on the euthanasia of animals.

The AVMA specifically recommends *against* the use of nitrogen gas: "Use of Ar [Argon gas] or N2 [nitrogen gas] is unacceptable for […] mammals," apart from pigs, according to the AVMA, because "These gases create an anoxic environment that is distressing for some species and aversive to laboratory rodents and mink; other methods of euthanasia are preferable for these species." American Veterinary Medical Association, *AVMA Guidelines for the Euthanasia of Animals* 28 (2020 ed.). Even pigs are not permitted to be euthanized using pure nitrogen gas (N2); the AVMA specifically finds that only Ar or a N2-CO2 gas mixture are acceptable for the euthanasia of pigs. *Id.* In short, pure nitrogen gas, which was used to kill Mr. Smith, is specifically not acceptable for the euthanasia for *any* mammal according to the AVMA. *Id.*

39. Neither doctors, nor veterinarians, nor the international community condone the use of nitrogen gas. International law proscribing the use of gas against human beings dates back to at least the Protocol for the Prohibition of the Use in War of Asphyxiating, Poisonous or Other Gases, and of Bacteriological Methods of Warfare, also known as the Geneva Protocol, which went into force in 1925 in the aftermath of the First World War. Prior to Mr. Smith's execution, the United Nations High Commissioner for Human Rights, Ravina Shamdasani, expressed concern that the execution of Mr. Smith would "breach the prohibition on torture or other cruel, inhuman, or degrading treatment or punishment," and four United States Special Rapporteurs expressed concern that the execution would violate the United Nations Convention Against Torture and Other Cruel, Inhuman or Degrading Treatment or Punishment as well as the Body of Principles for the Protection of All Persons under Any Form of Detention or Imprisonment, G.A. Res. 43/173 (Dec. 9, 1988). *See* Jacqui Wise, "Use of nitrogen in US execution may constitute torture, warns human rights agency," The BMJ (January 18, 2024); United Nations Human Rights Office of the High Commissioner, "United States: UN experts alarmed at prospect of first-ever untested execution by

nitrogen hypoxia in Alabama," United Nations (January 3, 2024), https://www.ohchr.org/en/press-releases/2024/01/united-states-un-experts-alarmed-prospect-first-ever-untested-execution.

40. The fact is, despite its scientific-sounding name, "nitrogen hypoxia" as a method of execution was not conceived by scientists or doctors, but rather by criminal law professors. In 2014, Professors Michael Copeland, Christine Pappas, and Thomas Parr at Oklahoma's East Central University co-authored a 14-page white paper (hereinafter "the Copeland Paper") in which they advocated for the use of nitrogen gas asphyxiation (which they called "nitrogen hypoxia")[5] over lethal injection. *See* Michael Copeland, Thom Parr, and Christine Papas, *Nitrogen Induced Hypoxia as a Form of Capital Punishment* (2014). At the time, Oklahoma was under fire for multiple botched executions using lethal injection. In September 2014, Mike Christian of Oklahoma's House of Representatives invited Copeland to present his research to the Oklahoma House Judiciary Committee.[6] Soon thereafter, in February 2015, Rep. Christian introduced House Bill 1879 to authorize "nitrogen hypoxia" as a legal alternative to lethal injection. The bill sailed through the Oklahoma state legislature (without expert review), and Governor Mary Fallin signed HB 1879 into law just over two months from its introduction. Oklahoma thereby became the first state to sanction execution by nitrogen gas asphyxiation. Approximately two years later, Mississippi and Alabama followed suit—adopting statutes with language nearly identical to Oklahoma's HB 1879.

[5] The term "nitrogen hypoxia" itself reflects the method's non-medical origin. The word "hypoxia" means "low oxygen." It does not describe a process, but rather a state of being. A medical professional would instead describe this execution method as "asphyxiation"—i.e., the *process* of being deprived of oxygen. Thus, Mr. Wilson's Complaint uses the more medically accurate phrase "nitrogen gas asphyxiation" rather than Copeland's imprecise "nitrogen hypoxia."

[6] Jack Shuler, "Can Executions Be More Humane?," *Atlantic* (March 20, 2015), https://www.theatlantic.com/politics/archive/2015/03/can-executions-be-more-humane/388249/.

41. Alabama became the first state to use nitrogen gas asphyxiation as a method of execution, in a human experiment that officials botched miserably on January 25, 2024, and then seven times thereafter. It cannot be allowed to do so again.

42. Plaintiff David P. Wilson, by and through counsel, hereby files this first amended complaint requesting that the Court enforce his constitutional rights under the Eighth and Fourteenth Amendments to the U.S. Constitution by issuing injunctive and declaratory relief. Mr. Wilson petitions this Court to order Defendant to abstain from carrying out his execution using the state's new gas-mask nitrogen asphyxiation protocol, and to declare that protocol facially unconstitutional or, alternatively, unconstitutional as applied to Mr. Wilson in light of his unique medical conditions.

43. Mr. Wilson brings three causes of action pursuant to 42 U.S.C. § 1983. First, Alabama's new nitrogen asphyxiation protocol violates the Eighth and Fourteenth Amendments in all of its applications by exposing persons to an unconstitutional risk of gratuitous pain. Second, Mr. Wilson's unique medical conditions will almost certainly cause him to suffer a painful and prolonged death in violation of the Eighth and Fourteenth Amendments if the state is allowed to execute him using its current nitrogen asphyxiation protocol. Third, Mr. Wilson also brings a *jus cogens* international law claim which binds the states through the Supremacy Clause of the U.S. Constitution.

## JURISDICTION

44. Federal question jurisdiction over this matter arises under 42 U.S.C. § 1983, 28 U.S.C. § 1292, 28 U.S.C. § 1331, 28 U.S.C. § 1343, 28 U.S.C. § 1651, 28 U.S.C. § 2201, and 28 U.S.C. § 2202.

## VENUE

45. Venue is appropriate in the Middle District of Alabama under 28 U.S.C. § 1391(b) because Plaintiff Wilson's death sentence was imposed in Dothan, Alabama, in Houston County, which is within the district; his federal habeas corpus petition is currently pending in the Middle District of Alabama; and Defendant Hamm, who is sued his official capacity, presides over the Department of Corrections headquartered in Montgomery, Alabama, in the Middle District.

## THE PARTIES

46. Plaintiff David Wilson is a United States citizen and resident of the State of Alabama. He is under a death sentence and is currently being held in the custody of Defendant at W.C. Holman Correctional Facility in Atmore, Alabama.

47. Defendant John Q. Hamm is the Commissioner of the Alabama Department of Corrections, which is headquartered in Montgomery, Alabama. Mr. Hamm is responsible for overseeing operations at the Alabama Department of Corrections. He is charged with overseeing all executions. He has an obligation to ensure that all executions are carried out in compliance with the United States Constitution. He is being sued in his official capacity. He is a United States citizen and resident of Alabama.

