# EXHIBIT B

IN THE UNITED STATES DISTRICT COURT
FOR THE MIDDLE DISTRICT OF ALABAMA
NORTHERN DIVISION

| | |
|---|---|
| **IN RE:<br>ALABAMA NITROGEN HYPOXIA PROTOCOL LITIGATION** | **CASE NO. 2:24-cv-00111-ECM** |
| **THIS DOCUMENT RELATES TO<br><br>MARK JENKINS,<br><br>Plaintiff,<br><br>v.<br><br>GREG LOVELACE, in his official capacity as Commissioner, Alabama Department of Corrections, and<br><br>TERRY RAYBON, in his official capacity as Warden, Holman Correctional Facility,<br><br>Defendants.** | **CASE NO. 2:25-cv-00676-ECM<br><br>CAPITAL CASE** |

~~MARK JENKINS~~ ~~)~~

~~Prison Number Z-527~~ ~~)~~
~~)~~

~~)~~

~~)~~

~~Plaintiff,~~ ~~)~~

~~)~~

~~v.~~ ~~)~~ ~~Civ. Action No.~~ ________

)
JOHN HAMM )
Commissioner )
Alabama Department of Corrections, )
)
)
and )
)
TERRY RAYBON - )
Warden )
William C. Holman Correctional Facility )
)
)
and )
)
JOHN DOES I-X, )
)
Individually, and in their official )
capacities, )
)
Defendants. )
)

**[PROPOSED] AMENDED COMPLAINT FOR DECLARATORY AND INJUNCTIVE RELIEF**

## INTRODUCTION

1. By this action, Plaintiff Mark Jenkins ("Jenkins") challenges the Alabama Department of Corrections' ("ADOC") painful and prolonged method of execution by nitrogen hypoxia (*i.e.*, suffocation by nitrogen gas), which violates Jenkins's constitutional right to be executed without superadded pain.

2. In January 2024, the State of Alabama completed the first ever execution by the novel method of nitrogen hypoxia. As there was no precedent for this experimental method, there was no information on how nitrogen hypoxia would work in practice and whether it would subject the condemned person to superadded pain. Even so, before it conducted the first execution by nitrogen hypoxia, the State of Alabama represented that it was "the most painless and humane method of execution known to man."[1] According to the State of Alabama, death by nitrogen hypoxia would be like going to sleep. Before the experimental method was first employed, the Alabama Attorney General represented that "[i]n all likelihood, hypoxia will cause unconsciousness ***in a matter of seconds***, rendering [the condemned] unable to feel pain."[2] The Attorney General further

[1] Kim Chandler, *Alabama Calls Nitrogen Execution Method Painless and Humane, but Critics are Raising Doubts*, AP NEWS (Jan. 23, 2024), https://apnews.com/article/alabama-nitrogen-execution-death-penalty-95fabff69f275a77fe76e54f453c50f3 (quotations omitted).

[2] Defs.' Post-Hr'g Br. in Opp'n to Pl. Smith's Mot. for Prelim. Inj., *Smith v. Hamm,* No. 2:23-cv-00656 (M.D. Ala. Dec. 29, 2023), ECF No. 66 at 15 (emphasis added); *see* Opp'n to App. for Stay of Execution Pending Pet. for Writ of Cert. & Br. in Opp'n at 22, *Smith v. Hamm*, No. 23A688 (U.S. 2024) ("The State's method will rapidly lower the oxygen level in the mask, ensuring unconsciousness in seconds.").

claimed: "ADOC's nitrogen hypoxia protocol will rapidly reduce oxygen inside the mask, cause unconsciousness ***within seconds***, and cause death ***within minutes.***"[3] Not one of these claims was true.

3. The State of Alabama severely misstated how condemned persons would die through nitrogen hypoxia. Alabama described the dying process in a way that suggested that nitrogen would function like anesthesia. Based on information and belief, the State of Alabama did not understand (or worse, understood and ignored) that nitrogen has no anesthetic qualities. Death by nitrogen hypoxia is not akin to peacefully going to sleep. It is instead painful suffocation.

4. ~~The~~**No less than** five executions in Alabama to date show that the State of Alabama was wrong. In each of the executions of Kenneth Smith (January 25, 2024), Alan Miller (September 26, 2024), Cary Grayson (November 21, 2024), Demetrius Frazier (February 6, 2025), and Gregory Hunt (June 10, 2025), the condemned man struggled while conscious for multiple minutes and then labored for air for many more while he slowly suffocated. All five of these executions followed a very similar pattern of visible distress as the condemned person struggled and then eventually died. Death by nitrogen hypoxia is akin to

[3] *Id.* at 12 (emphasis added).

death by drowning, carrying both pain and psychological anguish. The State of Alabama's experimental method should now be stopped.

5. Jenkins timely brings this challenge not to prevent his execution, but to prevent the State from employing this particular protocol, which is unconstitutionally cruel and unusual. This protocol has only been made publicly available in heavily redacted form (hereafter, the "Redacted Protocol"). A copy of the Redacted Protocol is attached hereto as **Exhibit 1**.

~~6. For Jenkins specifically, death by nitrogen hypoxia will be particularly horrific and psychologically painful considering his unique personal history. Jenkins suffered severe child abuse and beatings at the hands of his mother and stepfather. Jenkins's parents routinely beat him, neglected him, and on multiple occasions placed soiled diapers with his own urine and feces over his face when he was a young child. As a result, Jenkins has diagnosed post-traumatic stress disorder ("PTSD") and panic disorder that result in acute attacks of anxiety, with physical symptoms such as hyperventilating, hysterical crying, coughing, and heaving. Because it evokes his childhood abuse, placing a mask over Jenkins's face is highly likely to induce acute panic symptoms.~~

~~7~~**6**. When Jenkins signed a form provided by the ADOC electing nitrogen hypoxia, he had no information at all regarding this method and less than 30 days to consider it. Indeed, he was required to make an election a full five years before the State developed any protocol. Subsequently, Jenkins discovered the deficiencies in the protocol and learned of the pattern of excruciating deaths of

other condemned individuals by nitrogen hypoxia. Notably, many details of this experimental method remain hidden **to the public** behind the redactions of the Redacted Protocol, but the painful and shocking executions to date show that this experimental execution method must end.

~~8~~**7**. Jenkins seeks only to be executed under a protocol that does not inflict superadded pain. To that end, he has identified specific, available modifications to the nitrogen hypoxia protocol that if applied together could reduce the risk of unconstitutional suffering. Additionally, he proposes execution by firing squad as a known and available alternative. Either of these options would mitigate the intense physical and psychological distress caused by the current protocol, which violates the United States Constitution and Jenkins's legal rights.

~~9~~**8**. In short, the ADOC's nitrogen hypoxia protocol violates Jenkins's constitutional right not to suffer cruel and unusual punishment at the hands of the State, and the State of Alabama should be enjoined from using this method to kill him. Specifically, Jenkins brings this action for injunctive and declaratory relief to prevent violations of his rights ~~under the U.S. Constitution, including: (i) his right~~ to be free from cruel and unusual punishment under the Eighth Amendment of the U.S. Constitution~~; (ii) his right to access to counsel under the Sixth Amendment of the U.S. Constitution; (iii) his right to free exercise of religion under the First Amendment of the U.S.~~

~~Constitution, along with his rights under the Religious Land Use and Institutionalized Persons Act ("RLUIPA"), 42 U.S.C. § 2000cc, *et seq*.; and (iv) his right to Due Process under the Fourteenth Amendment of the U.S. Constitution.~~.

## THE PARTIES

### Plaintiff Mark Jenkins

~~10~~**9**. Plaintiff Mark Jenkins is a resident of the State of Alabama who is incarcerated at the William C. Holman Correctional Facility in Atmore, Alabama ("Holman Correctional Facility"). Jenkins is sentenced to death, in the custody of Defendants John Hamm, Terry Raybon, and John Does I-X (collectively, "Defendants"), and under the control and supervision of the ADOC. Defendants will attempt to execute Jenkins in a special chamber in Holman Correctional Facility, which is operated and controlled by Defendants.