## PROCEDURAL HISTORY

48. David Wilson was convicted and sentenced to death by the Circuit Court of Houston County on December 5, 2007. (Tr. C. 354-55.) On direct appeal, the Alabama Court of Criminal Appeals (ACCA) remanded to the trial court to determine if the prosecution violated *Batson v. Kentucky*, 476 U.S. 79 (1986). *Wilson I*, 142 So. 3d at 747-48. After a hearing, the circuit court denied the claim. (Tr. C-Remand 40.) On March 23, 2012, the ACCA affirmed Mr. Wilson's conviction and sentence. *Wilson*, 142 So. 3d at 748 (op. on return to remand), and on June 22, 2012, denied rehearing. *Id*. The Alabama Supreme Court ("ASC") denied certiorari on September

20, 2013. *Ex parte Wilson*, No. 1111254 (Ala. Sept. 20, 2013). The United States Supreme Court denied Mr. Wilson's petition for writ of certiorari on May 19, 2014. *Wilson v. Alabama*, 134 S. Ct. 2290 (2014).

49. Mr. Wilson filed a Rule 32 state post-conviction petition on September 19, 2014. (C. 16-88.) He filed an Amended Petition on December 11, 2015 (C. 224-1027), and a supplement on September 7, 2016 (C. 1429-61). The State filed an Amended Answer and Motion to Dismiss on February 24, 2016 (C. 1051-1124), and a response to the supplement on October 6, 2016 (C. 1485-91). The court held a hearing on the State's Motion on November 8, 2016 (R. 113), and dismissed the petition in its entirety without granting discovery or holding an evidentiary hearing on February 24, 2017 (C. 1524-1646, 1647-176914). Mr. Wilson filed a Motion to Reconsider on March 24, 2017 (C. 1772-1861), which was denied by operation of law on March 26, 2017. *But see* C. 1873, 1874 (orders dated April 7, 2017, incorrectly stating that Mr. Wilson's notices of appeal divested the court of jurisdiction to rule on his motion to reconsider). The ACCA affirmed the dismissal of Mr. Wilson's Rule 32 petition on March 9, 2018. *Wilson v. State*, No. CR-16-0675 (Ala. Crim. App. Mar. 9, 2018) (unpublished table decision) ("Wilson II"), and denied rehearing on May 4, 2018.

50. Mr. Wilson petitioned for certiorari from the Alabama Supreme Court. That court denied certiorari on August 24, 2018. *Ex parte David Phillip Wilson*, No. 1170747 (Ala. Aug. 24, 2018). Mr. Wilson filed a petition for writ of certiorari with the U.S. Supreme Court on January 18, 2019. The Supreme Court denied certiorari on April 29, 2019.

51. Mr. Wilson then filed for a federal writ of habeas corpus on April 22, 2019. Mr. Wilson filed an amended habeas corpus petition on February 10, 2025. His petition is before Judge R. Austin Huffaker, Jr.

52. On June 8, 2026, The Eleventh Circuit held that Alabama's nitrogen gas execution protocol causes superadded pain in violation of the *Baze-Glossip* standard and the Eighth Amendment's prohibition against cruel and unusual punishment. *Lee v. Comm'r, Ala. Dep't of Corr.*, 2026 WL 1651147 (11th Cir. June 8, 2026) (per curiam). On June 9, 2026, the District Court held that the firing squad is a feasible, readily implemented alternative method of execution that significantly reduces the substantial risk of serious harm posed by the nitrogen gas protocol, and declared the nitrogen gas protocol to violate the Eighth Amendment. *Lee v. Lovelace*, 2026 WL 1664095, at *2 (M.D. Ala. June 9, 2026). On July 22, 2026, the District Court's order became final when the Court denied Mr. Lee's motion to amend the judgment. *Lee v. Lovelace*, Case 2:25-cv-00680-ECM, Doc. 209 (M.D. Ala. July 22, 2026).

53. Judge Marks emphasized that the protocol is facially unconstitutional: "the Court concludes that the Protocol violates the Eighth Amendment" (*Lee v. Lovelace*, 2026 WL 1664095, (M.D. Ala. June 9, 2026, at *8); "the specific harm at issue here: that the Protocol violates the Eighth Amendment." (*Id.* at *23); "Lee has shown by a preponderance of the evidence that the Protocol constitutes cruel and unusual punishment in violation of the Eighth Amendment…On this record, and in this posture, Lee has shown that the ADOC's nitrogen hypoxia execution protocol violates the Eighth Amendment." (*Id.* at *24); and finally, the Court declared that "The ADOC's nitrogen hypoxia execution protocol violates the Eighth Amendment." (*Id.* at *25).

## ADDITIONAL FACTS

54. Plaintiff David Wilson suffers from pulmonary problems, Asperger's Syndrome (which renders him hyperreactive to tactile input), and light sensitivity and vision problems that mandate eyewear.

**i. *Pulmonary Issues***

55. Mr. Wilson's medical records demonstrate that he suffers from pulmonary health problems of long date, including tuberculosis and other respiratory difficulties. These are chronic and permanent conditions that constrict the airways in his lungs, making it difficult for him to breathe. Mr. Wilson was prescribed an albuterol inhaler to treat his respiratory illness when he was detained in the Houston County Jail back in February 2008. *See* Appendix A. Mr. Wilson has contracted tuberculosis (TB) and tested positive for tuberculosis at Holman Prison. *See* Appendix B. He was placed on tuberculosis medication for nine months in 2010, and is subject to medical examination every three months for a tuberculosis update to ensure that active tuberculosis does not flare up. Mr. Wilson's airways are chronically clogged by phlegm and other discharge that makes it difficult for him to breathe normally. Mr. Wilson reports coughing up fluid on a regular basis. Mr. Wilson has also had COVID-19 on several occasions, which has impaired his lungs further. Mr. Wilson reports that his lungs often feel inflamed, and he has a sensation of burning when he breathes.

**ii. *Asperger's Syndrome***

56. As Mr. Wilson has pled in his post-conviction and habeas corpus petitions, Mr. Wilson is on the autism spectrum and has Asperger's Syndrome. *See David Wilson v. John Q. Hamm,* Case No. 1:19-cv-284, Doc. 1, Petition for Writ of Habeas Corpus, filed April 24, 2019, at 189. Trial counsel was ineffective in failing to retain a medical expert to diagnose Mr. Wilson prior to his conviction; post-conviction counsel retained Dr. Robert D. Shaffer, a forensic and neuropsychologist who interviewed Mr. Wilson and his family and who was prepared to testify that Mr. Wilson "suffers from Asperger's Syndrome, a constituent of autism spectrum disorder

[ASD].” *David Wilson v. John Q. Hamm,* Case No. 1:19-cv-284, Doc. 1, Petition for Writ of Habeas Corpus, at 190.