~~11. Jenkins has a deeply traumatic personal history marked by severe childhood abuse and neglect, which has resulted in chronic panic disorder and PTSD. Jenkins was born as the result of an extramarital affair between his mother, Donna Jo Jenkins, and a sailor, during a period when her husband, Steven Jenkins, Sr., was incarcerated for robbery.~~

~~12. During Jenkins's infancy and childhood, Donna Jo used drugs and drank heavily. In sworn testimony, Jenkins's family members described how Donna Jo routinely neglected to bathe him, left him unattended under the sink, locked him in a back room shared with the family dog, forced him to spend prolonged periods of time in soiled diapers, and shoved dirty diapers into Jenkins's face and onto his body.~~

~~13. When Jenkins was three years old, his stepfather, Steven Sr., returned from prison and rained hell on Jenkins, who for Steven Sr. was a constant reminder of Donna Jo's infidelity. Steven Sr. regularly beat Jenkins with wooden 2 by 4s, belts, shovels, coat hangers, and other items. These beatings occurred almost daily until Jenkins ran away from home at age 13. Even the Alabama Attorney General "concede[d]" that Jenkins "had a horrible childhood,"[4] and a federal court in the Northern District of Alabama found it "indisputable that Jenkins had a horrible childhood in which he was seriously abused, ignored, and mistreated by his parents."[5]~~

~~14. Jenkins has been diagnosed with panic disorder stemming from this childhood trauma, which manifests in regular and severe anxiety attacks. During these attacks, Jenkins's psychological distress is expressed in physical symptoms. In the beginning of an attack, Jenkins's vision begins flickering, he feels pain on the back of his knees, he develops cramps in his stomach, and he collapses into a ball, either rocking back and forth in an attempt to self soothe or instead being frozen with pain. Jenkins has used this coping mechanism since childhood, when he would ball himself up and hide to escape the abuse. During his panic attacks, Jenkins uncontrollably cries, coughs, heaves, and hyperventilates, losing the ability to speak. Jenkins is highly likely to suffer a similar debilitating attack at his time of execution in light of the painful and deficient Redacted Protocol described below.~~

## The Defendants

~~15~~**10**. Defendant ~~John Hamm~~**Greg Lovelace** is the Commissioner of the ADOC. As Commissioner, Defendant ~~Hamm~~**Lovelace** is the final executive authority responsible for carrying out sentences of death against Alabama

~~[4] Hr'g Tr. 10:21-22, *Jenkins v. State of Alabama*, Case No. CC1989-68.62, (St. Clair Cnty. Cir. Ct. Sept. 25, 2023).~~
~~[5] *Jenkins v. Allen*, 2015 WL 1488899, at *21 (N.D. Ala. Mar. 31, 2015).~~

prisoners. He is sued here in his official capacity for the purpose of obtaining declaratory and injunctive relief.

~~16~~**11**. Defendant Terry Raybon is the Warden of the Holman Correctional Facility, the ADOC facility where death sentences are carried out. In that position, he is charged with management of the Holman Correctional Facility and the oversight and conduct of operations there, including the oversight and conduct of executions carried out at the facility. He is sued here in his official capacity for the purpose of obtaining declaratory and injunctive relief.

~~17. Defendants John Does I-X are employed by, or contracted with, the ADOC to consult with, prepare for, and/or carry out Jenkins's execution. Jenkins does not know, and the Defendants have not revealed, their identities or positions. They are sued here in their official capacities for the purpose of obtaining declaratory and injunctive relief.~~

~~18~~**12**. The Defendants are acting, and each of them at all times relevant hereto were acting, in their respective official capacities with respect to all acts described herein and were in each instance acting under the color and authority of state law. Upon information and belief, unless preliminarily and permanently enjoined, the Defendants, and each of them, intend to act in their respective official capacities and under the authority of state law in executing Jenkins using the ADOC's nitrogen hypoxia protocol, in violation of Jenkins's constitutional rights.

## JURISDICTION AND VENUE

~~19~~**13**. This is an action for declaratory judgment, injunctive relief, and any other relief available from the Court.

~~20~~**14**. This Court has jurisdiction over this matter pursuant to 42 U.S.C. § 1983, 28 U.S.C. § 1331, 28 U.S.C. § 1343, 28 U.S.C. § 2201, and 28 U.S.C. § 2202.

~~21~~**15**. Venue is proper in this Court under 28 U.S.C. § 1391(b)(1)-(2). The ADOC is headquartered in this District and a substantial part of the events giving rise to the claims made herein took place in this District, including the formulation of the Redacted Protocol.

~~22~~**16**. The claims in this Complaint are cognizable under the constitutional ~~and statutory~~ grounds identified above and described in more detail below. Jenkins does not challenge the validity of his conviction or death sentence through this action. Instead, he alleges that the protocol that Defendants will use to carry out his execution violates his constitutional rights.

~~23~~**17**. Jenkins has standing to bring this action for declaratory judgment and injunctive relief.

## EXHAUSTION OF REMEDIES

~~24~~**18**. Jenkins has no available administrative remedies to exhaust because State law exempts "[t]he policies and procedures of the Department of Corrections

for executions of persons sentenced to death . . . from the Alabama Administrative Procedure Act, Chapter 22 of Title 41."[~~6~~4]

## FACTUAL ALLEGATIONS

### Alabama Prepares to Execute Prisoners through Nitrogen Hypoxia

~~25~~**19**. For much of Jenkins's incarceration, lethal injection has been the primary method of execution in Alabama.

~~26~~**20**. Lethal injection, however, has a fraught history in Alabama. The ADOC has—on several occasions—failed to competently execute individuals by lethal injection. During these botched executions, state personnel failed to properly place the intravenous line ("IV"), jabbing the condemned persons repeatedly with IV needles and thus subjecting them to intense physical and psychological pain.

~~27~~**21**. On June 1, 2018, Alabama Act 2018-353 (the "Act") went into effect, offering prisoners on death row the option to forego lethal injection and, instead, elect nitrogen hypoxia. At that time, nitrogen hypoxia had never been used anywhere in the world to execute humans.[~~7~~5]

~~28~~**22**. The Act gave prisoners on death row approximately thirty days, until June 30, 2018, to notify the warden of their election.[~~8~~6] Individuals made this

[~~6~~4] Ala. Code § 15-18-82.1(g).
[~~7~~5] *See* Ala. Laws Act 2018-353; Ala. Code § 15-18-82.1(b).
[~~8~~6] *Id.* at § 15-18-82.1(b)(2).

election without the ability to review and understand the protocol, which had not yet been drafted.

~~29~~**23**. On or about June 26, 2018, only a few days before the method-election deadline, Cynthia Stewart, then the warden at Holman Correctional Facility ("Warden Stewart"), was ordered by the ADOC to notify prisoners on death row of the recent change in the law by distributing forms entitled "Election to be Executed by Nitrogen Hypoxia" ("Hypoxia Election Form"). A copy of the Hypoxia Election Form signed by Jenkins is attached as **Exhibit 2**.

~~30~~**24**. Warden Stewart directed Captain Jeff Emberton ("Captain Emberton") to distribute the forms, along with blank envelopes to each of the prisoners on death row. As Captain Emberton passed the forms out, he told the prisoners on death row that anyone who wanted to elect nitrogen hypoxia as their method of execution needed to fill out the form. Then, the prisoners on death row were instructed to put the form in the provided envelopes, which Captain Emberton would later collect and return to Warden Stewart.

~~31~~**25**. Without any understanding of how nitrogen hypoxia would be carried out or the full consequences of his election, Jenkins opted in to the protocol by completing and timely returning the form. At the time, Jenkins

believed that an unknown method could not be worse than the well-documented suffering associated with the ADOC's lethal injection protocol.

~~32~~**26**. Jenkins expressly preserved his ability to challenge the constitutionality of the Redacted Protocol. The form Warden Stewart provided stated: "This election is not intended to affect the status of any challenge(s) (current or future) to my conviction(s) or sentence(s), *nor waive my right to challenge the constitutionality of any protocol adopted for carrying out executions by nitrogen hypoxia*."[~~9~~7]

~~33~~**27**. Ever since the Alabama legislature authorized nitrogen hypoxia, the ADOC's development of the protocol has been shrouded in secrecy. As noted above, the Redacted Protocol was published by Alabama in a heavily redacted form. The redactions obscure many details, which limit Jenkins's ability to review the protocol and understand its risks. Jenkins brings his present challenges based on the deficiencies apparent on the face of the Redacted Protocol and reserves the right to amend his claims if and when an unredacted copy of the protocol is obtained.