57. The current diagnostic criteria established by the Diagnostic and Statistical Manual of Mental Disorders V (DSM-V) provides that, in addition to “persistent deficits in social communication and social interaction across multiple contexts,” individuals with ASD exhibit “Restricted, repetitive patterns of behavior, interests, or activities,” manifested through at least two of four behaviors, one of which is sensory perceptual issues. Individuals with autism spectrum disorder often have “Hyper- or hypo-reactivity to sensory input or unusual interest in sensory aspects of the environment.” *See Diagnostic and Statistical Manual of Mental Disorders V* (Am. Psychiatric Ass’n. 2013), Autism Spectrum Disorder, at 50. Although not all individuals with ASD experience sensory perceptual issues, the vast majority of individuals with ASD (approximately 90%)[7] experience sensory perceptual issues, and about “70 percent of people with ASD experience tactical sensory differences.”[8] Mr. Wilson is one such individual.

**iii. *Light Hyper-sensitivity and Vision Impairment***

58. Consistent with Mr. Wilson’s ASD and compounding his hyper-sensitivity to physical touch or constrictions, Mr. Wilson’s medical records demonstrate that he suffers from atypically high sensitivity to light and has repeatedly requested permission to wear sunglasses. *See* Appendix C, David Wilson Medical Records. Without sunglasses, bright lights (even mere sunlight) cause Mr. Wilson significant distress. During an execution, Mr. Wilson would be required to stare straight into high-intensity ceiling lights, as the protocol requires him to be strapped to a gurney facing the ceiling. Compounding Mr. Wilson’s light sensitivity caused by his

---

[7] “Research suggests up to 90 percent of individuals with autism display sensory differences compared with people who do not have autism.” “What are Sensory Processing Differences and How Do They Relate to Autism?,” *Mount Sinai* (Jun. 30, 2022), https://health.mountsinai.org/blog/what-are-sensory-processing-differences-and-how-do-they-relate-to-autism/.

[8] Diarmuid Heffernan, *Sensory Issues for Adults with Autism Spectrum Disorder* 52 (Jessica Kingsley Publishers 2016).

ASD, Mr. Wilson has written that direct light also causes him severe migraines if he does not wear sunglasses. His repeated requests for sunglasses show that these migraines are chronic and continue to this day.

59. According to media witnesses who were present at Mr. Smith's execution, the mask used by the State to carry out executions covers the condemned person's face from "forehead to chin." *See* Bogel-Borroughs, "A Select Few Witnessed Alabama's Nitrogen Execution. This Is What They Saw."

60. Mr. Wilson would not be able to wear sunglasses under the full face-mask during any execution and would have to stare straight into the ceiling lights. Therefore, there is a significant likelihood that Mr. Wilson would either have to suffer severe migraines during his execution, or keep his eyes closed and forfeit his last chance to see his family and loved ones before he is killed. Mr. Wilson wears prescription glasses. He would not be able to wear those glasses with the mask on and therefore would be killed without the opportunity to see his family.

**CAUSES OF ACTION**

61. David Wilson incorporates by reference, here and below, all facts and allegations detailed throughout this complaint.

62. Mr. Wilson raises a facial and an as-applied challenge to the Alabama nitrogen asphyxiation protocol under the Eighth Amendment.

63. The Eighth Amendment to the U.S. Constitution prohibits "cruel and unusual punishments." Punishments are cruel and unusual when "'terror, pain, or disgrace [are] superadded' to the penalty of death." *Bucklew v. Precythe*, 587 U.S. 119, 130 (2019). *See also Weems v. United States*, 217 U.S. 349, 370 (1910). In addition, punishments may not "involve unnecessary or wanton infliction of pain." *Estelle v. Gamble*, 492 U.S. 97, 102 (1976); *see also In*

*re Kemmler*, 136 U.S. 436, 447 (1890) ("[P]unishments are cruel when they involve torture or a lingering death.").

64. To establish that a future harm will violate the Eighth Amendment, "the conditions presenting the risk must be '*sure or very likely* to cause serious illness and needless suffering,' and give rise to 'sufficiently *imminent* dangers.'" *Baze v. Rees*, 553 U.S. 35, 50 (2008) (citing *Helling v. McKinney*, 509 U.S. 25, 33, 34-35 (1993)). In the context of executions, "there must be a 'substantial risk of serious harm,' an 'objectively intolerable risk of harm,' that prevents prison officials from pleading that they were 'subjectively blameless for the purposes of the Eighth Amendment.'" *Id*. at 1531 (citing *Farmer v. Brennan*, 511 U.S. 825, 842 (1994)). A "substantial risk of serious harm" may occur when the method of execution involves "torture or a lingering death," *Baze*, 553 U.S. at 49, or the "'super[addition]'of 'terror, pain, or disgrace.'" *Bucklew v. Precythe*, 587 U.S. 119, 133 (2019) (quoting *Baze*, 553 U.S. at 48). Moreover, whether a method of execution poses a "substantial risk of serious harm" and "superadds pain" is a comparative question. A state's method of execution "superadds pain" when the petitioner has pled "a feasible and readily implemented alternative method of execution that would significantly reduce a substantial risk of severe pain and that the State has refused to adopt without a legitimate penological reason." *Bucklew*, 587 U.S. at 134.

65. A person challenging a method of execution is legally required to identify an alternative method that is "feasible, readily implemented, and [will] in fact significantly reduce a substantial risk of severe pain." *Id.* at 1532. If a plaintiff offers an alternative that meets the *Baze* criteria and "a State refuses to adopt such an alternative in the face of these documented advantages, without a legitimate penological justification for adhering to its current method of execution, then a State's refusal to change its method can be viewed as 'cruel and unusual' under the Eighth Amendment." *Id.* If no constitutional method of execution is permissible under

Alabama law, then the state cannot execute Mr. Wilson until a constitutional method becomes available. *Nance v. Comm'r, Ga. Dep't of Corr.*, 59 F.4th 1149, 1155 (11th Cir. 2023). David Wilson can make both of these showings, and challenges Alabama's gas-mask nitrogen asphyxiation method on its face and as applied to his case.