**The Brutal Executions by Nitrogen Hypoxia**

~~34~~**28**. Recent events have shown that nitrogen hypoxia under the Redacted Protocol violates the Eighth Amendment's prohibition on cruel and unusual

[~~9~~7] Ex. 2 (emphasis added).

punishment. In each of their respective executions, the condemned men—Kenneth Smith, Alan Miller, Cary Grayson, Demetrius Frazier, and Gregory Hunt—suffered prolonged and painful deaths.[~~10~~8]

~~35~~**29**. Before any executions by nitrogen hypoxia took place, Alabama state officials claimed that nitrogen hypoxia would be a quick, effective, and humane method of execution. For example, before Kenneth Smith's execution, the Alabama Attorney General's Office told an appellate court that nitrogen hypoxia is "the most painless and humane method of execution known to man,"[~~11~~9] that it "quickly causes a person to lose consciousness,"[~~12~~10] and that it leads to "death within minutes."[~~13~~11] Additionally, Alabama officials claimed that dying from nitrogen hypoxia would be "very effective" and "a lot more humane [than other methods]."[~~14~~12]

[~~10~~8] The five aforementioned men were all executed in Alabama. The state of Louisiana executed Jessie Hoffman Jr. on March 18, 2025 using a nitrogen hypoxia protocol modeled after Alabama's. Kat Stromquist, *Louisiana Executes Jessie Hoffman by Nitrogen Gas in 1st Use of Death Penalty in 15 Years*, WBHM90.3 (Mar. 19, 2025), https://wbhm.org/2025/louisiana-executes-jessie-hoffman-by-nitrogen-gas-in-1st-use-of-death-penalty-in-15-years/.

[~~11~~9] Chandler, *supra* note 1 (quotations omitted).

[~~12~~10] Nicholas Bogel-Burroughs, *After a Botched Execution, Alabama is Trying an Untested Method*, N.Y. TIMES (Jan. 23, 2024), https://www.nytimes.com/2024/01/23/us/nitrogen-execution-alabama-kenneth-smith.html (quotations omitted).

[~~13~~11] Kim Chandler, *Alabama Plans to Carry Out First Nitrogen Gas Execution. How Will it Work and What are the Risks?*, ASSOCIATED PRESS (Jan. 21, 2024), https://apnews.com/article/nitrogen-gas-execution-alabama-c3c813841bcebdf0f77371fc7f1da3d9 (quotations omitted).

[~~14~~12] Minjee Kim, *Alabama Prepares to Become First State to Carry Out Execution by Nitrogen Gas*, AMERICAN BAR ASSOCIATION (Nov. 21, 2023), https://www.americanbar.org/groups/committees/death_penalty_representation/publications/project_blog/alabama-prepares-for-execution-by-nitrogen-gas/ (alteration in original) (quotations omitted).

~~36~~**30**. Before the method was used for the first time, medical experts disagreed with the State of Alabama's predictions that nitrogen hypoxia would be painless. Dr. Jeffrey Keller, president of the American College of Correctional Physicians, noted: "This has never been done before. It is an experimental procedure" and "[i]t is little different than putting a plastic bag over one's head."~~[15]~~[13] Indeed, the veterinary medical community has condemned the use of nitrogen hypoxia. The American Veterinary Medical Association (AVMA) determined nitrogen-induced hypoxia "unacceptable" for nearly all mammals due to the distress caused by the anoxic environment.~~[16]~~[14]

~~37~~**31**. The executions of Kenneth Smith, Alan Miller, Cary Grayson, Demetrius Frazier, and Gregory Hunt all demonstrate a disturbing pattern of superadded pain and suffering prohibited by the Eighth Amendment. Each execution was a long and torturous suffocation where the condemned man writhed and gasped for air and was not pronounced dead until over twenty minutes after the nitrogen apparently began flowing. Each man's physical movements indicated consciousness for several minutes as he struggled to breathe. Far from being a painless and humane method that lasted mere seconds, nitrogen hypoxia under the

~~[15]~~[13] Kim Chandler, *Alabama Defends Untested Nitrogen Execution Method, but Experts Doubt Claims of Painlessness*, PBS NEWS (Jan. 23, 2024), https://www.pbs.org/newshour/nation/alabama-defends-untested-nitrogen-execution-method-but-experts-doubt-claims-of-painlessness (quotations omitted).

~~[16]~~[14] American Veterinary Medical Association, AVMA Guidelines for the Euthanasia of Animals: 2020 Edition.

Redacted Protocol has been proven five times over to be a psychologically terrifying and painful method of execution.

***The Execution of Kenneth Smith by Nitrogen Hypoxia***

~~38~~**32**. On January 25, 2024, Kenneth Smith was the first person executed by nitrogen hypoxia. ADOC Captain Brandon McKenzie ("Captain McKenzie") oversaw the execution team. Prior to Smith's execution, Defendants Hamm, Raybon, and the ADOC asserted that the Redacted Protocol would "cause unconsciousness within seconds" by the nitrogen flowing into the mask.~~[17]~~[15]

~~39~~**33**. Contrary to the State of Alabama's promise of a "humane" and "painless" death, Smith experienced obvious and serious pain and distress, as multiple independent eyewitnesses confirmed. For at least two minutes, Smith "shook violently and writhed on the gurney, sometimes pulling against the restraints and shaking the gurney with the force of his movements. That was followed by several minutes of heavy breathing, until breathing was no longer perceptible."~~[18]~~[16] After Smith's initial violent movements stopped, "there were

~~[17]~~[15] Defs.' Post-Hr'g Br. in Opp'n to Pl. Smith's Mot. for Prelim. Inj., *Smith v. Hamm,* Case No. 2:23-cv-00656-RAH (M.D. Ala. Dec. 29, 2023), ECF No. 66 at 12.

~~[18]~~[16] Kim Chandler, *Alabama Man Shook Violently on Gurney During First Nitrogen Gas Execution*, MISSISSIPPI FREE PRESS (Jan. 26, 2024), https://www.mississippifreepress.org/39339/alabama-man-shook-violently-on-gurney-during-first-nitrogen-gas-execution; *see also* Taylor Mitchell, *News 19's Lauren Layton's Account of the Nation's First Nitrogen Hypoxia*

several minutes–about between 5 and 7 minutes–according to media witnesses of heavy breathing on the gurney.”~~[19]~~[17]

~~40~~**34**. Reporter Lee Hedgepeth, who had previously observed four other executions in Alabama, stated that he had “never seen such a violent reaction to an execution.” Mr. Hedgepeth recounted, consistent with other press accounts, that once the execution began, “[Smith] began thrashing against the straps, his whole body and head violently jerking back and forth for several minutes. . . . Smith’s efforts to breathe continued for several minutes . . . .”~~[20]~~[18]

~~41~~**35**. Additionally, at the ADOC’s post-execution press conference, one of Smith’s victim’s sons, Mike Sennett, said Smith convulsed “like a fish out of water for some time,”~~[21]~~[19] with “all that struggling and jerking and trying to get off that table.”~~[22]~~[20] Sennett further provided, “[w]e were told by some people that

---

*Execution*, NEWS 19 (Jan. 26, 2024), https://whnt.com/news/alabama-news/kenneth-eugene-smith/news-19s-lauren-laytons-account-of-the-nations-first-nitrogen-hypoxia-execution/.

~~19~~17 AL.com, *Witness Describes Final Moments of Alabama Prisoner Kenneth Smith Killed with Nitrogen Gas*, YOUTUBE (Jan. 25, 2024), https://www.youtube.com/watch?v=X6MVEWMcdrM. Additionally, Montgomery Advertiser reporter Marty Roney reported that at 8:01 pm, four minutes after the nitrogen had started flowing, Smith began convulsing. Marty Roney, *Nitrogen Gas Execution: Kenneth Smith Convulses for Four Minutes in Alabama Death Chamber*, MONTGOMERY ADVERTISER (Jan. 25, 2024), https://www.montgomeryadvertiser.com/story/news/local/alabama/2024/01/25/four-minutes-of-convulsions-kenneth-smith-executed-with-nitrogen-gas/72358038007/. Smith was gasping for air with clenched fists, and his eyes rolled back into his head. *Id.* Smith was conscious throughout this experience. *Id.*

~~20~~18 Lee Hedgepeth, *‘Never Alone’: The Suffocation of Kenneth Eugene Smith*, TREAD. (Jan. 26, 2024), https://www.treadbylee.com/p/never-alone-the-suffocation-of-kenneth.

~~21~~19 Abigail Brooks, Erik Ortiz, & Dasha Burns, *Alabama Inmate Kenneth Smith Put to Death in First U.S. Nitrogen Gas Execution*, NBC NEWS (Jan. 25, 2024), https://www.nbcnews.com/news/us-news/alabama-prepares-first-us-nitrogen-gas-execution-inmate-kenneth-smith-rcna135568 (quotations omitted).