66. Furthermore, David Wilson raises one claim to vindicate his rights guaranteed by international law, which is binding on the states through the Supremacy Clause of the U.S. Constitution. David Wilson challenges Alabama's gas-mask nitrogen asphyxiation protocol as a violation of international law against torture, as reflected in *jus cogens*. The right to be free from torture is well-established in international law, and torture is "prohibited by the law of nations. The prohibition is clear and unambiguous. […] [Conventions ratified by the United States] as well as the foreign policy of our own government, all make it clear that international law confers fundamental rights upon all people vis-a-vis their own governments." *Filartiga v. Pena-Irala*, 630 F.2d 876, 884-885 (2d Cir. 1980); *Siderman de Blake v. Republic of Argentina*, 965 F.2d 699, 716 (9th Cir. 1992) ("There is no doubt that the prohibition against official torture is a norm of customary international law[.]"). The international law against torture is part of the "supreme law of the land" under the Supremacy Clause United States Constitution. U.S. Const. art. VI, cl. 2. ("all Treaties made, or which shall be made, under the Authority of the United States, shall be the supreme Law of the Land."), and is thus enforceable against the states through §1983. It must be implemented by both the federal governments and the state and local governments. *See* Vienna Convention on the Law of Treaties, Art. 27; *Siderman de Blake v. Republic of Argentina*, 965 F.2d at 715 ("*jus cogens* 'embraces customary laws considered binding on all nations,' and 'is derived from values taken to be fundamental by the international community, rather than from the fortuitous or self-interested choices of nations.' […] The fundamental and universal norms constituting *jus cogens* transcend [the consent of states], as exemplified by the theories underlying

the judgments of the Nuremberg tribunals following World War II"); *Al Shimari v. Caci Premier Technology*, 368 F.Supp.3d 935, 958-959 (E.D.Va. 2019) ("*Jus cogens* norms not only carry with them an obligation on the part of states to respect the norms but also confer an unquestionable right on each individual to be free from states violating those norms. This right, which is created by international law, is binding on the federal government and enforceable in the federal courts. […] The basic principle that international law is incorporated into American law and is binding on the federal government and enforceable by American courts is as old as the Republic itself. In 1796, the Supreme Court 'held that the United States had been bound to receive the law of nations upon declaring its independence,' which meant that 'the United States was required' to recognize international norms when those norms were recognized by all other nations… (citing *Ware v. Hylton*, 3 U.S. (3 Dall.) 199, 1 L.Ed. 568 (1796))… Indeed, at the time of the Founding, American law was expected to conform to the dictates of international law.")

67. The executions of Mr. Kenneth Smith, Mr. Alan Miller, Mr. Carey Grayson, and Mr. Demetrius Frazier revealed three factual predicates demonstrating a violation of international law, including: (a) an excessive timeframe for the duration of the execution; (b) an unacceptable level of pain in the death constituting torture, cruel, and inhuman punishment; and (c) an unacceptable risk deducible from the use of a method of execution whose only performances to date have been horrifying botches. *See*, *Ng v. Canada*, U.N. Doc. CCPR/C/49/469/1991 (1994), para. 11.10, in which the Committee found a violation of the prohibition of torture, cruel and inhuman punishment under ICCPR art. 7. These violations are challengeable in domestic proceedings as violations of *jus cogens* international law against torture.

## I. COUNT 1: ALABAMA'S NITROGEN GAS ASPHYXIATION PROTOCOL IS FACIALLY UNCONSTITUTIONAL UNDER THE EIGHTH AND FOURTEENTH AMENDMENTS.

### A. The State's Current Nitrogen Gas Asphyxiation Protocol Causes Superadded Pain, Terror, Distress, Disgrace, and Serious Suffering in Violation of the Eighth Amendment

68. Human beings breathe in life-sustaining oxygen and breathe out carbon dioxide. People who have experienced suffocation describe it as agonizing. The Eleventh Circuit has recognized this fact and specifically held that a "substantial risk of conscious suffocation can create an Eighth Amendment problem regardless of the method of execution being used." *Grayson v. Comm'r, Ala. Dep't of Corr.*, 121 F.4th 894, 898 (11th Cir. 2024).

69. Proponents of nitrogen gas asphyxiation as a method of execution believed that the pain of suffocation was caused not by the lack of oxygen, but rather by the buildup of carbon dioxide in the lungs. Since a condemned person would still be able to breathe out carbon dioxide, while breathing in pure nitrogen, proponents argued that the condemned person would not experience the pain of "air hunger." As such, proponents maintained that nitrogen gas asphyxiation ought to have been quick and painless.

70. The scientific evidence suggested otherwise. Studies had indicated that fatally low oxygen levels alone could cause agony, anxiety, and intense fear, and that asphyxiation itself is deeply painful and can produce severe nausea, disorientation, dizziness, and seizures—irrespective of the body's carbon dioxide levels.

71. The results of the first human experiments are now in and they demonstrate that nitrogen gas asphyxiation is neither quick nor painless, but agonizing and painful. The execution of Mr. Smith on January 25, 2024, demonstrates that the method resulted in about four to six minutes of struggling, writhing, and shaking against restraints, followed by five to seven minutes of deep breathing. The three nitrogen executions that have occurred since Mr. Smith's execution

have corroborated those results, with all three individuals experiencing several minutes of tortured breathing and agonized movement.

72. As evidenced by Mr. Kenneth Smith's torturous, 22-minute execution, and the similar experiences of the three individuals executed by the State of Alabama with nitrogen gas since then, Alabama's nitrogen asphyxiation protocol carries a substantial risk of causing superadded pain, terror, distress, and disgrace, and serious suffering in violation of the Eighth Amendment.

**B. Alternative Methods**

73. It is morally repugnant that federal judges have interpreted the Eighth Amendment to impose on persons who are going to be executed the responsibility of pleading and proving that there are more humane methods of execution than the one they are facing. There is nothing in the Eighth Amendment that requires this burden, as a textual, originalist, or contextual matter, and the judicial interpretation is legally obscene. Moreover, there is no other type of § 1983 action that requires a plaintiff to suggest a way for the government to accomplish its goals without violating the plaintiff's constitutional rights.

74. The requirement that a plaintiff must develop his own execution protocol—despite the fact that there is no rational relation between the constitutionality of one method of execution and the existence of an alternative method—forces a person to participate in their own execution. It is the moral equivalent of forcing someone to dig their own grave, which has been found to be a form of torture under international law.[9] To be sure, the State of Alabama and the federal courts are not alone in mandating this macabre practice. The Nazis forced Jewish persons to dig their own

[9] *Aloeboetoe et al. v. Suriname*, Judgment (Reparations and Costs), Inter-Am. Ct. H.R., §VII, ¶51 (Sept. 10, 1993) ("The beatings received, the pain of knowing they were condemned to die for no reason whatsoever, the torture of having to dig their own graves are all part of the moral damages suffered by the victims.")

graves.[10] More recently, Russian armed forces were accused of forcing a Ukrainian woman to dig her own grave.[11] According to Amnesty International, such practices are common in North Korean prisons today.[12] But the practice is roundly understood by the international community as a form of torture for the executed person and a violation of international law.