~~22~~20 Nicholas Bogel-Burroughs, *A Select Few Witnessed Alabama’s Nitrogen Execution. This Is What They Saw*, N.Y. TIMES (Feb. 1, 2024), https://www.nytimes.com/2024/02/01/us/alabama-nitrogen-execution-kenneth-smith-witnesses.html.

worked [in the prison system] that he'd take two or three breaths and he'd be out and gone. That ain't what happened. After about two or three breaths, that's when the struggling started."[23][21] Sennett declared that Alabama's nitrogen hypoxia execution under the Redacted Protocol is "just something I don't ever want to see again."[24][22]

~~42~~**36**. Following the execution, Smith's attorney Robert Grass testified before the Kansas State Legislature that, "[a]t a minimum, Mr. Smith did not appear to be unconscious in seconds and dead in minutes as Alabama predicted." He further explained that Smith "appeared to be having convulsions or seizures. His eyes rolled up. His legs moved violently up and down several times. His head thrust forward and back to the gurney several times. He clenched his fists and his arms and body strained against the gurney restraints."[25][23]

~~43~~**37**. Smith was pronounced dead approximately 29 minutes after the execution began.

***The Execution of Alan Miller by Nitrogen Hypoxia***

~~44~~**38**. On September 26, 2024, Alan Miller was executed by nitrogen hypoxia. Defendants Hamm and Raybon performed the execution using the

[23][21] *Id.* (quotations omitted).
[24][22] *Id.* (quotations omitted).
[25][23] KS H.B 2782, Statement of Robert M. Grass (Feb 15, 2024).

Redacted Protocol, and Captain McKenzie oversaw the execution team. Once more, the State of Alabama's promises were proven false.

~~45~~**39**. Multiple witnesses reported that Miller struggled against his restraints for approximately two minutes, which was followed by approximately five to six minutes of further labored breathing. One witness recounted that when the execution began, "Miller started jerking and shaking, struggling against the restraints. While this was happening, he gasped for air and his eyes were open, staring at the ceiling and darting back and forth."~~[26]~~[24] The witness explained that "[t]his went on for about two minutes before Miller stopped moving. Then, for the next five or six minutes, Miller periodically gasped for breath. Some of the gasps were so large that his head lifted off the gurney. His left hand turned blue."~~[27]~~[25] Another witness of Miller's execution stated that "his face was twisted and he looked like he was suffering."~~[28]~~[26]

~~46~~**40**. Miller was pronounced dead approximately 22 minutes after the execution began.~~[29]~~[27]

---

~~26~~24 Lauren Gill, *"Agony" and "Suffering" as Alabama Experiments with Nitrogen Executions*, BOLTS (Oct. 8, 2024), https://boltsmag.org/alabama-nitrogen-executions/.

~~27~~25 *Id.*; *see also* Ivana Hrynkiw, *Alabama Inmate Alan Miller Executed with Nitrogen Gas Thursday for 1999 Shootings*, AL.COM (Sept. 26, 2024), https://www.al.com/news/2024/09/alabama-inmate-alan-miller-set-to-be-executed-with-nitrogen-gas-thursday-for-1999-shootings.html.

~~28~~26 Gill, supra note 26 (quotations omitted).

~~29~~27 Hrynkiw, *supra* note 27; Kim Chandler, *Alabama puts Man Convicted of Killing 3 to Death in the Country's Second Nitrogen Gas Execution*, ASSOCIATED PRESS (Sept. 26, 2024), http://apnews.com/article/alabama-nitrogen-execution-alan-miller-29d624a776d5daa265f376a79ae2f86b; Marty Roney, *Alabama Executes Alan Eugene Miller with Nitrogen Gas*, MONTGOMERY ADVERTISER (Sept. 26, 2024), https://www.montgomeryadvertiser.com/story/news/crime/2024/09/26/alabama-executes-alan-eugene-miller-with-nitrogen-gas/75360739007/.

### *The Execution of Carey Grayson by Nitrogen Hypoxia*

~~47~~**41**. On November 21, 2024, Carey Grayson was the third individual in Alabama to be executed by nitrogen hypoxia.~~[30]~~[28] Defendants Hamm and Raybon executed Grayson using the Redacted Protocol, and Captain McKenzie oversaw the execution team.

~~48~~**42**. According to eyewitnesses, Grayson struggled against his restraints and gasped for air for around six minutes, after which he took intermittent deep gasping breaths for an additional five minutes. Once nitrogen started to flow, Grayson "rocked his head, shook and pulled against the gurney restraints."~~[31]~~[29] Notably, several minutes into the execution, "Grayson's legs rose into the air for about 30 seconds before lowering back down to the gurney."~~[32]~~[30]

~~49~~**43**. Grayson was pronounced dead approximately 21 minutes after the execution began.~~[33]~~[31]

### *The Execution of Demetrius Frazier by Nitrogen Hypoxia*

~~50~~**44**. On February 6, 2025, Demetrius Frazier was the fourth individual to be executed by nitrogen hypoxia. Defendants Hamm and Raybon executed Frazier

~~30~~28 *Alabama Carries out Nation's 3rd Nitrogen Gas Execution on a Man for a Hitchhiker's Killing*, CNN NEWS (Nov. 21, 2024), https://www.cnn.com/2024/11/21/us/carey-dale-grayson-alabama-execution.

~~31~~29 Ed Pilkington & Sam Levine, *Alabama Man Shook and Gasped in Final Moments of Nitrogen Gas Execution*, THE GUARDIAN (Nov. 22, 2024), https://www.theguardian.com/us-news/2024/nov/22/alabama-nitrogen-gas-execution.

~~32~~30 Asher Redd, *Carey Dale Grayson Executed by Nitrogen Hypoxia*, WKRG NEWS (Nov. 22, 2024), https://www.wkrg.com/alabama-news/carey-dale-grayson-executed-by-nitrogen-hypoxia/.

~~33~~31 *Id.*

using the Redacted Protocol. Again, independent witnesses recounted a slow death process involving apparent superadded pain.

~~51~~**45**. Frazier was strapped to the gurney with a mask placed over his face. After nitrogen gas began flowing, media witnesses reported that Frazier struggled to breathe for several minutes during the execution and observed Frazier's body twitching.[~~34~~32] Like the others before him, Frazier "exhibited visible signs of distress during the execution, grimacing and quivering."[~~35~~33] He "shuddered and twitched until about eight minutes after the gas began flowing."[~~36~~34]

~~52~~**46**. Similar to Grayson, Frazier's legs also tensed and raised off of the gurney several minutes after the nitrogen had apparently started to flow.[~~37~~35]

~~53~~**47**. Frazier was pronounced dead approximately twenty-six minutes after the execution began.[~~38~~36]

[~~34~~32] Sarah Clifton, *Alabama Executes Demetrius Frazier by Nitrogen Gas for 1991 Murder*, Montgomery Advertiser (Feb. 6, 2025), https://www.montgomeryadvertiser.com/story/news/local/alabama/2025/02/06/alabamaexecutes-demetrius-frazier-by-nitrogen-gas-for-1991-murder/78282236007/; Ralph Chapoco, *Alabama Executes Demetrius Terrence Frazier for 1991 Rape and Murder of Pauline Brown*, ALABAMA REFLECTOR (Feb. 6, 2025), https://alabamareflector.com/2025/02/06/alabama-executes-demetrius-terrence-frazier-for-1991-rape-and-murder-of-pauline-brown/.

[~~35~~33] Bill Britt, *Alabama Executes Demetrius Frazier with Nitrogen, Adding to State's Grim Record*, ALABAMA POLITICAL REPORTER (Feb. 7, 2025), https://www.alreporter.com/2025/02/07/alabama-executes-demetrius-frazier-with-nitrogen-adding-to-states-grim-record/.

[~~36~~34] Greta Cross, *'A Monster': Demetrius Frazier Executed by Nitrogen Gas in Alabama for Woman's 1991 Murder*, USA TODAY (Feb. 6, 2025), https://www.usatoday.com/story/news/nation/2025/02/06/demetrius-frazier-execution-death-penalty-pauline-brown-nitrogen-gas/78290700007/.

[~~37~~35] Clifton, *supra* note 34.

[~~38~~36] *Alabama Puts Man to Death for a 1991 Murder in the Nation's Fourth Execution using Nitrogen Gas*, CNN NEWS (Feb. 7, 2025), https://www.cnn.com/2025/02/07/us/alabama-execution-demetrius-frazier.

***The Execution of Gregory Hunt by Nitrogen Hypoxia***

~~54~~**48**. On June 10, 2025, Alabama executed Gregory Hunt using nitrogen hypoxia, and his execution followed a similar pattern as the other four. Defendants Hamm and Raybon executed Hunt using the Redacted Protocol.