75. Torture is a crime under customary international law, belonging in the category of *jus cogens*, and its prohibition is codified in the United Nations Convention Against Torture and Other Cruel, Inhuman or Degrading Treatment or Punishment (ratified by the United States in 1994, and Congress enacted 18 U.S.C. §§ 2340-2340A to carry out the United States' obligations under the Convention in 1994), the International Covenant on Civil and Political Rights (ratified by the United States in 1992), and the Inter-American Convention To Prevent And Punish Torture. *See also Definition of Torture Under 18 U.S.C. §§ 2340–2340A*, 28 Op. O.L.C. 297 (December 20, 2004). Forms of torture include "any act by which severe pain or suffering, whether physical or mental, is intentionally inflicted on a person" for purposes including that of punishment. *See* United Nations Convention Against Torture and Other Cruel, Inhuman or Degrading Treatment or Punishment, Dec. 10, 1994, 1465 U.N.T.S. 85. Mock executions, including forcing someone to dig their own grave, is considered such a form of torture. *See* 18 U.S.C. § 2340A (2)(C) (2000). It should also be understood as an immoral and torturous imposition on counsel for the condemned person, as well as for the federal judges deciding these cases. It unnecessarily inflicts trauma on

---

[10] Jennifer Holton, "Auschwitz survivor turns 100 despite being forced to dig his own grave by Nazis," Fox 13 (March 7, 2022), available at https://www.fox13news.com/news/auschwitz-survivor-turns-100-despite-being-forced-to-dig-his-own-grave-by-nazis; "Nazis Force Jews in Minsk District to Dig Their Own Graves," Jewish Telegraphic Agency (August 12, 1941), https://www.jta.org/archive/nazis-force-jews-in-minsk-district-to-dig-their-own-graves.

[11] Jake Epstein, "Ukrainian woman said her Russian captors mocked her execution and forced her to dig her own grave," *Business Insider* (April 19, 2023), available at https://www.businessinsider.com/ukrainian-woman-survived-russian-captivity-forced-dig-own-grave-2023-4.

[12] Alexander Smith, "North Korea expands prison camp where inmates dig own graves: Amnesty International," *NBC News* (December 5, 2013), available at https://www.nbcnews.com/news/world/north-korea-expands-prison-camp-where-inmates-dig-own-graves-flna2d11698391.

defense counsel and the judge, neither of whom are willing participants in the state's machinery of death.

76. Should this Court nevertheless continue to require a plaintiff to prove the existence of a less cruel method of execution, there are of course many ways that governments have executed their citizens lawfully over the centuries. Socrates was executed by an oral ingestion of hemlock in Athens in 399 BCE. Jesus of Nazareth was executed by crucifixion outside of Jerusalem in 30 CE. The Habsburg Emperor Maximilian I was executed by firing squad in the Mexican Republic in 1867. Marie Antoinette was beheaded at the guillotine in 1793. Nathan Hale was executed by hanging in 1776. There is a long menu of methods of execution used in human history that have been held to be legal.

*The "Socratic Method"*

77. Sticking with Socrates, it would be very easy to turn to new methods of medical aid-in-dying currently used in the United States: the injection of a ten-gram dose of secobarbital; alternatively, the injection of a drug cocktail known to doctors as "DDMP II," which is composed of 1 gram of diazepam, 100 milligrams of digoxin, 15 grams of morphine sulfate, and 2 grams of propranolol; or the injection of a drug cocktail known to doctors as "DDMAPh," which is composed of 100mg of digoxin, 1g of diazepam, 15g of morphine, 8g of amitriptyline, and 5g of phenobarbital. Dr. Charles David Blanke, an experienced physician who specializes in end-of-life care, specifically in medical-aid-in-dying (MAID) in Oregon, has testified about this alternative in federal court in Alabama. *See Hamm v. Dunn,* No. 2:17-cv-02083-KOB (N.D. Ala., 2018), Doc. 15, Appendix C, Affidavit of Dr. Charles David Blanke, ¶ 5, 6, 11. This "Socratic method" is feasible, readily implementable, and would surely reduce the certainty of severe pain associated with nitrogen gas asphyxiation. *See Baze*, 553 U.S. at 50. The United States District Court for the Northern District of Alabama already deemed this alternative to be a lawful alternative method of

execution to lethal injection. *See Hamm v. Dunn,* No. 2:17-cv-02083-KOB (N.D. Ala. Feb. 6, 2018), Doc. 30, *reversed on other grounds*.[13] The evidence regarding this alternative method has already been presented to the federal court in *Hamm v. Dunn,* No. 2:17-cv-02083-KOB (N.D. Ala. Feb. 6, 2018) and is incorporated herein by reference. *See* Appendix D (Hearing on oral injection on January 31, 2018, cross examination starting at page 106, direct examination starting at page 113); and Appendix E (Court order on oral injection alternative). If the Court should require an alternative method, this is one that has already been approved by a federal judge in Alabama.

*Firing Squad*

78. Moreover, on June 9, 2026, this Court ruled that the "firing squad is feasible, readily implemented, and significantly reduces the substantial risk of serious harm posed by the Protocol." *Lee v. Lovelace*, 2026 WL 1664095, at *2 (M.D. Ala. June 9, 2026). Thus, this Court has already found that the firing squad is an alternative method that satisfies the second prong of the *Baze-Glossip* standard.

79. Mr. Wilson hereby incorporates verbatim the alternative method that was pleaded by Mr. Jeffery Lee in his complaint and that this Court already found satisfies the second *Baze-Glossip* prong:

80. Execution by firing squad is a method of execution authorized in five states. *See* Death Penalty Info. Ctr., *Authorized Methods of Execution by State*, https://deathpenaltyinfo.org/executions/methods-of-execution/authorized-methods-by-state (last visited July 28, 2026). Most recently, South Carolina executed condemned prisoners on March 7,

---

[13] Note that Alabama law does not limit lethal injection to solely intravenous injection. The statute states only that "[a] death sentence shall be executed by lethal injection." Ala. Code § 15-18-82.1(a). The definition of "injection" is not confined to only intravenous injections. The Oxford English Dictionary defines "injection" as "[t]he action of forcing a fluid, etc. into a passage or cavity, as by means of a syringe, or by some impulsive force." Therefore, an oral form of lethal injection is actually authorized by Alabama statute. In contrast to other states that explicitly narrow the term injection to venous injection, the Alabama statute clearly allows for other forms of injection, such as oral injection.

2025, April 11, 2025, and November 14, 2025 by firing squad. *See* Death Penalty Info. Ctr., *Execution List 2025*, https://deathpenaltyinfo.org/executions/2025 (last visited July 28, 2026).