~~55~~**49**. About two minutes after the gas began flowing, while Hunt was still conscious, Hunt shook, gasped, and raised his head off the gurney, similar to the other four executions.[~~39~~37] He also lifted his legs off of the gurney and curled his hands into fists.[~~40~~38] Hunt gasped for air for several minutes, and he appeared to take his last breath approximately nine minutes after the nitrogen gas began flowing.[~~41~~39]

~~56~~**50**. Hunt was pronounced dead approximately 30 minutes after the execution began.[~~42~~40]

~~57~~**51**. These five executions by nitrogen hypoxia show that the Redacted Protocol results in a prolonged and torturous death, characterized by superadded pain and psychological distress.

---

[~~39~~37] Kim Chandler, *Alabama Executes a Man by Nitrogen Gas for the Beating Death of a Woman in 1988*, ASSOCIATED PRESS (June 10, 2025), https://apnews.com/article/execution-alabama-nitrogen-gas-1799b231099c2e260bee7f55b97fa31f.

[~~40~~38] Ivana Hrynkiw & Savannah Tyrens-Fernandes, *Alabama Executes Gregory Hunt for Brutal 1988 Walker County Murder*, AL.COM (June 11, 2025), https://www.al.com/news/2025/06/gregory-hunt-set-to-die-by-nitrogen-gas-in-alabama-for-brutal-1988-walker-county-murder.html?outputType=amp.

[~~41~~39] Alex Gladden, *Alabama Executes Gregory Hunt for 1988 Murder of Karen Lane*, MONTGOMERY ADVERTISER (June 10, 2025), https://www.montgomeryadvertiser.com/story/news/crime/2025/06/10/alabama-completes-fifth-execution-by-nitrogen-hypoxia/84069592007/.

[~~42~~40] Hrynkiw & Tyrens-Fernandes, *supra* note 40.

~~58~~**52**. Despite this demonstrated pattern of emotionally and physically painful executions, the State has refused to acknowledge that the reality of execution by nitrogen hypoxia in no way resembles the State's predictions. After Kenneth Smith's execution, the Alabama Attorney General described execution by nitrogen hypoxia as "reliable and humane,"[~~43~~41] stating that "[w]hat occurred [during Smith's execution] was textbook."[~~44~~42] Even as the subsequent executions proceeded and evidence of the Redacted Protocol's deficiencies mounted, Alabama Attorney General Steve Marshall continued to dismiss concerns as media speculation[~~45~~43] and reaffirmed the State's commitment to its nitrogen hypoxia protocol.[~~46~~44]

~~59~~**53**. Accordingly, Jenkins brings this challenge promptly to prevent the State from subjecting him to an execution prescribed by the Redacted Protocol that violates his Eighth Amendment and other rights. He does not bring this challenge to avoid execution but to ensure that it is carried out in a manner

[~~43~~41] *Alabama Attorney General Marshall Successfully Defends Constitutionality of Nitrogen Hypoxia Method of Execution*, ATTORNEY GENERAL STEVE MARSHALL (Aug. 5, 2024), https://www.alabamaag.gov/alabama-attorney-general-marshall-successfully-defends-constitutionality-of-nitrogen-hypoxia-method-of-execution (quotation omitted).

[~~44~~42] Abigail Brooks & Eric Ortiz, *Alabama AG Calls First Nitrogen Gas Execution 'Textbook,' but Witnesses say Inmate Thrashed in Final Moments*, NBC NEWS (Jan. 26, 2024), https://www.nbcnews.com/news/us-news/alabama-ag-calls-first-nitrogen-gas-execution-textbook-witnesses-say-i-rcna135810 (quotations omitted).

[~~45~~43] *Alabama Attorney General Steve Marshall Statement on the Execution of Murderer Kenneth Smith by Nitrogen Hypoxia*, ATTORNEY GENERAL STEVE MARSHALL (Jan. 25, 2024), https://www.alabamaag.gov/alabama-attorney-general-steve-marshall-statement-on-the-execution-of-murderer-kenneth-smith-by-nitrogen-hypoxia/.

[~~46~~44] *Id.*

consistent with constitutional and statutory standards. Jenkins has identified multiple known and readily available alternatives that would significantly reduce the risk of unnecessary suffering and uphold the dignity the Constitution demands, even in death.

**The Redacted Protocol Lacks Safeguards and Will Lead to Jenkins Being Executed in an Unconstitutional Manner**

~~60. Though the Redacted Protocol is heavily obscured, what can be ascertained from it reveals serious flaws infringing on Jenkins's civil and constitutional rights.~~ **54.** Unless this Court intervenes, the ADOC will execute Jenkins with this deficient protocol, inflicting superadded pain and suffering as his body is deprived of oxygen.

~~61~~**55**. The psychological pain of death by nitrogen hypoxia is severe. Unlike other methods of execution where the condemned person is powerless against the entry of the lethal device (such as a firing squad bullet into their chest, or a lethal injection drug through an IV), nitrogen hypoxia requires the condemned person to take the breaths of nitrogen gas with full knowledge that those breaths will eventually kill him. The condemned person thus becomes a necessary participant in their own execution, by a slow and painful suffocation process as they inhale toxic nitrogen and are slowly deprived of oxygen.

~~62~~**56**. The condemned person will be in a state of panic and fear based on the knowledge that their body will be deprived of necessary oxygen as they

eventually suffocate to death. As the nitrogen begins to flow into the mask, the body's sympathetic nervous system will be activated. The condemned person's heart rate will rise, they will experience the profound sensation of air hunger, and they will hyperventilate in response to lowered oxygen levels. Once the condemned person begins to inhale nitrogen, the psychological effects of nitrogen hypoxia are the same as suffocation.

~~63~~**57**. Experts have emphasized that forced nitrogen inhalation is inhumane and can cause profound distress, even in controlled environments.[~~47~~45] This is *nothing* like going to sleep. This is instead the body's instinctive and programmed response to struggle for life, which is highly distressing and painful.

~~64. In Jenkins's case, these risks are significantly heightened due to the particular forms of childhood abuse he endured and his resulting PTSD and panic disorder, which make the experience of being restrained, masked, and suffocated especially triggering. Jenkins's personal experience of extreme child abuse parallels in critical ways what he will experience under the nitrogen hypoxia protocol strapped down, face forcibly covered, unable to breathe, and emotionally terrorized and helpless. Nitrogen hypoxia under the Redacted Protocol will be particularly horrific for Jenkins given that this method evokes the horrors he suffered as a child.~~

[~~47~~45] *See* Bickler, P.E. & Lipnick, M.S., *Evidence Against Use of Nitrogen for the Death Penalty*, 331 JAMA 2075 (2024). Dr. Bickler is a Professor of Anesthesia and Director of Neuroanesthesia at the University of California at San Francisco (UCSF) and has more than 30 years of experience studying the effects of hypoxia on human beings. Dr. Lipnick is an Associate Professor of Anesthesia at UCSF, is Board-certified in Internal Medicine and Critical Care Medicine, and has 20 years of experience studying hypoxia.

~~65~~**58**. These risks are not speculative; they are foreseeable and medically recognized. It is therefore imperative that any execution protocol be designed to minimize such dangers. Yet, the Redacted Protocol contains deficiencies that heighten—rather than mitigate—the likelihood of these dire outcomes, placing Jenkins at an unconstitutional risk of superadded pain.

~~66. The following is a non-exhaustive list of the serious issues with the Redacted Protocol, which individually and collectively present a substantial risk of serious harm and thus impose cruel and unusual punishment in violation of the Eighth Amendment:~~

~~67. *First*, the Redacted Protocol does not provide for any procedures to mitigate Jenkins's extreme panic disorder and PTSD. For instance, placing the mask over Jenkins's face is a trigger for his panic attacks because the forceable placement of a large mask parallels the abuse he endured at the hands of his mother and stepfather.~~

~~68~~**59**. ~~*Second*~~**In addition**, Jenkins is at risk of experiencing nausea (to the point of vomiting) and seizures. Either of these events would interfere with Jenkins's execution and increase his pain and terror. The Redacted Protocol provides for no procedures if Jenkins vomits into the mask (which could result in Jenkins choking on his vomit) or has a seizure.

~~69. *Third*, there is no requirement that a physician or other qualified medical professional be present, which is contrary to the practices of states that require the presence of medical professionals at executions. On the face of the Redacted Protocol, it is unclear what (if any) monitoring of the condemned person's vital signs occurs during the execution and who (if~~

anyone) will be present and qualified to determine when that the condemned person is dead. The Redacted Protocol only states: "The Warden or his/her designee will contact physicians to determine whether they are willing and available to attend the executions and pronounce the condemned inmate's time of death on the date the execution is scheduled." Redacted Protocol § V.G.