81. After being ministered to by his spiritual advisor and being allowed to make a final statement, the prisoner shall be seated in a chair set up between stacked sandbags to prevent bullets from ricocheting. A designated person on the execution team shall pin a target over the prisoner's heart and a hood over the prisoner's head.

82. The firing squad shall be comprised of five trained marksmen, one of whom is the firing squad team leader. The firing squad shall set up at a distance of 21 feet from the inmate, armed with .30-caliber rifles. One of the rifles shall be loaded with blanks so that it is unknown which firing squad member kills the prisoner. The firing squad team leader shall ensure the executioners do not see which weapon contains the blank cartridges.

a. The warden or his designee shall order the firing squad team leader to begin the cadence for the firing squad to fire. The firing squad team leader shall ready the weapons in a controlled and safe manner.

b. After the first volley:

    i. If the prisoner appears to be unconscious, the warden or his designee shall call for the medical examiner to enter the execution chamber and check the prisoner's vital signs.

        1. If there are no vital signs, the medical examiner shall certify the prisoner's death.

        2. If vital signs are detected, the medical examiner shall exit the execution chamber. The warden or his designee shall order the firing squad team leader to make the weapons ready for fire, and shall order the firing squad team leader to begin the cadence for the firing

squad to fire a second volley. The warden or his designee, the firing squad, and medical examiner shall repeat the procedures until no vital signs are detected.

ii. If the prisoner is obviously conscious, the warden or his designee shall immediately instruct the first squad team leader to prepare the weapons and fire again.

c. After the second volley, the warden or his designee, the firing squad, and medical examiner shall repeat the procedures until no vital signs are detected.

83. This constitutes the exact alternative that this Court reviewed and found to be a feasible alternative in the *Lee v. Lovelace* decision. As this Court described it: "First, a member of the execution team would restrain the condemned inmate to a chair placed "between stacked sandbags." (Doc. 40 at 20, para. 71). Next, an execution team member would place a hood over the inmate's head and a target over his heart. (*Id*.). The firing squad team leader would then direct the execution team to stand at attention twenty-one feet from the condemned inmate. (*Id*. at 21, para. 72). Five trained marksmen armed with .30-caliber rifles would take aim and fire. (*Id*.). If, after the first volley, the condemned "is obviously conscious," the warden "shall immediately instruct the firing squad team leader to prepare the weapons and fire again." (Doc. 40 at 21–22, para. 72; *see also* doc. 173-46 (Utah's protocol))." *Lee v. Lovelace*, 2026 WL 1664095, at *4 (M.D. Ala. June 9, 2026).

84. Mr. Wilson is not saying that he *wants* to be executed by this method, and still contests the obligation placed on the prisoner to propose his own method of execution, but he alleges that it is an alternative that has been found to satisfy the *Baze-Glossip* standard.

## II. COUNT 2: ALABAMA'S NITROGEN GAS ASPHYXIATION PROTOCOL IS UNCONSTITUTIONAL UNDER THE EIGHTH AND FOURTEENTH AMENDMENTS *AS APPLIED* TO DAVID WILSON, IN LIGHT OF HIS UNIQUE MEDICAL CONDITIONS.

### A. The State's Use of Nitrogen Gas Asphyxiation to Execute David Wilson is Highly Likely to Cause Him Severe Pain and Suffering.

85. There is a "substantial" and "objectively intolerable" risk that Mr. Wilson will experience severe pain and suffering, meeting and exceeding the superadded pain requirement of *Bucklew*, if Alabama proceeds to execute him by nitrogen asphyxiation, in violation of his Eighth Amendment rights.

#### i. *Pulmonary Health Problems*

86. Alabama's current nitrogen gas asphyxiation protocol would cause Mr. Wilson severe pain and suffering, meeting the superadded pain, terror, distress, and disgrace requirement, in light of his pulmonary health issues. Mr. Wilson's medical records demonstrate that he suffers from chronic (lifelong) conditions that constrict the airways in the lungs. He has contracted tuberculosis, which has been worsened by several bouts of COVID-19. As a result of his compounding pulmonary issues, Mr. Wilson's airways are chronically clogged by phlegm and other discharge. A nitrogen asphyxiation protocol would cause Mr. Wilson severe distress.

87. These pulmonary health problems include symptoms such as inflammation, airway hyperresponsiveness, and bronchoconstriction, which might collectively interfere with the nitrogen gas protocol and cause Mr. Wilson severe pain and suffering. A person suffering from these conditions typically has inflamed bronchioles (breathing tubes), accompanied by excess mucus, which dramatically reduces the size of the airway—making it very difficult for air to pass through. While inflammation may be present even when a person is not experiencing pulmonary problems, their bronchioles can become further constricted due to airway hypersensitivity.

88. It is unknown whether the inhalation of nitrogen gas alone is likely to trigger a pulmonary attack. However, there is evidence that low levels of oxygen, as would be the case in nitrogen asphyxiation, can lead persons with pulmonary health problems to struggle to breathe. *See* Robert Geisler, "Asthma and High Elevation Activity," Children's Hospital Los Angeles (Feb. 27, 2014), available at https://www.chla.org/blog/advice-experts/asthma-and-high-elevation-activity#:~:text=Why%20High%20Elevation%20Triggers%20Asthma,or%20quick%20breathing%20can%20occur. This would be excruciating for Mr. Wilson. Furthermore, given that Mr. Wilson has also been repeatedly infected with COVID-19, which weakens the immune system, he is at even greater risk of active tuberculosis. Active tuberculosis causes lung tissue to harden and die, making it vastly more difficult for the individual to breathe.

89. Mr. Wilson has chronic discharge within his airways and has permanently constricted airways. Even without an active tuberculosis diagnosis, Mr. Wilson does not breathe like a healthy person. Mr. Wilson's pulmonary issues would interfere with the efficacy of the nitrogen gas asphyxiation protocol. If Mr. Wilson experiences a pulmonary attack at the time of his execution, his involuntary coughing might cause the nitrogen gas-mask to become dislodged—thereby introducing atmospheric oxygen into the system and the possibility of brain damage. Similarly, the constriction of Mr. Wilson's airways would likely prolong his suffering, by restricting the intake of nitrogen gas into his lungs. All the while, Mr. Wilson would be experiencing the severe pain and suffering associated with a pulmonary attack and asphyxiation.

**ii. *Asperger's Syndrome***

90. Alabama's current nitrogen gas asphyxiation protocol would cause Mr. Wilson severe pain and suffering in light of his Asperger's Syndrome. Mr. Wilson's medical records demonstrate that he suffers from hyper-reactivity to sensory input. He has atypically high

sensitivity to light and has repeatedly requested sunglasses. Without sunglasses, the light causes Mr. Wilson to experience severe migraines. This symptom is consistent with the sensory perceptual issues experienced by persons with ASD.