70. The absence of a physician or other qualified medical professional at the execution is a serious flaw that increases the risk to Jenkins. Only a qualified medical professional can properly administer an intravenous sedative (if provided), monitor any monitoring systems (*e.g.*, EKG, pulse oximeter), confirm when the condemned person loses consciousness, determine whether complications occurred (*e.g.*, seizure or vomiting) and what (if anything) can be done to mitigate pain in the event of any complications, and determine when the condemned person is actually dead. The lack of a qualified medical professional during this form of execution is also likely to induce superadded psychological pain for Jenkins, further compounding his distress.

71. *Fourth*, the Redacted Protocol unconstitutionally burdens Jenkins's First Amendment rights and violates his rights under the Religious Land Use and Institutionalized Persons Act, 42 U.S.C. § 2000cc, *et seq*. ("RLUIPA"). Jenkins is a Christian and holds sincere beliefs based on his Christian faith. He had his first religious experience when he attended a church service at age thirteen during a difficult time in his life. Jenkins has been a Christian ever since and was baptized in Alabama shortly after he moved there. He keeps a Bible in his cell, prays every day (particularly in moments of panic and anxiety), and has memorized John 3:16 because it reminds him of his first religious experience in church as a teenager. Jenkins has prayed over the telephone with his brother to help his family members through difficult times.

Jenkins also says the Lord's Prayer daily, particularly when he feels a panic attack starting. Jenkins plans to pray audibly with his spiritual advisor during the execution.

72. The Redacted Protocol provides that a mask will be placed over Jenkins's face before he is permitted to make a statement, including praying aloud. Praying aloud is a common and core component of the Christian faith, and it is a right that is protected by the First Amendment. During the execution, Jenkins will have to choose either to exercise his First Amendment right to free exercise of religion – and in doing so risk heightened physical pain and suffering if the mask gets dislodged while praying aloud – or to forego his free exercise rights during his execution. There is no compelling governmental interest that justifies this burden on Jenkins's religious rights. Moreover, there are less restrictive means to accomplish any purported compelling governmental interest.

73. *Fifth*, the lack of procedures for ensuring that no nitrogen is leaking out of the mask further burdens Jenkins's First Amendment right to have a spiritual advisor participate in religious actions within execution chambers. The visible text of the Redacted Protocol does not require Jenkins's spiritual advisor to maintain a certain distance from Jenkins, but the Acknowledgement of Spiritual Advisor Form (the "Acknowledgment Form") to the Redacted Protocol that has been made public requires that the advisor must "agree to remain at least three (3) feet away from the mask or any outflow of breathing gases discharging from the system."[48] A copy of the Acknowledgment Form is attached hereto as **Exhibit 3**. Perhaps even more importantly, the overwhelming panic Jenkins will likely experience while masked negates the comfort he would otherwise feel by having a spiritual advisor by his side. As discussed above, masking Jenkins will likely trigger Jenkins's PTSD, resulting in a panic attack. Jenkins would

[48] Ex. 3.

like to have a spiritual advisor by his side to comfort him. However, as written, the distance requirement in the Acknowledgment Form will prevent this.[49] There is no compelling governmental interest that justifies such a burden on Jenkins's religious liberties, and there are less restrictive means available to accomplish any purported compelling governmental interest. Moreover, the presence of restrictions on Jenkins's religious freedoms that are visible in the Acknowledgement Form, but not visible in the available text of the Redacted Protocol, suggests that additional violations of Jenkins's rights, both religious and otherwise, may be hidden by redactions.

74. *Sixth*, the Redacted Protocol does not provide for an audio connection (*e.g.*, microphone and speaker) during the execution to the observation rooms where the condemned person's counsel and media participants observe the execution. As a result, after the warrant is read and the condemned person gives their last statement, Jenkins's counsel (along with any media observers) will be unable to hear or severely limited in hearing indications of physical and/or emotional distress as the execution is carried out.

75. *Seventh*, the Redacted Protocol does not allow Jenkins's attorney to be present with him in the execution chamber in the preparation for the execution and during the execution. Among other things, Jenkins's counsel should be able to supervise the placement of the mask and monitor the execution as it occurs for potential violations of his constitutional rights.

76. For these reasons, and any others later determined through review of the full and unredacted protocol, Jenkins's respectfully requests that the Court preliminarily and permanently enjoin his execution through the unconstitutional method of nitrogen hypoxia as described in the Redacted Protocol.

[49] *See* Ex. 3.

## REASONABLE, AVAILABLE ALTERNATIVE METHODS OF EXECUTION

~~77~~**60**. There are alternative methods of execution including, but not limited to, the alternatives discussed herein that would not present the Eighth Amendment problems raised by the Redacted Protocol. Jenkins has identified the alternatives below based on available information, but the Defendants have sole possession of the information regarding other potential alternatives, which they should provide in discovery in this case.

~~78~~**61**. First, the ADOC can amend the Redacted Protocol to cure its deficiencies by ~~including provisions to~~**adding the following**:

~~(a) Provide Jenkins with an option of anti-nausea and anti-seizure medication to prevent Jenkins's from vomiting or seizing that could complicate the execution.~~

**(a) Approximately one hour prior to being transported to the execution chamber, the inmate shall receive an anti-emetic, such as 20 milligrams of metoclopramide or 8 milligrams of ondansetron, to prevent nausea and vomiting. Metoclopramide and ondansetron are not controlled substances and are readily available in pharmacies throughout Alabama.**

(b) ~~Provide Jenkins with the option of a sedative that would be administered by intravenous injection by a qualified medical professional in a dose sufficient to~~

~~render him unconscious.~~ **<u>The inmate will be placed on the gurney in the execution chamber.</u>**

~~(c) Provide for a licensed physician or other medical professional who (1) will be present to observe the proper placement of the mask; (2) will, should Jenkins elect the option of the sedative described above, administer its intravenous injection; (3) will be responsible for monitoring appropriate and visible monitors (*e.g.*, EKG, pulse oximeter) from the time those monitors are connected and throughout the execution; (4) will be permitted to temporarily remove the mask should Jenkins vomit into the mask; and (5) will be responsible for pronouncing the time of death based on his/her expertise and review of the monitors.~~

~~(d) Provide Jenkins an opportunity to speak and to audibly pray with his spiritual advisor without being masked and to ensure that the fit of his mask will allow for audible prayer without dislodging the seal of the mask or imposing other risks on Jenkins.~~

~~(e) Provide Jenkins an opportunity to be in close physical proximity to his spiritual advisor, to touch his spiritual advisor, and to hold his spiritual advisor's hand.~~

~~(f) Provide Jenkins an opportunity to have his counsel with him in the execution chamber during the execution, including to observe the placement of the mask, and/or provide that audio of the execution is delivered to his counsel's separate observation room through a microphone and speaker or another reliable method.~~

**<u>(c) At the start of the execution, IV lines will be connected to the inmate consistent with lethal injection executions.</u>**

(d) The inmate shall then be allowed to make a final statement.

(e) Before and after the final statement, the inmate shall be allowed to be ministered to by his or her spiritual advisor, according to the previously approved plan.

(f) The inmate shall then receive an intravenous injection of 30 mg of morphine. Morphine is an opiate that has been found to provide relief of air hunger and clinical dyspnea by depressing both ventilatory drive and ascending perpetual pathways. Morphine is a controlled substance that can be obtained from a pharmacy. ADOC possesses and/or can obtain morphine for use in executions.

(g) The inmate shall then receive an intravenous injection of midazolam sufficient to render the inmate unconscious. The preparation and administration of the does should follow the ADOC's protocol for injecting midazolam during a lethal injection. Midazolam, an analgesic and sedative, is a controlled substance and is readily available in pharmacies throughout Alabama.

(h) Five minutes after the administration of the midazolam is complete, a member of the execution team will conduct a

**"consciousness check" identical to the consciousness check employed in ADOC's lethal injection protocol.**

**(i)** **In the unlikely event that the inmate is still conscious after the first dose of midazolam, a second, identical dose will be administered, followed by a five-minute wait and another consciousness check.**

**(j)** **After the inmate is deemed unconscious, and at least 15 minutes after injection of the morphine, the designated execution team member(s) shall place the mask securely on the condemned and proceed as provided in the Protocol.**

(~~g~~**k**) ~~Provide~~**Provisions** for comprehensive training for the ~~execution team members~~**individuals administering the medications above and** placing ~~and~~**or** adjusting the mask over Jenkins's face, state their level of experience with the masks being used, and state the metrics that will be used to ensure the mask is "properly placed" and passes the "final inspection," as required by the Redacted Protocol.