91. Defendant's current nitrogen asphyxiation protocol requires that a full face-mask be fitted over the condemned person's entire face. In an effort to prevent atmospheric oxygen from seeping into the nitrogen delivery system, the mask is required to be fitted tightly. It would not allow for wearing glasses.

92. During the COVID-19 pandemic, mask use became prevalent. For some individuals with ASD and their families, including Mr. Wilson, mask requirements posed an enormous challenge—as what was a minor discomfort for neurotypical individuals was an unbearable experience for people with ASD. In 2020, the Harvard Medical School published an online guide to managing the pandemic for individuals with ASD. In it, they write:

> Many people with ASD are highly sensitive to touch, and the face can be especially so. Wearing a face mask involves many unpleasant sensations. On the surface, there's the scratchy texture of fabric, tight contact where the top of the mask meets the skin, and the tug of elastic on the ears. Sensations under the mask are no more pleasant and include the warm, damp smell of recycled air. In addition, the sensation of breathing in and exhaling air through the nose can feel restrictive, leading to concern and worry for many individuals with ASD. While wearing a mask is uncomfortable at best, these unpleasant sensory experiences can be intensely magnified in people with ASD.[14]

Mr. Wilson could not wear either a mask or face shield during the COVID-19 pandemic. He felt like he was suffocating when he had a mask on. The mask required by Alabama's current nitrogen asphyxiation protocol is not merely a slip of cloth covering the nose and mouth. It is a stiff and

---

[14] "Helping people with autism spectrum disorder manage masks and Covid-19 tests," *Harvard Medical School* (Jun. 10, 2020), https://www.health.harvard.edu/blog/helping-people-with-autism-spectrum-disorder-manage-masks-and-covid-19-tests-2020061020089#:~:text=Many%20people%20with%20ASD%20are,of%20elastic%20on%20the%20ears.

suffocating gas mask. Such a mask would be intolerable for people like Mr. Wilson who suffer from sensory perceptual issues due to ASD. While no person sentenced to death has the right to a painless death, Alabama's current nitrogen gas asphyxiation protocol would cause Mr. Wilson to experience suffering far in excess of that which a neurotypical condemned person would endure.

93. While any method of execution would create sensory stimuli, not all would involve the level of stimulation that Mr. Wilson would experience from Alabama's current nitrogen gas asphyxiation protocol—which requires extensive tactile stimulation of the face (a particularly sensitive part of the body). Alternatives would involve far less stimulation.

**iii. *Light Sensitivity and Visual Impairment***

94. Mr. Wilson experiences hypersensitivity to light, suffering from severe migraines when exposed to direct light. He wears sunglasses each time he goes outdoors. It is inevitable that, forced to stare straight into ceiling lights, Mr. Wilson would suffer from crippling migraines during the execution.

95. Furthermore, Mr. Wilson wears prescription glasses and is not able to see clearly without them. During the nitrogen gas execution, he would not be able to see his family and friends or the movements of the people in the execution chamber.

96. As a result, Mr. Wilson would need to wear prescription sunglasses during the execution.

97. The State of Alabama's nitrogen asphyxiation protocol uses a gas mask that covers the entire face of the condemned person. Mr. Wilson would not be able to wear any glasses during the execution. He would thus be put in the position of either suffering from debilitating migraines during his last moments of life in order to catch a blurry glimpse of his family and friends, or in the alternative, forfeit his last opportunity to see his loved ones at all.

### B. There Are Feasible, Readily Implemented Alternatives that Would Eliminate the Substantial Risk of Severe Pain Arising from David Wilson's Unique Medical Conditions

98. As discussed earlier, the burden should not be on Mr. Wilson to propose an alternative method of execution; there are, however, alternatives available that have been found to be legal alternatives by federal courts, including medical aid-in-dying or a firing squad, that would cause him significantly less pain and suffering than Alabama's current nitrogen gas asphyxiation protocol. The United States District Court for the Northern District of Alabama has already found that execution by oral injection is a feasible and readily available alternative to Alabama's protocol that significantly reduces the risk of severe harm. The United States District Court for the Middle District of Alabama has found that the firing squad is a feasible and readily available alternative. *Lee v. Lovelace*, 2026 WL 1664095, at *2 (M.D. Ala. June 9, 2026).

## III. [COUNT 3: This claim has been dismissed by the Court. Doc. 73. Plaintiff objects and preserves this claim for appeal]

## IV. COUNT 4: ALABAMA'S DEVELOPMENT AND USE OF THE NITROGEN GAS ASPHYXIATION PROTOCOL IS A VIOLATION OF *JUS COGENS* INTERNATIONAL LAW.

**[PARTS A and B: These parts of Count IV have been dismissed by the Court. Doc. 73. Plaintiff objects and preserves these parts of the claim for appeal]**

### C. The Nitrogen Gas Protocol Is a Violation of *Jus Cogens*

99. *Jus cogens* are the peremptory norms of general international law and have been incorporated into federal common law. *Al Shimari v. CACI Premier Tech., Inc.*, 368 F. Supp. 3d 935, 959 (E.D. Va. 2019) ("Accordingly, there is today a federal common law right derived from international law that entitles individuals not to be the victims of *jus cogens* violations.") It "is a

norm accepted and recognized by the international community of states as a whole as a norm from which no derogation is permitted and which can be modified only by a subsequent norm of general international law having the same character." *Siderman de Blake v. Republic of Argentina*, 965 F.2d 699, 714 (9th Cir. 1992) (quoting the Vienna Convention on the Law of Treaties). The "unquestionable right" to be free from violations of *jus cogens* is "enforceable in the federal courts." *Al Shimari v. CACI Premier Tech., Inc.*, 368 F. Supp. 3d at 958. There is significant evidence that executing individuals with nitrogen gas under Alabama's protocol is in violation of *jus cogens* today. The Alabama nitrogen asphyxiation execution protocol violates the well-established *jus cogens* of the prohibition of torture. The prohibition against torture is one of the uncontested *jus cogens* recognized by the international community, and as alleged *supra* in Section A of this Count, Alabama's nitrogen asphyxiation protocol fits within the definition of torturous execution under international law standards. *See* The International Law Commission's *Draft Conclusions on identification and legal consequences of peremptory norms of general international law (*jus cogens*), with commentaries* (2022), https://legal.un.org/ilc/texts/instruments/english/commentaries/1_14_2022.pdf (providing a non-exhaustive list of established *jus cogens*).