~~(h)~~ ~~Remedy any other problems disclosed through any subsequent release of an unredacted protocol.~~

**62.** **While Jenkins has proposed intravenous injection as the method by which morphine and midazolam (*supra* paragraphs 65(f)-(g)) may be**

**administered, Jenkins further notes that subcutaneous muscle injection or oral administration of these medications are equally effective methods of administration which can be feasibly added to the Protocol.**

~~79~~**63**. Alternatively, if Defendants are unwilling or unable to amend the Protocol so that it complies with constitutional requirements, execution by firing squad is an available and feasible alternative that will substantially reduce the risk to Jenkins of superadded pain posed by the Redacted Protocol. Utah and South Carolina both have firing squad protocols, either of which could easily be implemented.

~~80~~**64**. For example, Utah's firing squad protocol provides that five trained shooters will perform the execution. Four of the shooters' guns will be loaded while the fifth shooter's gun is loaded with a non-lethal wax bullet. Utah approved the firing squad as a viable method of execution through their legislative process—a process that can be done in Alabama. Indeed, execution by firing squad "is the most widely used method in the world, and it has been for a long time."[~~50~~46]

[~~50~~46] Josh Friedland, *Is the Firing Squad a More Human Method of Execution?*, FORDHAM LAW NEWS, Mar. 20, 2025, https://news.law.fordham.edu/blog/2025/03/20/is-the-firing-squad-a-more-humane-method-of-execution/; *see Glossip v. Gross*, 576 U.S. 863, 977 (2015) (Sotomayor, J., dissenting) ("[T]here is evidence to suggest that the firing squad is significantly more reliable than other methods."); *Arthur v. Dunn*, 137 S. Ct. 725, 733 (Sotomayor, J., dissenting) ("Some might find this choice regressive, but the available evidence suggests 'that a competently performed shooting may cause nearly instant death.' . . . In addition to being near instant, death by shooting may also be comparatively painless. . . And historically, the firing squad has yielded significantly fewer botched executions.") (citations omitted).

~~81~~65. Use of firing squad, a known and available alternative based on either Utah's or South Carolina's protocol, would involve a lesser risk of pain than the significant superadded pain Jenkins will endure under the Redacted Protocol. Execution by firing squad is "pretty instantaneous," and it is the "only method for which we have trained people to perform executions."~~[51]~~[47]

## ~~CLAIMS~~CLAIM FOR RELIEF

~~**First Claim for Relief**~~

### Violation of Jenkins's Right to be Free from Cruel and Unusual Punishment Under the Eighth and Fourteenth Amendments to the U.S. Constitution (42 U.S.C. § 1983)

~~82~~66. Jenkins realleges and incorporates herein by reference the foregoing allegations of the Complaint as if set forth in full below.

~~83~~67. The Eighth Amendment to the U.S. Constitution, as applicable to the State through incorporation into the due process clause of the Fourteenth Amendment, prohibits "cruel and unusual punishments." U.S. Const. amend. VIII.

~~84~~68. A method of execution violates the Eighth Amendment if "the risk of pain associated with the State's method is substantial when compared to a known and available alternative." *Bucklew v. Precythe*, 587 U.S. 119, 134 (2019) (citation modified). The Eighth Amendment forbids "forms of punishment that intensif[y] the sentence of death with a (cruel) superadd[ition] of terror, pain, or

~~51~~47 Friedland, *supra* note 50.

disgrace." *Id.* at 133 (citation modified); *see also Baze v. Rees*, 553 U.S. 35, 50 (2008) (noting a method of execution violates the Eighth Amendment if it presents a "substantial risk of serious harm" such as "a lingering death"). "Punishments are cruel when they involve torture or a lingering death . . . something more than the mere extinguishment of life." *In re Kemmler*, 136 U.S. 436, 447 (1890). Depriving a conscious person of oxygen, which is what occurs under the Redacted Protocol, creates a "constitutionally unacceptable risk of suffocation." *Baze*, 553 U.S. at 53. *Baze* makes clear that conscious suffocation during an execution violates the Eighth Amendment. *Id.*

~~85~~**69**. The Eighth Amendment also forbids "deliberate indifference" to a prisoner's medical needs, which includes intentional mistreatment that is likely to seriously aggravate the prisoner's condition. *Estelle v. Gamble*, 429 U.S. 97, 104 (1976).

~~86~~**70**. Despite alternatives being available, Defendants, acting under color of state law, intend to execute Jenkins in a manner that is arbitrary, cruel, and/or unreliable; and that will inflict upon Jenkins, or that has a foreseeable and significant risk of causing Jenkins, excruciating and unnecessary pain. Because the Redacted Protocol poses a substantial risk of serious harm to Jenkins, it violates Jenkins's constitutional rights to be free from arbitrary, capricious, cruel, and unusual punishment.

~~87~~**71**. Defendants intend to execute Jenkins by nitrogen hypoxia using the Redacted Protocol, which will expose Jenkins to a severe risk of superadded pain as shown through the recent executions of Kenneth Smith, Alan Miller, Carey Grayson, Demetrius Frazier, and Gregory Hunt described above. The Redacted Protocol is likely to cause the painful sensation of suffocation, and potentially other complications such as seizures, stroke, vomiting, or choking on bodily fluids. These physiological responses, individually and collectively, will cause the superadded pain proscribed by the Eighth Amendment.

~~88~~**72**. Jenkins has alleged above several alternatives to the Redacted Protocol. There are feasible and available alternatives that would reduce the risk to Jenkins as compared to the Redacted Protocol, including amending the Redacted Protocol as indicated in paragraph 78 or execution by firing squad.

~~89~~**73**. Jenkins will suffer irreparable harm in the absence of an injunction.

~~**1. Second Claim for Relief**~~

~~**Violation of Jenkins's Right to be Free from Cruel and Unusual Punishment Under the Eighth and Fourteenth Amendments to the U.S. Constitution (42 U.S.C. § 1983) *as Applied* to Jenkins**~~

~~90. Jenkins realleges and incorporates herein by reference the foregoing allegation of the Complaint as if set forth in full below.~~

~~91. Jenkins has severe PTSD, panic disorder, uncontrollable panic attacks, and physical symptoms of his panic during these attacks.~~

92. Jenkins will almost certainly suffer a panic attack during his impending execution by nitrogen hypoxia, which could result in complications during any attempted execution. In the lead-up to execution by nitrogen hypoxia, Jenkins will be strapped to a gurney and will have a mask placed over his face, which could trigger early childhood memories of the soiled diapers that were forced over his face and constrained his breathing.

93. If and when Jenkins begins to experience a panic attack, he will experience physical manifestations including but not limited to potential shaking, crying, dry heaving, vomiting, and asphyxiation. These manifestations will be tortuous in themselves and could further complicate Jenkins's death by suffocation by dislodging the mask or causing him to choke before he is killed. This will result in physical and psychological superadded pain.

94. Jenkins has alleged above several alternatives to the Redacted Protocol. There are feasible and available alternatives that would reduce the risk to Jenkins as compared to the Redacted Protocol, including amending the Redacted Protocol as indicated in paragraph 78 or execution by firing squad.

95. Jenkins will suffer irreparable harm in the absence of an injunction.

**Third Claim for Relief**

**Violation of Jenkins's Right to Access to Counsel Under the Sixth Amendment to the U.S. Constitution (42 U.S.C. § 1983)**

96. Jenkins realleges and incorporates herein by reference the foregoing allegations of the Complaint as if set forth in full below.