100. Following the United Nations consideration of the Complaint submitted on behalf of Mr. David Wilson on November 15, 2024, seven UN Special Procedures (the human rights mechanisms of the United Nations) stated:

> we would like to call your attention to an emerging international customary norm prohibiting the death penalty as a form of cruel, inhuman, or degrading punishment. The International Law Commission's Draft conclusions on identification and legal consequences of peremptory norms of general international law of 2022 provides a guiding methodology for UN Special Procedures to state the jus cogens violations of the death penalty (either as a new norm or in violation of the right to life or the prohibition of torture). This is also the conclusion of a recent report from the UN Special Rapporteur on extrajudicial, summary or arbitrary executions, which on the basis of latest medical and

medico-legal research, found that "the idea that the death penalty does not constitute torture simply lacks persuasion.[15]

101. The International Law Commission's *Draft Conclusions on identification and legal consequences of peremptory norms of general international law (*jus cogens*), with commentaries* (2022), Yearbook of the International Law Commission 2022 vol. II, Part Two, (https://legal.un.org/ilc/texts/instruments/english/commentaries/1_14_2022.pdf), provides evidence for recognizing *jus cogens* and in Draft Conclusions 8 and 9, it includes the jurisprudence derived from court decisions.[16] Such evidence includes works by expert bodies, such as the Special Procedures, as well as jurisprudence derived from international court decisions, among other sources. Moreover, United States federal courts have recognized since the early republic that *jus*

---

[15] The seven Special Procedures include: Mandates of the Working Group on Arbitrary Detention; the Special Rapporteur on the rights of persons with disabilities; the Special Rapporteur on extrajudicial, summary or arbitrary executions; the Special Rapporteur on the independence of judges and lawyers; the Independent expert on the promotion of a democratic and equitable international order; the Special Rapporteur on contemporary forms of racism, racial discrimination, xenophobia and related intolerance and the Special Rapporteur on torture and other cruel, inhuman or degrading treatment or punishment. Ref.: UA USA 27/2024, Palais des Nations, 1211 Geneva 10, Switzerland, 15 November 2024, p. 10, available online at: https://spcommreports.ohchr.org/TMResultsBase/DownLoadPublicCommunicationFile?gId=29503. The response from the United States Permanent Mission to the United Nations, dated December 2, 2024, is available on line here: https://spcommreports.ohchr.org/TMResultsBase/DownLoadFile?gId=38788.

[16] Draft Conclusion 8 states:

> Conclusion 8
> Evidence of acceptance and recognition
> 1. Evidence of acceptance and recognition that a norm of general international law is a peremptory norm (jus cogens) may take a wide range of forms.
>
> 2. Forms of evidence include, but are not limited to: public statements made on behalf of States; official publications; government legal opinions; diplomatic correspondence; constitutional provisions; legislative and administrative acts; decisions of national courts; treaty provisions; resolutions adopted by an international organization or at an intergovernmental conference; and other conduct of States.
>
> Conclusion 9
> Subsidiary means for the determination of the peremptory character of norms of general international law
> 1. Decisions of international courts and tribunals, in particular of the International Court of Justice, are a subsidiary means for determining the peremptory character of norms of general international law. Regard may also be had, as appropriate, to decisions of national courts.
> 2. The works of expert bodies established by States or international organizations and the teachings of the most highly qualified publicists of the various nations may also serve as subsidiary means for determining the peremptory character of norms of general international law.

*cogens* and customary international law can be ascertained "'by consulting the works of jurists, writing professedly on public law; or by the general usage and practice of nations; or by judicial decisions recognizing and enforcing that law.' *United States v. Smith*, 18 U.S. (5 Wheat.) 153, 160–61, 5 L.Ed. 57 (1820) (Story, J.)." *Siderman de Blake v. Republic of Argentina*, 965 F.2d 699, 714–15 (9th Cir. 1992). In line with the statement by the seven UN Special Procedures, there is ample evidence from these sources that a prohibition on nitrogen gas executions is emerging as a *jus cogens*.

102. In the *Jadhav* case (*India v. Pakistan*) in the International Court of Justice, Judge Cançado Trindade stated in his Separate Opinion:

> there is evidence that there is an evolving customary international law of prohibition of the death penalty, as sustained by an *opinio juris communis*. There are nowadays, as already observed, international treaties on the abolition of the death penalty. There remain some States, however, that in practice seem to overlook this relevant development, in keeping on applying the death penalty; yet, they cannot at all pretend to exclude themselves from the evolving customary international law in prohibition of the death penalty. This would amount to a breach of it, in the present case interrelated with the breach of Article 36 (1) (b) of the VCCR.

*See* Separate Opinion of Judge Cançado Trindade*, Jadhav (India v. Pakistan),* Judgment, I.C.J. Reports 2019, p. 462.

103. A significant majority of UN member states have voted in the most recent resolutions to prohibit and restrict the death penalty (80% of the UN General Assembly with 130 votes in favor, 32 against, and 22 abstentions for the *Moratorium on the use of the death penalty*, A/RES/79/179, December 17, 2024) and 72% of the 2022 composition of the Human Rights Council with 28 in favor to 11 against, with 7 abstentions in the vote for the *Question of the death penalty*, A/HRC/RES/54/35, October 17, 2023).

104. It is therefore clear that execution by a torturous method of nitrogen gas asphyxiation is a violation of the peremptory norms of general international law (*jus cogens*)

prohibiting torture. *Jus cogens* sit at the pinnacle in the hierarchy of international law. Therefore, in addition to violating the Eighth Amendment protections provided by the United States Constitution, the use of a nitrogen gas protocol for purposes of the death penalty is a violation of the highest threshold of international law. Seven UN Special Procedures have already taken this position in Mr. Wilson's case. *See,* the UN Special Procedures Communication to the US government in the case of Mr. David Wilson, Ref: UA USA 27/2024, Nov. 15, 2025, p. 10, at https://spcommreports.ohchr.org/TMResultsBase/DownLoadPublicCommunicationFile?gId=29503.

**PRAYER FOR RELIEF**

For the foregoing reasons, Plaintiff David P. Wilson respectfully requests that this Court:

Enter a declaratory judgment that Defendant's current nitrogen gas asphyxiation protocol violates David Wilson's right to be free from cruel and unusual punishment under the Eighth and Fourteenth Amendments to the United States Constitution and international law.

Grant injunctive relief to enjoin the Defendant from proceeding with the execution of David Wilson using its nitrogen gas asphyxiation protocol, which will cause David Wilson cruel and unusual suffering, in violation of the Eighth and Fourteenth Amendments and international law.

Grant any further relief as it deems just and proper.

Dated this 9th day of September 2026.

Respectfully submitted,

Bernard E. Harcourt
Alabama Bar Number: ASB-4316-A31B
Columbia Law School
435 West 116th Street
New York, New York 10027
Telephone: (212) 854-1997
Fax: (212) 854-7946
Email: beh2139@columbia.edu

Attorney for Plaintiff David P. Wilson