97. The Redacted Protocol does not provide prisoners with access to counsel during the execution. Therefore, under the Redacted Protocol, Jenkins will be deprived of access to counsel during the execution and will not be able to communicate with counsel regarding any problems, including constitutional violations. Moreover, after Jenkins gives his final statement,

~~there is no audio output from the execution chamber to the separate room where Jenkins's counsel observes the execution, such that Jenkins's counsel will be unable or severely limited in hearing indications of physical and/or emotional distress as the execution is carried out.~~

~~98. In addition, the Redacted Protocol does not permit witnesses, including attorneys, to view the setting of the mask, which could help identify issues with its placement.~~

~~99. This deprivation of access to counsel violates the Sixth Amendment of the U.S. Constitution. Counsel must have access to the process to ensure that the execution proceeds without violation of Jenkins's legal rights.~~

~~100. Jenkins will suffer irreparable harm in the absence of an injunction.~~

**~~Fourth Claim for Relief~~**

**~~Violation of Jenkins's Rights to Free Exercise of His Religion Under the First Amendment to the U.S. Constitution (42 U.S.C. § 1983)~~**

~~101. Jenkins realleges and incorporates herein by reference the foregoing allegations of the Complaint as if set forth in full below.~~

~~102. The First Amendment to the U.S. Constitution, applicable to the states through incorporation into the due process clause of the Fourteenth Amendment provides that "Congress shall make no law . . . prohibiting the free exercise [of religion]. . ." U.S. Const. amend. I.~~

~~103. Jenkins is a Christian and holds sincere beliefs based on his Christian faith. He had his first religious experience when he attended a church service at age thirteen during a difficult time in his life. Jenkins has been a Christian ever since and was baptized in Alabama shortly after he moved there. He keeps a Bible in his cell, prays every day (particularly in moments of panic and anxiety), and has memorized John 3:16 because it reminds him of his first religious experience. Jenkins has prayed over the telephone with his brother to help his family members through difficult times. Jenkins says the Lord's Prayer every day, particularly when he~~

~~feels a panic attack starting. Jenkins plans to audibly pray with his spiritual advisor at the time of his execution; however, the mask over his head will prevent his ability to practice his free exercise of religion.~~

~~104. The Redacted Protocol will also unconstitutionally restrict Jenkins's free exercise of his religion.~~

~~105. The Acknowledgment Form provides that spiritual advisors must "remain at least three (3) feet away from the mask or any outflow of breathing gases discharging from the system."[52] This will prevent Jenkins's spiritual advisor from being at his side in the time before his death to pray audibly with him and provide him comfort.~~

~~106. In addition, based on the Acknowledgment Form provided by the ADOC, a spiritual advisor could conclude that the risk to their own personal health and safety is too great and decline to be present in the room when the condemned person is executed by nitrogen hypoxia.[53] This would further burden Jenkins's religious exercise by potentially preventing him from having any spiritual advisor, or one of his choosing, in the room at the time of his execution.~~

~~107. Defendants cannot establish that the burden on Jenkins's religious exercise is justified by a compelling governmental interest and, even if they could, cannot establish that the burden on Jenkins's religious exercise is the least restrictive means to further any purported compelling governmental interest.~~

~~108. Jenkins will suffer irreparable harm in the absence of an injunction.~~

[52] ~~Ex. 3.~~
[53] ~~*See id.*~~

**Fifth Claim for Relief**

**Violation of Jenkins's Rights Under RLUIPA**

109. Jenkins realleges and incorporates herein by reference the foregoing allegations of the Complaint as if set forth in full below.

110. RLUIPA provides: "No government shall impose a substantial burden on the religious exercise of a person residing in or confined to an institution . . . even if the burden results from a general applicability, unless the government demonstrates that imposition of the burden on that person – (1) is in furtherance of a compelling governmental interest; and (2) is the least restrictive means of furthering that compelling governmental interest." 42 U.S.C. § 2000cc-1(a).

111. As described in detail above, Jenkins is a Christian and holds sincere beliefs based on his Christian faith, including the desire to pray audibly with his spiritual advisor during his execution. The Redacted Protocol burdens Jenkins's religious exercise to pray audibly because he will be masked as soon as he enters the execution chamber, which may prevent Jenkins's prayers from being audible.

112. The Redacted Protocol further substantially burdens Jenkins's religious exercise to pray audibly by preventing him from speaking and praying, lest he face the dangerous consequences of dislodging the mask while praying.

113. The Acknowledgment Form provides that spiritual advisors must "remain at least three (3) feet away from the mask or any outflow of breathing gases discharging from the system."[54] A spiritual advisor could conclude that the risk to their own personal health and safety is too great based on the Acknowledgment Form provided by the ADOC and decide that they

[54] Ex. 3.

will not be present in the room when the condemned person is executed by nitrogen hypoxia.[55] This would further burden Jenkins's religious exercise by potentially preventing Jenkins from having his spiritual advisor in the room at the time of the execution.

114. Defendants cannot establish that the burden on Jenkins's religious exercise is justified by a compelling governmental interest and, even if they could, cannot establish that the burden on Jenkins's religious exercise is the least restrictive means to further any purported compelling governmental interest.

115. Jenkins will suffer irreparable harm in the absence of an injunction.

**Sixth Claim for Relief**

**Violation of Jenkins's Right to Due Process Under the Fourteenth Amendment to the U.S. Constitution (42 U.S.C. § 1983)**

116. Jenkins realleges and incorporates herein by reference the foregoing allegations of the Complaint as if set forth in full below.

117. The ADOC stated more than five years ago that the government was working on a nitrogen hypoxia protocol.[56] However, between the time of the announcement and the recent publication of the Redacted Protocol, the ADOC did not provide any public information or seek any public input about the new protocol.

118. Defendants, acting under color of federal law, have not disclosed sufficient details regarding the procedures that will be utilized in carrying out Jenkins's execution, preventing him from determining all the aspects of the Redacted Protocol that may constitute cruel and unusual punishment and from consulting medical experts concerning those aspects.

[55] *See id.*
[56] *See Federal Court Rules Against Convicted Cop-Killer Days Before Scheduled Execution*, AL.COM (Mar. 3, 2020), https://www.al.com/news/birmingham/2020/03/federal-court-rules-against-convicted-cop-killer-days-before-scheduled-execution.html.

~~119. The foregoing is a violation of the Due Process Clause.~~

~~120. Jenkins will suffer irreparable harm in the absence of an injunction.~~

## PRAYER FOR RELIEF

~~121~~**74**.WHEREFORE, in order to prevent the ~~violations of the First, Sixth, Eighth, and Fourteenth Amendments~~**violation of the EighthAmendment** of the U.S. Constitution~~, and other statutory violations that are alleged above~~, Jenkins requests that the Court enter a judgment:

~~122~~**75**.Declaring that the Defendants' actions, practices, customs, and policies with regard to their means, methods, procedures, and customs regarding executions, and specifically the Redacted Protocol, are illegal and violate the ~~First, Sixth,~~ Eighth~~, and/or Fourteenth Amendments~~ **Amendment** of the U.S. Constitution~~, along with the Religious Land Use and Institutionalized Persons Act, 42 U.S.C. § 2000cc, *et seq*~~.

~~123~~**76**.Preliminarily and permanently enjoining Defendants from executing Jenkins by nitrogen hypoxia using the Redacted Protocol.

~~124. Declaring that as applied to Jenkins specifically, the Redacted Protocol violates the Eighth Amendment and enjoining Defendants and all persons acting on their behalf from implementing the Redacted Protocol or any revised protocol that places Jenkins in substantial risk of experiencing superadded pain and/or permanent injury;~~

~~125~~**77**.Granting Jenkins his reasonable attorneys' fees pursuant to 42 U.S.C. § 1988.

~~126~~**78**.Granting such further relief as the Court deems just and proper.

This ~~22nd day~~XXday of ~~August~~September, ~~2025~~2026.

Respectfully submitted,

*/s/ ~~J. Andrew Pratt~~Draft*

J. Andrew Pratt (AL State Bar No. ASB-3507-J)
Joshua Toll (D.C. Bar No. 463073) (*Pro hac vice* ~~admission pending~~)
~~1. Kathryn Lehman (Florida State Bar No. 0095642) (*Pro hac vice* admission pending)~~

Samuel R. Diamant (California State Bar No. 288738) (*Pro hac vice* ~~admission pending~~)
King & Spalding LLP
1180 Peachtree Street, NE, Suite 1600
Atlanta, GA 30309
Tel.: (404) 572-4600
Emails: *apratt@kslaw.com*
*jtoll@kslaw.com*
~~*klehman@kslaw.com*~~

*sdiamant@kslaw.com*

*Counsel for Plaintiff Mark Jenkins*

| **Summary report:**<br>**Litera Compare for Word 11.10.1.2 Document comparison done on 9/18/2026 3:58:32 PM** | |
|---|---|
| **Style name:** K&S Show Moves | |
| **Intelligent Table Comparison:** Active | |
| **Original filename:** LIVE Jenkins - Draft Complaint.docx | |
| **Modified filename:** Exhibit A - Jenkins Proposed Amended Complaint 9.15.docx | |
| **Changes:** | |
| **Add** | 193 |
| ~~Delete~~ | 321 |
| ~~Move From~~ | 0 |
| Move To | 0 |
| **Table Insert** | 1 |
| ~~Table Delete~~ | 0 |
| Table moves to | 0 |
| ~~Table moves from~~ | 0 |
| Embedded Graphics (Visio, ChemDraw, Images etc.) | 0 |
| Embedded Excel | 0 |
| Format changes | 0 |
| **Total Changes:** | 515 |